# In the United States Court of Appeals
# for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M. F., BY AND THROUGH NEXT FRIEND VANESSA FERNANDEZ; Z. B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs–Appellees*,

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant–Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff–Appellee*,

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS,

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

JEFFREY A. STEPHENS
Assistant Solicitor General
Jeff.Stephens@oag.texas.gov

*Counsel for Defendant–Appellant*

# CERTIFICATE OF INTERESTED PERSONS

No. 25-51073

STUDENTS ENGAGED IN ADVANCING TEXAS; M. F., BY AND THROUGH NEXT FRIEND VANESSA FERNANDEZ; Z. B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs–Appellees,*

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant–Appellant.*

*consolidated with*

No. 26-50001

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff–Appellee,*

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS,

*Defendant–Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Jeffrey A. Stephens
JEFFREY A. STEPHENS
*Counsel of Record for*
*Defendant–Appellant*

i

# STATEMENT REGARDING ORAL ARGUMENT

Texas requests oral argument. The district court's facial injunctions prohibiting enforcement of Texas's law wrongly applied strict scrutiny and the Supreme Court's requirements in *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Oral argument will help to clarify and explore the App Store Accountability Act and the important First Amendment, severability, and other issues raised in this appeal.

# Table of Contents

                                                                     Page

Certificate of Interested Persons .................................................................i

Statement Regarding Oral Argument .........................................................ii

Table of Authorities ....................................................................................v

Statement of Jurisdiction ........................................................................... 1

Issues Presented ......................................................................................... 1

Introduction ................................................................................................2

Statement of the Case ................................................................................4

    I.   The App Store Accountability Act ................................................4

        A.  Duties of App Stores ................................................................4

            1.   Age category verification .................................................4

            2.   Parental consent ..............................................................4

            3.   Age rating and content display ........................................6

            4.   Developer access to age category and consent information ..........6

            5.   App store protection of personal data .............................6

            6.   App store violations .........................................................7

        B.  Duties of Developers ...............................................................7

            1.   Age rating and content information provided to app stores ..........7

            2.   Age category and consent verification .............................8

            3.   Developer use of personal data ........................................8

            4.   Developer violations .........................................................8

    II.  Procedural History ........................................................................9

Summary of the Argument ........................................................................ 12

Standard of Review ................................................................................... 16

Argument ................................................................................................... 17

    I.   The State Is Likely to Succeed on the Merits. ............................. 17

        A.  The orders enjoining enforcement of SB2420 erroneously applied strict scrutiny. ............................................................ 17

            1.   SB2420 applies to commercial speech, which receives intermediate scrutiny. ................................................ 17

2. SB2420 survives intermediate scrutiny...........................................23

3. The district court erroneously relied on two exceptions to the parental-consent provisions to apply strict scrutiny. .............26

B. The injunction orders did not apply the facial invalidity analysis required by *Moody*. ................................................32

C. SB2420's terms are not unconstitutionally vague............................36

D. The injunction orders fail to apply the severability clause. ................39

E. At a minimum, the district court erred by entering universal injunctions. ........................................................................40

II. The Remaining Injunction Factors Favor Texas. ......................................41

Conclusion and Prayer ..........................................................................43

Certificate of Compliance ......................................................................44

Addendum..........................................................................................45

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Alaimalo v. United States,*
645 F.3d 1042 (9th Cir. 2011) ...................................................................38

*Am. Ass'n of Pol. Consultants, Inc. v. FCC,*
923 F.3d 159 (4th Cir. 2019) ....................................................................28

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs,*
894 F.3d 692 (5th Cir. 2018) ....................................................................16

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) ........................................................................*passim*

*Bd. of Trs. v. Fox,*
492 U.S. 469 (1989) ....................................................... 17, 18, 21, 22

*Blanchard v. Via,*
No. 22-10458, 2023 WL 3316326 (5th Cir. May 9, 2023) ...........................37-38

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) ...................................................................... 21

*Brown v. Entertainment Merchants Ass'n,*
564 U.S. 786 (2011) ....................................................................20

*Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980) ..........................................................17, 18, 21, 29

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) .....................................................................35

*Davis v. Tex. Farm Bureau Ins.,*
470 S.W.3d 97 (Tex. App.—Houston [1st Dist.] 2015, no pet.)......................38

*Farrington v. Tokushige,*
273 U.S. 284 (1927)................................................................. 24, 41

*Florida Bar v. Went For It, Inc.,*
515 U.S. 618 (1995) .................................................................... 17

*Free Speech Coal., Inc. v. Paxton,*
606 U.S. 461 (2025) .......................................................23, 24, 27, 35

*Ginsberg v. New York,*
390 U.S. 629 (1968) ................................................................. 36, 41

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ..................................................38

*Harrison v. Ollison*,
    519 F.3d 952 (9th Cir. 2008) ...............................38

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ..................................................36

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981) ..................................................27

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .............................................*passim*

*NetChoice, LLC v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) .........................*passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................41

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978) ..................................................18

*Pavatt v. Carpenter*,
    928 F.3d 906 (10th Cir. 2019) ...........................38

*Penthol, L.L.C. v. Vertex Energy Operating, L.L.C.*,
    149 F.4th 504 (5th Cir.) ........................................38

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) ..................................................24

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ..................................................20

*Randall v. Sorrell*,
    548 U.S. 230 (2006) ..................................................31

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..................................................29

*Reno v. ACLU*,
    521 U.S. 844 (1997) ..................................................24

*Rose v. Doctors Hospital*,
    801 S.W.2d 841 (Tex. 1990) ........................30, 39

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ........................................................................ 18

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......................................................................... 27

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ............................................................ 2, 15, 41

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) ........................................................................ 24

*United States v. Edge Broad. Co.*,
509 U.S. 418 (1993) ........................................................................ 27

*United States v. Hansen*,
599 U.S. 762 (2023) ........................................................................ 33

*United States v. Lueben*,
838 F.2d 751 (5th Cir. 1988) ......................................................... 37

*United States v. Stark*,
56 F.4th 1039 (5th Cir. 2023) ....................................................... 38

*United States v. Symington*,
195 F.3d 1080 (9th Cir. 1999) ....................................................... 38

*Veasey v. Abbott*,
870 F.3d 387 (5th Cir. 2017) ................................................... 15, 41

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ............................................................ 14, 29, 38

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ........................................................................ 32

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................ 16

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ................................................................... 24, 41

*Zauderer v. Off. of Disciplinary Couns.*,
471 U.S. 626 (1985) ........................................................................ 20

*Zuniga v. Garland*,
No. 23-60584, 2024 WL 2953133 (5th Cir. June 12, 2024) ....... 38

**Constitutional Provisions and Statutes:**

U.S. Const. amend. I..........................................................16, 18, 21, 27, 34

Tex. Const. art 1, § 37 ...................................................................................24

15 U.S.C. § 6501 et seq..................................................................................28

Tex. Bus. & Com. Code

ch. 121.......................................................................................................4
§ 121.002 ...............................................................................................28
§ 121.021...............................................................................7, 11, 19, 25
§ 121.021(a) ....................................................................................... 4, 43
§ 121.021(b) ................................................................................................4
§ 121.022 ..................................................................... 7, 8, 19, 25, 27
§ 121.022(a) ........................................................................................ 4, 11
§ 121.022(b) ........................................................................................ 4, 11
§ 121.022(d) .........................................................................................5, 11
§ 121.022(e) ............................................................................................. 11
§ 121.022(f) ............................................................................................. 11
§ 121.022(f)(1) .................................................................................5, 7, 36
§ 121.022(g) ..................................................................................... 5, 11, 37
§ 121.022(h) ............................................................................................26
§ 121.022(h)(1) ..................................................................... 6, 26, 27, 28
§ 121.022(h)(1)(B) ...................................................................................28
§ 121.022(h)(1)(C) ...................................................................................28
§ 121.022(h)(2) ..................................................................... 6, 27, 29
§ 121.022(h)(2)(A)...................................................................................26
§ 121.022(h)(2)(B) ...................................................................................29
§ 121.023................................................................................................. 6, 19
§ 121.024 ............................................................................... 6, 7, 8, 11
§ 121.025.....................................................................................................7
§ 121.026(a) ...............................................................................................7
§ 121.026(a)(2) ........................................................................................36
§ 121.026(a)(3)......................................................................................... 11
§ 121.026(b) ........................................................................................7, 11
§ 121.052.............................................................................. 5, 8, 19, 36
§ 121.052(a) ...............................................................................................7
§ 121.052(b) ........................................................................................ 7, 36
§ 121.053....................................................................................... 11, 37

§ 121.053(a) ....................................................................... 5, 8

§ 121.053(b) ..................................................................... 8, 37

§ 121.053(b)(3) ..................................................................... 37

§ 121.053(b)(4) ............................................................... 10, 37

§ 121.054 ...................................................................... 8, 11, 19

§ 121.055(a) ........................................................................... 8

§ 121.055(b) ........................................................................... 8

§ 121.056(a) ........................................................................... 9

§ 121.056(b) ....................................................... 9, 14, 25, 36

§ 121.056(c) ...................................................................... 9, 11

Tex. Educ. Code § 32.152 ......................................................... 29

**Other Authorities:**

Apple, Family Privacy Disclosure for Children,
https://www.apple.com/legal/privacy/en-ww/parent-disclosure/
(last visited May 11, 2026) ...................................................... 19

Apple, Privacy Policy — Parent Disclosure,
https://www.apple.com/legal/privacy/en-ww/parent-disclosure/
(visited Dec. 1, 2025) ............................................................... 19

89th Leg., R.S., ch. 200, Tex. Gen. Laws 385-90 ......................... 4

H.J. of Tex., 89th Leg., R.S. 3578 (2025) ................................ 19

H.J. of Tex., 89th Leg., R.S. 3721 (2025) .................................... 4

S.J. of Tex., 89th Leg., R.S. 1326 (2025) .................................... 4

# STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

# ISSUES PRESENTED

1. Did the district court err in applying strict scrutiny to all of SB2420's provisions despite that the law regulates commercial speech?

