No. 26-50001 & 25-51073 (Consolidated)

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

Plaintiff-Appellee,

v.

KEN PAXTON, et al.,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Western District of Texas, No. 1:25-cv-01660
Hon. Robert Pittman, United States District Judge

_____

**BRIEF OF *AMICI CURIAE* DIGITAL CHILDHOOD INSTITUTE AND
PROTECT YOUNG EYES IN SUPPORT OF DEFENDANT-APPELLANT
AND REVERSAL**

_____

William C. Duncan
1868 N 800 E
Lehi, UT 84043
801-367-4570
*Attorney for Amici Curiae Digital
Childhood Institute, et al.*

May 22, 2026

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, *amici curiae* Digital Childhood Institute and Protect Young Eyes submit this supplemental certificate of interested persons to fully disclose all those with an interest in this brief and provide the required information as to their corporate status and affiliations.

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case, in addition to those listed in the briefs of the parties. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

A.    Amicus curiae Digital Childhood Institute is a 501(c)(3) non-profit. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

B.   Amicus curiae Protect Young Eyes is a Michigan corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

/s/ William C. Duncan
William C. Duncan
*Attorney for Amici Curiae*
*Digital Childhood Institute, et al.*

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..............................................2

TABLE OF CONTENTS ............................................................................3

TABLE OF AUTHORITIES.......................................................................4

INTEREST OF AMICI CURIAE.................................................................6

SUMMARY OF ARGUMENT....................................................................7

ARGUMENT............................................................................................11

   I.   The District Court Misclassified App Stores and the Conduct Regulated by the Act. .............................................................................11

   II.   Contractual Capacity and Parental Authorization Govern Transactions with Minors. .......................................................................14

   III.  App Age Ratings Must Not Be Deceptive or Misleading. .................18

   IV.   Existing Parental Controls and Education Are Not Viable Alternatives.........................................................................................24

CONCLUSION.........................................................................................29

CERTIFICATE OF COMPLIANCE ........................................................31

CERTIFICATE OF SERVICE..................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Apple v. Pepper*, 587 U.S. 237 (2019)..........................................................12

*CCIA v. Uthmeier*, No. 25-11881 (11th Cir. Nov. 25, 2025) .........................29

*Free Speech Coalition v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *affirmed*, 606 U.S. 461 (2025)..........................................................................................24

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ...........................................13

*Packingham v. North Carolina*, 582 U.S. 98, 115 (2017)..............................12

*Parham v. J.R.*, 442 U.S. 584, 602 (1979) ....................................................15

*Screws v. United States*, 325 U.S. 91, 102 (1945).........................................23

*Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)..............................29

**Other Authorities**

Aaron Tilley, *Apple's App Store Puts Kids a Click Away From a Slew of Inappropriate Apps*, Wall St. J. (Dec. 22, 2024).......................................20

Apple, *New Requirements for Apps Available in Texas*, Apple Developer News (Oct. 8, 2025)..............................................................................................8

Apple, *Share Age Ranges with Apps on iPhone*, Apple Support ....................7

Apple, *Update on Age Requirements for Apps Distributed in Texas*, Apple Developer News (Dec. 23, 2025) .................................................................8

Chris McKenna, *How to Protect Kids from Porn*, After Babel (July 17, 2025) ..........................................................................................................21

Digital Childhood Institute, *Request for FTC Investigation of Apple's Deceptive and Unfair App Store Practices* (Aug. 19, 2025).....................17

Digital Childhood Institute, *Request for FTC Investigation of Google's Deceptive Age Ratings and Unfair Play Store Practices* (Oct. 14, 2025) 17

Family Online Safety Institute & Ipsos, *Connected and Protected: Insights from FOSI's 2025 Online Safety Survey* (May 28, 2025)..........................28

Filipe Espósito, *App Store Review Process Has over 500 Human Experts; Less than 1% of Rejections Are Appealed*, 9to5Mac, (May 7, 2021) .......22

FTC, *In the Matter of Apple Inc., Consent Agreement* (Jan. 15, 2014) ........17

Google Play *Help, Apps & Games Content Ratings on Google Play*...........22

Heat Initiative & Parents Together Action, *Rotten Ratings: 24 Hours in Apple's App Store* (Dec. 22, 2024) ............................................................20

International Age Rating Coalition, *How IARC Works*...................................22

