Nos. 25-51073 & 26-50001

———————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————————

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND
VANESSA FERNANDEZ; Z.B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs-Appellees*,

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee*,

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

———————————————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

———————————————

**BRIEF OF AMICI CURIAE CHILDREN AT RISK, DAVID'S LEGACY
FOUNDATION, NOT ON OUR WATCH TEXAS, TEXAS YOUTH
SUMMIT, UNBOUND NOW LOUISIANA, AND UNBOUND NOW TEXAS
IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

———————————————

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for Amici Curiae*

May 26, 2026

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, the undersigned certifies that the following persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case, in addition to those listed in the briefs of the parties and other amici. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.   **Amici curiae**

    Children At Risk
    David's Legacy Foundation
    Not on Our Watch Texas
    Texas Youth Summit
    Unbound Now Louisiana
    Unbound Now Texas

2.   **Attorneys for Amici Curiae**

    J. Carl Cecere
    Cecere PC
    6035 Mc Commas Blvd.

    Dallas, TX 75206

*/s/ J. Carl Cecere*

J. Carl Cecere

# TABLE OF CONTENTS

Certificate of interested persons.................................................................. ii

Table of authorities................................................................................... iv

statement of interest .................................................................................1

Summary of the argument..........................................................................2

Argument....................................................................................................5

I.     The Current App Ecosystem Makes Meaningful Parental Oversight Increasingly Difficult, Necessitating S.B. 2420. ............................................5

II.    The Trial Court's Injunction Interferes with Parents' Constitutional Right to Parent. ...............................................................................10

Conclusion ...............................................................................................12

Certificate of compliance.........................................................................13

Certificate of service ...............................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Arcara v. Cloud Books, Inc.,*
    478 U.S. 697 (1986). ..................................................................................................9

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011)...................................................................................................11

*City of Austin, Texas v. Reagan National Advertising of Austin, LLC*,
    596 U.S. 61 (2022) .....................................................................................................9

*Mirabelli v. Bonta,*
    146 S. Ct. 797 (2026)...........................................................................................10, 11

**Statutes**

Children's Online Privacy Protection Act of 1998,
    15 U.S.C.§§ 6501-6505 ..............................................................................................3

Texas App Store Accountability Act ("S.B. 2420"), Tex. Bus. & Com. Code §
    121.001 *et seq.* .........................................................................................................2

**Other Authorities**

https://companiesmarketcap.com/ (May 20, 2026). ......................................................6

American Academy of Child & Adolescent Psychiatry, *Screen Time and Children*
    (June 2025) ................................................................................................................5

App Store for iPhone..........................................................................................................8

Andrew Buck, MobiLoud, *What Percentage of Internet Traffic is Mobile?* (Feb.
    20, 2026). ...................................................................................................................5

Canadian Centre for Child Protection, *Reviewing the Enforcement of App Age
    Ratings in Apple's App Store and Google Play* (Jan. 2022). ....................................8

David Curry, Business of Apps, *Apple App Store Statistics (2026)*
    (Feb. 23, 2026)........................................................................................................5,7

Jonathan Haidt, *The Anxious Generation:  How the Great Rewiring of Childhood Is
    Causing an Epidemic of Mental Illness* (2024)........................................................6

Beata Mostafavi, Univ. of Mich.: Michigan Medicine, *Study: Average Teen
    Received More than 200 App Notifications a Day* (Sept. 26, 2023). ......................5

Sarah Perez, TechCrunch, *Apple introduces new child safety initiatives, including an age-checking system for apps* (Feb. 27, 2025),. ...............................................9

Psychiatrist.com, *Chronic Smartphone Use Linked to Teen Anxiety, Depression, and Insomnia.* ...............................................................................................6

Aaron Tilley, Wall St. J., *Apple's App Store Puts Kids a Click Away from a Slew of Inappropriate Apps* (Dec. 22, 2024).....................................................7

**STATEMENT OF INTEREST**[1]

Amici curiae are nonprofit organizations dedicated to youth safety and advocacy.

**Children At Risk** is a research and advocacy nonprofit leading the way in improving the quality of life for Texas' children.

**David's Legacy Foundation** is a nonprofit dedicated to ending cyberbullying and youth suicide. The foundation advocates for "David's Law" (Texas Senate Bill 179), which equips schools and law-enforcement officials with tools to investigate cyberbullying and provides legal resources for affected families.