2. Must the district court's preliminary injunction orders be reversed or vacated because the court did not conduct the rigorous analysis required by *Moody*?

3. Did the district court err in holding SB2420's age rating, "material[]changes," and "new opportunities to make a purchase" terms unconstitutionally vague despite the law's reference to industry standards, the context of these provisions, and clear meanings?

4. Did the district court err in refusing to sever any provisions of SB2420 determined to be facially unconstitutional, which would preserve the statute's constitutional applications?

5. Do the balance of equities and public-interest factors favor Texas because (1) the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws; and (2) Texas's compelling interests in protecting children and providing parents the information needed to make informed choices affecting their children far outweigh the minimal burdens Plaintiffs complain of?

1

# Introduction

Texas Senate Bill 2420, the App Store Accountability Act, was enacted to build on tools already provided by mobile device application stores and developers to help parents direct and supervise children's downloads of apps and in-app purchases. The Act accomplishes these goals by requiring age verification, parental consent, and age rating and content display.

The district court universally enjoined enforcement of SB2420 in its entirety in one case and enjoined enforcement of specific provisions in another, despite similar challenges being raised by two sets of plaintiffs. In determining that the State is not likely to succeed on the merits, the court ignored that SB2420 regulates *commercial* speech, which is subject to intermediate scrutiny at most. The court wrongly held that two exceptions to the parental-consent provisions required applying strict scrutiny to the entire Act. In addressing the facial challenge, the district court did not apply the strict requirements of *Moody v. NetChoice, LLC* to rigorously map a statute's constitutional and unconstitutional applications and facially enjoin a statute only if its unconstitutional applications "substantially outweigh" its constitutional applications. 603 U.S. 707, 724 (2024). The court's conclusions on vagueness and severability fare no better, and it entered a universal injunction that "falls outside the bounds of a federal court's equitable authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). Accordingly, Texas is likely to succeed on the merits.

The balance of equities and public-interest factors also favor Texas, whose interests in protecting children far outweigh the minimal burdens on plaintiffs.

This Court should reverse the facial injunctions—or at minimum vacate and remand for a proper *Moody* analysis—to uphold Texas's compelling interest in protecting children. And even if the Court determines that any provision of SB2420 is likely facially unconstitutional, only those provisions may be enjoined. The unconstitutional provisions should be severed to preserve the remainder of the statute, thus maintaining Texas's vital interest in child safety.

STATEMENT OF THE CASE

## I.  The App Store Accountability Act

In 2025, the Texas Legislature enacted SB2420[1] with overwhelming bipartisan support. S.J. of Tex., 89th Leg., R.S. 1326, 2888 (2025); H.J. of Tex., 89th Leg., R.S. 3721 (2025). SB2420 imposes various duties on app stores and developers related to age verification, assigning and displaying age and content ratings, parental consent for downloads and purchases by minors, and protecting personal data.

### A.  Duties of App Stores

#### 1.  Age category verification

SB2420 requires app stores to use a commercially reasonable method to verify the age category of an individual who creates an account with the app store. Tex. Bus. & Com. Code § 121.021(a).[2] SB2420 defines age categories for child, younger teenager, older teenager, and adult. § 121.021(b).

#### 2.  Parental consent

A minor's account with an app store must be affiliated with a parent account. § 121.022(a)-(b). "[T]he owner of an app store must obtain consent from the minor's parent or guardian through the parent account affiliated with the minor's

---

[1] 89th Leg., R.S., ch. 200, Tex. Gen. Laws 385-90, codified at Tex. Bus. & Com. Code ch. 121.

[2] The full text of the Act is included in the Addendum. The Act was codified as Texas Business & Commerce Code chapter 121 but was not the only law to be codified as such. *See* Addendum at 1 (noting other instances of Chapter 121). Unless indicated otherwise, all statutory citations are to the Texas Business & Commerce Code and citations to sections of chapter 121 of the Code are to SB2420, the App Store Accountability Act.

account before allowing the minor to: (1) download a software application; (2) purchase a software application; or (3) make a purchase in or using a software application." § 121.022(d).

Section 121.052 of SB2420 requires app developers to assign an age rating to each app and purchase that can be made through the app, and the app developer must provide the app store with the rating and the specific content that led to the assigned rating. To obtain consent, the app store owner must disclose to the parent or guardian the following:

(A) the specific software application or purchase for which consent is sought;

(B) the rating under Section 121.052 assigned to the software application or purchase;

(C) the specific content or other elements that led to the rating assigned under Section 121.052;

(D) the nature of any collection, use, or distribution of personal data that would occur because of the software application or purchase; and

(E) any measures taken by the developer of the software application or purchase to protect the personal data of users.

§ 121.022(f)(1).

App stores must also notify parents before significant changes are made to the terms of service or privacy policy of apps for which consent has been given and obtain consent for the minor's continued use of the app. *See* §§ 121.022(g), .053(a). This allows parents to consider whether the app is no longer suitable for their child.

Parental consent is not required for a minor to download an app that "provides direct access to emergency services," including "9-1-1 emergency services," "a crisis hotline," or "an emergency assistance service that is legally available to a minor." § 121.022(h)(1). To qualify, the emergency services app must be operated by a qualifying entity, must limit data collection in specific ways, and cannot require the minor to create an account to access and use the app. *Id.* A second exception for consent applies if the app "is operated by or in partnership with" a regulated nonprofit organization that "develops, sponsors, or administers" standardized tests used for certain post-secondary education purposes. § 121.022(h)(2).

### 3. Age rating and content display

SB2420 requires app stores to display age ratings and other content notices for each app, which may be satisfied by an existing mechanism if an explanation of the mechanism is made available to users. *See* § 121.023.

### 4. Developer access to age category and consent information

Under section 121.024, app stores must use a commercially available method to allow the developer of an app to access current information about the age category of each user of the app and whether consent has been obtained for each minor user. § 121.024.

### 5. App store protection of personal data

SB2420 also imposes duties on app stores to protect the personal data of users. These duties include "limiting the collection and processing of personal data to the minimum amount necessary" to accomplish enumerated tasks and "transmitting

6

personal data using industry-standard encryption protocols that ensure data integrity and confidentiality." § 121.025.

### 6. App store violations

Under SB2420, an app store violates the Act if it:

(1) enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.022;

(2) knowingly misrepresents information disclosed under Section 121.022(f)(1) [relating to disclosures required to obtain consent];

(3) obtains a blanket consent to authorize multiple downloads or purchases; or

(4) shares or discloses personal data obtained for purposes of Section 121.021, except as required by Section 121.024 or other law.

§ 121.026(a). "The owner of an app store is not liable for a violation of Section 121.021 or 121.022" if it "uses widely adopted industry standards to: (A) verify the age of each user as required by Section 121.021; and (B) obtain parental consent as required by Section 121.022," provided the app store "applies those standards consistently and in good faith." § 121.026(b).

## B. Duties of Developers

### 1. Age rating and content information provided to app stores

As noted above, SB2420 requires app developers to assign an age rating to each app and purchase that can be made through the app. § 121.052(a). The app developer must provide the app store with the assigned rating and the specific content that led to the assigned rating. § 121.052(b).

In addition, an app developer must provide notice to the app store "before making any significant change to the terms of service or privacy policy of the software application." § 121.053(a). Significant changes are defined in the statute and include certain changes (1) to the use of personal data, (2) affecting the rating of the app or content that led to the rating, (3) adding new monetization features, or (4) that "materially change[] the functionality or user experience" of the app. § 121.053(b).

### 2. Age category and consent verification

An app developer must use information received from an app store under section 121.024 to verify the age category of a user of an app and, if a minor, verify whether consent has been obtained under section 121.022. § 121.054.

### 3. Developer use of personal data

SB2420 specifies that developers "may use personal data provided … under Section 121.024 only to" accomplish specific tasks. *Id.* § 121.055(a). The developer also must "delete personal data provided by the owner of an app store under Section 121.024 on completion of the verification required by Section 121.054." § 121.055(b).

### 4. Developer violations

A developer violates SB2420 if it:

(1) enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.054;

(2) knowingly misrepresents an age rating or reason for that rating under Section 121.052; or

(3) shares or discloses the personal data of a user that was acquired under this subchapter.

§ 121.056(a). Similar to the app stores, there is a safe harbor depending on the use of widely adopted industry standards applied consistently and in good faith for designating age ratings, § 121.056(b), and a safe harbor for age verification if a developer relies in good faith on age category and consent information received from an app store, § 121.056(c).

## II. Procedural History

SB2420 had an effective date of January 1, 2026. Before that date, two sets of plaintiffs filed two suits against Attorney General Paxton in the Western District of Texas and sought preliminary injunctions enjoining enforcement of SB2420. *See CCIA v. Paxton*, 1:25-CV-01660 (W.D. Tex.); *SEAT v. Paxton*, 1:25-CV-01662 (W.D. Tex).