Kevin Wrenn et al., *Policy Analytics Dashboard, BU Spark! in collaboration with the Applied Social Media Lab*, Berkman Klein Center for Internet & Society, Harvard University (Mar. 4, 2026)...............................................15

*Man Charged with Rape, Kidnapping After Using Snapchat to Meet 13-Year-Old*, WMC Action News 5 (Jan. 15, 2026)........................................20

Protect Young Eyes, *Complete Guide to YouTube Parental Controls* .........20

Protect Young Eyes, *iOS Parental Controls (Screen Time) Complete Guide* .................................................................................................................26

Stipulated Voluntary Dismissal, *Computer & Communications Industry Ass'n v. Brown*, No. 2:26-cv-00094-TC-DAO (D. Utah Apr. 21, 2026)...11

Teagan D'Addeo, *Transparency Hub Reveals What You Really Agreed to Online*, Harvard Law School (Apr. 8, 2026) .............................................15

Tech Transparency Project, *Apple and Google Are Steering Users to Nudify Apps* (Apr. 15, 2026) ...............................................................................21

Tiffany Munzer et al., *Council on Communications and Media, Digital Ecosystems, Children, and Adolescents: Policy Statement*, Pediatrics, (Feb. 2026), 157(2), e2025075320 ............................................................28

# INTEREST OF *AMICI CURIAE*

*Amici curiae* Digital Childhood Institute and Protect Young Eyes are child-safety advocates, and researchers that conduct extensive research into app store exploitation issues and child online safety legislation. Over nearly a decade, the members of these organizations have documented the exact harms that SB 2420 ("the Act") was designed to address, including specific deceptive rating practices, broken parental controls, a dangerous lack of regulation, and exploitative contracting.[1]

Co-*amici* testified at a hearing before the United States Senate Judiciary Committee in July 2019. They filed formal complaints with the Federal Trade Commission documenting Apple's and Google's ongoing violations. They spent two years developing the model app store accountability legislation that became the Act. The Act reflects their work.

*Amici* submit this brief to provide the Court with the factual and commercial context that the district court lacked. The court below held no evidentiary hearing, received no expert testimony on online child safety or app store practices, and resolved contested factual questions regarding parental controls and commercial

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that this brief was not authored in whole or in part by counsel for any party, and no person or entity other than *amici curiae* or their counsel made a monetary contribution to the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

conduct without a developed expert record. *Amici* can fill that gap. Their combined experience positions them to explain how app stores actually work, how parental controls actually perform, and why a decade of advocacy, congressional testimony, and industry voluntary commitment have produced no meaningful change for children.

## SUMMARY OF ARGUMENT

The App Store Accountability Act is a contract and consumer protection law. It applies well-understood principles of contractual capacity, informed consent, and truthful commercial disclosure to a digital marketplace that has spent years treating minors as legally competent adults, excluding parents from decisions they have a legal right to make, and deceiving both about the safety of what is being sold.

Apple and Google's app stores collect a date of birth from every user during account creation. Every account belonging to a child under thirteen is already linked to a parent through Apple's Family Sharing or Google's Family Link. At the moment any app is downloaded, Apple and Google know whether the user is a child. But they withhold that critical information from app developers.

Technology already exists that can privately and seamlessly communicate the age range of a user downloading an app from the app store to the app developer.[2] In

---

[2] Apple, *Share Age Ranges with Apps on iPhone*, Apple Support, https://support.apple.com/guide/iphone/share-age-ranges-with-apps-iphe56aab53d/ios (last visited Apr. 16, 2026).

anticipation of this Act taking effect, both Apple and Google announced that age range communication tools would be made available to all developers.[3] The moment the district court enjoined the Act, they withdrew those tools.[4] That withdrawal prevents compliance with the Children's Online Privacy Protection Act ("COPPA") and gives developers exactly what they want: plausible deniability about whether the user at the other end of their contract is a child.

Every other regulated industry that serves consumers in similar ways, including banking and title companies, is prohibited from exploiting that kind of information asymmetry when it knows the counterparty lacks legal capacity. The Act asks nothing more of app stores.

The requirements of the Act are narrow. App stores must verify the age categories of account holders and link minor accounts up to age 18 to a parent or guardian so that consent to download apps and make in-app purchases is provided by a legally capable person – bringing app downloads in line with every comparable area of contract law.