**Not on Our Watch Texas** is a nonprofit rallying all women to raise awareness of online abuse, exploitation, and sextortion of children and youth.

**Texas Youth Summit** is a nonprofit dedicated to equipping thousands of young people with Judeo-Christian and conservative values by hosting some of the nation's most influential political and religious leaders. The mission of the Texas Youth Summit is to identify, educate, and train students to promote principles of fiscal responsibility, free market, limited government, and American Exceptionalism.

---

[1] This brief was not authored in whole or part by counsel for any party, and no one other than amici curiae or their counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

**Unbound Now Louisiana** and **Unbound Now Texas** are nonprofits fighting to end human trafficking by identifying victims, supporting survivors, seeking justice, and leading system change.

We are parents and advocates who care about children and desire better tools to help us care for children more effectively in digital spaces. We support the Texas App Store Accountability Act ("S.B. 2420"), Tex. Bus. & Com. Code § 121.001 *et seq.*, because it helps parents like us stay involved in our children's digital lives. We would like the Court to understand our perspective as it considers the arguments from industry lawyers.

## SUMMARY OF THE ARGUMENT

S.B. 2420 is a critical step toward ensuring transparency, accountability, and parental authority over Texas children's online experience. The Act provides three basic, common-sense protections that finally give Texas parents the tools they need to protect their children in an online world:

1. **Parental Approval for App Downloads and Purchases**: The Act requires app stores to obtain consent from a parent or guardian before minors can download apps or make in-app purchases, protecting children from privacy risks, financial harm, and unenforceable contracts.

2. **Accurate and Transparent Age Ratings**: The Act requires age ratings to reflect actual in-app experiences. Currently, there are no consequences for

2

developers who misrepresent their app. Without accurate information about an app, a parent cannot assess whether an app is appropriate for their child.

3. **Secure Age Verification**: The Act requires app stores to use the infrastructure they already employ and data they already collect to verify age, link minors with a parent/guardian account, and securely share anonymized age categories with apps. This privacy-preserving solution enables developers to comply with laws like the Children's Online Privacy Protection Act of 1998, 15 U.S.C.§§ 6501-6505. Such sharing also allows developers to apply the age safeguards they have created for minors.

For too long, app stores have operated as digital gatekeepers with little accountability, allowing children to download apps and enter complex contracts with billion-dollar corporations without a parent ever knowing. These agreements often give apps sweeping access to kids' personal data—photos, contact lists, exact locations, even their voices—without their parents even knowing, and without meaningful safeguards. This would be unthinkable in any other industry. S.B. 2420 fills this critical gap by providing some parental oversight in this vital aspect of their kids' daily lives.

S.B. 2420 fulfills this role without infringing on First Amendment liberties. S.B. 2420 focuses on the contracts that minors enter when they download apps onto their smartphone—not the speech or content of the apps themselves. The Act protects kids by ensuring parents are involved in that app-contracting process. The Act therefore does not violate the constitutional rights of app providers, app creators, or children.

Instead, S.B. 2420 preserves and reaffirms the equally essential constitutional right of parents to choose how to raise their children. The Act finally gives parents oversight rather than allowing Big Tech to sideline parents and have unfettered access to kids. For that essential reason, it should be upheld.

**ARGUMENT**

**I. The Current App Ecosystem Makes Meaningful Parental Oversight Increasingly Difficult, Necessitating S.B. 2420.**

The vast digital landscape that encircles teens is harming them. Teens spend a stunning amount of time on screens—an average of 7.5 hours per day.[2] Children have an average of 40 different apps on their phones, each with its own risks, privacy policies, settings, and data-collection practices.[3] That results in an average teen getting more than 200 app notifications every single day,[4] during the nearly 90% of their mobile time they spend in apps.[5]

Apple's app store alone generates over $110 billion per year in revenue from app games and downloads.[6] Google Play generates similar sales. These massive revenue streams have helped to make Apple and Google, as of this writing, two of

---

[2] American Academy of Child & Adolescent Psychiatry, *Screen Time and Children* (June 2025), <https://bit.ly/4nJUi4I>.

[3] Beata Mostafavi, Univ. of Mich.: Michigan Medicine, *Study: Average Teen Received More than 200 App Notifications a Day* (Sept. 26, 2023), <https://bit.ly/4drxBPq>.

[4] *Id.*

[5] Andrew Buck, MobiLoud, *What Percentage of Internet Traffic is Mobile?* (Feb. 20, 2026), <https://bit.ly/3PHzxKo>.