The first set of plaintiffs include Students Engaged in Advancing Texas (SEAT) and two minors, M.F. and Z.B. (collectively, "the SEAT plaintiffs"). SEAT claims it "represents a coalition of Texas students—from middle school to college-age—who seek to increase youth participation in policymaking, including through mobile apps." ROA.25-51073.84. "M.F. is a 17-year-old high school student and photographer who uses apps and paid content—including social media apps and documentaries he purchases online—to follow the news, edit photographs, study, and conduct research for his debate team and other school activities." ROA.25-51073.84. "Z.B. is a 16-year old high school student journalist and content creator who uses apps to socialize, study, report stories, follow current events, and publish valuable

information regarding financial literacy and study skills to her audience of over 1 million teens." ROA.25-51073.84.

The other lawsuit was brought by Computer & Communications Industry Association (CCIA). CCIA claims it "is a membership-based trade organization whose members operate some of the world's popular mobile app publishing services." ROA.26-50001.339. According to CCIA, "[t]he app stores operated by CCIA members that are regulated by S.B. 2420 are: (1) Google Play; (2) the Amazon Appstore; and (3) the Apple App Store." ROA.26-50001.339. CCIA also states that its "members are also leading app developers, who create and offer popular mobile apps for download in app stores," including "email apps like Gmail, video-viewing and sharing apps like YouTube, e-book or audiobook apps like Kindle and Audible, and apps that allow users to communicate and obtain information on a wide variety of topics (e.g., IMDb, Goodreads, Twitch)." ROA.26-50001.339-340.

Plaintiffs moved for preliminary injunctions against enforcement of SB2420. The district court granted the injunctions after a combined hearing. The SEAT order[3] determined that SB2420 is content-based and strict scrutiny applies, that the State likely cannot show a compelling state interest, that SB2420 would fail intermediate scrutiny anyway, and that the provisions of SB2420 are not severable. ROA.25-51073.670-683. The court further held that the "materially changes" provision (§ 121.053(b)(4)) is unconstitutionally vague and that SB2420 is facially invalid but did not reach an argument presented on prior restraint. ROA.25-51073.684-687. The

---

[3] ROA.25-51073.670-689 (SEAT Dkt. 38).

court enjoined the State "from taking any action to implement or enforce Tex. Bus. & Com. Code §§ 121.021, 121.022(a)-(b), 121.022(d)-(g), 121.024, 121.026(a)(3), 121.026(b), 121.053, 121.054, and 121.056(c)." ROA.25-51073.689.

The CCIA order[4] was similar, except there was no issue of prior restraint, and the district court further held that "[t]he portions of the Act that hold app developers and stores liable for getting age ratings wrong are impermissibly vague." ROA.26-50001.1153-1170. The court enjoined the State "from taking any action to implement, enact, or enforce Texas S.B. 2420." ROA.26-50001.1171-1172.

The State appealed from both injunction orders on December 23, 2025, the day they were issued. ROA.25-51073.690-691; ROA.26-50001.1173-1174. On April 14, 2026, this Court granted the State's motion to consolidate the two appeals. Dkt. 28.

On January 23, 2026, the State moved in the district court to stay the injunctions pending appeal. ROA.25-51073.701-709; ROA.26-50001.1183-1190. On May 6, 2026, the district court denied the State's motions for stay of the injunctions pending appeal. *See* 26-50001 Dkt. 36. The State thus moved in this Court to stay the injunctions pending appeal. *Id.*

---

[4] ROA.26-50001.1153-1172 (CCIA Dkt. 65).

The district court's facial injunctions should be reversed. To protect children, SB2420 imposes obligations on app stores and developers to perform age verification, obtain parental consent, and assign and display age and content ratings, among other important duties such as protecting user data. The district court's erroneous rulings undermine Texas's compelling interest in protecting children. This Court should reverse the injunctions outright, or at minimum vacate and remand for a proper analysis under *Moody*. Alternatively, if it deems any provision likely facially unconstitutional, it should sever that provision for purposes of the injunctions to preserve SB2420's valid applications.

*First*, the district court stumbled out of the gate in holding that strict scrutiny applies to SB2420 or any of its provisions. The court ignored that SB2420 is a regulation on commercial speech because it prevents app stores and developers from proposing or entering into contracts (e.g., terms of service, data collection or privacy practices) with minors without parental consent by requiring age verification and parental consent before minors may download an app or make a purchase. Concern that many of the millions of apps offered by the app stores are also particularly harmful to minors does not change the commercial speech analysis. That parents can choose to protect their children by reviewing accurate app content in deciding whether to consent to their children accepting the proposed contract terms does not undermine the concerns with commercial speech proposing to enter into contracts with minors.

In deciding that the entire Act was subject to strict scrutiny, the district court wrongly deemed two exceptions to the parental-consent provisions to be "coverage

12

definitions" that would affect the scope and application of all of SB2420's provisions. These exceptions—for emergency services and apps provided by an entity that develops standardized tests for use in postsecondary education—are not even content-based. And to the extent either exception forms the basis for determining that any part of SB2420 would fail constitutional scrutiny, it must be severed in accordance with the Act's severability provision and severability principles.

*Second*, the district court flouted *Moody*'s rigorous framework for facial challenges, recently reaffirmed by this Court in *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025). In *Moody*, every justice on the Supreme Court agreed that facial challenges are disfavored and difficult to justify. *Moody* thus requires courts to map a statute's *full* range of applications, distinguishing the constitutional from the unconstitutional, and ensure the unconstitutional applications "substantially outweigh" constitutional applications before issuing a facial injunction. *Moody*, 603 U.S. at 724. It is not enough to "discuss [a statute's] inclusion and exclusion of *some* of the activities and actors arguably regulated by the law." *Fitch*, 134 F.4th at 808 (emphasis added). But that is exactly what the district court did here. Indeed, given the incorrect standard of scrutiny applied and the conclusory analysis suggesting SB2420 would also fail intermediate scrutiny, the court failed to identify any unconstitutional application of any provision of SB2420. And even if it had correctly identified any unconstitutional application of SB2420, the district court never determined the number of apps that are not expressive or would otherwise not be burdened by SB2420. This vital aspect of a facial attack is simply not addressed.

*Third*, the district court's vagueness holdings are erroneous. For age ratings, SB2420 does not need to specify criteria because (1) a developer is not liable for incorrect age ratings if it "uses widely adopted industry standards to determine the rating and specific content" and "applies those standards consistently and in good faith," § 121.056(b), and (2) the statute contemplates app stores relying on developer ratings as long as the app store does not knowingly misrepresent age rating or content information. In light of the "good faith" defense, the district court is not correct that following existing nongovernmental standards "may not be sufficient." ROA.26-50001.1168. For "material[] changes" and "new opportunities to make a purchase," context also aids in understanding these terms. In addition, the term "material change" is also used by courts in various contexts without the need for a specific definition, and "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 795 (1989).

*Fourth*, if any challenged provision of SB2420 is likely facially unconstitutional, the law's severability clause would preserve the remainder, and, therefore, enjoining enforcement of the entire law is not proper. Age verification would still serve a valuable purpose even if SB2420's parental-consent provisions were invalid. Likewise, the terms that were determined to be unconstitutionally vague could be severed. And the district court does not explain how it determined that none of the Act's provisions are severable when most provisions relating to protection of personal data and age rating and content display are unaffected by the district court's analysis. The all-or-nothing approach of the injunctions is unsupported and contradicts the Supreme

Court's observation that "it is fairly unusual for the remainder of a law not to be operative" when only a portion is invalid. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 628 (2020).

*Fifth*, even if SB2420 were constitutionally problematic, the district court exceeded its equitable authority by entering a universal permanent injunction. *CASA*, 606 U.S. at 847.

Finally, the remaining injunction factors—balance of equities and public interest—favor Texas. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). App stores and developers claim to already do much of what SB2420 would require, and the Act refers to industry standards such as "commercially reasonable" methods of age verification. Texas's important and compelling interest in protecting children and facilitating parents' receipt of the information needed to make informed choices affecting their children far outweigh the minimal burdens that plaintiffs complain of. Moreover, any burden imposed by requiring parental consent before minors can enter into contracts associated with downloading apps is present because the app stores and developers themselves propose such commercial transactions.

This Court should reverse the facial injunctions on any of these bases. Alternatively, it should vacate and remand for a thorough analysis under *Moody* and *Fitch*, if that is even feasible here, or sever any unconstitutional provisions, upholding SB2420's vital role in protecting children and recognizing the role of parents and guardians in doing so.

## Standard of Review

"A preliminary injunction is an extraordinary remedy." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). Plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of such relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

When reviewing preliminary injunctions for legal error, this Court does not apply blind deference. Questions of law — First Amendment violations, for example — are reviewed de novo. *Id.*

# ARGUMENT

## I. The State Is Likely to Succeed on the Merits.

Texas is likely to succeed on the merits of its appeal because the district court's preliminary injunction orders are severely flawed. Strict scrutiny does not apply to any provision of SB2420, the district court did not make the requisite findings or weigh of all unconstitutional and constitutional applications required for facial invalidity under *Moody*, the terms challenged on vagueness grounds are reasonably clear, the injunction orders fail to find any provision is severable, and the district court had no power to enter a universal injunction.

### A. The orders enjoining enforcement of SB2420 erroneously applied strict scrutiny.

#### 1. SB2420 applies to commercial speech, which receives intermediate scrutiny.

The district court held that "SB 2420 is not a regulation on commercial speech" and that strict scrutiny applies to all provisions of the law. *E.g.*, ROA.26-50001.1163. But SB2420 regulates only speech that proposes a commercial transaction. *See Bd. of Trs. v. Fox*, 492 U.S. 469, 482 (1989). Commercial speech is subject to intermediate scrutiny under the framework set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). *See Fox*, 492 U.S. at 475; *see also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995).