---

[3] Apple, *New Requirements for Apps Available in Texas*, Apple Developer News (Oct. 8, 2025), https://developer.apple.com/news/?id=btkirlj8.
[4] Apple, *Update on Age Requirements for Apps Distributed in Texas*, Apple Developer News (Dec. 23, 2025), https://developer.apple.com/news/?id=8jzbigf4.

Before each download, they must truthfully disclose the app age ratings and content descriptors they already use, such as "drug use," "nudity," and "violence," and make them highly visible so parents know what they are authorizing.

And they must transmit a verified age signal to developers, so that COPPA compliance becomes possible, age-based safety defaults can activate, and platforms can no longer treat children as adults with impunity.

To enjoin the Act, the district court analogized app stores to bookstores. The analogy does not survive scrutiny. Bookstores do not bind children to nonnegotiable contracts, process recurring payments, collect and monetize device-level data, track a child's location, give strangers access to contact lists and private photos, or misrepresent safety disclosures to parents making decisions with serious legal and physical consequences.

The Constitution does not exempt app stores from the obligations every comparable commercial actor in American law must follow. FTC consent decrees entered against Apple and Google in 2014 require express informed parental consent before charging minors for in-app purchases.

Those decrees remain in force, and the Digital Childhood Institute's 2025 FTC complaints document how Apple and Google continue to charge minors for in-

app purchases without parental consent, in violation of those decrees. A decade after settling federal charges for the same conduct, little has changed.

Contractually binding children to app terms of service without any parental involvement should be recognized as unconscionable. A party of vastly superior bargaining power, with teams of lawyers and billions in revenue, extracts nonnegotiable terms from someone who lacks the legal capacity to understand or refuse them, in language written to exceed the reading comprehension of most American adults. All the Act asks, to modestly address that problem, is the involvement of a parent.

The district court's alternative was not merely inadequate; it was incoherent, lacking even basic safeguards. Parental controls depend on accurate age ratings. They depend on children being linked to their parents' account. They depend on parents knowing when their children are downloading apps. They depend on app stores correctly identifying who is a child and who is an adult. Every one of these pieces is missing from the alternatives proposed by a district court. The District Court's hypothesized alternative merely maintains the broken ecosystem this Act was created to fix.

The district court did not identify a less restrictive alternative. It destroyed the infrastructure that parental controls depend on and replaced enforceable law with voluntary tools built by companies that have every financial incentive to make them

as ineffective as possible, and that already fail to comply with federal consent decrees requiring the same parental consent this Act demands.

The Computer & Communications Industry Association recently dismissed its parallel challenge to Utah's App Store Accountability Act before the court could reach the merits to avoid an adverse ruling. Stipulated Voluntary Dismissal, *Computer & Communications Industry Ass'n v. Brown*, No. 2:26-cv-00094-TC-DAO (D. Utah Apr. 21, 2026), ECF No. 35. There is no basis for this Court to reach a different conclusion than the court would have. This injunction should be reversed.

## ARGUMENT

### I.    The District Court Misclassified App Stores and the Conduct Regulated by the Act.

The district court enjoined SB 2420 by analogizing app stores to bookstores. This analogy does not accurately describe app stores. It describes what app stores want courts to think they are. The wrong analogy produces the wrong level of scrutiny. That is exactly what happened here.

SB 2420 does not restrict what apps may say or what ideas they may express. It regulates when and how a platform may enter into a legal and financial relationship with a child, and what information must be disclosed to parents and developers during that process. These are ordinary forms of regulation governing contract formation, contractual capacity, and truthful commercial representations. They have

never required First Amendment justification in any other commercial context. They do not require it here.

Justice Samuel Alito wrote that courts should be "cautious in applying our free speech precedents to the internet" because "[c]yberspace is different from the physical world," requiring courts to "proceed circumspectly" before striking down state laws designed to protect children. *Packingham v. North Carolina*, 582 U.S. 98, 115 (2017) (Alito, J., concurring in the judgment).

The district court did the opposite of what the Supreme Court has cautioned. App stores are not bookstores or any other simple brick-and-mortar enterprise with a single point of sale. They are massive global digital retailers that dictate nonnegotiable terms of service, process ongoing payments, retain control over updates, and grant developers access to the consumer's private photos or contact lists. Books do not track children or broadcast their location to strangers. The analogy does not reflect how app stores work. It reflects how app stores wish they were regulated.

The Supreme Court determined in *Apple v. Pepper*, 587 U.S. 237 (2019), that Apple is the direct seller or commercial retailer when users purchase apps, rather than a passive intermediary between developers and consumers. Direct commercial retailers are routinely subject to requirements that protect consumers, especially children.