[6] David Curry, Business of Apps, *Apple App Store Statistics (2026)* (Feb. 23, 2026), <https://bit.ly/4veNPS5>.

the three largest companies in the world—with the market capitalizing for each soaring above $4.4 *trillion*.[7]

Even the most involved parents cannot combat this massive corporate influence or keep up with the sheer number of apps their kids are using. The challenge is not parental indifference; rather, the current digital ecosystem is not structured to provide parents with clear, centralized, and usable information necessary to exercise meaningful oversight and supervision.

With the widespread adoption of smartphones, and the rapid growth of app-based ecosystems, rates of depression, anxiety, social isolation, and suicidal ideation among children and adolescents have increased. A growing body of research suggests that increased smartphone and application use may be a significant contributing factor to mental health problems in teens and children.[8] To address that problem, S.B. 2420 gives parents more control over what apps their children download and use.

Currently, default smartphone settings allow teens to download apps without parental notification or consent, as app stores frequently permit users age 13 and older to independently create app store accounts, download apps, and manage

---

[7] https://companiesmarketcap.com/ (May 20, 2026).

[8] *E.g.*, Jonathan Haidt, *The Anxious Generation: How the Great Rewiring of Childhood Is Causing an Epidemic of Mental Illness* (2024); Psychiatrist.com, *Chronic Smartphone Use Linked to Teen Anxiety, Depression, and Insomnia*, <https://bit.ly/3RJOL2a>.

account permissions. These policies have created a form of digital adulthood at age 13 by shifting meaningful control over digital access and engagement away from parents and toward minors. Children can download a video chatting app that lets them talk to strangers, a disappearing-messages app, or a hookup app, use it for one night, then delete it before morning. And their parents would never be the wiser.

Even when parents manage to successfully navigate the complex maze of steps to engage parental controls, they are often met with deceptive safety disclosures from the App store and developers. The existing parental controls are tied to app age ratings in app stores, and these ratings are often misleading, inconsistent, and lack accountability. Many apps are rated for 4- and 9-year-olds yet permit access to violence, nudity, conversations with complete strangers, and allow those strangers to obtain a child's precise location.

Apple, which built its iPhone so that consumers can download apps only through its App Store, acts as a gatekeeper to over 2.4 million apps,[9] but it fails to take accountability for the apps it distributes. *The Wall Street Journal* reported that Apple regularly labels apps with violent, sexual, or exploitative content as safe for young users.[10] The Canadian Centre for Child Protection found that both Apple's

---

[9] Curry, *supra*.

[10] Aaron Tilley, Wall St. J., *Apple's App Store Puts Kids a Click Away from a Slew of Inappropriate Apps* (Dec. 22, 2024), <https://bit.ly/3RlyMaD>.

and Google's rating systems fail to accurately reflect the risks of the apps they promote.[11]

Apple and Google have long been trusted as stewards of digital marketplaces for families, but their practices have exposed children and teens to harm and predatory interactions. Parents reasonably rely on app store ratings and descriptions, but that information does not always accurately reflect the nature of apps and cannot be relied upon to provide an indicator of safety. Apple's own current standards for age ratings deem nudity, realistic violence, and drug use as appropriate for 13-year-olds.[12]

S.B. 2420 empowers parents to protect minors from contracts and apps that they deem harmful. To make parental control meaningful, the Act requires developers to provide information on the contract terms and accurate age ratings so parents can have the information they need before consenting to an app for their child.

Importantly, S.B. 2420 does not burden adults with separate age-verification steps, recognizing that Apple and Google already have the necessary information to perform that function. S.B. 2420 reflects the Legislature's recognition that a

---

[11] Canadian Centre for Child Protection, *Reviewing the Enforcement of App Age Ratings in Apple's App Store and Google Play* (Jan. 2022), <https://bit.ly/4uBI68U>.

[12] App Store for iPhone, <https://bit.ly/4uHBCVS>.

consumer's age is already in their phone, and most adults already have a credit card in their digital wallet, which provides all the information needed to verify that someone is an adult. Smartphone users also must enter their age when they register their devices and obtain access to the app store, and Apple already has an application programming interface (or "API") that communicates age category information.[13] Therefore, centralized age verification at the app store preserves privacy rather than risks it as it minimizes personal data collection, limits data exposure, and eliminates the need for children or adults to submit sensitive age information to third parties.