The Supreme Court "ha[s] recognized 'the commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.'" *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980) (quoting

17

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978)). "The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 562-63. Commercial speech may even be regulated on the basis of content because (1) "commercial speakers have extensive knowledge of both the market and their products," so "they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity," and (2) "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Id.* at 564 n.6. "'[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.'" *Barr*, 591 U.S. at 620 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The test for identifying commercial speech is whether it proposes a commercial transaction. *Fox*, 492 U.S. at 473-74.

App store transactions are commercial in nature. When users go to an app store, they can select different types of apps and then drill down to receive information to determine if they want to download or purchase an app. *E.g.*, ROA.26-50001.187-188. When minors download apps they are accepting terms of service, including agreements about how their data is used. ROA.26-50001.225. The child may even be agreeing to have the information in their phone monetized by the tech companies or used to track location. ROA.26-50001.225. The terms may also require minors to waive the right to sue by agreeing to "arbitration provisions that no child can understand." ROA.26-50001.226. Minors entering contracts with app stores and

developers without parental consent was the primary concern to SB2420's sponsors. *E.g.*, H.J. of Tex., 89th Leg., R.S. 3578 (2025).

Apple's and Google's app stores both present minors with terms of service and privacy or data collection policies that are accepted when downloading apps. Apple's app store, for example, "allow[s] minors to accept lengthy, complex terms of service," ROA.26-50001.670, citing Apple's "parent disclosure." Apple, Privacy Policy — Parent Disclosure, https://www.apple.com/legal/privacy/en-ww/parent-disclosure/ (visited Dec. 1, 2025). Indeed, Apple's lengthy disclosure itself warns that it "does not apply to the data collection practices of any third parties, including developers" and suggests parents "should review the terms, policies, and practices of such third-party apps to understand what data they may collect from your child and how such data may be used." Apple, Family Privacy Disclosure for Children, https://www.apple.com/legal/privacy/en-ww/parent-disclosure/ (last visited May 11, 2026) (capitalization altered). Google, in turn, admits that "users must have a Google Account, be signed into that account, and agree to Google Play's Terms of Service." ROA.26-50001.417. Developers in Google Play also have their own Terms of Service and Privacy Policies, which are considered "critical documentation about the app." ROA.26-50001.427.

SB2420 prevents app stores and developers from proposing or entering into these contracts with minors without parental consent by requiring age verification and parental consent before minors may download an app or make a purchase. *See* §§ 121.021, .022, .054. The age ratings and content notices for each app (which are supplied by the developer, *id.* §§ 121.023, .052) help parents decide whether or not

to consent to their minors entering into these transactions. *See, e.g.*, *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985).

The injunction orders purport to analyze whether "the targeted advertising requirements" constitute a regulation on commercial speech. *E.g.*, ROA.26-50001.1163. SB2420 does not contain "targeted advertising requirements" and the cited portion of the State's brief does not argue otherwise.

The injunction orders state that "[t]he Act is not limited to commercial speech" and that "restrictions on what content can be bought and sold may be subject to strict scrutiny." ROA.26-50001.1163. In support, the district court cited *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 789 (2011). But *Brown* does not control.

*Brown* dealt with a California law that "prohibit[ed] the sale or rental of 'violent video games' to minors, and require[d] their packaging to be labeled '18.'" *Id.* The Supreme Court held that the prohibition "imposes a restriction on the content of protected speech" and was subject to strict scrutiny. *Id.* at 799.[5]

*Brown* does not discuss commercial speech. In *Brown*, the only commercial transaction concerned the purchase of the violent video games. By contrast, the

---

[5] Justices Thomas and Breyer dissented. Justice Thomas showed that "[t]he practices and beliefs of the founding generation establish that 'the freedom of speech,' as originally understood, does not include a right to speak to minors (or a right of minors to access speech) without going through the minors' parents or guardians." *Brown*, 564 U.S. at 821 (Thomas, J., dissenting). Justice Breyer would have "reject[ed] the industries' facial challenge," *id.* at 840 (Breyer, J., dissenting), in part because "the 'power of the state to control the conduct of children reaches beyond the scope of its authority over adults,'" *id.* at 841-42 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944)).

contracts entered into when downloading an app propose commercial transactions related to children's data and privacy rights that far exceed access to the app. The app stores and developers are proposing these contracts along with promotional information about the app and conditioning access to the apps on accepting these contracts. The app stores and developers cannot avoid reasonable regulation of minors' participation in that process simply because some of the apps may contain speech. Otherwise, any company involved in proposing a commercial transaction could argue for strict scrutiny of any regulation surrounding the transaction merely by providing access to speech as part of the transaction. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67-68 (1983) ("We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." (quoting *Central Hudson*, 447 U.S. at 563 n.5); *Fox*, 492 U.S. at 474-75 ("Including these home economics elements no more converted AFS' presentations into educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech.").

Consider, for example, a prohibition on usury by bookstores. That works protected by the First Amendment are the object of the sale does not exempt the transaction from ordinary regulations governing commercial transactions.

As another example, consider a food truck that requires customers to sign a contract allowing the food truck operators to sell the customers' data and track the customers' physical locations. The State would have an interest in preventing the food truck from entering into such contracts with minors without parental consent and in

regulating the commercial speech surrounding such a transaction. Presumably such regulation would be subject to intermediate scrutiny under *Fox*, 492 U.S. at 480. The level of scrutiny for such commercial speech regulation should not change simply because the food truck gives out a "free" or discounted book instead of a "free" or discounted burger to anyone that signs the contract. In that scenario, the food truck operator has burdened the speech with the proposal for an invasive contract. So too, here, the app stores' and developers' obligatory terms of service and privacy policies propose transactions that burden any speech that may be accessed by accepting the contracts. Speech within the apps is merely incidental to the central transaction.

The injunction orders also determined that SB2420 "specifically sought to shield minors from certain speech the State deems objectionable or harmful" and thus has a "content-based justification" that warrants strict scrutiny. ROA.26-50001.1162. Amici have documented commercial harms to children, *e.g.*, ROA.26-50001.844-846, which can also lead to "substantial risk" when children are treated by developers as adults, *e.g.*, ROA.26-50001.842-843. In one instance involving an arbitration clause "accepted" by a minor, a family was unable to sue after their minor child "had been hospitalized because of an AI chatbot." ROA.26-50001.942; *see also* ROA.26-50001.989-990. Observations and studies also highlight the increased use of apps on smartphones at least correlating to "an increase in anxiety, depression, eating disorders, suicidal thoughts, sleep disorders, and contact with child predators." ROA.26-50001.950. And parents and government leaders are, of course, concerned about specific apps with addictive and other harmful features, such as social media and games that mimic gambling. *E.g.*, ROA.26-50001.986-991. A legislative

concern that many of the millions of apps offered by the app stores are also particularly harmful to minors does not change the commercial speech analysis. No speech is being singled out or banned by the Legislature, which merely empowers parents. Permitting parents to protect their children by reviewing app content (and the number of apps being downloaded) in deciding whether to consent to their children accepting the proposed contract terms does not take the regulation outside the realm of commercial speech.

It would be absurd to apply higher scrutiny to a parental-consent provision for an app store that offers apps with pornography and chat rooms known for predators grooming kids than to an app store that everyone agreed had appropriate content but nonetheless had the same issues with requiring minors to enter into contracts. If the State is justified in regulating the commercial speech that applies to all apps, as SB2420 does, then raising the stakes by offering apps with particular dangers for minors cannot suddenly make it *easier* for the app stores and developers to strike down the law. SB2420 is directed to commercial speech and is not subject to strict scrutiny. The provisions of SB2420 are, at most, subject to intermediate scrutiny.

### 2. SB2420 survives intermediate scrutiny.

The district court incorrectly concluded that "SB 2420 would fail intermediate scrutiny" because "Texas has not offered any evidence connecting the Act's goals to its methods." ROA.26-50001.1167. As in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 495-99 (2025), the Court can, without specific evidence, make a determination that a provision of law survives intermediate scrutiny because "it 'advances important governmental interests unrelated to the suppression of free speech and

does not burden substantially more speech than necessary to further those interests.,'" *id.* at 495-96 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

First, because the district court wrongly determined that commercial speech was not at issue it also wrongly dismissed the State's important interest in ensuring parental consent for minor children to enter into contracts involving their data and privacy. Congress's interest in "consumer privacy" was sufficient to uphold the robocall restriction in *Barr*, 591 U.S. at 622-23, and numerous cases have recognized the "legitimacy and importance of the congressional goal of protecting children from harmful materials," *Reno v. ACLU*, 521 U.S. 844, 849 (1997).

Under the Texas Constitution, "a parent has the responsibility to nurture and protect the parent's child and the corresponding fundamental right to exercise care, custody, and control of the parent's child, including the right to make decisions concerning the child's upbringing." Tex. Const. art 1, § 37. In addition, the courts have long recognized a parent's fundamental right to direct the upbringing of their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Farrington v. Tokushige*, 273 U.S. 284, 298 (1927); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925).

The State's interest in allowing parents the opportunity to consent to their minor children accepting terms of service and data collection practices is undoubtedly advanced by requiring app stores and developers to verify age and to obtain parental consent. And the requirements to assign age ratings and disclose to parents the age rating and content that led to the rating for an app allows parents to make an

informed choice when deciding whether to consent for their minor child to enter into such a transaction.