For example, a bank cannot open an account for a minor without parental authorization. A title company cannot conceal a minor's legal incapacity from other parties to a transaction. A car dealership cannot sell a vehicle to a sixteen-year-old and treat the contract as binding. Every other industry that conducts complex transactions involving children is already held to that standard. SB 2420 treats app stores just like those other businesses.

App stores also face incentives that bookstores do not. Revenue increases with downloads and engagement, so app stores benefit from minimizing friction, concealing a user's age, and overstating safety. Accuracy costs money. Inaccuracy pays.

The district court's analysis also conflates legislative motive with regulatory mechanism. That a statute is enacted to protect minors does not render it content-based. States routinely pursue child welfare objectives through content-neutral rules governing contracts, disclosures, and access conditions. The Supreme Court cases that apply strict scrutiny in the child-protection context involve laws that directly restrict access to expressive material based on its subject matter.

This Act regulates the transaction, not the content. The district court never seriously engaged with that distinction, which is itself a ground for reversal. See *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), which emphasizes the importance

of careful, evidence-based analysis before facially invalidating statutes on First Amendment grounds.

Because the Act regulates commercial transactions rather than speech, First Amendment scrutiny does not govern. The state's interest in ensuring that minors cannot be bound to nonnegotiable contracts without parental involvement and that the terms of those contracts are not misrepresented is substantial and well-established. There is no basis for this Court to hold otherwise.

## II.   Contractual Capacity and Parental Authorization Govern Transactions with Minors.

One of the oldest protections in commercial law is that contracts with minors are not binding. Apple and Google present these contracts to tens of millions of children anyway, through interfaces expertly engineered to make refusal functionally impossible.

They do it in language written to exceed the reading comprehension of most American adults, with no opportunity to negotiate a single word, no meaningful choice but to agree or go without, arbitration clauses that strip the right to a jury, and buried authorization to harvest a child's data before any parent has read or understood a single line.

A recent study by student researchers at Boston University's BU Spark!, using data from Harvard University's Transparency Hub database of more than 20,000

platform policy documents, found that 86 percent required college-level reading proficiency, that most major platforms have eliminated users' right to sue in court, and that the documents have grown longer and more complex over time.[5]

It is fundamentally unfair, indeed unconscionable, for trillion-dollar companies to extract terms from a child. Because the law presumes parents possess what children lack in maturity and capacity for judgment, *Parham v. J.R.*, 442 U.S. 584, 602 (1979), the Act requires that a parent consent before a minor can be bound by such a contract.

SB 2420 applies to app stores because of what they already know about the consumer. Apple and Google collect a date of birth from every user when they create an account. For children, that age is confirmed by a parent through Family Sharing or Family Link. For adults, it is confirmed by the credit card on file, since only adults can hold credit cards. Apple and Google, therefore, possess verified information about a user's age category at the time of every download.

Despite possessing that information, app stores withhold from developers the fact that they are dealing with a minor. The technology to communicate that

---

[5] Kevin Wrenn et al., *Policy Analytics Dashboard, BU Spark! in collaboration with the Applied Social Media Lab*, Berkman Klein Center for Internet & Society, Harvard University (Mar. 4, 2026), https://analytics.transparency.berkmancenter.org; see also Teagan D'Addeo, *Transparency Hub Reveals What You Really Agreed to Online*, Harvard Law School (Apr. 8, 2026), https://hls.harvard.edu/today/transparency-hub-reveals-what-you-really-agreed-to-online.

information privately and seamlessly already exists. Rather than use it, app stores have chosen to litigate against laws that would require them to do so.

The consequences are predictable and profitable. When app stores withhold age data, developers cannot comply with the Children's Online Privacy Protection Act , which Congress enacted in 1998 to protect the personal information of children under thirteen. COPPA's obligations are triggered by knowledge. A developer who does not know that it is dealing with a child under thirteen has no legal duty to act. App stores have manufactured that knowledge gap to enable data collection for profit. Plausible deniability pays.

By withholding the one fact that would trigger federal protections, they ensure that COPPA goes unenforced, age-based safety defaults never activate, and children are enrolled in commercial relationships that federal law was designed to prevent. SB 2420 closes that gap. It requires app stores to transmit a verified age signal to developers, enabling COPPA compliance at scale for the first time.