S.B. 2420 is also designed specifically to comply with First Amendment rights. It applies to all apps, not some subset. It does not favor one type of speech over another. This universality ensures the Act is "directed at unlawful conduct having nothing to do with . . . the expressive activity." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986). And it does not "single out any topic or subject matter for different treatment." *City of Austin, Texas v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61, 71 (2022).

---

[13] Sarah Perez, TechCrunch, *Apple introduces new child safety initiatives, including an age-checking system for apps* (Feb. 27, 2025), <https://bit.ly/4tXW9EJ>.

## II. The Trial Court's Injunction Interferes with Parents' Constitutional Right to Parent.

Indeed, only by *refusing* to enforce S.B. 2420 would a constitutional violation occur. When entering his injunction against S.B. 2420, the district court did not weigh or even consider the impacts of his order on the Constitutional right of parents to effectively parent their children.

That flatly contradicts the Supreme Court's extraordinary decision on its emergency docket in *Mirabelli v. Bonta*, 146 S. Ct. 797 (2026), which recognized the importance and constitutional foundations of that essential right. In *Mirabelli*, a California policy prevented schoolteachers from telling parents that their child was transitioning genders. The Supreme Court enjoined enforcement of the policy while litigation proceeded in the lower courts, recognizing that the parents were likely to eventually prevail in their challenge to the policy's constitutional validity. In doing so, the Court reaffirmed that "[u]nder long-established precedent, parents—not the State—have primary authority with respect to "the upbringing and education of children." *Id*. at 803. And "the right protected by these precedents includes the right not to be shut out of participation in decisions regarding their children's mental health." *Id*.

The Court then emphasized that even though California believed its policy was best for children, enjoining that policy during litigation "promotes child safety

by guaranteeing fit parents a role in some of the most consequential decisions in their children's lives." 146 S. Ct. at 803.

Indeed, while the various factions of the Court disagreed on much in *Mirabelli*, they were united in recognizing parents' constitutionally protected right to have a say in raising their children. In a concurring opinion, the Chief Justice, Justice Barrett and Justice Kavanaugh, often the critical swing justices in close decisions, wrote: "Relevant here, the doctrine of substantive due process has long embraced a parent's right to raise her child, which includes the right to participate in significant decisions about her child's mental health." 146 S. Ct. at 804 (Barrett, J, concurring). Even the two *Mirabelli* dissenters agreed the Constitution granted parents rights to raise their children. "I have no doubt that parents have rights, even though unenumerated, concerning their children and the life choices they make." *Id*. at 809 (Kagan, J dissenting).

These constitutional rights that united the Court's factions in *Mirabelli* apply with equal force in this case. This Court should therefore end the trial court's injunction so that parents are not "cut out" from "consequential decisions in their children's lives," even if litigation is required to continue.

Furthermore, the Constitution does not give for-profit companies the unfettered right to sideline parents to sell their products to children. *See, e.g., Brown v. Entertainment Merchants Association*, 564 U.S. 786, 821 (2011)

(Thomas, J dissenting) (the First Amendment does not give companies a right to speak to minors or a right to minors to access speech "without going through the minor's parents"). And yet that is what plaintiffs are arguing for. They would grant themselves the right to sell and distribute products that affect the mental health of teenagers and young children, without a parent ever knowing or consenting to the sale, all in the name of the First Amendment. The Founders never intended the First Amendment to impinge on the ability of parents to raise their children as they deem best.

**CONCLUSION**

For too long, parents have been expected to do the impossible—monitor every app, every update, every risk—while app stores profit off their kids. S.B. 2420 sets up commonsense guardrails while ensuring that parents and guardians have the final say. S.B. 2420 does this in a way that does not overly burden app stores or users, and it finally gives parents the tools they need to parent in digital spaces.

Please reverse the district court's order enjoining S.B. 2420, as the lower court did not consider the injunction's infringement on a parent's rights to raise a child, to know what their child was accessing digitally, and to determine if the child should obligate herself to a particular apps' contractual term of service.

Dated: May 26, 2026

Respectfully submitted,

*/s/ J. Carl Cecere*

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 2,441 words.

This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ J. Carl Cecere*

J. Carl Cecere

**CERTIFICATE OF SERVICE**

I certify that on May 26, 2026, the foregoing was filed electronically (via CM/ECF) on all counsel who have appeared in this case.

*/s/ J. Carl Cecere*

J. Carl Cecere