These provisions of SB2420 also do not burden substantially more speech than is necessary to further those interests. Plaintiffs do not dispute that all apps require acceptance of terms of service and data collection practices. Thus, to require age verification and parental consent for minors to download or purchase an app is exactly tailored to the interest of allowing parental consent before minors enter into such transactions. And disclosing to parents accurate information about an app's rating and the content that led to the rating is sufficiently tailored to Texas's interest in allowing parents to decide whether there may be additional reasons not to consent to minor children entering into these transactions. SB2420 also requires only "commercially reasonable" methods of verification (§§ 121.021, .022) and allows developers to use "widely adopted industry standards" in determining age ratings and content leading to those ratings (§ 121.056(b)), minimizing any burdens on app stores and developers.

The injunction orders' discussion of restricting categories of speech, ROA.26-50001.1164, not limiting the scope of the law "to apps that use addictive algorithms" or "apps that are responsible in particular for causing excessive screen time," ROA.26-50001.1164, whether evidence shows "that even some or most of the apps covered cause mental- or physical-health detriments for youth," ROA.26-50001.1166, and whether the law is under- or over-inclusive, ROA.26-50001.1165-1166, ignores the threshold issue of whether the State has sufficient interest in allowing parents to consent before app stores and developers enter sensitive agreements

with their minor children. The requirement to provide parents with information about age ratings and content merely allows parents to make informed choices in deciding whether to consent to their minor children entering into these transactions. Each of these provisions survives intermediate scrutiny and the State is also likely to be able to show the interests at stake are compelling enough for the provisions to also survive strict scrutiny.

### 3. The district court erroneously relied on two exceptions to the parental-consent provisions to apply strict scrutiny.

Section 121.022(h) provides two exceptions to the parental consent requirements: (1) apps that provide emergency services and meet specific criteria, and (2) an app that "is operated by or in partnership with" a regulated nonprofit organization that "develops, sponsors, or administers" standardized tests used for certain post-secondary education purposes.[6]

---

[6] The court's injunction orders are internally inconsistent regarding these exceptions to the parental-consent requirement. In one section, the district court incorrectly distinguishes between emergency services apps and apps operated by or in partnership with government entities that do not require the user to create an account. *E.g.*, ROA.26-50001.1156. These are all requirements that apply to the exception for emergency services in section 121.022(h)(1). In another section of the injunction orders, the district court lists three kinds of excluded apps, ROA.26-50001.1162, but there are not separate parental-consent exceptions for "standardized tests" and applications for admission to or placement in a postsecondary educational institution. Rather, the standardized tests must be "used for purposes of admission to or class placement in a postsecondary educational institution or a program within a postsecondary educational institution." § 121.022(h)(2)(A).

The injunction orders incorrectly call these provisions SB2420's "coverage definitions" to justify labeling the entire law "content-based" and applying strict scrutiny. *See, e.g.*, ROA.26-50001.1162.

The district court's analysis was backwards. Alleged under-inclusiveness of a law does not determine the level of scrutiny. In the regulation of commercial speech, a law need only advance the State's interests. "[U]nder intermediate scrutiny, 'the First Amendment imposes no freestanding under inclusiveness limitation' and Texas 'need not address all aspects of a problem in one fell swoop.'" *Free Speech Coalition*, 606 U.S. at 498 (quoting *TikTok Inc. v. Garland*, 604 U.S. 56, 76 (2025)). In other words, the Supreme Court does not require a government to "make progress on every front before it can make progress on any front." *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512 (1981) ("It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising."). Under intermediate scrutiny, the State could reasonably determine the law was served by exempting these categories of apps.

Under a section titled "Coverage Definition," the district court incorrectly states that "the Act ... exempts" certain apps. ROA.26-50001.1156; *see also* ROA.26-50001.1162. But the emergency services and standardized test exceptions to parental consent in section 121.022(h)(1) and (2) are not a "coverage definition," which may suggest it would govern the scope of the Act as a whole. The exceptions are recited in and apply only to the parental-consent provisions in section 121.022

and are not located in the "definitions" in section 121.002. And even if those exceptions justified applying strict scrutiny to them or to the parental-consent provisions, there would be no justification for applying strict scrutiny to all other provisions of SB2420.

Moreover, the emergency-services exception is not content-based, as it focuses on why the service is needed rather than what is being communicated. Notably, in *Barr*, which dealt with a broad restriction on robocalls and a government-debt exception that the Court severed and held invalid, there was also an exception for "a call made for emergency purposes." 591 U.S. at 615. There was no issue as to whether the emergency-call exception was improper. The Fourth Circuit, which was affirmed in *Barr*, found the debt-collection exception contrasted sharply with the emergency exemption in part because "emergency calls serve the vital purpose of protecting the safety and welfare of Americans." *Am. Ass'n of Pol. Consultants Inc. v. FCC*, 923 F.3d 159 (4th Cir. 2019), *aff'd sub nom. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020). Given the importance of protecting health and safety, the State has a compelling interest in exempting emergency services and concluding that these exemptions serve its interests. Section 121.022(h)(1) also directly addresses concerns with collection of minors' data in requiring that the emergency services app "limit[] data collection to information" that is: (i) "collected in compliance with" COPPA (15 U.S.C. § 6501 et seq.), and (ii) "necessary for the provision of emergency services." § 121.022(h)(1)(B). On top of that, section 121.022(h)(1)(C) requires that the user of the emergency service be able to access and use the app without being required to create an account.

The exception for an app that "is operated by or in partnership with" a regulated nonprofit organization that "develops, sponsors, or administers" standardized tests is also content-neutral. The exception focuses on the identity of the speaker and the need for students to be able to take tests "used for purposes of admission to or class placement in a postsecondary educational institution or a program within a postsecondary educational institution," § 121.022(h)(2), rather than the content of any speech. Section 121.022(h)(2)(B) also requires that the non-profit "is subject to" separate laws prohibiting certain uses of student information, *e.g.*, Tex. Educ. Code § 32.152, alleviating potential concerns with minors accepting overly broad data use agreements.

Rather than reviewing these exemptions under *Central Hudson* and intermediate scrutiny, the district court erroneously relied on these exemptions to apply strict scrutiny to all of SB2420's provisions. "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. As in *Barr*, "[t]his is not a case where a restriction on speech is littered with exceptions that substantially negate the restriction." 591 U.S. at 622.

The district court's reliance on *Reed v. Town of Gilbert* is also misplaced. 576 U.S. 155 (2015). In *Reed*, the town's ordinance was content-based because "[i]t define[d] 'Temporary Directional Signs' on the basis of whether a sign conveys the message of directing the public to church or some other 'qualifying event.'" *Id.* at 164. But, again, in SB2420, there is no ban, let alone a ban on a particular message.

Moreover, if the exceptions were unconstitutional, they should be severed in accordance with the Act's severability provision and severability principles. ROA.26-50001.388-89. This was the path the Supreme Court followed in *Barr*: "The text of the severability clause squarely covers the unconstitutional government-debt exception and requires that we sever it." 591 U.S. at 629. Texas applies similar severability principles. *See, e.g.*, *Rose v. Doctors Hospital*, 801 S.W.2d 841, 844-45 (Tex. 1990).

In *Barr*, the Court went on to hold that even if there were no severability clause it would apply the presumption of severability and sever the government-debt exception. *Id.* at 630. *Barr* also notes that the government-debt exception being added by amendment further supported severability, *id.*, contrary to the district court's suggestion here that adding exceptions by amendment somehow would weigh against disturbing the "overall balance" that legislators struck with one another, *see* ROA.26-50001.1163. Whether or not added by an amendment before or after the original legislation passes, the legislators' agreement on the severability clause expresses their intent as to severability and must be followed. *See Barr*, 591 U.S. at 629 ("[A] a severability clause must be interpreted according to its terms, regardless of when Congress enacted it."); *see also Barr*, 591 U.S. at 624 n.6 (explaining that "the text of the severability clause remains central to the severability inquiry," regardless of the order of enactment).

The injunction orders state that to sever what the court incorrectly called the "coverage definition" would require the court to "rewrite the law and 'to foresee which of many different possible ways the legislature might respond to the

constitutional objections we have found.'" *E.g.*, ROA.26-50001.1163 (quoting *Randall v. Sorrell*, 548 U.S. 230, 262 (2006)). *Randall* is inapposite.

In *Randall*, a plurality of the Court concluded, based on "five sets of considerations, taken together," that Vermont's contribution limits to political campaigns were not narrowly tailored. 548 U.S. at 261. These factors included, for example, that the limits were not indexed to inflation and that the limits also applied to political parties. The Court determined it could not sever some provisions "from others that might remain fully operative." *Id.* at 262. "To sever provisions to avoid constitutional objection here would require us to write words into the statute (inflation indexing), or to leave gaping loopholes (no limits on party contributions), or to foresee which of many different possible ways the legislature might respond to the constitutional objections we have found." *Id.* Because only the combined effect of several contribution limit provisions made them constitutionally suspect, it was not clear how the Court could permissibly sever specific provisions to avoid the constitutional problem.

Here, in contrast, there are two standalone exceptions to one provision that the district court pointed to as necessitating strict scrutiny review for the entire Act. The exceptions here are no less severable than the government-debt exception in *Barr*. There is no suggestion that invalidating either or both of the exceptions to the parental-consent provision would cause any other part of SB2420 not to operate. And while the State maintains that these exceptions do not require strict scrutiny review, and certainly not for every provision of the Act, if either or both exceptions cause

any provision to receive strict scrutiny review that cannot be met, only the offending exception can be invalidated or enjoined in accordance with the severability clause.