Judge Pittman offered news apps, fitness apps, and Bible apps as examples of the Act's overinclusiveness, categories so wholesome, he suggested, that no compelling interest could justify regulating them. But a fitness app knows when a user – adult or child – wakes up, how far they run, and where they go. It collects location data, health metrics, device identifiers, and usage patterns.

Any app downloaded by a child will collect their personal data and is subject to COPPA. Apple and Google are brokering access to the most sensitive data on the device, on behalf of millions of developers. The court's own examples make the case for the Act. There are no innocent apps.

A decade of federal complaints, enforcement actions, congressional oversight, and industry pledges of voluntary reform have produced no real structural change. App stores continue to enroll children in binding legal relationships, withhold the age data needed to protect them, misrepresent app safety, and allow children to make in-app purchases without proper parental consent, despite settling FTC charges over exactly that conduct in 2014.[6] *Amici* documented the same continuing violations in formal complaints filed with the Federal Trade Commission in 2025.[7] Self-regulation does not work.

SB 2420 corrects these systemic problems directly and at the layer where they occur. Rather than attempting to regulate individual apps or classify content, the Act operates at the app store level, where contracting, age verification, and data collection all happen. The Act renders unenforceable any contract or terms of service asserted against a minor without verifiable parental consent, closing a loophole that

---

[6] FTC, *In the Matter of Apple Inc., Consent Agreement* (Jan. 15, 2014). The consent order required Apple to obtain express, informed consent from account holders before billing for in-app purchases.
[7] Digital Childhood Institute, *Request for FTC Investigation of Apple's Deceptive and Unfair App Store Practices* (Aug. 19, 2025); Digital Childhood Institute, *Request for FTC Investigation of Google's Deceptive Age Ratings and Unfair Play Store Practices* (Oct. 14, 2025).

app stores have exploited for years. App store onboarding flows are standardized and applied uniformly across hundreds of millions of users. The Act regulates them on the same scale.

The district court never addressed this argument. The industry offered no evidence or argument on contracting practices. The court focused entirely on speech and ignored the contractual basis entirely. Regulating the contractual capacity of minors has never required First Amendment justification under American law, and it does not require one here.

### III.  App Age Ratings Must Not Be Deceptive or Misleading.

App age ratings are the numerical labels that appear on every app in the Apple App Store and Google Play Store and purport to tell parents whether an app is appropriate for their child. In the Apple App Store, those recently updated labels are 4+, 9+, 13+, 16+, and 18+. In Google Play, the store displays categories from the Entertainment Software Ratings Board (ESRB): Everyone, Everyone 10+, Teen, Mature, and Adults Only (AO). Parents rely on these labels to make download decisions. Schools reference them in device policies. Parental control tools use them as the primary filter for restricting children's access to apps. They are a foundational safety signal in the app store ecosystem.

They are also representations made by a commercial actor with a direct financial interest in misrepresenting the answer. A lower rating expands the

audience. More downloads mean more commissions. The parties that profit most from a deceptive rating are the same parties that set them. When ratings are false, every layer of protection built around them fails, exposing children to exactly the harm the ratings were supposed to prevent.

As direct commercial sellers, Apple and Google are subject to the same requirements of honest labeling and accurate commercial disclosure that govern every other retailer. Those obligations do not disappear because the storefront is digital.

The record of deception is long, documented, and known to the industry. In 2019, Chris McKenna, founder of co-amicus Protect Young Eyes, testified before the United States Senate Judiciary Committee that apps like Instagram and Snapchat, both at the time rated as safe for preteens in the Apple App Store, routinely exposed minors to predators and explicit content.

To demonstrate the point, his team created a fake account for a twelve-year-old girl and received dozens of graphic messages from adult men within a week. Even though an expert publicly testified under oath before the United States Senate Judiciary Committee that apps were harming children and put the industry on clear warning of the dangers, Apple and Google refused to adjust the age ratings in response.

In December 2022, YouTube's App Store rating was quietly downgraded from 17+ to 12+ with no explanation and no notice to the families relying on the 17+ restriction to protect their children. Overnight, YouTube appeared on devices where parents had specifically blocked it, parental controls built around the 17+ restriction failed, and children gained access to a platform their parents had deliberately excluded, all without a single notification that anything had changed.[8]

In 2026, a thirty-two-year-old Memphis man used Snapchat's location feature to track down a thirteen-year-old girl, then pointed a gun at her head and held a knife while he sexually assaulted her.[9] Snapchat remains rated as appropriate for users 13+. Apple features it in curated categories, including "Editor's Choice."