## B. The injunction orders did not apply the facial invalidity analysis required by *Moody*.

Even if the district court were correct that SB2420 is unconstitutional in some applications, the district court failed to apply the correct analysis for facial invalidity under *Moody*. Rather than weigh the constitutional applications of SB2420 against the unconstitutional, as *Moody* requires, the district court speculated about edge cases and concluded without systematic analysis that all of SB2420's provisions are facially invalid. This Court should correct those errors by reversing or, at a minimum, vacating the injunctions and remanding for the required analysis under *Moody* and *Fitch*.

Plaintiffs "chose to litigate these cases as facial challenges, and that decision comes at a cost." *Moody*, 603 U.S. at 723. "'Claims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). "And 'facial challenges threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quoting *Wash. State*, 552 U.S. at 451). The Supreme Court "has therefore made facial challenges hard to win." *Id.*

*Moody* emphasized again and again that plaintiffs bringing facial challenges must clear a "high bar," given that facial challenges require invalidating a law in *all* its potential applications. *Id. Moody* involved challenges to Texas and Florida social-

media laws that lower courts facially enjoined without fully assessing the full scope and constitutionality of the laws. *Id.* at 717-18. The Court vacated the facial injunctions, holding that a proper facial analysis requires two steps: first, mapping the statute's "full range" of applications by identifying the actors and activities regulated and distinguishing between constitutional and unconstitutional applications; second, weighing the former against the latter and determining whether unconstitutional applications "substantially outweigh" constitutional ones. *Id.* at 717, 724. Only then may a district court facially enjoin a statute. This standard is intentionally difficult to meet.

In a facial challenge, Plaintiffs bear the burden to ensure that the court evaluates the full scope of the law's coverage, to show which of the law's applications are constitutionally permissible and which are not, *id.,* and to show that "the ratio of unlawful-to-lawful applications is … lopsided enough to justify the strong medicine of facial invalidation," *United States v. Hansen*, 599 U.S. 762, 784 (2023) (internal quotation omitted). "The need for [Plaintiffs] to carry [their] burden on those issues is the price of [their] decision to challenge the laws as a whole." *Moody*, 603 U.S. at 744. In some cases, the burden may be impossible to carry. *Id.* at 745 (Barrett, J., concurring) ("In fact, dealing with a broad swath of varied platforms and functions in a facial challenge strikes me as a daunting, if not impossible, task.").

In *Fitch*, this Court reaffirmed *Moody* and vacated a preliminary injunction of a law designed to protect children from harmful online content, remanding the case to the district court for a thorough *Moody* analysis. *Fitch*, 134 F.4th at 809. Here, as in

*Fitch*, Plaintiffs did not bear their burden to ensure that the district court conducted an adequate *Moody* analysis.

After concluding that "SB 2420 is a content-based regulation and fails strict scrutiny," the injunction orders purport to perform a *Moody* analysis for facial invalidity. *E.g.*, ROA.26-50001.1169-1170. In a single paragraph, the district court concludes that "the requirements exclusively target speech, only a small portion of which falls outside First Amendment coverage." *E.g.*, ROA.26-50001.1170.

But even under their legal theory, Plaintiffs did not provide evidence to meet their burden to show the number of apps with content to which SB2420 could and could not be applied. *Moody*, 603 U.S. at 744. Without such evidence, it was impossible for the district court to conclude that, for each of SB2420's provisions, the unconstitutional applications substantially outweigh the constitutional ones.

The few examples of apps mentioned in the district court's injunction orders fail to provide a full review of the millions of apps available on the app stores and a basis for determining whether they might present a constitutional or unconstitutional application of any particular provision of SB2420, as required for a facial attack. The district court provides no analysis of potential First Amendment protections for a host of apps and app types. For example, utility apps such as calculators or appliance controls, and commercial apps such as banking, insurance, or restaurants will require a different analysis than the social media and other communicative apps referenced by the district court. No systematic analysis was performed, let alone any mapping of the full range of applications of the Act.

The district court also erroneously determined that it must ignore applications of the statute "that are already covered by other laws." *E.g.*, ROA.26-50001.1170. The district court relied on *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015), but misapplied it.

In considering a facial challenge to a statute authorizing warrantless searches, *Patel* ignores applications where the statutes at issue "do no work." *Id.* at 418-19. The district court here determined that, because Texas's H.B. 1181 at issue in *Free Speech Coalition* restricts harmful online content for minors, "only in the vast minority of applications would SB 2420 have a constitutional application to unprotected speech not addressed by other laws." ROA.26-50001.1171. The district court did not evaluate whether "an Internet website" under H.B. 1181's language encompasses the apps addressed by SB 2420. Even if H.B. 1181 did apply, the district court missed that SB2420's parental-consent provisions would "do work" where an app had content that was sexual material harmful to minors but did not rise to the one-third threshold of H.B. 1181. There is no factual basis to support that this would apply only to the "vast minority" of applications as the district court stated, and the district court's apparent speculation on that factual matter is inconsistent with *Moody's* stringent standards for facial invalidity. In addition, SB2420's age rating and content display provisions would "do work" even if apps were subject to the age verification upheld in *Free Speech Coalition*.

Thus, even if SB2420 were unconstitutional in some applications, Plaintiffs did not meet their burden under *Moody*, and the State is highly likely to succeed on appeal.

## C. SB2420's terms are not unconstitutionally vague.

The vagueness doctrine ensures fair notice of prohibited conduct and "minimal guidelines" to prevent arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). Civil statutes, particularly those protecting minors, require only reasonable certainty, not scientific precision. *Ginsberg v. New York*, 390 U.S. 629, 643 (1968). SB2420's terms meet this standard, as they are anchored in legal precedent, statutory definitions, and references to industry practice.

*Age ratings*. Section 121.052 requires app developers to assign an age rating to each app and purchase that can be made through the app. The app developer must provide the app store with the assigned rating and the specific content that led to the assigned rating. *Id.* § 121.052(b). The district court concluded that SB2420 does not provide meaningful guidance about how to determine the age rating of an app and is vague for that reason. ROA.26-50001.1168. But section 121.022(f)(1), which requires app stores to provide certain information in obtaining parental consent, refers to the ratings and content in section 121.052, which is determined by the developer. Thus, under section 121.026(a)(2) an app store cannot "knowingly misrepresent[]" age rating or content information, but otherwise the statute contemplates reliance on information obtained from the developer. The developer, in turn, is not liable for an incorrect age rating if it "uses widely adopted industry standards to determine the rating and specific content" and "applies those standards consistently and in good faith." § 121.056(b). In light of the "good faith" defense, the district court's speculation that following existing nongovernmental standards "may not be sufficient" is incorrect. ROA.26-50001.1168.

*Significant changes.* Section 121.053 requires developers to provide notice to app stores before making significant changes to the terms of service or privacy policy of an app. A change is defined as significant if it "adds new monetization features to the software application, including … new opportunities to make a purchase in or using" the app. § 121.053(b)(3). A change is also significant if it "materially changes the functionality or user experience of the software application." § 121.053(b)(4).

The district court determined that the terms "material[] changes" and "new opportunities to make a purchase" in section 121.053(b) are unconstitutionally vague. The injunction order suggests it is unclear whether a developer may be liable, for example, by not providing notice for each new song added to Apple Music or when a new category of content is made available, such as when Spotify added podcasts. ROA.26-50001.1169.

Other than repeating the hypotheticals, the district court does not explain what is vague about "material[] changes" or "new opportunities to make a purchase" as used in section 121.053(b), particularly in the context of this statute. The term "material[] changes" is not recited in the abstract; a change is significant if it "materially changes the functionality or user experience" of the app. § 121.053(b)(4). In the context of updates needed for a parent to provide informed consent for a minor to continue to use an app, § 121.022(g), a material change is one that has the capacity to influence that decision. *Cf. United States v. Lueben*, 838 F.2d 751, 754 (5th Cir. 1988) (discussing standard for prosecuting material false statements). The term "material change" is used in contracts, laws, regulations, and judicial decision-making in various contexts without the need for a specific definition. *See, e.g.*, *Blanchard v. Via*, No.

22-10458, 2023 WL 3316326, at *1 (5th Cir. May 9, 2023) (per curiam) (discussing contract referring to "a material change of any kind"); *Penthol, L.L.C. v. Vertex Energy Operating, L.L.C.*, 149 F.4th 504, 512 (5th Cir.) (using "material changes" to define contract repudiation); *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 104 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("A material change in a proposed contract constitutes a counteroffer."); *Zuniga v. Garland*, No. 23-60584, 2024 WL 2953133, at *1 (5th Cir. June 12, 2024), *cert. denied*, 145 S. Ct. 1090 (2025) (noting federal regulation reciting "material change of fact or law"); *United States v. Stark*, 56 F.4th 1039, 1040 (5th Cir. 2023) (per curiam) (discussing statute allowing court to adjust a restitution payment "where there has been 'any material change in the defendant's economic circumstances'"); *Pavatt v. Carpenter,* 928 F.3d 906, 932 (10th Cir. 2019) ("material change in the law"); *Alaimalo v. United States*, 645 F.3d 1042, 1047-48 (9th Cir. 2011) (same); *Harrison v. Ollison*, 519 F.3d 952, 960 (9th Cir. 2008) (same); *United States v. Symington*, 195 F.3d 1080, 1090 (9th Cir. 1999) (using "material change in the financial condition" without definition). The concept of a material change is well established, easily understood, and not vague.

The "new opportunities to make a purchase" phrase is even more straightforward, using plain and ordinary language. The phrase itself uses the term "opportunities," not "items," and additional context indicates it is a "new monetization feature[]" and relates to the terms of service or privacy policy of the app.