A December 2024 investigation by child safety organization Heat Initiative, covered by the Wall Street Journal, reviewed approximately 800 apps in a single 24-hour period and found that one-fourth contained content inappropriate for children despite carrying child-friendly age ratings. These included sexual games, stranger-chat platforms, and apps providing unfiltered access to banned websites.[10]

---

[8] Protect Young Eyes, *Complete Guide to YouTube Parental Controls*, protectyoungeyes.com/blog-articles/the-ultimate-guide-to-youtube-for-caregivers.

[9] *Man Charged with Rape, Kidnapping After Using Snapchat to Meet 13-Year-Old*, WMC Action News 5 (Jan. 15, 2026), https://www.actionnews5.com/2026/01/15/man-charged-with-rape-kidnapping-after-using-snapchat-meet-13-year-old/.

[10] Aaron Tilley, *Apple's App Store Puts Kids a Click Away From a Slew of Inappropriate Apps*, Wall St. J. (Dec. 22, 2024); Heat Initiative & Parents Together Action, *Rotten Ratings: 24 Hours in Apple's App Store* (Dec. 22, 2024).

A January 2026 Tech Transparency Project investigation identified over 100 nudity apps across both major app stores distributed in violation of the companies' own policies, with many rated suitable for minors. A follow-up investigation in April 2026 found the stores were actively directing users to those apps through sponsored advertisements and autocomplete search suggestions.[11]

The problem is not limited to social media. The district court suggested that apps like the Bible App represent the Act's overreach. The Bible App is rated 4+ in the Apple App Store, and even that app contains a hidden browser through which children can access pornographic content even when every Apple parental control has been activated. Chris McKenna, founder of co-amicus Protect Young Eyes, documented this vulnerability directly. With Apple's Screen Time parental controls enabled, the Safari browser disabled, and Apple's explicit content filter toggled on, he accessed pornography through a hidden browser inside the Bible App.[12] There are no innocent apps.

The ratings parents rely on are self-declared by app developers. Self-declaration without stringent independent verification cannot produce consistently

---

[11] Tech Transparency Project, *Apple and Google Are Steering Users to Nudify Apps* (Apr. 15, 2026).
[12] Chris McKenna, *How to Protect Kids from Porn*, After Babel (July 17, 2025), afterbabel.com/p/how-protect-kids-from-porn.

accurate safety information when the declaring party profits from inaccuracy. Developers are incentivized to downplay risks.

A developer seeking to distribute an app through the Apple App Store completes a short online questionnaire about the app's content and receives a rating based on their answers, with only about 12 minutes of human review.[13]

Google delegates rating responsibility to developers through the International Age Rating Coalition (IARC), an automated self-reporting system in which developers complete a short online questionnaire and receive a rating instantly. No independent auditor reviews the answers before the rating is assigned.[14]

SB 2420 adds a crucial accountability mechanism: a legal prohibition on knowing misrepresentation in app age ratings and content descriptors, and a requirement to disclose significant changes to terms or functionality when they occur.

The district court misread the Act's age categories as a state-mandated content rating system. The Act contains two distinct systems, which the court conflated into a single system. The first classifies users by legal status: child, younger teenager,

---

[13] Filipe Espósito, *App Store Review Process Has over 500 Human Experts; Less than 1% of Rejections Are Appealed*, 9to5Mac, (May 7, 2021), https://9to5mac.com/2021/05/07/app-store-review-process-has-over500-human-experts-less-than-1-of-rejections-are-appealed/.

[14] International Age Rating Coalition, *How IARC Works*, https://globalratings.com/how-iarc-works/ (last visited Apr. 16, 2026); Google Play *Help, Apps & Games Content Ratings on Google Play*, https://support.google.com/googleplay/answer/6209544 (last visited Apr. 16, 2026) ("Ratings are the responsibility of the app developers and the International Age Rating Coalition.").

older teenager, and adult. These categories determine which consent mechanisms apply, which default app settings are activated, and which legal obligations, such as COPPA, are triggered. The categories say nothing about what content is appropriate for different ages.

The second system is developer-assigned app ratings, which describe content and risks. Developers assign those ratings using Apple's and Google's existing proprietary frameworks. The Act mandates no rating system or criteria of its own. It requires only that a developer not knowingly misrepresent whatever rating they have already assigned.