"[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794; *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never

expect mathematical certainty in our language."). Texas is likely to succeed on the merits because plaintiffs' vagueness challenges should fail. Even if not, those terms would be likely to be severed and would not justify an injunction against enforcement of the entire Act.

### D. The injunction orders fail to apply the severability clause.

As discussed above regarding the two exceptions to the parental-consent provisions, the Act includes a strong severability provision. ROA.26-50001.388-389. Not only are provisions, sections, subsections, sentences, clauses, phrases, and words severable from one another, but "applications" of the provisions are also severable. ROA.26-50001.388-389; *see also Rose*, 801 S.W.2d at 845 (striking only statute's application to common law claims).

Despite the Legislature's unambiguous admonition, the district court incorrectly held that the provisions of SB2420 "cannot be severed from one another." *E.g.*, ROA.26-50001.1167. The only example given is that "the parental-consent provisions could not operate without the age-verification requirements, and requiring age-verification without parental override would not achieve the Act's ends of limiting minors' access to apps." ROA.26-50001.1167. The district court cites no authority holding that a provision cannot remain if it would not by itself achieve all the purposes of the statute once another provision is invalidated. Requiring age verification by app stores and developers would allow developers to comply with other laws governing treatment of minors' data, for example, even if the parental-consent provisions were not operable. *See, e.g.*, ROA.26-50001.843 (amicus brief noting FTC complaints regarding app stores "distributing apps that collect sensitive data in violation

of COPPA because app developers are unaware the end user is a child, even though the app store is fully aware"). Thus, the parental-consent provisions are severable and the age-verification provisions can operate without them. If age verification survives scrutiny, then those provisions must be preserved. The district court's failure to apply severability indicates the State is likely to succeed on the merits in overturning the injunctions.

In addition, most provisions relating to protection of personal data and age rating and content display are unaffected by the district court's constitutional analysis. And there is no indication that the allegedly vague terms could not be severed if they were determined to be unconstitutional. As noted in *Barr*, "it is fairly unusual for the remainder of a law not to be operative." 591 U.S. at 628. And even if it is required to sever somewhat more than an unconstitutional provision, the entire law is still not invalidated. *Id.* at 628 n.9. The district court's failure to sever and preserve any of SB2420's provisions is an error that indicates the State is likely to succeed on the merits.[7]

### E. At a minimum, the district court erred by entering universal injunctions.

The district court's remedy exceeded what was necessary to redress Plaintiffs' injuries and thus what was permissible under the law. Its orders bar Defendant from enforcing SB2420 against anyone, not just the SEAT plaintiffs or members of CCIA (who must necessarily be identified to determine the scope of the injunction). The

---

[7] The narrower scope of the SEAT injunction appears to acknowledge some severability, contrary to the district courts determination that no provisions can be severed.

injunctions thus operate as universal preliminary injunctions, forbidding the State from applying the statute at least to countless app developers.

Such relief "falls outside the bounds of a federal court's equitable authority." *CASA*, 606 U.S. at 847. At a minimum, on appeal this Court should vacate the injunctions "to the extent that [they are] broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. The appropriate remedy, if any relief were warranted, would be an injunction limited to enforcement against the SEAT plaintiffs and any identified CCIA members—not a blanket prohibition on enforcement of SB2420 statewide.

## II.  The Remaining Injunction Factors Favor Texas.

The remaining injunction factors favor Texas. Texas has a compelling interest in protecting children, and enforcing SB2420 will not impose undue burdens on the Plaintiffs.

"When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey*, 870 F.3d at 391. Where, as here, an injunction affects a State, the balance of equities and public interest factors merge. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009). The interest of the State and the public interest factors here coincide: the protection of children and granting to parents the information needed to make informed choices affecting their children. *See Ginsberg*, 390 U.S. at 640 (recognizing the state has a strong interest in protecting children); *see also Yoder*, 406 U.S. at 232 (recognizing a parent's "fundamental right" to direct their child's upbringing); *Farrington*, 273 U.S. at 298.

Without SB2420, app stores are allowed to have minors download applications and make in-app purchases without giving parents accurate content information or obtaining informed parental consent. As pointed out in amicus briefs, app stores have violated existing consumer-protection and child-privacy laws for years, even after entering a federal consent decree. *See, e.g.*, ROA.26-50001.845-855 (Amici Curiae Brief of The National Center on Sexual Exploitation and The Digital Childhood Institute). Parents rely on app age ratings as a benchmark when deciding which apps their children can use; without SB2420 providing enforcement of the accuracy of those ratings, the ability of Texas parents to protect their children from harm is imperiled.

SB2420 provides age verification at account creation, accountability for existing age-rating systems, timely notice before minors download apps and thereby enter complex terms-of-service agreements, and the transmission of the user's verified age range to apps so they can comply with applicable laws.

Plaintiffs will not be irreparably injured. Indeed, the Coalition for a Competitive Mobile Experience (CCME), which includes app developers such as Meta and Spotify, submits that SB2420 "is a workable, commercially reasonable approach that standardizes obligations at the app-store level and clarifies the respective responsibilities of app stores and developers." ROA.26-50001-1023. Moreover, app stores already group apps into age categories and supply information on the apps' contents to parents. The Apple and Google app stores already issue age ratings of the various apps they carry, and display those issued ratings, as admitted by CCIA in its complaint. ROA.26-50001.27 ("Every app store, on information and belief, engages in

42

age-rating."). App stores also already provide tools that enable parents to limit what apps children can download or make purchases in. ROA.26-50001.28-29. ("CCIA's app store members also provide voluntary tools for parents to control their children's exposure to apps and the content they contain."). SB2420 requires only that app stores use "commercially reasonable" means to perform essentially the same actions that they already do as a matter of course for their business. *See* § 121.021(a). As such, little additional burden is placed on Plaintiffs, especially when compared to the harms to the State and the public interest, including our children, if the injunctions remain in place. Moreover, any burden imposed by requiring parental consent before minors can enter into contracts associated with downloading apps is there because the app stores and developers themselves propose such commercial transactions.

## Conclusion and Prayer

For these reasons, this Court should reverse the district court's orders granting facial preliminary injunctions. At minimum, it should vacate and remand for a proper analysis under *Moody* and *Fitch* or sever any provisions it deems facially unconstitutional.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ Jeffrey A. Stephens
Jeffrey A. Stephens
Assistant Solicitor General
Jeff.Stephens@oag.texas.gov

*Counsel for Defendant-Appellant*

43

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,768 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ Jeffrey A. Stephens
JEFFREY A. STEPHENS

# ADDENDUM

**Texas Business & Commerce Code Chapter 121**

BUSINESS AND COMMERCE CODE

TITLE 5.  REGULATION OF BUSINESSES AND SERVICES

SUBTITLE C.  BUSINESS OPERATIONS

Chapter 121, consisting of Secs. 121.001 to 121.102, was added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1.

For another Chapter 121, consisting of Secs. 121.001 to 121.006, added by Acts 2025, 89th Leg., R.S., Ch. 497 (S.B. 1383), Sec. 1, see Sec. 121.001 et seq., post.

For another Chapter 121, consisting of Secs. 121.001 to 121.104, added by Acts 2025, 89th Leg., R.S., Ch. 943 (H.B. 2963), Sec. 1, see Sec. 121.001 et seq., post.

For another Chapter 121, consisting of Secs. 121.001 to 121.002, added by Acts 2025, 89th Leg., R.S., Ch. 1089 (H.B. 3966), Sec. 1, see Sec. 121.001 et seq., post.

CHAPTER 121.  SOFTWARE APPLICATIONS


SUBCHAPTER A.  GENERAL PROVISIONS


Sec. 121.001.  SHORT TITLE.  This chapter may be cited as the App Store Accountability Act.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.002.  DEFINITIONS.  In this chapter:

(1)  "Age category" means information collected by the owner of an app store to designate a user based on the age categories described by Section 121.021(b).

(2)  "App store" means a publicly available Internet website, software application, or other electronic service that

distributes software applications from the owner or developer of a software application to the user of a mobile device.

(3) "Minor" means a child who is younger than 18 years of age who has not had the disabilities of minority removed for general purposes.

(4) "Mobile device" means a portable, wireless electronic device, including a tablet or smartphone, capable of transmitting, receiving, processing, and storing information wirelessly that runs an operating system designed to manage hardware resources and perform common services for software applications on handheld electronic devices.

(5) "Personal data" means any information, including sensitive data, that is linked or reasonably linkable to an identified or identifiable individual. The term includes pseudonymous data when the data is used by a person who processes or determines the purpose and means of processing the data in conjunction with additional information that reasonably links the data to an identified or identifiable individual. The term does not include deidentified data or publicly available information.
Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


SUBCHAPTER B. DUTIES OF APP STORES


Sec. 121.021. DUTY TO VERIFY AGE OF USER; AGE CATEGORIES. (a) When an individual in this state creates an account with an app store, the owner of the app store shall use a commercially reasonable method of verification to verify the individual's age category under Subsection (b).

(b)  The owner of an app store shall use the following age categories for assigning a designation:

(1)  an individual who is younger than 13 years of age is considered a "child";

(2)  an individual who is at least 13 years of age but younger than 16 years of age is considered a "younger teenager";

(3)  an individual who is at least 16 years of age but younger than 18 years of age is considered an "older teenager"; and

(4)  an individual who is at least 18 years of age is considered an "adult."