The trial court's vagueness finding rests on a misreading of the statute. The district court worried that developers could not know what a correct rating looks like and, therefore, could not know when they were in violation. But the Act simply prohibits a knowing misrepresentation of whatever rating and descriptors a developer chooses to assign under the app store's existing framework. Those are fundamentally different things. Courts enforce that standard every day under ordinary consumer protection law. A defendant who acts with that kind of deliberate knowledge cannot claim lack of warning. *Screws v. United States*, 325 U.S. 91, 102 (1945).

SB 2420 requires that safety information shown to parents be accurate and that significant changes to an app be disclosed when they occur. That is not

unconstitutional vagueness. It is the minimum that parents need to make informed decisions about what their children access online.

### IV. Existing Parental Controls and Education Are Not Viable Alternatives.

For nearly two decades, courts and technology companies have argued that parental controls and education are adequate substitutes for enforceable law. Experience has proved otherwise. Deceptive age ratings and misleading safety disclosures mean parents routinely make decisions with serious legal and safety consequences based on incomplete, outdated, or deliberately false information.

This Court has already upheld age verification safeguards designed to protect minors in commercial digital contexts. In *Free Speech Coalition v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *affirmed*, 606 U.S. 461 (2025), the Fifth Circuit and Supreme Court upheld Texas's age-verification requirement for websites distributing content harmful to minors, rejecting the argument that parental controls and content-filtering software were constitutionally sufficient alternatives.

The district court in that case, Judge Ezra of the same Western District of Texas, applied strict scrutiny, found parental controls to be a less restrictive means, and enjoined the law on reasoning functionally identical to Judge Pittman's here. This Court reversed. The Supreme Court affirmed.

When a legislature determines that voluntary tools are inadequate to protect children in a commercial context, courts owe deference to that judgment rather than substituting their own assessment of what might work. The reasoning that compelled reversal in *Paxton* compels the same result here.

The district court's alternative was not merely inadequate but incoherent. Parental controls depend on accurate age ratings and safety disclosures. They depend on parents knowing when their children are downloading apps. They depend on app stores correctly identifying who is a child and who is an adult. The court struck down every requirement that makes those things possible, then pointed to parental controls as a sufficient alternative. The district court did not identify a less restrictive alternative. It destroyed the one that existed and called that a solution.

Parental controls fail for three reasons. They are overly complex, children over age 12 are not required to be linked to a parent, and they depend on accurate age ratings that, as demonstrated above, are systematically unreliable. Google, in fact, undermined the controls a parent set up by emailing every child on their thirteenth birthday with instructions on how to remove those parental controls without parental consent.[15]

---

[15] Jaryn Crouson, *Google Reverses Policy on Emailing Kids How to Remove Parental Controls After Backlash*, Daily Caller (Jan. 16, 2026), https://dailycaller.com/2026/01/16/google-reverses-policy-on-emailing-kids-how-to-remove-parental-controls-after-backlash/.

Judge Pittman held no evidentiary hearing to understand or address that. Google did not stop until January 2026, mid-litigation, and only after an exposé by the President of the Digital Childhood Institute went viral. A company that quits profitable conduct only while being sued can resume the moment the suit ends. The app stores can continue to undermine parental controls, the supposed superior alternative that has not worked, if the Act is permanently enjoined.

Co-amicus organization Protect Young Eyes publishes a 50-page guide requiring dozens of sequential steps and screenshots just to configure Apple's Screen Time parental controls, and notes that they are still riddled with loopholes and backdoors.[16]

App stores build parental controls the same way they build everything else: to maximize revenue. They collect a commission on every transaction a child completes. Controls that actually work reduce that revenue. A court cannot point to a less restrictive alternative that the defendant controls, profits from undermining, and has demonstrably failed to make effective.

Consider how the Act fixes the incentives behind faulty parental controls. It links every minor account to a parent. It makes age ratings accurate and legally

---

[16] Protect Young Eyes, *iOS Parental Controls (Screen Time) Complete Guide*, protectyoungeyes.com/devices/apple-ios-iphone-ipad-parental-controls.

enforceable. It imposes liability on developers for knowingly treating a child as an adult. Each of those requirements strikes directly at the business model.

An app with infinite scroll, push notifications, and algorithmically targeted content rated safe for young children reaches the widest possible audience, generates maximum advertising revenue and in-app purchases, and faces no liability under federal privacy law because the app store did not disclose that the user was a child.