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.022.  PARENTAL CONSENT REQUIRED.  (a)  If the owner of the app store determines under Section 121.021 that an individual is a minor who belongs to an age category that is not "adult," the owner shall require that the minor's account be affiliated with a parent account belonging to the minor's parent or guardian.

(b)  For an account to be affiliated with a minor's account as a parent account, the owner of an app store must use a commercially reasonable method to verify that the account belongs to an individual who:

(1)  the owner of the app store has verified belongs to the age category of "adult" under Section 121.021; and

(2)  has legal authority to make a decision on behalf of the minor with whose account the individual is seeking affiliation.

(c)  A parent account may be affiliated with multiple minors'

accounts.

(d)   Except as provided by this section, the owner of an app store must obtain consent from the minor's parent or guardian through the parent account affiliated with the minor's account before allowing the minor to:

(1)   download a software application;

(2)   purchase a software application; or

(3)   make a purchase in or using a software application.

(e)   The owner of an app store must:

(1)   obtain consent for each individual download or purchase sought by the minor; and

(2)   notify the developer of each applicable software application if a minor's parent or guardian revokes consent through a parent account.

(f)   To obtain consent from a minor's parent or guardian under Subsection (d), the owner of an app store may use any reasonable means to:

(1)   disclose to the parent or guardian:

(A)   the specific software application or purchase for which consent is sought;

(B)   the rating under Section 121.052 assigned to the software application or purchase;

(C)   the specific content or other elements that led to the rating assigned under Section 121.052;

(D)   the nature of any collection, use, or distribution of personal data that would occur because of the software application or purchase; and

(E)   any measures taken by the developer of the software application or purchase to protect the personal data of

users;

(2)  give the parent or guardian a clear choice to give or withhold consent for the download or purchase; and

(3)  ensure that the consent is given:

(A)  by the parent or guardian; and

(B)  through the account affiliated with a minor's account under Subsection (a).

(g)  If a software developer provides the owner of an app store with notice of a change under Section 121.053, the owner of the app store shall:

(1)  notify any individual who has given consent under this section for a minor's use or purchase relating to a previous version of the changed software application; and

(2)  obtain consent from the individual for the minor's continued use or purchase of the software application.

(h)  The owner of an app store is not required to obtain consent from a minor's parent or guardian for:

(1)  the download of a software application that:

(A)  provides a user with direct access to emergency services, including:

(i)  9-1-1 emergency services;

(ii)  a crisis hotline; or

(iii)  an emergency assistance service that is legally available to a minor;

(B)  limits data collection to information:

(i)  collected in compliance with the Children's Online Privacy Protection Act of 1998 (15 U.S.C. Section 6501 et seq.); and

(ii)  necessary for the provision of emergency

services;

        (C)  allows a user to access and use the software application without requiring the user to create an account with the software application; and

        (D)  is operated by or in partnership with:

        (i)  a governmental entity;

        (ii)  a nonprofit organization; or

        (iii)  an authorized emergency service provider; or

        (2)  the purchase or download of a software application that is operated by or in partnership with a nonprofit organization that:

        (A)  develops, sponsors, or administers a standardized test used for purposes of admission to or class placement in a postsecondary educational institution or a program within a postsecondary educational institution; and

        (B)  is subject to Subchapter D, Chapter 32, Education Code.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


    Sec. 121.023.  DISPLAY OF AGE RATING FOR SOFTWARE APPLICATION.  (a)  If the owner of an app store that operates in this state has a mechanism for displaying an age rating or other content notice, the owner shall:

        (1)  make available to users an explanation of the mechanism; and

        (2)  display for each software application available for download and purchase on the app store the age rating and other

content notice.

(b)  If the owner of an app store that operates in this state does not have a mechanism for displaying an age rating or other content notice, the owner shall display for each software application available for download and purchase on the app store:

(1)  the rating under Section 121.052 assigned to the software application; and

(2)  the specific content or other elements that led to the rating assigned under Section 121.052.

(c)  The information displayed under this section must be clear, accurate, and conspicuous.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.024.  INFORMATION FOR SOFTWARE APPLICATION DEVELOP-ERS.  The owner of an app store that operates in this state shall, using a commercially available method, allow the developer of a software application to access current information related to:

(1)  the age category assigned to each user under Section 121.021(b); and

(2)  whether consent has been obtained for each minor user under Section 121.022.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.025.  PROTECTION OF PERSONAL DATA.  The owner of an app store that operates in this state shall protect the personal data of users by:

(1)  limiting the collection and processing of personal

data to the minimum amount necessary for:

        (A)  verifying the age of an individual;

        (B)  obtaining consent under Section 121.022; and

        (C)  maintaining compliance records; and

    (2)  transmitting personal data using industry-standard encryption protocols that ensure data integrity and confidentiality.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


    Sec. 121.026.  VIOLATION.  (a)  The owner of an app store that operates in this state violates this subchapter if the owner:

    (1)  enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.022;

    (2)  knowingly misrepresents information disclosed under Section 121.022(f)(1);

    (3)  obtains a blanket consent to authorize multiple downloads or purchases; or

    (4)  shares or discloses personal data obtained for purposes of Section 121.021, except as required by Section 121.024 or other law.

  (b)  The owner of an app store is not liable for a violation of Section 121.021 or 121.022 if the owner of the app store:

    (1)  uses widely adopted industry standards to:

        (A)  verify the age of each user as required by Section 121.021; and

        (B)  obtain parental consent as required by Section 121.022; and

(2) applies those standards consistently and in good faith.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.

Sec. 121.027. CONSTRUCTION OF SUBCHAPTER. Nothing in this subchapter may be construed to:

(1) prevent the owner of an app store that operates in this state from taking reasonable measures to block, detect, or prevent the distribution of:

(A) obscene material, as that term is defined by Section 43.21, Penal Code; or

(B) other material that may be harmful to minors;

(2) require the owner of an app store that operates in this state to disclose a user's personal data to the developer of a software application except as provided by this subchapter;

(3) allow the owner of an app store that operates in this state to use a measure required by this chapter in a manner that is arbitrary, capricious, anticompetitive, or unlawful;

(4) block or filter spam;

(5) prevent criminal activity; or

(6) protect the security of an app store or software application.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.

SUBCHAPTER C. DUTIES OF SOFTWARE APPLICATION DEVELOPERS

Sec. 121.051. APPLICABILITY OF SUBCHAPTER. This subchapter

applies only to the developer of a software application that the developer makes available to users in this state through an app store.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.052.  DESIGNATION OF AGE RATING.  (a)  The developer of a software application shall assign to each software application and to each purchase that can be made through the software application an age rating based on the age categories described by Section 121.021(b).

(b)  The developer of a software application shall provide to each app store through which the developer makes the software application available:

(1)  each rating assigned under Subsection (a); and

(2)  the specific content or other elements that led to each rating provided under Subdivision (1).

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.053.  CHANGES TO SOFTWARE APPLICATIONS.  (a)  The developer of a software application shall provide notice to each app store through which the developer makes the software application available before making any significant change to the terms of service or privacy policy of the software application.

(b)  For purposes of this section, a change is significant if it:

(1)  changes the type or category of personal data collected, stored, or shared by the developer;

(2)  affects or changes the rating assigned to the software application under Section 121.052 or the content or elements that led to that rating;

(3)  adds new monetization features to the software application, including:

(A)  new opportunities to make a purchase in or using the software application; or

(B)  new advertisements in the software application; or

(4)  materially changes the functionality or user experience of the software application.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.054.  AGE VERIFICATION.  (a)  The developer of a software application shall create and implement a system to use information received under Section 121.024 to verify:

(1)  for each user of the software application, the age category assigned to that user under Section 121.021(b); and

(2)  for each minor user of the software application, whether consent has been obtained under Section 121.022.

(b)  The developer of a software application shall use information received from the owner of an app store under Section 121.024 to perform the verification required by this section.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.055.  USE OF PERSONAL DATA.  (a)  The developer of a software application may use personal data provided to the

developer under Section 121.024 only to:

(1)  enforce restrictions and protections on the software application related to age;

(2)  ensure compliance with applicable laws and regulations; and

(3)  implement safety-related features and default settings.

(b)  The developer of a software application shall delete personal data provided by the owner of an app store under Section 121.024 on completion of the verification required by Section 121.054.

(c)  Notwithstanding Subsection (a), nothing in this chapter relieves a social media platform from doing age verification as required by law.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.056.  VIOLATION.  (a)  Except as provided by this section, the developer of a software application violates this subchapter if the developer:

(1)  enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.054;

(2)  knowingly misrepresents an age rating or reason for that rating under Section 121.052; or

(3)  shares or discloses the personal data of a user that was acquired under this subchapter.

(b)  The developer of a software application is not liable for a violation of Section 121.052 if the software developer:

(1)  uses widely adopted industry standards to determine the rating and specific content required by this section; and

(2)  applies those standards consistently and in good faith.

(c)  The developer of a software application is not liable for a violation of Section 121.054 if the software developer:

(1)  relied in good faith on age category and consent information received from the owner of an app store; and

(2)  otherwise complied with the requirements of this section.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


SUBCHAPTER D.  ENFORCEMENT


Sec. 121.101.  DECEPTIVE TRADE PRACTICE.  A violation of this chapter constitutes a deceptive trade practice in addition to the practices described by Subchapter E, Chapter 17, and is actionable under that subchapter.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.


Sec. 121.102.  CUMULATIVE REMEDIES.  The remedies provided by this chapter are not exclusive and are in addition to any other action or remedy provided by law.

Added by Acts 2025, 89th Leg., R.S., Ch. 200 (S.B. 2420), Sec. 1, eff. January 1, 2026.