Every layer of that deliberately flawed system generates profit. The deceptive age rating expands the audience. The absent parental consent produces a frictionless transaction. The withheld age data allows maximum data collection while COPPA goes unenforced. The Act dismantles all three at once.

If parental consent becomes a legal precondition for every minor transaction, seamless parental tools stop being a cost and become a competitive advantage. The industry has spent decades proving it can build elegant, frictionless experiences when profit depends on it. Parental controls have never been that product because no law has ever required them to be. The Act changes that.

A nationally representative 2025 survey of one thousand parents found that only 47 percent use parental controls on smartphones, the primary device children

use to access apps.[17] That number is not an indictment of parents. It is an indictment of the controls.

The American Academy of Pediatrics reached the same conclusion shortly after the district court issued its injunction. In January 2026, after reviewing hundreds of studies spanning more than two decades, the Academy released updated guidance concluding that individual screen-time limits and parental controls cannot overcome the structural forces that digital platforms deploy against children. As Dr. Tiffany Munzer explained, "Powerful systemic factors shape children's digital experiences, and that's exactly why companies and policymakers must share the responsibility."[18]

Digital platforms are deliberately built to maximize engagement through persistent notifications and frictionless access. Those design choices routinely overpower parental intent, even when parents are actively trying to set limits. The problem is not inattentive parents; the problem is a system engineered to defeat them.

The district court's proposed alternative, a narrower law targeting apps with "harmful material" or "specific addictive qualities," would itself be a content-based law, which would be more constitutionally problematic than SB 2420, not less.

---

[17] Family Online Safety Institute & Ipsos, *Connected and Protected: Insights from FOSI's 2025 Online Safety Survey* (May 28, 2025), fosi.org/research/connected-and-protected-insights-from-fosis-2025-online-safety-survey.

[18] Tiffany Munzer et al., *Council on Communications and Media, Digital Ecosystems, Children, and Adolescents: Policy Statement*, Pediatrics, (Feb. 2026), 157(2), e2025075320.

A Florida district court, citing similar reasons to the Texas district court, enjoined a law requiring age verification and parental consent for minors' social media accounts on the ground that educational campaigns and parental controls were sufficient. The Eleventh Circuit stayed that injunction, holding it was reasonable for the state to conclude that voluntary measures would achieve its interest less effectively, citing *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). *CCIA v. Uthmeier*, No. 25-11881 (11th Cir. Nov. 25, 2025) (order granting stay of preliminary injunction). Two circuits have now examined this reasoning and found it lacking.

The Computer & Communications Industry Association recently voluntarily withdrew a parallel challenge to Utah's App Store Accountability Act rather than risk a ruling. There is no basis for this Court to reach a different conclusion.

## CONCLUSION

The district court acknowledged that children are being exploited through the commercial systems that this Act regulates. It enjoined the law anyway, on the theory that a bookstore analogy properly fit trillion-dollar digital retailers that bind children to nonnegotiable contracts, harvest their data, and profit from withholding their age.

That theory is wrong as a matter of commercial law, First Amendment doctrine, and logic. The court struck down the truthful disclosures, age verification, and parental consent requirements that parental controls depend on to function, then

pointed to parental controls as a sufficient substitute. The court's alternative requires the very infrastructure the court destroyed. That is not a less restrictive means. It is a fantasy.

No banker, car dealer, or title company may conduct complex transactions with a minor while concealing the minor's legal incapacity from the other parties. Apple and Google have done exactly that, at scale, for a decade, through interfaces engineered to make refusal practically impossible and language written to exceed the comprehension of most American adults. The FTC told them to stop in 2014. Congress held hearings. *Amici* filed formal complaints documenting continuing violations. The violations continue.

SB 2420 is a legislative solution that has come after everything else has failed. The people's elected representatives are entitled to that judgment. The preliminary injunction should be reversed.

/s/ William C. Duncan
William C. Duncan
*Attorney for Amici Curiae*
*Digital Childhood Institute, et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 5,338 words.

This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ William C. Duncan
William C. Duncan
*Attorney for Amici Curiae*
*Digital Childhood Institute, et al.*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 22, 2026, and that all counsel of record were served by CM/ECF.

Respectfully submitted,

/s/ William C. Duncan
William C. Duncan
*Attorney for Amici Curiae*
*Digital Childhood Institute, et al.*