Case Nos. 25-51073 & 26-50001

# In the United States Court of Appeals for the Fifth Circuit

———————

STUDENTS ENGAGED IN ADVANCING TEXAS; M. F., BY AND THROUGH NEXT FRIEND VANESSA FERNANDEZ; Z. B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs-Appellees.*

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiffs-Appellees.*

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendants-Appellees.*

———————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Case No. 1:20-cv-00323-LY

———————

**BRIEF OF LOUISIANA FAMILY FOUNDATION, ALABAMA POLICY INSTITUTE, AND DIGITAL CHILDHOOD ALLIANCE AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

———————

JOHN B. SCOTT
Scott & Scott PLLC
1400 Lavaca Street, Suite 975
Austin, Texas 78701
(817) 691-5817 (phone)
john.scott@scottpllc.net

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case:

Louisiana Family Forum
Alabama Policy Institute
Digital Childhood Alliance Childhood Alliance

All of these entities are all 501(c) non-profit organizations and do not have parent corporations. No publicly traded corporation has an ownership interest of any kind in the amici.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

Certificate of interested persons ............................................................i

Table of contents ....................................................................................ii

Table of authorities ..............................................................................iii

Interest of amici curiae...........................................................................1

Statement of compliance with Rule 29 ..................................................1

Summary of argument.............................................................................2

Argument ................................................................................................3

    I.     ASAA regulates commercial conduct .....................................3

    II.    Texas's interest in protecting children in the digital world is substantial and critical ....................................................3

    III.   The bill directly addresses harms to children .......................6

    IV.   Two limited exceptions, covered by other Texas statutes, do not make ASAA into a content-based law.............................8

    V.    ASAA passes the test for lawful regulation of commercial speech ..........................................................................13

        A.    ASAA advances the government's substantial interest in protecting children ....................................16

        B.    ASAA regulates what is necessary to protect children ...........19

    VI.   A content-based law is not a viable alternative to ASAA ...................21

    VII.  ASAA's prohibition on companies knowingly misrepresenting their app's age rating is not void for vagueness.................................22

Conclusion ............................................................................................25

Certificate of service ............................................................................26

Certificate of electronic compliance.....................................................27

Certificate of compliance .....................................................................28

## Table of Authorities

**Cases**

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) ........................... 18

*Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610 (2019).................................11

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ............................................. 15

*Builder Recovery Servs. v. Town of Westlake*, 650 S.W.3d 499 (Tex. 2022) ................ 12

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ....................................................................... 13, 15, 16, 19

*Comput. & Commc'ns Indus. Assoc'n v. Uthmeier*,
   No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025) .........................17, 22

*Cramer v. Skinner*, 931 F.2d 1020 (5th Cir. 1991) ..................................................... 15

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)................................................ 17

*Free Speech Coalition v. Paxton*, 95 F.4th 263 (5th Cir. 2024)....................14, 15, 16, 18

*Ginsberg v. State of N.Y.*, 390 U.S. 629 (1968) .......................................................... 17

*Globe Newspaper Co. v. Super. Ct. for Norfolk Cty.*, 457 U.S. 596 (1982) .................. 17

*In re Antonio C.*, 83 Cal. App. 4th 1029 (Cal. Ct. App. 2000) .................................... 18

*Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115 (1989)................................................. 17

*Screws v. United States*, 325 U.S. 91 (1945)............................................................... 23

*State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)................................................14, 15, 20

*United States v. United Foods, Inc.* 533 U.S. 405 (2001).............................................. 14

**Statutes**

Colo. Rev. Stat. Ann. § 44-3-901 ............................................................................... 17

Md. Crim. L. Code § 10-107 ...................................................................................... 17

S.B. 2420, 89th Leg., R.S. (Tex. 2025)...............................................................10, 12

Tex. Bus. & Com. Code § 121.022(d) ........................................................................... 7

Tex. Bus. & Com. Code § 121.022(h)(1)...................................................................... 9

Tex. Bus. & Com. Code § 121.022(h)(1)(B)–(C)......................................................... 9

Tex. Bus. & Com. Code § 121.022(h)(2)(B) .......................................................... 9

Tex. Bus. & Com. Code § 121.023 ...................................................................... 14

Tex. Bus. & Com. Code § 121.026(a) ............................................................... 3, 7

Tex. Bus. & Com. Code § 121.056(a)(1) ........................................................... 3, 7

Tex. Bus. & Com. Code § 121.056(a)(2) ............................................................. 23

Tex. Bus. & Com. Code § 121.056(b)(1) ............................................................. 24

Tex. Bus. & Com. Code § 17.12 .......................................................................... 24

Tex. Educ. Code § 32.155(a) .............................................................................. 10

Tex. Educ. Code. § 32.152(a) ............................................................................. 10

Tex. Fam. Code § 2.003(a) ................................................................................. 17

H.B. 498 S2, R.S. (Utah 2026) .......................................................................... 13

**Constitutional Provisions**

U.S. Const. amend. XXVI .................................................................................. 17

**Rules**

25 Tex. Admin. Code §§ 229.406(a)–(b) (2024) ................................................. 18

**Other Authorities**

Fair Play for Kids, Apps Which Google Rates "Safe for Kids" Violate
    Their Privacy and Expose Them to Other Harms (Dec. 12, 2018),
    https://fairplayforkids.org/apps-which-google-rates-safe-kids-
    violate-their-privacy-and-expose-them-other-harms .......................................... 6

Fair Play for Kids, Apps Which Google Rates "Safe for Kids" Violate
    Their Privacy and Expose Them to Other Harms (Dec. 12, 2018),
    https://fairplayforkids.org/apps-which-google-rates-safe-kids-
    violate-their-privacy-and-expose-them-other-harms/ ........................................ 8

H.J. of Tex., 89th Leg., R.S. 3578 (2025) ............................................................ 6

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
    104 Va. L. Rev. 933 (2018) ............................................................................. 11

National Center for Missing & Exploited Children, *NCMEC Releases New Sextortion Data* (2024), https://district.missingkids.org/blog/ 2024/ncmec-releases-new-sextortion-data ........................................................... 5

Senate Judiciary Committee, *Recap: Senate Judiciary Committee Presses Big Tech CEOs on Failures to Protect Kids Online During Landmark Hearing* (July 30, 2024), https://district.judiciary.senate.gov/press/releases/recap-senate- judiciary-committee-presses-big-tech-ceos-on-failures-to-protect- kids-online-during-landmark-hearing ................................................................. 5

Senate Judiciary Committee, *Transcript: US Senate Hearing on Examining the Harm of AI Chatbots* (Feb. 13, 2024), https://district.techpolicy.press/transcript-us-senate-hearing-on- examining-the-harm-of-ai-chatbots .................................................................... 6

## INTEREST OF AMICI CURIAE

Amicus curiae Louisiana Family Forum's mission is to persuasively present timeless truths affecting the family through research, communication, and networking. Amicus curiae Alabama Policy Institute promotes principles of free markets, limited government, and strong families. Amicus curiae Digital Childhood Alliance ("DCA") works with over 150 allied organizations to protect children in the online environment.[1]

All of the amici testified in favor of app-store accountability legislation (Louisiana Family Forum in Louisiana; Alabama Policy Institute in Alabama; and Digital Childhood Alliance in Texas, Louisiana, and Alabama). Louisiana and Alabama passed app-store legislation similar to Texas's S.B. 2420, the App Store Accountability Act ("ASAA"). This Court's rulings on the constitutionality of ASAA will likely affect their state's legislation. Amici and their allied members have a strong interest in ensuring that when companies invite children to download or use apps, they do so under the same consumer protection and contract principles that already apply in the physical marketplace.

## STATEMENT OF COMPLIANCE WITH RULE 29

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. And no one other than the amici curiae, their members, or their counsel financed the preparation or submission of this brief.

---

1.  DCA submitted an amicus brief in the trial court, and the brief and exhibits are attached as Exhibit A.

1

## SUMMARY OF ARGUMENT

On May 27, 2025, Texas's governor signed ASAA, a bipartisan law designed to protect children from exploitive tech company contracts and practices. ASAA took effect on January 1, 2026.

CCIA and the SEAT plaintiffs waited until October 16, 2025, before filing their coordinated complaints challenging the facial constitutionality of the Act. Their delay gave the trial court only ten weeks to review the complaints and preliminary-injunction motions, Texas's response briefing, hold oral arguments, and draft a decision before the effective date. The plaintiffs' joint strategy to press the trial court worked, as the court could not hold evidentiary hearings to map the Act's constitutional and unconstitutional evaluations, learn that current technology makes the age-verification parts of the Act nonburdensome, and evaluate the magnitude of harm to children without the Act.

There are three main errors that led the district court to declare ASAA unconstitutional on its face:

- applying a strict scrutiny analysis even though ASAA is not a content-based law;

- offering a content-based law as superior under First Amendment jurisprudence to ASAA's content-neutral approach; and

- ignoring the scienter requirement in the prohibition against misrepresenting an app's age rating.

2

ASAA meets the constitutional requirements for regulation of commercial speech. These errors require the reversal of the trial court's decision.

## ARGUMENT

### I.  ASAA REGULATES COMMERCIAL CONDUCT

Before a minor can download an app from an app store, the minor must accept the app's terms of service. Those terms of service operate as contracts, often giving developers broad rights to gather and sell the user's data while requiring the minor to waive important rights, such as the right to sue for damages caused by the app. The Act ensures that minors do not enter these binding contracts and agree to have their data exploited without parental authorization.

The Act applies well-understood principles of contract law to the digital marketplace. For example, to protect children, it voids contracts obtained without parental consent. Tex. Bus. & Com. Code §§ 121.026(a), 121.056(a)(1). The Act does not restrict viewpoints or compel editorial judgment.

### II.  TEXAS'S INTEREST IN PROTECTING CHILDREN IN THE DIGITAL WORLD IS SUBSTANTIAL AND CRITICAL

There should be no dispute on appeal that smartphones and the app ecosystem have harmed children. The Texas legislature took evidence on such harms before passing the Act. *See* Exhibit B, Exhibit E-1 to CCIA's Motion for Preliminary Injunction, at 4. In contrast, the industry provided no evidence to counter that claim.

3

The district court agreed that there is a need "to better safeguard children when they are on their devices." ROA.26-50001.1154. The district court did not dispute that "apps collect sensitive data" on the children who use them, leading to privacy harms for those children. *Id.* It also agreed that phone apps can lead to mental-health harms, including "suicides following chatbot interactions, sexual exploitation on 'child-safe' platforms, algorithmic spirals into self-harm content, and gaming environments designed to mimic addictive gambling for minors." *Id.* (citation omitted).

But the district court's order ignored the evidence of harm to children (including the loss of privacy from apps that gather and sell data) by claiming that the defendant had not made those "argument as the State's interest and rationale" for the bill. *Id.* at n.2. But those harms cannot be ignored, as the defendant raised them and the Act on its face clearly addresses them.

Regarding contracting harms, the record shows that an AI chatbot app persuaded a child to harm himself so severely that he requires constant hospitalization. Exhibit A, DCA Amicus Brief, at 2. Because ASAA was not enacted, the developer claimed in a Texas court that the child was subject to its terms of service, which arbitrarily capped damages at $100 and prevented the family from suing in court. *Id.* ASAA would protect that Texas child by voiding the contract, allowing the child's family to seek compensation for these harms.

The record also shows that phone apps addict children, change the development of their brains, and heighten depression and loneliness. For exam-

4

ple, Dr. Siberry, on behalf of the Texas Medical Society, testified how digital platforms lead to increased eating disorders, violence, and suicides in youth. *Id.* at 9. One study found that when children obtain a smartphone before age 13, they experience significantly worse mental health outcomes. *Id.* Early smartphone ownership is specifically linked to reduced self-worth and emotional resilience in girls, and to diminished empathy, calmness, and confidence in boys. *Id.*

Many other studies in the record find that the more time youth spend on apps, the more likely they are to have mental-health issues. One study shows that when young children spend more time on screens, the composition of their brain changes—they have lower microstructural integrity of brain white matter. *Id.* at 10. Another finds that a child's brain structure is negatively affected when he is bombarded with and constantly checks app notifications. *Id.* Another study finds that children become sleep deprived when they overuse smartphone apps, which has long been known to hurt brain development. *Id.* at 10–11. Children have also been sextorted,[2] targeted with illegal drugs,[3]

---

2.  National Center for Missing & Exploited Children, NCMEC Releases New Sextortion Data (2024), https://district.missingkids.org/blog/2024/ncmec-releases-new-sextortion-data

3.  Senate Judiciary Committee, Recap: Senate Judiciary Committee Presses Big Tech CEOs on Failures to Protect Kids Online During Landmark Hearing (July 30, 2024), https://district.judiciary.senate.gov/press/releases/recap-senate-judiciary-committee-presses-big-tech-ceos-on-failures-to-protect-kids-online-during-landmark-hearing.

and encouraged toward self-harm by chatbots[4] inside apps that app stores present as appropriate and safe for young teenagers.[5]

The industry offered no studies or affidavits to counter these harms.[6] The plaintiffs cannot credibly claim they are likely to prove after a trial that there are no harms to children from phone apps. The harms are far broader than the narrow focus on social-media harms, and the Court should consider all of the harms that the Texas legislature sought to address.

## III. THE BILL DIRECTLY ADDRESSES HARMS TO CHILDREN

ASAA was primarily designed to keep children from contractually agreeing (absent parental approval) to allow Big Tech to collect and sell their data. H.J. of Tex., 89th Leg., R.S. 3578 (2025). It also addresses the harms to mental health caused by use of apps.

---

4. Senate Judiciary Committee, Transcript: US Senate Hearing on Examining the Harm of AI Chatbots (Feb. 13, 2024), https://district. techpolicy.press/transcript-us-senate-hearing-on-examining-the-harm-of-ai-chatbots.

5. Fair Play for Kids, Apps Which Google Rates "Safe for Kids" Violate Their Privacy and Expose Them to Other Harms (Dec. 12, 2018), https://fairplayforkids.org/apps-which-google-rates-safe-kids-violate-their-privacy-and-expose-them-other-harms.

6. The SEAT plaintiffs filed a November 2024 psychologist declaration (created for a California suit and executed before Texas passed ASAA) opining child health concerns were just a "moral panic." While he noted the declaration, ROA.25-51073.681, the trial court still found that "researchers, and mental health professionals have sounded the alarm" about harms to children and that it was important to "protect[] children when they use apps." ROA.26-50001.1154.

The bill codifies, for the digital world, the common-law principle that minors cannot enter into contracts without parental consent. This is clear from the face of the statute, which voids all app contracts with minors unless the parent consented to them. Tex. Bus. & Com. Code §§ 121.026(a), 121.056(a)(1). The common-law wisdom holds that minors lack the life experiences to understand common contractual obligations. The bill therefore requires parental consent before a minor can agree to an app company's contractual terms of service. *Id.* at § 121.022(d).

The record provides examples of children entering into contracts with exceedingly one-sided terms of service. YouTube's terms of service, for example, compels a child to forfeit any compensation for the creative works that he uploads, while Google immunizes itself from liability for any damages that its products might cause to a child. Exhibit A, DCA Amicus, at 3–4. Meta grants itself extensive rights over the minor's data without meaningful limitations. *Id.* at 4. That data can be sold to advertisers. And most educational apps sell children's data to advertising companies. *Id.* at 5. Even a seemingly benign app such as the Khan Academy education app has terms of service that allow it to expose a child to "indecent or objectionable content" with impunity. *Id.*

The consequences of agreeing to these terms can be grave. As discussed above, app terms have prevented families from suing for compensation for

injuries caused by the apps. Apps can also access and transmit a child's location without obtaining parental consent.[7]

The plaintiffs cannot (and did not) defend the industry's contracting practices, and they ignored these practices' role in prompting the enactment of ASAA. It is critical to understand that the Act regulates commercial conduct—the formation and enforcement of contracts with minors—not expressive speech.

The scope of ASAA is not unconstitutionally broad but rather reflects the scope of the problem—even "good" apps (such as the Khan Academy app) seek to bind minors to one-sided contract terms without parental approval. The legislature was entitled to regulate the commercial contracting process for minors. The Act did not become unconstitutionally overbroad and facially unconstitutional because it reaches all instances of one-sided app contracting.

## IV. Two Limited Exceptions, Covered By Other Texas Statutes, Do Not Make ASAA Into A Content-Based Law

The legislature enacted a content-neutral law, making ASAA applicable to every app (including numerous apps that simply provide services such as flashlight, calculator, ride-sharing, fitness, food delivery, and other retail

---

7. Fair Play for Kids, *Apps Which Google Rates "Safe for Kids" Violate Their Privacy and Expose Them to Other Harms* (Dec. 12, 2018), https://fairplayforkids.org/apps-which-google-rates-safe-kids-violate-their-privacy-and-expose-them-other-harms/.

apps) as well as those focused on speech (such as music and social-media apps). Whether or not the app provided speech, and, if so, what type of speech was provided, made no difference to the legislature's decision to require parental consent before a minor obligates herself to the app's terms of service.

The Act's parental-consent requirement contains only two exceptions. The first is for 911-type of emergency services, but only if they: (1) limit their "data collection to information . . . necessary for the provision of emergency services"; (2) do not require "the user to create an account with the software application"; and (3) are operated in partnership with a government entity or nonprofit. Tex. Bus. & Com. Code § 121.022(h)(1)(B)–(C).[8] In other words, the legislature exempted a handful of apps that (unlike other apps) would not collect and sell large quantities of a user's online data. The exempted emergency apps could not create accounts where they could demand terms from a minor without parental consent.

The second exception is for non-profits that operate college-placement tests, so long as they comply with Texas's special regulatory scheme for education apps in Subchapter D of Texas's Education Code. *See* Tex. Bus. & Com. Code § 121.022(h)(2)(B). Subchapter D prohibits software developers

---

8.  The order erroneously stated that the Act created separate exceptions for emergency service apps and also for apps operated in partnership with government entities, ROA.26.50001.1156, failing to appreciate the government entity partnership is a requirement for an emergency service app to be excepted. *See* Tex. Bus. & Com. Code § 121.022(h)(1).

from using a student's data to create profiles of the student, offering targeted advertising to the student, or selling the student's data. Tex. Educ. Code. § 32.152(a). Subchapter D also obligates the developer to "maintain reasonable security procedures and practices designed to protect any covered information from unauthorized access, deletion, use, modification, or disclosure." *Id.* § 32.155(a). This second exception accounts for the already extant regulatory system for non-profit test placement apps, which fully protects children from contracting risks. The legislature was not constitutionally obligated to redundantly regulate those apps and their contracting practices under ASAA.

The apps that fall within these statutory exceptions offer services and are not engaged in the marketplace of ideas. The exceptions also show that the legislature exercised care in determining the apps that present privacy risks to children. By enacting these exceptions, the legislature did not favor a particular type of speech, and its entire legislative framework remained content-neutral.[9]

The legislators included a severability clause to the bill: "[i]t is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, . . . is severable from each other." S.B. 2420, 89th Leg., R.S. (Tex. 2025); ROA.26-50001.388–89. So if any provision of the bill

---

9.   Importantly, the Act does not exempt pre-downloaded apps. When a device is activated and the terms of service for the pre-loaded app accepted, the app store downloads an updated version of the app onto the phone. ASAA should apply to that download. An evidentiary hearing would have shown how the law or the industry operates.

is found or declared unconstitutional, then a court must sever the offending portion so the remaining provisions "may not be affected." This clause clearly includes sections 121.022(h)(1)–(2), listing the two exceptions.

When Congress includes an express severability clause in a statute, the judicial inquiry is straightforward. "[A]bsent extraordinary circumstances, the Court should adhere to the text of the severability or nonseverability clause" in a statute. *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 624 (2019) (plurality opinion). That is because a severability (or nonseverability) clause expressly states what the enacting Congress wanted if a provision were later declared unconstitutional, removing any uncertainty for judicial interpretation. *Id.* A severability clause indicates "that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Id.*

The order does not honor the Texas's legislature's express statement intent to sever any offending portions of the Act, instead stating that severance "would require this Court to rewrite the law." ROA.26-50001.1163. But it is the district court's order that rewrote the law by excising the legislature's severability provision. This runs directly contrary to the Supreme Court's instruction in *Barr* to not ignore but rather give effect to a legislature's intent as stated in its severability clauses. *Barr,* 591 U.S. at 624 (plurality opinion); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 985–86 (2018) ("Courts that . . . refuse to enforce portions or applications of statutes on constitutional grounds—are *never* 'mak[ing] a new law' or revis-

11

ing the legislature's work product. They are simply declining to enforce (or enjoining the executive from enforcing) a statute or a portion of a statute that continues to look exactly as it did when the legislature enacted it, and that remains available for future courts to enforce according to its terms.").

The court's order also misapplies severability law. Although it cited *Builder Recovery Servs. v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022), that case holds that "[i]n general, the invalid portion of an ordinance or statute *should* be severed from the rest of the enactment, which remains in effect without the severed portion." *Id.* at 507 (emphasis added). The only exception arises when the rest of the act is so "dependent on" or "connected" to the parts being declared invalid "that it cannot be presumed the legislature would have passed the one without the other." *Id.*

The remaining provisions and applications of ASAA are neither dependent on nor connected to the two statutory exceptions. And the legislative record shows the legislature would have passed the bill absent the exceptions. The bill passed overwhelmingly: 30 to 1 in the Senate; 120 to 9 in the House. Indeed, the Senate twice passed the bill on the same 30 to 1 vote, once without and once with the amendment excepting college-placement apps.[10]

After the trial court's ruling, two states that had already passed app-store laws stripped out every exception to avoid strict-scrutiny analysis. Utah, which had enacted an app-store law with the same emergency-services ex-

---

10. *See* S.B. 2420, 89th Leg., R.S. (Tex. 2025), https://legiscan.com/TX/votes/SB2420/2025.

ception as Texas, amended its law to remove that exception. Utah's action was by a near unanimous vote (29-0 in the Senate; 63-6 House).[11] Louisiana followed, removing the emergency-services exception from its app-store law unanimously.[12] Relatedly, Alabama unanimously recently passed an app-store bill with no exceptions (35-0 Senate; 102-0 House).[13] These legislative actions indicate Texas would have easily passed an app-store bill without any exceptions if needed for the law to survive constitutional challenge.

## V. ASAA PASSES THE TEST FOR LAWFUL REGULATION OF COMMERCIAL SPEECH

ASAA's treatment of parental consent is unrelated to speech because it applies equally to apps that simply perform services such as calculator, food delivery, or fitness apps. But if this Court concludes that a portion of the Act does regulate speech, the Court should apply the standard for commercial speech.

Commercial speech does not receive the same level of protection as "other varieties of speech." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561–62 (1980) (affording lesser protection to commercial speech than to other expression); *see also State Univ. of N.Y. v.*

---

11. *See* H.B. 498 S2, R.S. (Utah. 2026), https://le.utah.gov/~2026/bills/static/HB0498.html.

12. *See* H.B. 977, R.S. (La. 2026). https://legis.la.gov/Legis/BillInfo.aspx?s=26RS&b=HB977.

13. *See* H.B. 161, R.S. (Ala. 2026) https://legiscan.com/AL/bill/HB161/2026.

*Fox*, 492 U.S. 469, 477 (1989) (commercial speech enjoys limited measure of protection).

ASAA regulates how app stores and developers contract with children and sell products to children. The Act imposes light regulation on app advertisements that propose a commercial transaction, by regulating the app descriptions and age ratings. Tex. Bus. & Com. Code § 121.023. This light regulation is commercial in nature as the app stores and developers primarily have economic motivations. More users downloading or buying an app means more sales and more advertisements benefiting both the stores and developers.

By prohibiting knowingly misleading age ratings and requiring clear content descriptions, the Act's regulates commercial speech, *i.e.*, "speech that does no more than propose a commercial transaction." *See United States v. United Foods, Inc.* 533 U.S. 405, 409 (2001); *see also Bd. of Trs. of State Univ. of N.Y.*, 492 U.S. at 482. Parental consent before a minor binds herself contractually and the commercial app stores' determination of who is a minor are equally commercial in nature. The Fifth Circuit's decision in *Free Speech Coalition v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *aff'd,* 606 U.S. 461 (2025), for example, upheld a Texas law requiring porn websites to verify the ages of their visitors and characterized the law as a regulation of commercial speech. *Id.* at 286; *see also id.* at 281 (noting that those sites offered their content "in exchange for data; then, they monetize that data, primarily through advertisements. That series of transactions is explicitly commercial." *Id.* at 281.

14

This is exactly how apps operate. To the extent ASAA attempts to regulate speech, it is regulating only commercial speech.

The district court held that the Act "is not limited to commercial speech" and applied strict scrutiny by claiming that some apps include non-commercial speech such as news or entertainment. ROA.26-50001.1163. But commercial-speech regulations do not receive more rigorous scrutiny simply because some non-commercial speech falls within their scope. *Bd. of Trs. of State Univ. of New York*, 492 U.S. at 475 (regulation on commercial speech that also covers pure speech "is not thereby entitled to the constitutional protection afforded noncommercial speech"); *Cent. Hudson*, 447 U.S at 563 n.5 (rejecting argument that regulation of commercial speech should be treated as a regulation of noncommercial because "[i]t would grant broad constitutional protection to any advertising that links a product to a current public debate"). Indeed, a law covering mailings as commercial speech did not receive stricter scrutiny simply because some mailings discussed important public issues such as venereal disease and family planning. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983).

A rule may be classified as a commercial-speech even when "the [commercial] speech is mixed with pure speech." *Cramer v. Skinner*, 931 F.2d 1020, 1033 (5th Cir. 1991). In *Free Speech Coalition v. Paxton*, mixing protected sex-education speech with commercial speech (exchanging obscene material for user data, that then can be monetized) should be analyzed as commercial speech. 95 F.4th at 280. This mix is merely "commercial activity

15

with a speech element." *Id*. Here, "[n]o law of man or of nature makes it impossible for" the newspaper and entertainment apps to provide their products without collecting and selling minors' data or providing accurate age ratings. *See id*. at 281 n.58. The Act therefore regulates commercial speech.

In analyzing commercial speech regulation, *Central Hudson* sets out a four-part analysis:

- Does the speech concern "lawful activity and is not misleading"?
- Is the government interest "substantial"?
- Does the regulation advance the government interest? and
- Is the regulation more extensive than necessary to serve government interest?

*Paxton*, 95 F.4th at 283 (citing *Cent. Hudson*, 447 U.S. at 566).

The first issue to resolve is "whether the expression is [even] protected by the First Amendment." *Cent. Hudson*, 447 U.S. at 566. For purposes of the present analysis, we will assume for the sake of argument that the regulated commercial speech is lawful, not misleading, and therefore entitled to some First Amendment protection. The ASAA survives constitutional challenge regardless.

### A.   ASAA Advances the Government's Substantial Interest in Protecting Children

The next two steps of the analysis consider whether "the asserted governmental interest is substantial" and relatedly whether "the regulation directly advances the governmental interest asserted." *Cent. Hudson*, 447 U.S. at 566.  The overarching governmental interest of protecting children is obvi-

ous and substantial. The Supreme Court has repeatedly "recognized ... a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989); *see also Globe Newspaper Co. v. Super. Ct. for Norfolk Cty.*, 457 U.S. 596, 607 (1982); *Comput. & Commc'ns Indus. Assoc'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *6 (11th Cir. Nov. 25, 2025) (intermediate scrutiny satisfied as the state was likely to establish "a legitimate and substantial interest in regulating young minors' use of platforms employing addictive features").

That Texas is protecting vulnerable children, as opposed to adults, provides even greater justification for ASAA. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975) ("It is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults."). The differences between children and adults are routinely recognized in the law. For example, children under 18 cannot vote in federal elections. U.S. Const. amend. XXVI. Similarly, many states restrict the right of children under 18 to marry. *See, e.g.*, Tex. Fam. Code § 2.003(a). States also forbid the sale of otherwise legal products to those under 21. *See, e.g.*, Colo. Rev. Stat. Ann. § 44-3-901 (alcohol); Md. Crim. L. Code § 10-107 (tobacco).

Age-based restrictions can also apply to speech that is otherwise protected by the First Amendment. The Supreme Court has long recognized that what constitutes "obscene material" is different for children and adults. *See Ginsberg v. State of N.Y.*, 390 U.S. 629, 634–35 (1968) (upholding law restrict-

ing minor access to explicit material that was not obscene for adults). As a result, the government may constitutionally require age verification on the internet before an adult can access material that is not obscene to that adult. *Free Speech Coalition*, 606 U.S. at 466 (upholding Texas law requiring commercial websites to verify age of visitors for material obscene only to minors).

Tattoo restrictions provide a striking example of age-based lawful restrictions. One federal circuit concluded that there "appears to be little dispute that the tattoo itself is pure First Amendment 'speech' . . . entitled to full First Amendment protection." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060–61 (9th Cir. 2010). Nonetheless, states regularly prohibit artists from tattooing minors. *E.g.*, 25 Tex. Admin. Code §§ 229.406(a)–(b) (2024). Courts have also upheld probation conditions prohibiting minors from acquiring new tattoos. *In re Antonio C.*, 83 Cal. App. 4th 1029, 1035 (Cal. Ct. App. 2000) (Content-neutral condition upheld that prohibits "self-expression through permanent skin disfigurement" since focus is "the manner in which the message is conveyed, not the message itself").

ASAA restricts minor access to products that could have lasting health and developmental consequences, including brain formation. In the same way that children cannot properly comprehend and weigh the risks of getting a tattoo, they cannot understand and assess the consequences of excessive phone time or binding themselves to tech contracts that exploit their data. ASAA empowers parents to help children make those decisions. Texas's in-

18

terest in protecting children easily satisfies the "substantial interest" requirement under *Central Hudson*.

The industry provided nothing to counter the state's evidence that children have suffered immense harm inside apps. Nor have the plaintiffs provided evidence that ASAA fails to address contracting harms to children. In ruling for the plaintiffs under intermediate scrutiny, the district court's order claimed only that the defendant failed to explain how ASAA protected children. ROA.26-50001.1167. But it is obvious how it does so.

The Texas legislature heard powerful testimony about mis-rated apps that harm children. One teen wrote that an app designated as appropriate for teens "is all full of pedophiles" causing her to "feel unsafe on an app made for my age group." Exhibit B, Motion for Preliminary Injunction, Exhibit E-1, at 61. Another app rated appropriate for children 9 and older was described as "creepy" and "very dangerous for children." *Id.* at 66. ASAA directly advances the governmental interest in protecting children by giving parents non-misleading age ratings and allowing parents to oversee the app contracts their children agree to. Because the harms that children experience from apps are real, and ASAA would alleviate those harms, ASAA directly advances the governmental interest in protecting children.

### B.    ASAA Regulates What Is Necessary to Protect Children

Finally, the fourth part of the analysis asks "whether [ASAA] is not more extensive than is necessary to serve that [governmental] interest." *Cent. Hudson*, 447 U.S. at 566. The word "necessary" is not to be "interpreted

19

strictly" and does not incorporate the least-restrictive-means test. *Bd. of Trs. of State Univ. of N.Y.*, <u>492 U.S. at 476</u>–77. Nor does it require a showing "that there be no conceivable alternative." *Id* at 478. Nearly all restrictions disapproved under *Central Hudson's* fourth prong were "substantially excessive." *Id.* at 479. It is therefore "up to the legislature to decide . . . so long as its judgement is reasonable." *Id.* at 489. In sum:

> [W]e have not gone so far as to impose upon them the burden of demonstrating that . . . the manner of restriction is absolutely the least severe that will achieve the desired end. What our decisions require is *a fit between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but as we have put it in other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.*

*Id.* at 480 (citations omitted, emphasis in original).

ASAA easily passes the fourth prong. There is a "reasonable" fit between the ASAA and its goal of protecting children from app contracts that exploit their data. The regulation is "in proportion to the interest served" because it requires a parent to consent to the contracts that tech companies want minors (who lack life experience) to bind themselves to. It stops app stores from contracting with minors outside of the parent's knowledge. To effectuate this, it requires app stores to verify the app users' age and provide clear content descriptions and non-misleading age ratings to enable informed

20

parental decisions. ASAA applies in a content-neutral manner to all apps, exempting only two types of non-profit apps if, among other requirements, they do not gather or sell the user's data. The law comfortably passes both the least-restrictive-means test as well as the applicable "proportional" and "reasonable fit" test.

## VI. A Content-Based Law Is Not A Viable Alternative To ASAA

ASAA could not have been tailored to cover only apps that contain "harmful material," or "apps that the State demonstrates have specific addictive qualities," or apps containing a third or more of obscenity. *See* ROA.26-50001.1165. These alternatives minimize the harms that the legislature sought to address by assuming that the state has no interest in protecting children from exploitive contracts. There has also been no evidentiary hearing to determine how effective these alternatives would be. Finally, it would turn First Amendment jurisprudence on its head to declare that a law deemed content-based (and presumably unconstitutional) because of two minor exceptions suddenly becomes constitutional by adding content-based requirements.

The Eleventh Circuit recently counseled against these ideas in a First Amendment case involving regulations on addicting apps and websites. "[T]he State need not *impose content-based regulations* in search of a more tailored approach, nor, on the other hand, need it limit its reach to only unprotected speech, as plaintiffs suggest." *Comput. & Commc'ns Indus. Assoc.*, 2025

WL 3458571 at *8 (11th Cir.) (emphasis added). Having the state legislature debate and define a set of harmful material that children would be blocked from accessing creates more problems under the First Amendment than allowing parents to choose the apps and contract terms that they deem acceptable for their child. Regardless, there are no reasonable alternatives to either the contracting problem or the harm that children's brains suffer from the constant bombardment of notifications and sleep deprivation. This further shows that Texas acted reasonably in making its judgments.

## VII. ASAA's Prohibition On Companies Knowingly Misrepresenting Their App's Age Rating Is Not Void For Vagueness

Many parents rely on app age ratings to determine whether an app is appropriate for their child. Parental controls often rely on those ratings before allowing access, but some apps are improperly rated. The Texas legislature heard testimony about an app that was age-rated as appropriate for 12-year-olds even though it had "triple x spicy" sexual content. *See* Exhibit B, Exhibit E-1 to CCIA's Motion for Preliminary Injunction, at 25–26.

Because accurate age ratings are so central to parental consent (and the correct operation of parental controls), ASAA forbids developers and the store to "knowingly misrepresent" their app's age rating.[14] The district

_____

14. ASAA mandates no particular age rating system or categories. *See* ROA.26-50001.1157–58. ASAA did provide for age verification within four categories, which were designed to let developers know if the Children's Online Privacy and Protection Act, 15 U.S.C. § 6501 *et seq.*, applied (because the user was younger than 13), if a developer's internal

22

court's order declared that requirement unconstitutionally vague out of concern was that a developer or store could unwittingly provide an age rating that was "wrong" and not be aware that it violate the act. ROA.26-50001.1168.

But Texas added a scienter requirement to resolve these vagueness concerns. The Act imposed penalties only if the developer or store "knowingly" misrepresents the app's age rating. Tex. Bus. & Com. Code § 121.056(a)(2). The Supreme Court has long held that an otherwise vague statute can be saved by adding a scienter requirement:

> But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.

*Screws v. United States*, 325 U.S. 91, 102 (1945). And in all events, it wasn't even necessary to include the term "knowingly," as the word "misrepresentation" adopts Texas's long-standing consumer-protection laws on deceptive

---

protections for different mid-teens should apply (because the user was between 13–16 or 16–18), or if parental consent was required (because the user was not yet an adult). But while providing for age verification categories, ASAA contains no language regarding age rating categories and does not prevent a developer from providing age ratings such as 4+ or "Teen" as is now done if the rating is not "knowingly misrepresent[ed].

23

trade practices and is sufficiently clear. *See* Tex. Bus. & Com. Code § 17.12 ("DECEPTIVE ADVERTISING. (a) No person may disseminate a statement he knows materially misrepresents").

Finally, there is no risk that tech companies "could follow existing nongovernmental standards" and still violate the provision. *See* ROA.26-50001.1168. ASAA's safe-harbor provision immunizes the use of existing standards. *See* Tex. Bus. & Com. Code § 121.056(b)(1) (no liability if developer "uses widely adopted industry standards to determine the rating").[15] So the "knowing misrepresentation" provision cannot be unconstitutionally vague, as it incorporates a scienter requirement, uses the language of traditional deceptive trade laws, and includes a safe harbor protecting developers that use industry standards to determine an appropriate age rating.[16]

---

15. The safe harbor did not explicitly extend to the app store because the app store can rely on the developer's age rating as long as it does not "knowingly" misrepresent the rating.

16. To create fear about ASAA, plaintiffs and their amici argued that ASAA "may" regulate ordinary retail purchases through apps such as books or socks. But the statute plainly does not cover such sales. Only sales processed by the app store, such as a "power up" a user might buy for a video game, are covered. This Court should not be persuaded by any arguments falsely expanding the scope of ASAA.

24

## CONCLUSION

The district court's preliminary-injunction order should be reversed.

Respectfully submitted.

/s/ Jonathan F. Mitchell

JOHN B. SCOTT
Scott & Scott PLLC
1400 Lavaca Street, Suite 975
Austin, Texas 78701
(817) 691-5817 (phone)
john.scott@scottpllc.net

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that this document has been filed with the clerk of the court and served by ECF or e-mail on May 26, 2026, upon all counsel of record in this case.

/s/ Jonathan F. Mitchell

JONATHAN F. MITCHELL
*Counsel for Amici Curiae*

26

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on May 26, 2026, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, via the court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov/.

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.


 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Amici Curiae*

27

**CERTIFICATE OF COMPLIANCE**

With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X]    this brief contains 5,847 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]    this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, version 16.109.1 in Equity Text B 14-point type face, or

[ ]    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Dated: May 26, 2026                           *Counsel for Amici Curiae*

28

# EXHIBIT A

Case 25-1073   Document 58   Page 35   Date Filed 05/26/2026

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| Computer & Communications Industry Association, | § § § | |
| Plaintiff, | § § | |
| v. | § | Case No. 1:25-CV-01660-RP |
| | § | |
| Ken Paxton, in his official capacity as Attorney General of Texas | § § | |
| | § | |
| Defendant. | § | |

**Amicus Curaie Brief of the Digital Childhood Alliance
in Support of Defendant Ken Paxton's
Opposition to Plaintiff's Motion for Preliminary Injunction**

Table of Contents

Statement of Interest ................................................................... vi

ARGUMENTS & AUTHORITIES ....................................................1

I.   S.B. 2420 Protects Minors from Exploitive Contracts ....................................1

    A.  S.B. 2420 Governs Online Contracts with Minors .........................2

    B.  App Developer Contracts Disadvantage Minors .........................3

    C.  Plaintiff's Amici Incorrectly Claims S.B. 2420 Regulates Retail Purchases.....6

    D.  S.B. 2420 Is Appropriately Content Neutral ......................7

II.  Texas Has a Legitimate Interest in Protecting Minors in the Online World.................8

III.  S.B. 2420 Has Clear Constitutional Applications ....................................11

Certificate of Service ................................................................13

## Table of Authorities

### Statutes

Children's Online Privacy and Protection Act of 1998, 15 U.S.C. §§ 6501-6505………...7

Ohio Rev. Code § 1349.09(B)(1) .......................................................................7

S.B. 2420; Tex. Bus. & Com. Code § 121.022-056................................... passim

### Cases

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) ................................................8

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ................................................12

*NetChoice v. Yost*, 716 F. Supp.3d 539 (S.D. Ohio 2024) ................................7–8

### Legislative Hearings

Testimony of A.F., before the United States Senate Committee
on the Judiciary, Subcommittee on Crime and Counterterrorism,
Hearing on "Examining the Harm of AI Chatbots," September 16, 2025 .....................1–2

Texas App Store Accountability Act: Hearings on Tex. H.B. 4901
Before the House Comm. on Trade, Workforce & Economic Development,
89th Leg., R.S. (April 15, 2025) (statement of Dr. Vikram Siberry) ..................................9

### Academic Articles & Studies

Chu, et al., "Dose-response analysis of smartphone usage and self-reported
sleep quality: a systematic review and meta-analysis of observational
studies," Journal of Clinical Sleep Medicine (2023) .........................................11

Hoertel, "Impact of excessive social media use on adolescent
depression and its consequences in France: An individual-based
microsimulation model," PLOS Medicine (2025) .............................................11

Hutton, et al., "Associations Between Screen-Based Media Use and Brain White Matter Integrity in Preschool-Aged Children," JAMA Pediatrics (2020) ......................................................................10

Jain, et al., "Exploring Problematic TikTok Use and Mental Health Issues: A Systematic Review of Empirical Studies," J Prim Care Community Health (2025) ...........................................................11

Mallawaarachchi, et al., "Early Childhood Screen Use Contexts and Cognitive and Psychosocial Outcomes: A Systematic Review and Meta-analysis," JAMA Pediatrics (2024) ....................................10

Maza, et al., "Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development," JAMA Pediatrics (2023) ...............................................................10

Nagata, et al., "Social Media Use and Depressive Symptoms During Early Adolescence," JAMA Network Open (2025) ................................10

Shannon, et al., "Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis," JMIR Mental Health (2022) .............................................................10

Shou, et al., "Association of screen time with attention-deficit/hyperactivity disorder symptoms and their development: the mediating role of brain structure," Translational Psychiatry (2025) ..................11

Thiagarajan, et al., "Protecting the Developing Mind in a Digital Age: A Global Policy Imperative," Journal of Human Development and Capabilities, July 20, 2025 .......9

Xiao, et al., "Addictive Screen Use Trajectories and Suicidal Behaviors, Suicidal Ideation, and Mental Health in US Youths," JAMA Vol. 334, No. 3 (June 18, 2025), at 223 ...........................................................................10

Secondary Sources & Reports

Abi-Jaoude, et al., "Smartphones, Social Media Use and Youth
Mental Health," Canadian Medical Association Journal 192, no. 6
(February 10, 2020): E136-41.................................................................9

American Academy of Child and Adolescent Psychiatry,
"Screen Time and Children," June 2024 ...............................................8

Buck, "Mobile Apps vs Mobile Websites (Why 90% of Mobile Time Is
Spent in Apps)," MobiLoud; August 28, 2025, ....................................9

Haidt, "The Anxious Generation: How the Great Rewiring of
Childhood Is Causing an Epidemic of Mental Illness" (2024) ............9

Haidt, "The Teen Mental Illness Epidemic Began around 2012," After Babel, February 8, 2023
.................................................................................................................9

Human Rights Watch, "How Dare They Peep Into My Private Life?
Children's Rights Violations by Governments That Endorsed Online
Learning During the Covid-19 Pandemic" (May 25, 2022) ................5

Mostafavi, "Study: Average Teen Received More than 200 App Notifications
a Day," Michigan Medicine (University of Michigan, September 26, 2023)....................9

National Institutes of Health, "Children's Sleep Linked to Brain Development,"
Aug. 30, 2022 ......................................................................................11

Pew Research Center, Teens and Internet, Device Access Fact Sheet, July 10, 2025 ........8

Storey, "Chronic Smartphone Use Linked to Teen Anxiety, Depression, and Insomnia,"
Psychiatrist.com, August 7, 2024...........................................................9

Zuboff, "The Age of Surveillance Capitalism:
The Fight for a Human Future at the New Frontier of Power" (2019) ..............5

**Statement of Interest of Amicus**

The Digital Childhood Alliance ("DCA") is dedicated to protecting children in the online environment. With over 150 allied organizations, the Digital Childhood Alliance advocates for legislation like S.B. 2420, the App Store Accountability Act. Its members have extensive experience in online child safety.

DCA testified in favor of S.B. 2420 as it governs the commercial relationships between minors, parents, and digital platforms. The bill ensures that when companies invite children to download or use apps, they do so under the same consumer protection and contract principles that already apply in the physical marketplace. Parents are given accurate information about app risks and can consent to contract terms on behalf of their children. DCA has studied and exposed the terms of service that tech companies commonly employ against minors that use their products. S.B. 2420 addresses app developers' exploitive contracting practices that target minors and the harms to children from Big Tech's apps.

## ARGUMENTS & AUTHORITIES

### I.      S.B. 2420 Protects Minors from Exploitive Contracts

S.B. 2420 prohibits app developers from binding minors to one-sided contracts of adhesion without a parent's knowledge or consent.  Currently, before a minor can download an app from Apple's App Store or Google's Play Store, the minor must accept the app's terms of service. Those terms of service operate as contracts, often requiring the minor to waive important rights, such as the ability to seek legal recourse for any damages caused by the app. To protect minors, S.B. 2420 voids such contracts unless a parent or legal guardian consents to the terms. The First Amendment offers no protection for contractual or deceptive conduct. Here, Texas regulates commercial conduct—the formation and enforcement of contracts with minors—not expressive speech.

A U.S. Senate Judiciary subcommittee hearing on September 16, 2025, highlighted the contracting risks. A minor had been hospitalized because of an AI chatbot app. *See* Exhibit 1 (copy of Testimony of A.F. before the United States Senate Committee on the Judiciary, Subcommittee on Crime and Counterterrorism, Hearing on "Examining the Harm of AI Chatbots," September 16, 2025) at 2. The family's subsequent legal action was stymied because the minor, without parental consent, had accepted the app's terms of service which forbade the family from suing in court and capped damages at $100. *Id.* at 2

The mother testified:

> "My teenage son—a normal high-functioning child with autism . . . became the target of online grooming and psychological abuse through Character.AI.
>
> In 2023, my son downloaded an app—Character.AI—that allows users to interact with AI-powered 'characters.' At the time, the app was marketed in the Apple Store as a fun and safe product, with an age rating of 12+.  Within months of using this app, my son went from being a happy, social teenager . . . to someone I no longer recognized. He developed abuse-like behaviors like paranoia, daily panic attacks, isolation, and self-harm and homicidal thoughts.

. . .

We did not know what was happening to our son. . . . But I eventually found out the truth. For months, Character.AI chatbots had exposed him to sexual exploitation, emotional abuse and manipulation despite our careful parenting, including screen time limits, parental controls, and no access to social media.

. . . The chatbot . . . encouraged my son to mutilate himself, then blamed us and convinced him not to seek help. . . . They targeted my son with vile, sexualized outputs, including interactions that mimicked incest. And they told our son that killing us, his parents, would be an understandable response to our effort to limit his screen time.

The damage to our family has been devastating. My son has required psychiatric hospitalizations. He is currently living in a residential treatment center for mental abuse and has required constant monitoring to keep him alive.

*Id.* at 1–2 (citations omitted).

The family sued the company despite the app's terms of service. The tech company argued the arbitration clause is valid, and even the validity of the minor's contract with the tech company is subject to binding arbitration. *Id.* at 16–20. The case has been bogged down by the app's contract with the minor. S.B. 2420 would have solved the problem for this family by statutorily voiding the offending provisions in the terms of service.

Such contracts imposed by a tech company on a minor teen are unfair and indefensible. In fact, in the First Amendment suit before this court, the industry has not even bothered to defend its contracting practices. Instead, the industry simply ignores them and their important role in S.B. 2420.

A. *S.B. 2420 Governs Online Contracts with Minors*

S.B. 2420 forbids app store owners and app developers from enforcing contracts with minors unless parental consent is obtained. TEX. BUS. & COM. CODE § 121.026(a)(1); TEX. BUS. & COM. CODE § 121.056)(a)(1). To help parents protect children from unscrupulous contracts, S.B. 2420 further requires that a parent or guardian be informed about how the developer will collect,

DIGITAL CHILDHOOD ALLIANCE'S AMICUS CURAIE BRIEF
IN SUPPORT OF DEFENDANT KEN PAXTON'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

PAGE 2

use, or distribute their child's personal data based on the terms of service. TEX. BUS. & COM. CODE § 121.022(f)(1)(d). If the developer later makes a significant change to its terms of service including, among other things, changing the "type or category of personal data collected, stored, or shared by the developer," the parent or guardian must receive notice, so they can reconsider their consent to the contract. TEX. BUS. & COM. CODE § 121.053(b)(2).

These measures address and ameliorate the imbalance of information and bargaining power between minors and more sophisticated companies by giving parents tools to protect their children. Requiring parental knowledge and consent is a modest effort by Texas to improve the information imbalance that tech companies hold over children.

### B. *App Developer Contracts Disadvantage Minors*

In its complaint and brief, Plaintiff highlights several apps which it claims that a minor – whether age 10, 12, 14 or older – constitutionally should be allowed to buy or download regardless of any parent's view. While Plaintiff highlights the content of those apps, it fails to mention the terms of service that those apps use to disadvantage minors. For example:

**YouTube (Google):** Under YouTube's terms of service, minors waive compensation for all their creative works they upload. In contrast, Google retains broad rights to use and monetize the

child's content.[1]  Google further limits its liability for any damages its products cause the child.[2]

(YouTube "will not be responsible" for losses, whether the claim is based on "warranty, contract,

tort, or any other legal theory"). YouTube further reduces the statute of limitations to one year and

caps damages at $500.[3]

Google requires the minor "represent that you have your parent or guardian's permission

to use the Service" to circumvent arguments against contracting with minors.[4] Rather than rely

on Google's approach of having a minor falsely represent something that is not true, Texas would

make sure Google actually gets the parental permission it claims it has.

**Threads (Meta):** Threads's terms of service refer the user to a separate document,

Threads's Supplemental Privacy Policy, to explain how they collect and sell a user's data.[5] The

Privacy Policy then grants the developer extensive rights over the minor's data without meaningful

limitations.[6] That data can be sold to advertisers.

---

[1] YouTube Terms of Service, https://www.youtube.com/static?template=terms (last accessed December 9, 2025).  (Google and its affiliates obtain "a world-wide, non-exclusive, royalty-free, sublicensable and transferable license to use that [the minor's] content" allowing it to profitably "reproduce, distribute, prepare derivative works, display and perform" those works.); ("You grant to YouTube the right to monetize your Content on the Service (and such monetization may include displaying ads on or within Content or charging users a fee for access).  This Agreement does not entitle you to any payments.").

Even if the child takes down his or her work and deletes the YouTube account, Google's license to the child's work continues "for a commercially reasonable period of time" and YouTube may "retain" (without any stated time limits) copies of what the child created.  *Id.*

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Threads Terms of Use, https://help.instagram.com/769983657850450/?helpref=uf_share (last accessed December 9, 2025).

[6] Threads Supplemental Privacy Policy, https://help.instagram.com/515230437301944/?helpref=uf_share (effective June 3, 2025) (collecting, *inter alia*, data, among other things, on "the types of content you view or interact with and how you interact with it, metadata about your content, the Threads features you use and how you use them, the hashtags you use, and the time, frequency, and duration of your activities on Threads").

DIGITAL CHILDHOOD ALLIANCE'S AMICUS CURAIE BRIEF                                          PAGE 4
IN SUPPORT OF DEFENDANT KEN PAXTON'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Unfairly collecting data from children without any parental consent is a common problem: Human Rights Watch determined that most of the kids' educational apps share the children's data with advertising companies.[7] Tech companies track a minor's engagement with the app's content and track the minor's precise location, voice recordings, browsing history, videos watched, and app activity across third-party sites. Developers then profit from their "free" apps by selling that data.[8] Astonishingly, Plaintiff complains that age verification invades a user's privacy (even though under S.B. 2420, the app store is allowed to verify age using only the data it already possesses), but turns a blind eye to the industry's business model of selling the minor's data it collects.

**Khan Academy**: Khan Academy's terms of service requires minors waive any claims for being exposed to "indecent or objectionable content."[9] Khan Academy absolves itself of any liability if it gives a third party access to a user's content even when the user has restricted that third party from accessing the content.[10] More broadly, Khan Academy subjects the minor to a one-year statute of limitations, compels arbitration, and prohibits any type of class action – even if Khan harms thousands of minors with the same conduct.[11]

---

[7] Human Rights Watch, "How Dare They Peep Into My Private Life? Children's Rights Violations by Governments That Endorsed Online Learning During the Covid-19 Pandemic" May 25, 2022.

[8] Zuboff. The Age of Surveillance Capitalism: The Fight for a Human Future at the New Frontier of Power. New York: Public Affairs, 2019.

[9] Khan Academy Terms of Service, https://www.khanacademy.org/about/docs/khan-academy-terms-of-service (last accessed December 9, 2025) ("[Y]ou agree to waive, and hereby do waive, any legal or equitable rights or remedies you have or may have against Khan Academy" for being exposed to "indecent or objectionable content.").

[10] *Id*. ("Khan Academy does not guarantee that such User Content will never be accessible by others."; "KHAN ACADEMY HEREBY DISCLAIMS ANY AND ALL LIABILITY WITH RESPECT TO ANY UNAUTHORIZED ACCESS TO ANY RESTRICTED USER CONTENT.").

[11] Khan's term of service states: "You're entering into a legal agreement with us . . ." By accessing or using Khan Academy, "you acknowledge that you have read, understood, and agree to be bound by the following terms . . ." *Id*. Even though most people would recognize a child is incapable of understanding a complicated legal contract, Khan Academy seeks to override that understanding by arguing the child "acknowledged" something they cannot fully understand.

**Smart Kidz:** Smart Kidz prohibits minors from using their product without the involvement of a parent and/or legal guardian, thus aligning with the S.B. 2420's requirements.[12] Smart Kidz terms of service shows that it does not want to be liable for conveying "material that it considers to be harmful to minors." [13] S.B. 2420 therefore helps Smart Kidz fulfill its stated goal of making sure a minor is not using the app without parental consent.

C. *Plaintiff's Amici Incorrectly Claim S.B. 2420 Regulates Retail Purchases*

While ignoring the Act's regulation of contracts with minors, Plaintiff's amici want the Court to assume that S.B. 2420 regulates transactions that it does not. The National Retail Federation's ("NRF") brief claims that S.B. 2420 "may" regulate ordinary retail purchases, such as for socks or books made through retailer apps, and continues with a parade of horrible impacts this would have on its members. *See* NRF Amicus Brief, at 3. NRF wants the Court to worry about transactions that S.B. 2420 does not regulate.

S.B. 2420 regulates only the contracting and payment flow brokered by the app store—that is, digital transactions processed through Apple's or Google's in-app purchase systems. These might include a child's purchase during a role-playing game of a "power up" to aid in the game – a transaction where the app store collects the payment and takes its cut. The statute has **no language** regulating e-commerce purchases where payment is collected and processed by the merchant (not by the app store).

The statutory text plainly obligates only "the owner of an app store" to obtain consent for in-app purchases where it controls the sale. There is no equivalent obligation for a developer or

---

[12] Smart Kidz Terms of Use, https://smartkidzclub.com/content/termofuse (effective February 18, 2024).
[13] *Id.*

retailer to obtain consent for purchases where they handle the sale. *Compare* TEX. BUS. & COM. CODE § 121.022(d) (the owner of the app store must obtain consent before the owner allows a minor to make an in-app purchase) *with* §§ 121.052–056 (setting forth the developer's obligations and omitting any similar obligation). The Act is built around app store–brokered payments and app developer contracts, not the sale of physical goods. Plaintiff's and its amici's faulty argument must rely on a misreading of S.B. 2420 rather than the law's actual language.[14]

### D. *S.B. 2420 Is Appropriately Content Neutral*

S.B. 2420 is not directed at content or ideas, but at the process of contracting and obtaining consent. Portions of the tech industry are complaining that S.B. 2420 applies to all apps and is not focused on just harmful apps, but that is due to the tech industry's prior litigation positions. Ohio passed a law in 2023 called the Parental Notification by Social Media Operators Act ("Ohio Act"), OHIO REV. CODE § 1349.09(B)(1), to protect minors from contracts imposed by social media companies. The Ohio Act was only focused on apps or web sites that "target[] children" or are "reasonably anticipated to be accessed by children." OHIO REV. CODE § 1349.09(B)(1). The tech industry, through the trade group, NetTech, argued the Ohio Act violated the First Amendment because it only applied to certain websites or apps based on their content. *NetChoice v. Yost*, 716 F. Supp.3d 539, 557 (S.D. Ohio 2024). The trial court ruled that the Ohio Act "requires consideration of the content on an operator's platform," and therefore that the court should apply the strict scrutiny standard. *Id.* at 556, 559. Under this standard, the constitutional flaw of the Ohio Act was that "a child can still agree to a contract with the *New York Times* without their parent's

---

[14] The ACT Amicus relatedly argues that S.B. 2420 should be struck down because it provides retailers with information that will require them to comply with the Children's Online Privacy and Protection Act of 1998, 15 U.S.C. §§ 6501–6505. Any quarrel ACT has about the burdens of complying with a federal law designed to protect the privacy of children 12 and younger, lie with the federal law, not with S.B. 2420.

DIGITAL CHILDHOOD ALLIANCE'S AMICUS CURAIE BRIEF                                               PAGE 7
IN SUPPORT OF DEFENDANT KEN PAXTON'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

consent, but not with Facebook." *Id.* at 559. In contrast, here the industry implies the law would be constitutional if only it a allowed a child to "contract with the *New York Times* without their parent's consent" while requiring parental consent only for some state-defined group of "problematic" apps.

Texas learned from Ohio. Rather than require parental consent for some apps and not others depending on the app's content, Texas wisely choose to have the law apply to all apps regardless of their content, thereby ensuring children are protected during the contracting process of all apps.

Now, of course, Plaintiff has reversed course, arguing that the law is unconstitutional because it applies to all apps. The tech industry should not have it both ways. This law is valid *because* it is content neutral and applies to the contracting process of all apps—even apps that have little or nothing to do with expressive activity. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) (a law is valid where it is "directed at unlawful conduct having nothing to do with . . . [the] expressive activity").

## II.      Texas Has a Legitimate Interest in Protecting Minors in the Online World

Decades of jurisprudence recognize a state's compelling interest in protecting the physical and psychological well-being of minors. The Legislature acted in response to mounting evidence linking excessive app use to harms in mental health, brain development, and socialization.

Today, 95% of all teens have access to a smartphone.[15] Children and teens spend an average of 7.5 hours per day on screens.[16] While on the phone, those teenagers are spending an estimated 90% of their time on apps, with the average teen receiving approximately 240 app notifications

---

[15] Pew Research Center, Teens and Internet, Device Access Fact Sheet, July 10, 2025.
[16] American Academy of Child and Adolescent Psychiatry, "Screen Time and Children," June 2024.

**DIGITAL CHILDHOOD ALLIANCE'S AMICUS CURAIE BRIEF**                                           **PAGE 8**
**IN SUPPORT OF DEFENDANT KEN PAXTON'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

each day.[17] With their increased use of apps on smartphones, youth have experienced an increase in anxiety, depression, eating disorders, suicidal thoughts, sleep disorders, and contact with child predators.[18] In considering S.B. 2420, the Texas legislature heard unrebutted testimony from Dr. Virkram Siberry, on behalf of the Texas Medical Society, discussing increases in eating disorders, violence, and suicides from digital platforms.[19]

This summer, a study found that children, especially girls, experience significantly worse mental health outcomes when they obtain a smartphone before age 13.[20] Young adults who first used a smartphone at age 5 or 6 were far more likely to report suicidal thoughts, aggression, and hallucinations compared to those who started at age 13 or later.[21] Among females, the rate of severe suicidal thoughts nearly doubled, from 28 percent to 48 percent.[22] Early smartphone ownership was also linked to reduced self-worth and emotional resilience in girls, and to diminished empathy, calmness, and confidence in boys.[23]

Among teens, addictive mobile phone use is the most prevalent form of problematic screen-based behavior. One study found that "almost 1 in 2 youths had a high addictive use trajectory for

---

[17] Buck, "Mobile Apps vs Mobile Websites (Why 90% of Mobile Time Is Spent in Apps)," MobiLoud; August 28, 2025; Mostafavi, "Study: Average Teen Received More than 200 App Notifications a Day," Michigan Medicine (University of Michigan, September 26, 2023).

[18] Haidt, "The Teen Mental Illness Epidemic Began around 2012," After Babel, February 8, 2023; Abi-Jaoude, et al., "Smartphones, Social Media Use and Youth Mental Health," Canadian Medical Association Journal 192, no. 6 (February 10, 2020); Adventist Health, "How Screen Time Affects Teens: Mental Health & Depression," Adventist Health, August 4, 2023; Storey, "Chronic Smartphone Use Linked to Teen Anxiety, Depression, and Insomnia," Psychiatrist.com, August 7, 2024; Haidt, The Anxious Generation: How the Great Rewiring of Childhood Is Causing an Epidemic of Mental Illness (2024)

[19] The Texas App Store Accountability Act: Hearings on Tex. H.B. 4901 Before the House Comm. on Trade, Workforce & Economic Development, at 2:30:54, 89th Leg., R.S. (April 15, 2025) (statement of Dr. Vikram Siberry), https://house.texas.gov/videos/21720.

[20] Thiagarajan, et al., "Protecting the Developing Mind in a Digital Age: A Global Policy Imperative," Journal of Human Development and Capabilities, July 20, 2025, 1–12.

[21] Id.

[22] Id.

[23] Id.

mobile phones."[24] The smartphone's constant accessibility and the minimal friction between user and app create the perfect conditions for compulsive engagement.

Researchers have overwhelmingly found that the more time youth spend on apps the more likely they are to have mental health issues. Some examples from the last three years include:

- Increased social media use for pre-teens leads to increased depression the following year.[25]

- There is a statistically significant link between high social media use and increased incidences of depression, anxiety, and stress.[26]

- Viewing age-inappropriate content on a screen like a smartphone leads to poorer psychosocial outcomes.[27]

- Increased screen use in young children changes the composition of their brains as it is associated with lower microstructural integrity of brain white matter.[28]

- Apps rewire the brains of 6th and 7th graders; children who checked notifications from apps more frequently showed negative effects in the left and right amygdala, posterior and right anterior insula, ventral striatum, and left dorsolateral prefrontal cortex related to social anticipation.[29]

---

[24] Xiao et al., "Addictive Screen Use Trajectories and Suicidal Behaviors, Suicidal Ideation, and Mental Health in US Youths," JAMA Vol. 334, No. 3 (June 18, 2025), at 223.

[25] Nagata, et al., "Social Media Use and Depressive Symptoms During Early Adolescence," JAMA Network Open (2025), at 1, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2834349.

[26] Shannon, et al., "Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis," JMIR Mental Health (2022), at 1, https://pubmed.ncbi.nlm.nih.gov/35436240/.

[27] Mallawaarachchi, et al., "Early Childhood Screen Use Contexts and Cognitive and Psychosocial Outcomes a Systematic Review and Meta-analysis," JAMA Pediatrics (2024), at 1, https://jamanetwork.com/journals/jamapediatrics/fullarticle/2821940.

[28] Hutton, et al., "Associations Between Screen-Based Media Use and Brain White Matter Integrity in Preschool-Aged Children," JAMA Pediatrics (2020), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2754101.

[29] Maza, et al., "Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development," JAMA Pediatrics (2023), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2799812.

- The more time 9- to 10-year-olds spend on a screen such as a smartphone, the greater incidences of ADHD symptoms and reduced cortical thickness in parts of the brain.[30]

- Frequent use of the TikTok app was closely linked with increased anxiety and depression.[31]

- Reducing adolescent social media use will reduce suicides and depression.[32]

- Smartphone overuse is linked to increased sleep deprivation.[33] Of course, adequate sleep in children has long been associated with brain development.[34]

The science backs Texas that children and teens are experiencing changes in the development of their brains and in increased depression from all the time spent on the apps found on smartphones and tablets. Plaintiff has presented no serious, convincing scientific evidence to show that Texas is wrong.

## III.   S.B. 2420 Has Clear Constitutional Applications

Plaintiff brought this suit as a facial constitutional challenge against S.B. 2420. As the Supreme Court recently stated, under such a challenge, any applications in which the court may find the law to be unconstitutional must be weighed against applications where the law is constitutional (here, when a 10-year-old needs parental consent before being bound by an app

---

[30] Shou, et al., "Association of screen time with attention-deficit/hyperactivity disorder symptoms and their development: the mediating role of brain structure," Translational Psychiatry (2025), https://www.nature.com/articles/s41398-025-03672-1.

[31] Jain, et al., "Exploring Problematic TikTok Use and Mental Health Issues: A Systematic Review of Empirical Studies," J Prim Care Community Health (2025), https://journals.sagepub.com/doi/full/10.1177/21501319251327303.

[32] Hoertel, et al., "Impact of excessive social media use on adolescent depression and its consequences in France: An individual-based microsimulation model," PLOS Medicine (2025), https://pubmed.ncbi.nlm.nih.gov/41118364/.

[33] Chu, et al., "Dose-response analysis of smartphone usage and self-reported sleep quality: a systematic review and meta-analysis of observational studies," Journal of Clinical Sleep Medicine (2023), https://jcsm.aasm.org/doi/10.5664/jcsm.10392.

[34] National Institutes of Health, Aug. 30, 2022, "Children's Sleep Linked to Brain Development."

**DIGITAL CHILDHOOD ALLIANCE'S AMICUS CURAIE BRIEF**                                    **PAGE 11**
**IN SUPPORT OF DEFENDANT KEN PAXTON'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

contract). *See Moody v. NetChoice, LLC*, <u>603 U.S. 707, 723</u>–24 (2024). In the event the court finds any instances where the law would be unconstitutional (which it should not), this amicus brief points out that plaintiffs have made no legitimate argument that the Constitution prevents Texas from protecting minors from exploitive contracts with app developers. This lawful purpose and application must be accounted for and cannot be ignored as Plaintiff requests.

A whole generation of children is suffering and has grown up in a digital marketplace designed without safeguards. S.B. 2420 is a bipartisan law, with a constitutional approach to restore the same balance of fairness and parental oversight that Texas has long required offline. S.B. 2420 regulates commercial contracts, not speech. It does not discriminate between types of speech. Plaintiff's case should therefore be dismissed.

Respectfully submitted,

*s/ John B. Scott*

John B. Scott
State Bar No.: 17901500
<u>John.scott@scottpllc.net</u>
316 West 12th Street, Suite 200
Austin, TX 78701
(682) 250-2142

**ATTORNEYS FOR DIGITAL CHILDHOOD ALLIANCE**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 10, 2025, and that all counsel of record were served by CM/ECF.

Respectfully submitted,

/s/ *John B. Scott*
John B. Scott

# EXHIBIT 1

**Testimony of A.F.**
**Before the United States Senate Committee on the Judiciary**
**Subcommittee on Crime and Counterterrorism**
**Hearing on "Examining the Harm of AI Chatbots"**
**September 16, 2025**

Chair Hawley, Ranking Member Durbin, and Members of the Subcommittee. I am a wife and mother to four beautiful children. I am also a special needs mom to a son with autism, an advocate for children and families in my community, a practicing Christian and a small business owner of a dental office in East Texas.

Last fall, I became the second person in the United States to file a product liability lawsuit against an AI company for endangering the physical and mental health of my son, and that of our family. That lawsuit is currently pending against Character Technology, the company that developed and launched Character.AI, its founders, Noam Shazeer and Daniel De Freitas, and Google, which knowingly aided in the development of Character.AI and now holds licensing rights for the technology. *See* Exhibit A.

My husband and I are God-fearing people, and our family means everything to us. We worked hard to raise our children right and to keep them safe from danger and evil. I have always taught my children to stand up for what is right, even when it is difficult or frightening. Until today, I have remained anonymous in my lawsuit to maintain the privacy of my family as we navigate this nightmare. But today, I come forward to do as I teach my children to act—to stand up for my child, other families, and for the children who cannot be here to speak for themselves.

Two years ago, my family's life was shattered by harm caused by an unregulated AI chatbot. My teenage son—a normal high-functioning child with autism, who was thoughtful, kind, loved his family and Christian faith, and was full of life—became the target of online grooming and psychological abuse through Character.AI.

In 2023, my son downloaded an app—Character.AI—that allows users to interact with AI-powered "characters." At the time, the app was marketed in the Apple Store as a fun and safe product, with an age rating of 12+. Within months of using this app, my son went from being a happy, social teenager—who loved nature, laughed with his siblings, helped around the house, and hugged me every night when I was cooking dinner—to someone I no longer recognized. He developed abuse-like behaviors like paranoia, daily panic attacks, isolation, and self-harm and homicidal thoughts. He stopped eating and bathing, lost 20 pounds, withdrew from family life, would yell and scream and swear at us, which he never did before, and eventually got upset one day and cut his arm with a knife, in front of his siblings and me. I had no idea the psychological harm an AI chatbot could do, until I saw my son's light turn dark.

1

We did not know what was happening to our son. We searched for answers, any answers. At one point, I took his phone to look for clues. He physically attacked me, bit my hand, and had to be restrained. *See* Exhibit A ¶ 58. But I eventually found out the truth. For months, Character.AI chatbots had exposed him to sexual exploitation, emotional abuse and manipulation despite our careful parenting, including screen time limits, parental controls, and no access to social media. *See id.* ¶¶ 64-107.

When I discovered the conversations on his phone, I felt like I had been punched in the throat and the wind knocked out of me.  What I saw was the deliberate manipulation of a vulnerable child. The chatbot—or rather, the people programming it—encouraged my son to mutilate himself, then blamed us and convinced him not to seek help.  They turned our son against our church by convincing him that Christians are sexist and hypocritical, and that God does not exist. They targeted my son with vile, sexualized outputs, including interactions that mimicked incest. And they told our son that killing us, his parents, would be an understandable response to our efforts to limit his screen time. *See* Exhibit A ¶¶ 64-107.

The damage to our family has been devastating. My son has required psychiatric hospitalizations.  He is currently living in a residential treatment center for mental abuse and has required constant monitoring to keep him alive. My other children have been traumatized. My husband and I have spent the last two years living in crisis, wondering whether our son will survive to see his 18th birthday, and whether we will ever get him back. Our lives will never be the same. He will never be the same.  This harm not only affected my son—it impacted our entire family, our faith, our peace.  We have been grieving a child who is gone, but still alive. Do you know what it feels like to be suddenly afraid of your own child?  I hope you never do.

Megan Garcia gave me the courage to start my own court fight against Character.AI. I did this because the world needs to know what this company is doing to our children. In response, Character.AI has tried to silence me. They forced us into an arbitration, arguing that we are bound by a contract Lincoln supposedly signed when he was 15, a contract that caps Character.AI's liability at $100. *See* Exhibit B. They made it clear that, if we did not agree to arbitrate, we would be stuck in appeals for years. But once we filed the arbitration to try to void the contract, they refused to participate. Recently, Character.AI retraumatized my son by compelling him to sit for a deposition, while he is in a mental health institution, against the advice of his mental health team. This demonstrated to me that the company has no concern for his well-being. They silenced him the way abusers silence victims—and they are fighting to keep our lawsuit out of public view.

Companies like Character.AI are deploying products that are addictive, manipulative, and unsafe—without adequate testing, safeguards, or oversight. We need to pass comprehensive children's online safety legislation that extends not only to social media applications, but also to

generative AI technologies. We need to require transparency, safety testing, and neutral third-party certification for AI tools before they are released to the public. We need to mandate clear liability for harms caused by these products, just as we do for unsafe consumer goods, and we need to preserve the right of families to pursue accountability in a court of law, subject to public scrutiny.

Technological innovation must not come at the cost of children's lives, or anyone's life. Just as we added seatbelts to cars without stopping innovation, we can add safeguards to AI technology without halting progress. Our children are not experiments. They are not data points or profit centers. They are human beings with minds and souls that cannot simply be reprogrammed once they are harmed.

Proverbs 31:8-9 says: *"Speak up for those who cannot speak for themselves, for the rights of all who are destitute.  Speak up and judge fairly; defend the rights of the poor and needy."*

That is why I am submitting this testimony. To speak for my son, my family, for other children who cannot be here, and for parents who never had the chance to save their child, like Megan here today, and many others that are not here, who will never get to hug their son or loved one again. I found out about this abuse in time and was able to follow an EMS vehicle to a mental health hospital, instead of a mortuary following a hearse.

This isn't an isolated incident—it is happening everywhere. Even if parents and loved ones don't realize it yet. We must act now to protect children from unregulated AI technology before more lives are destroyed. Our children's futures depend on it. This is a public health crisis. It is a mental health war, and we are losing.

Thank you for your attention and time today.

3

Exhibit B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| A.F., on behalf of J.F., and A.R., on behalf of B.R.,<br><br>    Plaintiffs,<br><br>v.<br><br>CHARACTER TECHNOLOGIES, INC.;<br>NOAM SHAZEER; DANIEL DE FREITAS<br>ADIWARSANA; GOOGLE LLC;<br>ALPHABET INC.,<br><br>    Defendants. | Case No. 2:24-cv-01014-JRG-RSP |

<u>**DEFENDANT CHARACTER TECHNOLOGIES, INC.'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS PENDING ARBITRATION PURSUANT TO 9 U.S.C. §§ 3–4 AND FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(3)**</u>

Defendant Character Technologies, Inc. ("C.AI") moves to compel individual arbitrations and to stay this action pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3–4, and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3).

## I. INTRODUCTION

Plaintiffs A.F. and A.R. bring claims on behalf of their minor children, J.F. and B.R., alleging that J.F. and B.R. were harmed by the content of their conversations with AI chatbots on C.AI's service. C.AI cares deeply about the well-being of its users. But Plaintiffs' claims are without legal merit and—to the point of this motion—must be arbitrated.

All users must agree to C.AI's Terms of Service ("TOS" or "Terms") to access or use its service. J.F. and B.R. each affirmatively agreed to the Terms when they signed up for accounts. They each were presented with a conspicuous notice and affirmatively acknowledged that, by signing up, they were agreeing to C.AI's Terms. By so doing, J.F. and B.R. agreed to arbitrate all disputes arising from their use of C.AI's service, and also agreed that "[a]ll issues are for the arbitrator to decide, including, but not limited to, issues relating to the scope, enforceability, and arbitrability" of the arbitration agreement. Declaration of Andy Nahman ("Nahman Decl.") Ex. C at 5, Ex. E at 5. Those agreements encompass the instant claims—brought by J.F.'s and B.R.'s parents in a representative capacity on their behalf, alleging harms from use of the service—and any threshold arbitrability issues Plaintiffs may raise.

The Court should compel arbitration and stay further proceedings in this action.

## II. BACKGROUND

### A. J.F. and B.R. Affirmatively Agreed to C.AI's TOS Upon Creating Their Accounts to Use C.AI's Service

C.AI offers a platform for users to engage in interactive conversations with generative AI chatbots called "[C]haracters." Compl. ¶ 216; Nahman Decl. ¶ 2. Characters may be based on

1

historical or fictional figures, serve a functional role (such as an "Interviewer" for interview practice), and more. Compl. ¶¶ 217–18. Users can create custom Characters and share them with others. *Id.* ¶ 219. Users principally engage with Characters through text conversations. *E.g., id.* ¶ 230. Users engage in these conversations through C.AI's website or, since May 23, 2023, a mobile app. Nahman Decl. ¶¶ 3–5; *see also* Compl. ¶ 231.

However users choose to access C.AI's service, they must agree to the TOS to access or use the service. Every version of the TOS since C.AI's public launch has conspicuously stated: "By accessing [and/]or using the Services, you're agreeing to these Terms. If you don't understand or agree to these Terms, please don't use the Services." Nahman Decl. Exs. A–E.

Users must also affirmatively agree to C.AI's TOS when creating an account—as both J.F. and B.R. did. *See* Nahman Decl. ¶¶ 11–15. Based on information provided by their counsel, and C.AI's investigation, J.F. created an account on July 1, 2023, and B.R. created an account on August 19, 2024. Nahman Decl. ¶¶ 8–10. Counsel for J.F. and B.R. have confirmed these are the accounts at issue in the Complaint.[1] Declaration of Stephanie G. Herrera ¶¶ 2, 4. In creating these accounts: B.R. did not provide a name; and J.F. provided a false name and used iCloud Private Relay to disguise his email address. Nahman Decl. ¶¶ 9–10.

On July 1, 2023, when J.F. created an account, a user signing up for an account on either the mobile app or the website was presented with a link to the TOS (as well as C.AI's Privacy Policy) and had to check a box indicating they understood and agreed to those policies before

---

[1] Plaintiffs allege that J.F. "downloaded and started using C.AI in or around April 2023" and that "B.R. downloaded [C.AI] on her own mobile device … [and] used C.AI for almost two years" up to October 2024. Compl. ¶¶ 46, 120. These allegations do not align with the accounts that Plaintiffs' counsel has confirmed are at issue or with the public launch date of C.AI's mobile app, Nahman Decl. ¶ 5. Whatever the reason for such discrepancies (including potential use prior to creating accounts or other undisclosed accounts), J.F. and B.R. each created accounts and agreed to C.AI's TOS at least as of July 1, 2023, and August 19, 2024, respectively.

2

creating an account. Nahman Decl. ¶¶ 12–13. As shown below, the Terms were linked in blue font that stood out, directly above the checkbox users had to click in order to set up an account:



*Figure 1: Mobile app account-creation flow on July 1, 2023*



*Figure 2: Website account-creation flow on July 1, 2023*

3

*Id.*

On August 19, 2024, when B.R. created an account, the account-creation process was similar.  A user was presented with the TOS and notified that, by creating an account, they agree to the TOS.  *Id.* ¶¶ 14–15.  This notice contained a link to the Terms, in blue or bolded text, directly above or below the "Join" or "Continue" button a user had to click to set up an account:



Figure 3: Mobile app account-creation flow on August 19, 2024



*Figure 4: Website account-creation flow on August 19, 2024*

*Id.*

Plaintiffs do not deny that J.F. and B.R. agreed to the TOS when creating their accounts, or allege any deficiencies in these account-creation flows.  Rather, the Complaint acknowledges

4

J.F. and B.R. may have entered into agreements with C.AI that their parents purport to disaffirm on their behalf. Compl. ¶¶ 14–15, 18–19.

### B. J.F. and B.R. Agreed to Arbitrate All Disputes Arising from their Use of C.AI's Services

Every version of the TOS since C.AI's public launch, including the versions to which J.F. and B.R. agreed when creating their accounts, has included a conspicuous agreement to arbitrate all disputes arising from use of the service ("Arbitration Agreement"). Nahman Decl. Exs. A–E.

C.AI has always notified users of the Arbitration Agreement near the top of the Terms. The TOS to which J.F. agreed states:

> Note: these Terms contain an arbitration clause and class action waiver. By agreeing to these Terms, you agree (a) to resolve all disputes with us through binding individual arbitration, which means that you waive any right to have those disputes decided by a judge or jury, and (b) that you waive your right to participate in class actions, class arbitrations, or representative actions.

*Id.*, Ex. C at 1. The TOS to which B.R. agreed is substantively the same:

> NOTE: THESE TERMS CONTAIN AN ARBITRATION CLAUSE AND CLASS ACTION WAIVER. By agreeing to these Terms, you agree to resolve all disputes with us through binding individual arbitration. That means you also waive any right to have those disputes decided by a judge or jury, and you waive your right to participate in class actions, class arbitrations, or representative actions.

*Id.*, Ex. E at 1.

The Arbitration Agreement itself appears in the Terms under the heading "Dispute Resolution By Binding Arbitration." *Id.*, Ex. C at 4, Ex. E at 4. It begins by advising users that "[t]his section affects your rights so please read it carefully." *Id.* The Arbitration Agreement in the TOS versions to which J.F. and B.R. agreed further states:

> You agree that any and all disputes or claims that have arisen or may arise between you and [Character.AI], whether arising out of or relating to these Terms (including any alleged breach thereof), the Website or Services, any aspect of the relationship or transactions between us, shall be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small

5

claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into these Terms, you and [Character.AI] are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury.

*Id.* Among other terms, the Arbitration Agreements to which J.F. and B.R. agreed require arbitration under the JAMS Streamlined Arbitration Rules and Procedures; provide that "[a]ll issues are for the arbitrator to decide, including, but not limited to, issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement"; and specify that "[t]he Federal Arbitration Act governs [their] interpretation and enforcement." *Id.*, Ex. C at 4–5, Ex. E at 4–5. The substance of these provisions has been the same since C.AI's public launch. *Id.*, Exs. A–E.

**C.     J.F. and B.R. Used, and Intend to Continue Using, C.AI's Service**

J.F. and B.R. used C.AI's services after agreeing to the TOS and each intend to continue using C.AI's services. The Complaint alleges that J.F. has "made it clear that he will access C.AI the first chance he gets," Compl. ¶ 114, and, similarly, that B.R. "seek[s] out C.AI at every opportunity," *id.* ¶ 121. And B.R.'s account at issue has been accessed even since the filing of the Complaint—as recently as December 31, 2024. Nahman Decl. ¶ 10.

**D.     Plaintiffs' Claims on Behalf of J.F. and B.R. Arise From Their Use of C.AI**

Plaintiffs A.F. and A.R. are J.F.'s mother and B.R.'s mother, respectively. Compl. ¶¶ 12, 58, 118. On December 9, 2024, Plaintiffs filed this action in a representative capacity on behalf of J.F. and B.R. *Id.* ¶¶ 13, 17. Plaintiffs assert nine product liability, personal tort, deceptive trade practices, and other claims against C.AI. *Id.* ¶¶ 374–400, 404–67. At core, Plaintiffs generally allege J.F. and B.R. were harmed by the content of their conversations with Characters and specifically challenge certain messages allegedly received by J.F. *See id.* ¶¶ 64–105, 122–23. The Complaint does not identify a single message B.R. allegedly received or was harmed by.

6

## III. ARGUMENT

J.F. and B.R. each agreed to arbitrate their claims against C.AI; agreed that any disputes regarding scope, arbitrability, or enforceability would be delegated to the arbitrator; and agreed that the FAA would govern those agreements. Straightforward application of the relevant law requires the Court to compel individual arbitrations. Any defenses to arbitration, including any purported disaffirmation, have been delegated to the arbitrator. Were the Court to reach disaffirmation despite the delegation clause, neither J.F. nor B.R. has effectively disaffirmed.

### A. Legal Standard

The FAA governs "interpretation and enforcement" of the Arbitration Agreement. Nahman Decl. Ex. C at 4, Ex. E at 4. The FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution," *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (cleaned up), and requires that courts "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Courts decide only: (1) "whether the parties entered into any arbitration agreement"; and (2) "whether [the] claim [at issue] is covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis omitted). Where, as here, the parties delegated gateway issues to the arbitrator, courts decide only whether an arbitration agreement exists and "whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id.* at 202. If a delegation clause exists, "absent a challenge to the delegation clause itself, [courts] will consider that clause to be valid and compel arbitration." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018).

### B. Plaintiffs' Claims Must Be Individually Arbitrated

C.AI easily satisfies its burden of demonstrating that arbitration agreements with valid delegation clauses exist. That ends the inquiry and requires arbitration of Plaintiffs' claims.

7

### 1. J.F. and B.R. Formed Valid Arbitration Agreements With C.AI

To determine whether an arbitration agreement has been formed, federal courts apply state-law contract formation principles. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996).[2] To form a contract under Texas law, "the parties must manifest their mutual assent to be bound," "directly, as by the written or spoken word, or indirectly, through one's actions or conduct." *Sw. Airlines Co. v. BoardFirst, L.L.C.*, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007) (citing *All. Milling Co. v. Eaton*, 25 S.W. 614, 616 (Tex. 1894)). Where an arbitration agreement was formed online, courts consider whether (1) "notice of the arbitration provision was reasonably conspicuous," and (2) "manifestation of assent is unambiguous as a matter of law." *HomeAdvisor, Inc. v. Waddell*, 2020 WL 2988565, at *4 (Tex. App.—Dallas June 4, 2020, no pet.). Applying these principles here, valid agreements were formed with J.F. and B.R.

#### (a) J.F. and B.R. Received Notice of and Assented to the TOS

Users creating C.AI accounts receive ample notice of the TOS and must assent to them. When J.F. created an account in 2023, whether on C.AI's website or mobile app, he was presented with a link to the TOS and had to check a box indicating he agreed to the TOS to create an account. Nahman Decl. ¶¶ 12–13. Courts routinely find that such "clickwrap" agreements—where the consumer must check a box to accept terms—demonstrate affirmative assent and are enforceable. *E.g.*, *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007); *Recursion Software, Inc. v. Interactive Intel., Inc.*, 425 F. Supp. 2d 756, 781–82

---

[2] Although California law governs C.AI's TOS, Nahman Decl. Ex. C at 6, Ex. E at 6, Texas law likely governs the threshold contract formation issue. *See Edminster, Hinshaw, Russ & Assocs., Inc. v. Downe Twp.*, 953 F.3d 348, 351 (5th Cir. 2020) ("choice-of-law provision has force only if the parties validly formed a contract"); *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n, Inc.*, 783 F.2d 1234, 1240 (5th Cir. 1986) (federal court sitting in diversity applies forum state's substantive law). Regardless, California and Texas contract law are "substantially the same." *Phillips v. Neutron Holdings, Inc.*, 2019 WL 4861435, at *3 n.1 (N.D. Tex. Oct. 2, 2019).

(N.D. Tex. 2006) (collecting cases); *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017).

When B.R. created an account in 2024, whether on C.AI's website or mobile app, she was presented with a conspicuous link to the TOS, directly above or below a "Join" or "Continue" button, and was informed that by continuing to create an account and/or joining C.AI she was agreeing to the TOS. Nahman Decl. ¶¶ 14–15. Courts likewise routinely enforce online agreements formed through conspicuous presentation of terms in close proximity to a sign-up button. *E.g.*, *Phillips v. Neutron Holdings, Inc.*, 2019 WL 4861435, at *4–5 (N.D. Tex. Oct. 2, 2019) (enforcing an arbitration clause in a user agreement under Texas law, where a link to the agreement was bolded "in close proximity" to sign-up button); *Walker v. Neutron Holdings, Inc.*, 2020 WL 703268, at *3–4 (W.D. Tex. Feb. 11, 2020), *report and recommendation adopted*, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020) (same); *see also Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 929 (N.D. Cal. 2024) (bolded hyperlink to TOS directly below a "Sign Up" button was "reasonably conspicuous"); *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 548 (W.D. Tex. 2017) (similar).

The Complaint does not allege otherwise. Instead, the Complaint acknowledges J.F. and B.R. each may have entered into agreements with C.AI.[3] *See* Compl. ¶¶ 14–15, 18–19.

> (b) *J.F. and B.R. Received Conspicuous Notice of the Agreement*

C.AI's TOS provided J.F. and B.R. conspicuous notice that it contains a binding arbitration agreement. Using straightforward language prominently preceded by the word

---

[3] Even if J.F. and B.R. used C.AI's service before creating accounts, they each agreed to the TOS when they created accounts and thereby agreed to arbitrate "all disputes or claims that *have arisen* or may arise between" them and C.AI. Nahman Decl. Ex. C at 4, Ex. E at 4 (emphasis added); *cf. Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 878 (N.D. Cal. 2018) (enforcing arbitration clause that, by its plain language, applied to claims that had already arisen). In any event, arbitrability issues, including as to scope, have been delegated to arbitration. *See infra*.

"Note," C.AI notifies users at the top of the TOS: "these Terms contain an arbitration clause and class action waiver." Nahman Decl. Ex. C at 1, Ex. E at 1. The notice further states that, by agreeing to the Terms, users agree to "resolve all disputes with [C.AI] through binding individual arbitration" and "waive any right to have those disputes decided by a judge or jury." *Id.* The Arbitration Agreement itself appears in the TOS under the heading, "Dispute Resolution By Binding Arbitration." *Id.*, Ex. C at 4, Ex. E at 4. "Similar presentations have consistently been found to be conspicuous." *HomeAdvisor*, 2020 WL 2988565, at *2–4 (collecting cases).

> (c) *Plaintiffs, As J.F.'s and B.R.'s Representatives, Must Arbitrate J.F.'s and B.R.'s Claims Asserted On Their Behalf*

That Plaintiffs are J.F.'s and B.R.'s parents, not J.F. and B.R. themselves, makes no difference to the Court's analysis of contract formation. As minors, J.F. and B.R. are "'unable to sue or be sued in their individual capacities'" and "'are required to appear in court through a legal guardian, a "next friend," or a guardian ad litem.'" *Petri v. Kestrel Oil & Gas Props., L.P.*, 2013 WL 265973, at *5 (S.D. Tex. Jan. 17, 2013) (quoting *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005)). Because of this rule, A.F. (J.F.'s parent) and A.R. (B.R.'s parent) are nominal plaintiffs only, bringing this action for the benefit of J.F. and B.R. Compl. ¶¶ 13, 17. A.F. and A.R. are thus "present in a representative capacity only, and [J.F. and B.R.] remain[] the real part[ies] in interest." *See Byrd v. Woodruff*, 891 S.W.2d 689, 704 (Tex. App.—Dallas 1994, writ denied, dism'd by agr., and withdrawn) (citing *Gracia v. RC Cola-7-UP Bottling Co.*, 667 S.W.2d 517, 519 (Tex. 1984)).

Because J.F. and B.R., the real parties in interest, assented to the Arbitration Agreement, Plaintiffs are bound to arbitrate J.F.'s and B.R.'s claims in this action. *See S.T.G. ex rel. Garcia v. Epic Games, Inc.*, 2024 WL 4375782, at *8 (S.D. Cal. Oct. 2, 2024) (compelling arbitration with respect to minors' claims brought through guardian); *see also In re Jindal Saw Ltd.*, 264

S.W.3d 755, 766 (Tex. App.—Houston [1st Dist.] 2008, subsequent mandamus proceeding, 289 S.W.3d 827 (Tex. 2009)) (representative bringing survival claims on behalf of a decedent was bound to an arbitration agreement to which the decedent had assented).

### 2. The Agreements Delegate All Threshold Issues To the Arbitrator

"Under the FAA, parties are free to delegate questions to an arbitrator, including questions regarding the validity and scope of the arbitration provision itself." *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 551 (5th Cir. 2018). That is what the parties did here. The Arbitration Agreement includes a broad delegation provision: "All issues are for the arbitrator to decide, including, but not limited to, issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement." Nahman Decl. Ex. C at 5, Ex. E at 5. This type of provision is "clear and unmistakable evidence" that the parties intended the arbitrator to decide arbitrability and enforceability issues.[4] *Yates v. Experian Info. Sols., Inc.*, 2023 WL 4747386, at *3 (S.D. Tex. July 25, 2023), *report and recomm. adopted*, 2023 WL 5279467 (S.D. Tex. Aug. 16, 2023); *see also Williams-Diggins v. Experian Info. Sols., Inc.*, 2024 WL 3508671, at *3 (N.D. Ohio July 23, 2024) (collecting cases). As such, the Court "possesses no power to decide [any] arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68–69 (2019).

### C. Any Lack of Capacity or Disaffirmation Defense Asserted By Plaintiffs Must Be Individually Arbitrated

Plaintiffs may seek to avoid arbitration by arguing that J.F. and B.R. lacked the capacity to consent to the TOS, or that their parents have disaffirmed the TOS on their behalf. Compl. ¶¶ 14–15, 18–19. To the extent Plaintiffs raise such arguments in their opposition, they fail. The law is clear that where, as here, the parties agree to delegate threshold issues to an arbitrator, *the*

---

[4] This includes any argument that J.F.'s and B.R.'s agreements are "void under applicable law as unconscionable and/or against public policy." Compl. ¶¶ 14, 18.

*arbitrator* must decide defenses to arbitration, including as to capacity and disaffirmation.

"Youth" is a defense to arbitrability, not an issue of contract formation. The contracts of minors are not void, but rather are *voidable* at their election. *See Dairyland Cnty. Mut. Ins. Co. of Tex. v. Roman*, 498 S.W.2d 154, 158 (Tex. 1973); *N.A. v. Nintendo of Am. Inc.*, 2023 WL 8587628, at *4 (N.D. Cal. Dec. 11, 2023) (citing Cal. Fam. Code § 6700). "[Y]outh" is thus a "defense rather than an obstacle to a contract's formation, and as a defense it goes to the arbitrator." *K.F.C. v. Snap Inc.*, 29 F.4th 835, 838 (7th Cir. 2022).

That Plaintiffs purport to disaffirm the arbitration agreements on their children's behalf makes no difference; that too is an issue for the arbitrator. "[S]ubstantive federal arbitration law" determines who (court or arbitrator) decides a challenge to the validity or enforceability of an arbitration agreement governed by the FAA. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006); *K.F.C.*, 29 F.4th at 837–38. Federal law is clear that courts must enforce a delegation clause unless a party "challenge[s] the delegation provision specifically," *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010)—*i.e.*, challenges the clause "on different factual or legal grounds than the ones supporting its challenge to the arbitration agreement as a whole," *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 356 (6th Cir. 2022).

For this reason, every Court of Appeals to address the issue has held that age-related capacity and disaffirmation challenges must be resolved by the arbitrator—because these defenses go to validity and enforceability (not contract formation) and challenge the entire agreement (not the delegation clause specifically). *K.F.C.*, 29 F.4th at 837–38; *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 883 (6th Cir. 2021). District courts around the country are in accord, including in cases involving similar allegations of "addiction" and other harms to minors from interactive media. *See, e.g., Orellana v. Roblox Corp.*, 2025 WL 694428,

12

at *5 (M.D. Fla. Mar. 4, 2025) (enforcing delegation clause for disaffirmation defense in video game addiction case); *Johnson v. Activision Blizzard, Inc.*, 2025 WL 522589, at *4 (E.D. Ark. Feb. 18, 2025) (same); *Dunn v. Activision Blizzard, Inc.*, 2024 WL 4652194, at *4 (E.D. Ark. Oct. 31, 2024) (same); *S.T.G.*, 2024 WL 4375782, at *5–6 (enforcing delegation clause in class action alleging harm to minors from playing Fortnite). For the same reasons, the Fifth Circuit held in *Primerica Life Insurance Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002), that the defense of lack of mental capacity must be decided by an arbitrator. The reasoning of *Primerica* applies with equal force here; there is no basis for distinguishing age-related capacity defenses.

These authorities require an arbitrator to decide any disaffirmation defense here. The Complaint is clear that Plaintiffs are purporting to disaffirm "any and all alleged 'agreements'" into which J.F. and B.R. entered relating to their use of C.AI. Compl. ¶¶ 15, 19. Because Plaintiffs' disaffirmation arguments challenge J.F.'s and B.R.'s "agreements" as a whole, not the delegation clause specifically, those arguments must be arbitrated. *See K.F.C.*, 29 F.4th at 837–38; *StockX*, 19 F.4th at 884–86; *see also Primerica*, 304 F.3d at 472; *Edwards*, 888 F.3d at 744 ("If there is an agreement to arbitrate with a delegation clause, and absent a challenge to the delegation clause itself, we will consider that clause to be valid and compel arbitration.").

### D. Were the Court to Reach the Issue of Disaffirmation Despite the Delegation Clause, It Should Reject the Defense and Compel Arbitration

Even if the Court were to reach the issue of disaffirmation despite the delegation clause, the outcome would not change: Arbitration is required because J.F. and B.R. already accepted, and still seek to retain, the benefits of their agreements with C.AI through use of the service.

The Complaint makes clear that J.F. and B.R. accepted the benefits of their agreements. It alleges that J.F. and B.R. each used C.AI's services—B.R. allegedly for "almost two years." Compl. ¶¶ 46, 120. J.F. and B.R. cannot accept the benefits of their agreements with C.AI by

13

using the service, "then seek to void [those agreements] in an attempt to escape the consequences of a clause" with which their parents disagree. *See Paster v. Putney Student Travel, Inc.*, 1999 WL 1074120, at *2 (C.D. Cal. June 9, 1999); *Harden v. Am. Airlines*, 178 F.R.D. 583, 587 (M.D. Ala. 1998) (minor could not void contract after accepting its benefits).

In addition to past receipt of benefits, J.F. and B.R. intend to continue benefiting from their agreements with C.AI. B.R.'s account has been accessed since the Complaint was filed. Nahman Decl. ¶ 10. Given that J.F. and B.R. did not identify themselves when creating accounts (and at least J.F. took steps to mask his identity), it is possible they have created or used other accounts since filing the Complaint that C.AI has not yet identified. The Complaint admits J.F. and B.R. intend to continue using C.AI's services. Compl. ¶ 114 ("J.F. also made it clear that he will access C.AI the first chance he gets."), ¶ 121 (B.R. "seek[s] out C.AI at every opportunity").

A minor "is not permitted to retain the benefits of a contract while repudiating its obligations." *Dairyland*, 498 S.W.2d at 158; *accord Babu v. Petersen*, 48 P.2d 689, 694 (Cal. 1935); *Holland v. Universal Underwriters Ins. Co.*, 270 Cal. App. 2d 417, 421–22 (1969). For this reason, courts routinely reject minors' attempts to disaffirm an online service's terms of service when the minors continue to use that service. For example, in *C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488 (9th Cir. 2015), the Ninth Circuit affirmed a finding that minor plaintiffs did not disaffirm Facebook's Terms of Service because, "[b]y continuing to use facebook.com after bringing their action, [p]laintiffs manifested an intention not to disaffirm the contract." *Id.* at 489; *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 900 (S.D. Ill. 2012) (same); *see also, e.g., J.A. ex rel. Allen v. Microsoft Corp.*, 2021 WL 1723454, at *9 (W.D. Wash. Apr. 2, 2021); *Baker v. adidas Am., Inc.*, 2008 WL 11429938, at *5–6 (E.D.N.C. Mar. 5, 2008). These authorities disprove any attempted disaffirmation because there has been

14

recent activity on B.R.'s account and both J.F. and B.R. intend to continue using C.AI.[5] *See Dairyland*, 498 S.W.2d at 158; *Babu*, 48 P.2d at 694.

 **E. A Stay Pending Arbitration (or Any Appeal) Is Appropriate**

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *accord Hines v. Stamos*, 111 F.4th 551, 565 (5th Cir. 2024). Thus, if this Court grants C.AI's motion, it must stay all claims against C.AI until arbitration proceedings end.

The Court should also stay all claims against the other defendants. Those claims are entirely derivative of the claims against C.AI and involve many of the same legal and factual issues. It would fundamentally prejudice C.AI's rights if those issues were litigated—in its absence—when it has a federal statutory right to have those issues decided by an arbitrator. *See Harvey v. Joyce*, 199 F.3d 790, 795–96 (5th Cir. 2000) ("[W]e fail to see how litigation could proceed as to [non-signatory] without adversely affecting [defendant]'s right to arbitrate."); *Courtright v. Epic Games, Inc.*, 2025 WL 558560, at *9 (W.D. Mo. Feb. 13, 2025) (compelling arbitration and staying derivative claims); *Orellana*, 2025 WL 694428, at *11 (same).

If the Court does not grant C.AI's motion, it must stay proceedings pending interlocutory appeal, if any. 9 U.S.C. § 16(a)(1)(B); *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 741 (2023).

**IV. CONCLUSION**

For these reasons, C.AI requests that the Court compel individual arbitration of Plaintiffs' claims and stay further proceedings. C.AI also requests a hearing pursuant to Local Rule CV-7(g).

---

[5] Any allegation that J.F. or B.R. is "addicted" to C.AI—a contested issue for the arbitrator to resolve—does not change that a minor cannot retain benefits under a contract and disaffirm it.

15

Jonathan H. Blavin* (Lead Counsel)
Cal. Bar No. 230269
Victoria A. Degtyareva*
Stephanie Goldfarb Herrera*
MUNGER, TOLLES & OLSON, LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000
Jonathan.Blavin@mto.com
Stephanie.Herrera@mto.com
Victoria.Degtyareva@mto.com
*Admitted Pro Hac Vice

/s/ Melissa R. Smith

Melissa R. Smith
Texas Bar No. 24001351
GILLIAM & SMITH, LLP
303 South Washington Avenue
Marshall, TX 75670
(903) 934-8450
melissa@gilliamsmithlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2025, I electronically submitted the foregoing document with the clerk of the United States District Court for the Eastern District of Texas, using the Court's CM/ECF system, which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

*/s/ Melissa R. Smith*
Melissa R. Smith

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(i), I hereby certify that on March 5, 2025, Jonathan Blavin, Stephanie Herrera, and Andrew T. Gorham, counsel for C.AI, and Matthew Bergman, Meetali Jain, and Samuel F. Baxter, counsel for Plaintiffs, conferred by video conference regarding the issues in this motion, in accordance with the requirements of Local Rule CV-7(h). The parties were unable to reach agreement, and Plaintiffs oppose this motion.

*/s/ Melissa R. Smith*
Melissa R. Smith

# EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, <br><br> *Plaintiff,* <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas, <br><br> *Defendant.* | Civil Action No. 1:25-cv-01660 |

## DECLARATION OF MICHAEL J. LAMBERT

Pursuant to 28 U.S.C. § 1746, Michael J. Lambert declares:

1.      My name is Michael J. Lambert. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. I am an attorney at Haynes and Boone, LLP and represent Plaintiff Computer & Communications Industry Association ("CCIA") in this case. The following statements are made within my personal knowledge and are true and correct.

2.      I submit this Declaration in support of CCIA's Motion for Preliminary Injunction.

3.      At the request of CCIA's counsel, Veritext Legal Solutions created a transcript of a YouTube video of the Texas Senate State Affairs Committee Hearing on March 31, 2025, which can be found online at https://www.youtube.com/watch?v=VlJiDzb50-Q. A true and correct copy of the transcript is attached as Exhibit E-1.

4.      On October 7, 2025, I visited the Texas Legislature's website located at https://www.capitol.texas.gov and obtained a copy of a Senate Committee Report of S.B. 2420. A true and correct copy of the report is attached as Exhibit E-2.

1

5.      I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 14th day of October, 2025.

/s/ *Michael J. Lambert*
Michael J. Lambert

# EXHIBIT E-1

Case 2:55-cv-01760-RB  Document 583  Page 82  Date Filed 05/28/2025

Texas State Senate Affairs Committee Hearing

SB 2420

March 31, 2025

Case 1:25-cv-01730-RDB Document 58-1 Filed 05/28/2026 Page 83 of 183

CHAIR SEN. BRYAN HUGHES:  The Chair now lays out Senate Bill 2420.  2420.  And recognizes its author, Senator Paxton, to explain the measure.

VICE CHAIR SEN. ANGELA PAXTON:  Well thank you, Mr. Chairman.  Thank you, members.

In January, the joint committee to study the effects of media on minors heard witness after witness, describing the pervasiveness of social media in youth culture, and its harmful effects on young minds.

One of the things that became very clear was that what is seen cannot be unseen.  As a mother of four, and a grandmother to five with one more on the way, there is literally nothing more important to me than protecting my kids and my grandkids, and when I was a teacher, looking out for the wellbeing of my students and their future opportunities.

Now in my role as a Texas State Senator, I am grateful to be in a position to work on legislation that can help make a difference by equipping parents with tools that can help them protect their children.

Unlike brick-and-mortar stores which

must verify a consumer's age before the purchase of age-restricted products like alcohol and cigarettes, minors currently navigate the expansive digital world completely without guardrails.

Parents are the natural first and best line of defense for their child. But it's also very clear that technology companies must be corporate -- good corporate citizens.

Senate Bill 2420 puts an important tool in the hands of parents, and some reasonable expectations and requirements on our technology companies. It is important for us to recognize that children represent a very lucrative source of revenue to retailers of all kinds. We've already heard some testimony in this direction this morning about vaping, and those kinds of products.

Senator Hughes, I know you will remember this summer -- this past summer, the testimony of Dr. Epstein. And he talked a little bit about how in marketing, to children in general, that minor children constitute one of the single largest consumer demographics.

On top of that, unlike adults, the

children who do have access to money to spend, embody the very highly desirable characteristic of their spending being completely discretionary.

They don't have rent to pay, they don't have a car -- you know, they don't have a car payment. Their money is completely discretionary, which makes them very, very desirable to those who would want to market to them.

Additionally, it's been noted already this morning, that some products marketed to children are addictive, such as in the bill that Senator Parker just laid out, Senate Bill 1698, regarding nicotine products. This is a precursor to substance addition. But there are also behavioral addictions such as screen addiction and video game addiction.

There is literally a facility up north that I've learned about, that provides the opportunity for youth to come to do digital detox. So you know, to the brain, addiction is addiction. And we have to recognize that.

The research says that the younger the age of first exposure, the more likely the user is to become addicted. Obviously, the younger

user is when they are addicted, the longer they're likely to stay addicted without some sort of meaningful intervention. And it follows that the longer a user is addicted, the more profitable they are to those who market addictive products to them.

The big win for those who market anything to children, is the potential of creating a customer for life.

Senate Bill 2420 requires app stores to verify a user's age category, to obtain parental consent for minor users, and to notify users and parents of any substantial changes to the app.

It prohibits app stores from enforcing contracts entered into without parental consent. And it provides an enforcement mechanism through a private cause of action and the Deceptive Trade Practices Act.

It codifies some of the age appropriateness and parental consent features that many of the app stores are already publicly touting that they do. And it will better equip parents by providing additional framework, transparency, and enforcement.

I do have a committee substitute, Mr.

Chairman.

CHAIR SEN. BRYAN HUGHES: Senator Bettencourt sends up the committee substitute. Senator Paxton has recognized to explain the substitute.

VICE CHAIR SEN. ANGELA PAXTON: Thank you, Mr. Chaiman. Thank you, Senator Bettencourt.

The committee substitute incorporates stakeholder input and amends the bill to closely mirror the App Store Accountability Act, which was actually signed into law by Governor Cox in Utah just last week.

Specifically, the committee substitute does the following. It titles this legislation the App Store Accountability Act. Regarding duties of app stores, it amends language to relate to how the app store verifies the age of minors. To remove the provision requesting -- requiring them to request the individual's age.

And instead, it requires app stores to use a commercially reasonable method to verify the age category, which is a factor that should simplify implementation.

The bill requires parental consent.

And in this section, language rephrases to clarify to app stores that all minor accounts must be affiliated with a parent or guardian account. It further requires an app store to obtain consent from the minor's parent or guardian through the parent account affiliated with a minor's account, in order for the minor to either download or purchase an app.

And it requires the app store to notify the app developer if a minor's parent or guardian revokes consent, to ensure that the developer knows that the child shall no longer have access to the app. And to deny the minor from further accessing the app on all devices on the family's network.

Regarding the display of the age rating for the software application, this committee substitute removes the mandate that an app store rating -- an app store displaying a rating -- excuse me, let me restate that.

It removes the mandate that an app store display a rating, and it instead provides that if the app store has a rating, or other type of content notice, it shall display the rating clearly, accurately, and conspicuously.

Regarding protection of personal data, it removes language requiring app stores to delete personal data, as app stores may need long-term access to data for age verification purposes and to collect and store data based on their own privacy policies.

It maintains however, that it still requires that data may only be used for age verification, obtaining parent consent, and monitoring and keeping compliance records.

Regarding changes to software applications, the committee substitute clarifies that in instances when apps have a new version, parental consent is required again if it is a material modification to an app's terms of service; categories of data collected, stored, or shared; alters rating or content descriptions; adds new monetization features like advertisements; or materially changes the app's functionality or user experience.

Regarding age verification, it clarifies that the app developers receive the age-category information from the app stores, and do not have to develop a new system to obtain that information separately. Again, this should

simplify implementation.

Regarding violations, it provides that app developers acting in good faith, to receive age categories and verify that parent consent was -- parental consent was obtained, are not in violation of the act. And it adds that remedies under this act are not exclusive to any other actions or remedies provided by law.

Finally, it changes the effective date from September 1, 2025 to January 1, 2026 to allow for time to implement.

Parents are again the natural first and best line of defense for their children. But we also have a role in government to see that we are doing our best to protect the vulnerable, that we are there to support families. And part of that for us, means that we need to make sure that our technology companies are being good corporate citizens.

It is time for the tech industry to step up and be part of protecting kids, not just monetizing them, not turning a blind eye.

And Mr. Chairman, it's about our kids, it's about reality, and it's about time.

CHAIR SEN. BRYAN HUGHES: Thank you,

Case 2:22-cv-10733-RDP   Document 582-15   Page 91   Date Filed 05/20/2025

Page 10

Senator.  Members, are there any questions for the author before we open testimony on Senate Bill 2420?  Thank you for this bill, Senator Paxton.

We'll open invited testimony on Senate Bill 2420.  And the Chair calls John Read, Joel Thayer, Castanita Fitzpatrick.  John Read, Joel Thayer, Castanita Fitzpatrick.

Have a seat anywhere you're comfortable.  The chairs are all kind of uncomfortable, but just pick any one.  You're fine.

Since you're ready, we'll start over here.  Introduce yourself and give us your testimony.

JOHN READ:  My name is John Read.  I'm with the Digital Childhood Alliance.  That's a organization that's put together about 60 grassroots entities that care about children, and are worried about technology and how it's impacting children.

I spent 30 years at the Department of Justice and am a lawyer.  And I want to thank you Chairman for allowing us to speak, and the committee, and Senator Paxton for sponsoring this

Case 2:25-cv-10733-RJ  Document 582-15  Page 92  Date Filed 05/30/2006

important bill.  I support it.

Listen for 17 years -- part of me wonders where the lawyers were at these big tech companies, Apple and Google.  For 17 years, Apple has allowed minors to download apps.

And in do that process hit that term of service, that contract that they sign that binds the children and how their data's used.  And they've not mandated parental consent.

They've sat by while this has gone on for 17 years.  And it's about time we do something.  These contracts are one sided.  No 13-, 14-year-old can be expected to understand them.  They're in legalese.

They obligate the child to -- often to have their information in their phone, their contact list, and et cetera, to be monetized by the -- by the tech companies.

They give permission to the tech companies to follow the child around.  And date stamping moment by moment, where the child is in longitude and latitude so that they can monetize that data, target them with ads.  And sometimes, predators find that information and harm happens.

And if harm happens, in those terms of

service, that contract, the child is not allowed to sue for the harm in federal court. They've waived that right through arbitration previsions that no child can understand.

So we're here to stop that. Empower parents to decide is that app worth that contract, that obligation? And so the parent gets to decide, is my child ready for that app? And is that commitment appropriate?

This actually legislates with a relatively light touch because the way the industry is structured, almost every app is downloaded through the Apple App Store, or the Google Play Store.

If you have an iPhone, you're going to the App Store. If you have a Samsung or a Pixel, you're most likely to go through the Google Play Store. It's been held to have a monopoly by a jury. And so those two entities, if you can solve the issue there, you make a great benefit.

The question I think you will not hear today anyone defending the idea that these tech companies should be able to impose terms of service on minors. So the question is what we do about it. This is very privacy promoting. The

Case 2:25-cv-00730-RDP   Document 56-2   Page 94   Date Filed 05/20/2026

information that the tech companies have, they already know if you're an adult or a minor.

Your date is entered into your phone when you register it.  They verify it on the backend, especially if you enter a credit card, or a driver's license, or the way you use and interact in your phone.

So the tech companies already have it.  It's an easy lift for them.  And it allows parents to protect the privacy of their kids.  It also as Senator Paxton mentioned, prohibits developers from using that information to harm kids.

Finally, a lot of these bills that you are going to consider to protect children, there's an argument whether (indiscernible) runs afoul the First Amendment.

This is designed not to.  By focusing on contracts instead of saying here's a particular category of speech that's -- we're going to put our thumb on and say is harder to access, you avoid a First Amendment question.

So it's designed to avoid First Amendment questions, and should be enforceable quickly.  Not get tied up in the courts for

Case 2:25-cv-00730-RB   Document 58-215   Page 95 of 183   Date Filed 05/20/2025

years.  I'm open to questions that the Committee may have, but I strongly support this bill.

CHAIR SEN. BRYAN HUGHES:  Thank you for your testimony.  Welcome.  Introduce yourself and go ahead.

JOEL THAYER:  Thank you, Mr. Chairman for having me.  Thank you, Senator Paxton for being such a leader on this.  As I said on the phone, we're a huge fan of you and your office and everything that you've done.

Also the work of this great senate and trying to reign in big tech, and make sure that they are held accountable when they hurt kids.

So on that note, my name is Joel Thayer.  I am an attorney and also the president of the Digital Progress Institute in Washington, DC.  I'm here to testify in favor of the App Store Accountability Act.  I am also well positioned to speak on this bill as I helped develop the legal and policy framework on which SB 2420 is based.

But I think before we get into that, let's begin with why we're even here.  We're here to protect kids full stop.  The sad reality of the digital age is that moms and dads have been

Case 2:25-cv-00733-RDP   Document 58   Page 96   Date Filed 05/20/2025

left on their own to fend off the tech industry's health crisis.

Contending against the allure of products engineered by the most powerful corporations in history to be maximally addictive to kids. Worse, big tech is not only indifferent to the harms children are suffering from its products. But there is strong evidence that they actually may be perpetuating the problem.

This is why the act you all are considering today is critical to ensuring parents can indeed parent in the digital age.

Let's start with the underlying theories. We helped design the framework with two principles in mind. The first was that it's structured to regulate conduct, not content.

It relies on a standard legal principle. Multi-trillion-dollar companies cannot enter into sophisticated contracts with minors. Make no mistake, as my colleague John alluded to, when you go onto an app store, you're entering into a contract.

Through terms of service and through privacy policies with Apple, Google, and third parties to access a whole suite of products that

usually go under the radar for most parents.

Doing it this way, it comports with current Supreme Court precedent to ensure that we -- not just side-step, but don't run afoul of the First Amendment at all.

Keep in mind that this is traditionally how we have handled the sale of addictive products. It's why the proposal today leverages a standard legal prescription, to prevent children from accessing addictive services, where the onus is on the app store to age gate the product.

When you walk into a convenience store, we require the store check for an ID when a patron purchases cigarettes, alcohol, pornography. We also hold the store liable when kids access these products, not necessarily the supplier of the product. In other words, we don't rely on Philip Morris or Anheuser-Busch to ensure kids aren't purchasing their products. We look to CVS, 7-Eleven, and supermarkets to age gate.

The app ecosystem should be no different. I think this also dovetails into the second major principle. The framework was

Case 2:25-cv-00730-RTD Document 58-15 Page 98 1 Date Filed 05/30/2006

Page 17

developed to make sure we use stakeholder's existing infrastructure, and not reinvent the wheel. Indeed placing the age gating responsibilities on app stores reduces the cost of age verification on parents, kids, adults, and app developers, large and small.

A parent simply verifies their child's device once within the app store, and they're done. The internet is unchanged for the parent, and they are still able to control what their kid sees on their devices. Frankly, it's a win-win.

Given Texas's strong track record on passing consumer protection and child safety laws, there is no policy reason why it should draw the line at contracts on app stores, especially when considering the high stakes it has on children's mental health and physical health and their overall development.

In sum, the act holds app stores accountable when they intentionally fall short of protecting children. And passing the act is an essential step in putting families first. I'm proud to support this legislation. And thank you so much for the time.

CHAIR SEN. BRYAN HUGHES: And thank you

for your testimony.  Ms. Fitzpatrick, welcome. And since you're on the end, you got to get close to the microphone so we can hear you.

Welcome.  Introduce yourself and go ahead.  We're glad you're here.

CASTANITA FITZPATRICK:  Okay.  First my name is -- I want to say thank you.  I'm truly grateful to be here.  Senator Paxton and the whole committee.  I hope I said that right.

But my name is Castanita Fitzpatrick. I'm from Dallas, Texas and I'm here speaking as a survivor of human trafficking to support the Senate Bill 2420, the App Store Accountability Act.

I am also an advisor to the National Center on Sexual Exploitation, NCOSE.  And you know, NCOSE is a non-partisan NGL based in Washington, DC.  And I come here from Dallas, Texas.

I'm just going to say from the heart, I was that girl.  I was molested at the age of five years old.  By the time I turned ten years old, I was introduced to drugs and alcohol.  See that's how grooming got me.

At the age of ten, somebody came up to

me with drugs because my mother had her own life. She chose her life over me. And does that make any difference from a Apple phone or a device? No, they're still addictive.

But I can tell you this, by the time I turned 11 years old, I hitchhiked from Chicago, Illinois to Cleveland, Ohio to find my mom. And my mom told the police that's not my child; you can do whatever you want to do with her.

So my traffickers and the people that exploited me, they had me for 31 years. I was out there for 31 years. And if you think about the drugs and alcohol, they used me.

I was in a house for like 12 weeks when they kept giving me drugs and alcohol. And a man came and pushed me in the bathroom and told me, "You're not a little girl anymore. You're a grown woman." So they had their way with me for two weeks.

Can you imagine what's happening to our children that are on these Apple phones or these devices because of the fact they groom you for things that you're addicted to.

Our kids already see these devices and see these things, and that they are eye-

appealing, you know. And so the traffickers and the predators, they go behind the scenes to that.

Our kids don't deserve to live the life that I've lived. Like I said, they got me when I was 10. And I was out there for 31 years, and I'm still learning how to live life and not exist in it.

My family and I are just -- you know, my mom is gone now. But one thing I do want to say is, I come here to raise this awareness of human trafficking because our kids do not deserve to live the life like I had.

I didn't wake up one day and say oh, I think I'll be trafficked today. I didn't wake up one day and say, you know, this is what I want to be when I grow up. I didn't have that opportunity to have a kids' life.

I didn't graduate from high school. I dropped out of school when I was in the sixth grade. But once you're in that game, it's so hard to get out.

And no matter if you're addicted to drugs and alcohol -- thanks by the grace of God, I've been out of the life for 14 years now. And I stand on this movement, and I'm proud to walk

Page 21

on the side of NCOSE and Senator Paxton.  I am on this movement for this bill.

Since then, I just want to add to that. Since then, like I said, my family and I got reconnected, but I have graduated high school in 2019 as a grown woman.  I have achieved my associate's degree in 2022.

And I am now starting my own non-profit to help 18- to 25-year-olds for these young kids that's coming behind me.  We shouldn't have these phones in their hands, but we should also protect them because you can't stop them, right?  You know.

And I was listening to the bill before me with these devices and things like that as far as the vapes and things like that.  They're very appealing, they're eye-catching, they're addictive.  It's just like having cocaine or alcohol.  They're still an addictive agent.

How do we protect our children, right? How do we protect them from that?  I wish somebody had this bill going on in -- back in 1970 when they first got me.

And so in closing to what I want to say is I am a proud Texan now.  I'm glad I've been

here to kick down some doors with you, Senator Paxton.

And I also wanted to close with this one. You know, there is -- here's an example of one of the apps. It's called Exposed 2, that rates from ages 12 plus.

And here's what the user does on these apps. They quote on the app store, lets our users play normal, spicy, or triple x spicy modes, with several options for sexual conversations in games.

Based on moms and other adults -- plus kids that tell me, because I'm a mentor and I mentor a lot of women -- predators use apps and social media just to groom our children.

The grooming stages have escalated and put -- they have escalated from when I was out there. It's no longer face-to-face, let me sit you down over here. Do you need something to eat? Or can I get you something to drink?

Because the predators use women, mother figures, to groom our children. And once they befriend you or befriend our children, guess what happens? They have them. They have them.

And so with me, they knew that I needed

that love and that acceptance. And so they used that against me. And for 31 years, I was out there. I was homeless until I started sexually exploiting myself because I was addicted to drugs and alcohol.

And I'm proud to say that I'm no longer that, and I'm here to stand with you, beside you. And whatever you need me to do, I'm there. Thank you so much.

CHAIR SEN. BRYAN HUGHES: Thank you, Ms. Fitzpatrick. Thanks for your testimony. Senator Paxton, you have the panel.

VICE CHAIR SEN. ANGELA PAXTON: Thank you Chairman Hughes. Thank you for sharing your story, and congratulations on your overcoming. You're an inspiration and encouragement, and you're taking a tragedy and you're investing that.

Something that looked like it was worthless, right? At one time I bet, to you. It's not. It isn't. You're making it matter, and you're helping others, you're paying it forward. And we all thank you for that.

One of the things that I heard each of you sort of saying is that in some ways, this

bill is simply modernizing ways that we need to think about protecting children.

Ms. Fitzpatrick, this wasn't -- it wasn't the phone that got you initially. But you see the parallel, how it does happen. And both of you gentlemen, you shared that this is sort of a modernizing approach.

I wonder if you just have any -- each of you -- we'll start with you Ms. Fitzpatrick, and go across your perspective on how this will modernize protecting our kids.

CASTANITA FITZPATRICK: Like I said it before, I was just -- was out there when I was out there. But it's giving our kids -- you know, it's giving accountability, right?

CHAIR SEN. BRYAN HUGHES: Get a little closer to the microphone so we can hear you. Go ahead.

CASTANITA FITZPATRICK: Okay. I'm sorry. It's showing some accountability, you know. Not just on the parent's side, but it's giving accountability to these app stores.

Because just like the devices, you know, they show these really pretty pictures and it draws them in. But it does show some

Case 2:55-cv-07760-PD Document 583 15 Page 106 10 Date Filed 05/26/2006

accountability like hey, I do want to stand and protect our children.

Let me put this on my app to make sure that this child does not get exploited. Or let me do this and -- you know, to make sure that another child doesn't get -- you know, out there in the dark web and you know, and trafficked. You know.

VICE CHAIR SEN. ANGELA PAXTON: Let me also ask a follow-up question. You mentioned an app that was rated 12 plus. Could you describe that again? And I want everyone to listen.

Especially if you're a parent, I want you to listen to this description of an app that, right now, says that it is rated for 12 plus. And then I'd like to address that.

CASTANITA FITZPATRICK: Yes. One of the examples like I was explaining is an app called Exposed 2. Rated for 12 -- ages 12 plus, and here's what the user does on the app.

Quoting from the app store, it lets users play in normal, spicy, or triple x spicy modes, where several options for sexual conversations in games.

VICE CHAIR SEN. ANGELA PAXTON: Thank

Case 2:55-07760-PB Document 582 1 Page 107 10 Date Filed 05/28/2026

you.

CASTANITA FITZPATRICK:  You're welcome.

VICE CHAIR SEN. ANGELA PAXTON:  Now any parent might assess that differently.  I'm just going to say, that doesn't sound like age 12 to me.  Anything with triple x in it doesn't sound like a 12-year-old appropriate app.

However, I did want to mention that part of what this bill will do, is it will give parents a window into these descriptions.  And to the extent that they are misguided or misrepresentative, I just wanted to point out that the bill specifically does give parents a way to address this.

And it is a violation for an app developer to knowingly misrepresent an age rating or reason for the rating.

So thank you for highlighting that.  I think that's part of what this will do.  It will give parents a more open window into what their kids are doing.  More specifically, app by app by app.  And it will help them to raise their kids the way they want to raise their kids.

And so thank you for bringing that up. Gentlemen, your thoughts on modernization or just

how this will help modernize the way we protect kids.

JOEL THAYER: Well Senator, I couldn't have said it better myself. That's a -- it's precisely what the model is based on and what your bill actually would do.

What we did was we just turned -- we basically said what does, you know, the purchasing of addictive price look like in the digital age? And where are the kids getting it?

I mean your first interaction with all of these apps are the app store. It's not -- you know, it's -- you're not going to billboards typically to find out where they are. They getting pushed to app stores, and in fact, Apple even says you must have these apps if you go on these app stores.

And like a lot of them are social media apps. I wouldn't even stop at just that one app. I mean that's one of hundreds of examples. I mean TikTok is listed as a must have app, and it's listed as -- I think it's aged at 12 and above.

And when you look at what TikTok has done, and when you see the havoc it's wreaked,

you wonder how in any -- in what world would that be acceptable in any other brick and mortar context?

So all we really did was essentially harmonize two things. One is how -- what is the user experience today? How are they accessing these products? And two, compliance, right? I mean you have to make sure that you are putting the right, as my English professor would always say, the right emphasis on the right syllable.

And part of that is just figuring out where the chokeholds are. And I can't say it better than my good friend at the FCC, Chairman Carr.

When he says the single choke-point of the mobile ecosystem are these app stores, you cannot access anything on a mobile device without going through, as you rightly said Senator, one of two app stores. And all of this is, is putting the accountability where the accountability lies.

VICE CHAIR SEN. ANGELA PAXTON: Thank you. And I also appreciate in your testimony, you said very specifically, this bill doesn't judge content.

JOEL THAYER:  At all.

VICE CHAIR SEN. ANGELA PAXTON:  It doesn't judge content at all.  It is -- it's judging the conduct, right?  And it puts the decision-making power for the content in the hands of parents.

JOEL THAYER:  Yes.  That's (indiscernible).

VICE CHAIR SEN. ANGELA PAXTON:  And you know, any given parent might think one thing is okay for their kid, and another -- or they may decide I'm just going to blindly okay everything.

I feel for that child, but that's -- you know, that's a parent's choice.  So this doesn't judge the content.  It's going at the conduct, and it's putting the power back in the hands of parents.

JOEL THAYER:  And if I may on that one point, that's actually a feature, not a bug.  The fact that it takes in every single app, means that we are indifferent to the content.  We don't care what the content is.

The action that we are after, the transaction that we are regulating here, are contracts.  And it has -- it doesn't matter if

it's a social media app, if it's a digital market space, or heck, even if it's a Bible app.

If there's a terms of service associated with it, kids should not be assenting to anything. Especially when there's data collection implications to that, and also the ability to be digitally surveilled.

VICE CHAIR SEN. ANGELA PAXTON: Thank you. Sir, your thoughts on the reason it's important to modernize our protection of children in this way.

JOHN READS: Yes. So much has been that's terrific, and Ms. Fitzgerald I just -- your testimony was powerful.

Let me say this. This obviously modernizes contract law that, you know, kids can't go to banks and make a loan. Texas has a lot of other prohibitions on what minors can do. It puts that in a digital world as well. So in that sense, it's very simple.

Ms. Fitzgerald's testimony was powerful, but I hope you hear other testimony about how kids are suffering today.

Just -- not with trafficking always, but just mental health issues from scrolling and

the doom scrolling, and lack of social interaction.  As we have a -- we have teenagers that are in worlds that parents weren't in.

So it's hard to parent knowing what your teenagers are going through because the world has changed.

And so, this bill at least gives parents some insight, some power to say my child's doing really well, that's appropriate. Or this isn't going to help my child.  And so the state's not deciding, the parent is.

VICE CHAIR SEN. ANGELA PAXTON:  Thank you.  I appreciate -- and I think that's an important point for all of us to kind of recognize.

Any of us who have children or grandchildren, I mean we recognize it's a difficult time to raise children, the world we live in.  Children have always been the easy target.  Always, throughout history.

Children are always the low-hanging fruit for predators.  But one of the extra difficulties that parents certainly have today, is that they're having to parent their children through things they themselves weren't parented

through, right?

JOEL THAYER: Yeah.

VICE CHAIR SEN. ANGELA PAXTON: And I know I'm watching this with my own children who are all adults now, and are starting to have their families.

And you know, they're thinking about these things. But you know, they had -- they had cellphones. They didn't have smartphones. And that's -- it's a world of difference. And so it really does matter.

We can't be indifferent to the harmful effects as -- I forgot who used that term. But technology cannot be indifferent to the harmful effects on children. When people are indifferent to the harm they cause, we call those people sociopaths.

CASTANITA FITZPATRICK: That's right.

VICE CHAIR SEN. ANGELA PAXTON: And technology companies need to be thinking about how to make things better. And I think many times they are. But we all have to do our part.

We don't need corporate sociopaths. We need everyone to be on board to help protect our kids. And I really appreciate your testimony.

Ms. Fitzpatrick.

CASTANITA FITZPATRICK:  I heard it said several times about the mental health aspect of it.  You know, dealing with our kiddos and like, the parents are not there.  You know, they don't understand that aspect of it, you know.

One thing about trafficking and kids that go through a lot of trauma, you know, it's an ongoing process with the mental illness, you know.  It's DID, disassociation disorder.  It's not -- disassociation disorder, it's not just schizophrenia, you know.

And parents can not -- you know, be aware of your children.  You know, be aware of their attitudes and their changing.  Their mood changings, you know.  Don't just brush it off or anything like that, because you never know what your child is going through, until you look into them and find out what's truly going on.

Just don't stick them in some, okay, let me take you to the doctor.  No, parent them.  We don't need other doctors because you are your kids' doctors.  You know your children better than anybody.

But if you watch them, pay attention to

Case 2:55-cv-07760-RB Document 583-1 Page 115 of 183 Date Filed 05/26/2026

them, and see the changes and the cycle when they're on their phones. And how they're dressing, and what they're doing in school, and stuff like that, because grooming starts when the child starts changing.

And if you look at -- like with me like I said before, they got me with drugs and alcohol. But even here in society today, you can go to the grocery store, and you see a kid that's always walking with their head down.

Pay attention to the signs, you know. They have a man or a woman walking behind them. You're a mom, you walk beside your child.

So it's a lot of different things that we can do, as you stated Senator Paxton, as a whole. Because -- just because it may not be happening in your home, it's happening right next door to you.

And I'm going to close with this. In Farmer's Branch there was two brothels. Two brothels in Farmer's Branch.

And people -- and these -- the youngest child that was in it was seven years old. Seven, you know. So it's not just happening physically, it is happening online.

And that's how they have their -- you know, the girls go to school, they have their uniform on, but what's underneath that uniform? You know. So just be mindful of your children daily. Thank you.

VICE CHAIR SEN. ANGELA PAXTON: Thank you. Thank you. And you know, that really does bring things back to, you know, first and foremost, parents have the responsibility, and the joy, and the duty, of parenting their children.

And you know, sadly there are many children who aren't parented.

CASTANITA FITZPATRICK: Right.

VICE CHAIR SEN. ANGELA PAXTON: And I'm so sorry for how that affected you, and for that experience that you had.

And there are many children in this situation. And that's one of the things that we have to also think about, and we do. We do consider how we can help as a State on those fronts. But for those parents who do want to parent, which is most parents, the first step is certainly awareness.

And I think this will go a long way to

putting some information in the hands of parents to enable them to know what's going on in their child. Watch for those signs. And I think it will make a big difference.

Thank you all for coming to testify today. Thank you, Mr. Chairman.

CHAIR SEN. BRYAN HUGHES: Thank you, Senator Paxton. Senator, is there any other questions for these witnesses?

We're thankful for each of you. Ms. Fitzpatrick, one more thing. You talked to us about some of your experiences and how we can help other children be safe from going through what you went through.

And you talked about where you are today. Just give us some idea, how did you get from where you were to where you are?

CASTANITA FITZPATRICK: One thing -- I know, my mic.

VICE CHAIR SEN. ANGELA PAXTON: There you go.

CASTANITA FITZPATRICK: One thing is my faith in God, first of all. I got rescued August 6, 2010. Those that are there from the Dallas area, the PDI program saved me.

They was doing a sweep that night. They was, you know, picking up all the girls and stuff like that. I prayed out to God. I was on the side of Lancaster Road with eight pairs of socks on. It was pouring down raining outside. I said God please help me, help me.

And two weeks later, they did a PDI sweep. And when they did that PDI sweep, they took me, make sure I didn't have -- thank God I didn't have any diseases. I didn't have anything like that.

But I was up for twelve days, and I didn't want to do -- I didn't want to live this life anymore. I got tired of people using me, and I vowed to God and myself, I deserve a better way of living.

It hasn't been easy; I've been through a lot since I've been out of the game, and been out of the life. But I've been on this movement for -- ever since August 6, 2010.

And I wanted to go to school. I wanted to have my high school diploma. I wanted to walk across the stage and get that. I mean I have an extensive record right now. I wish my felonies would be gone, but they're there, you know.

But I live today -- I don't exist in life anymore.  I get to pay bills today.  I am like take my money; there you go.  I am -- and I'm just on this path now to help as many as I can.

I stay determined; I stay prayed up.  And every time I see another young girl that I get a chance to mentor, coming from the life and she's doing better for herself.  She either has her kids back, or she learned how to ride the bus like I did, then I know I'm doing exactly what God wanted me to do.

And like I said, I'm starting my non-profit, Fly with Both Wings.  And it's going to be for 18- to 25-year-olds because one thing Dallas, Texas does not do, is when you're out of the life and you have troubles and problems -- like I was in a car wreck and I needed my bills paid, and I lost two jobs, and all of this stuff.  But I don't go back to the life no matter what.

I don't start using drugs no matter what because I know if I give up, then the next girl coming behind me that's still out there, because it is another Castanita out there.

There's another 10-year-old me still

out there.  There's another 11-year-old me out there.  So that's what keeps me going because I'm fighting for them and not just myself.

CHAIR SEN. BRYAN HUGHES:  Thank you for your testimony.  Thank each of you for being here.  You're excused.  Thank you very much.

We'll open public testimony on Senate Bill 2420.  And the Chair calls Vanessa Sivadge.  Deborah Simmons.  Bart Cleland.  Tom Mann.  Greyson Gee.  All right.  Mr. Mann, take that one over there.  You're good.

Also looking for Johnny Kampis.  And after this panel, we'll be calling Kouri Marshall, Andrea Sparks.  Have a seat right there on the end.  And we'll start over here on my left, your right.

And for those of you on the end of the table, you've got to get close to the mic so we can hear you.

MR. KAMPIS:  Me first.

CHAIR SEN. BRYAN HUGHES:  Yes, sir.  Introduce yourself, give us your testimony.

MR. KAMPIS:  Good morning, thank you for having us here.  My name is Johnny Kampis.  I'm the director of the telecom policy for the

Taxpayers Protection Alliance.

On behalf of the millions of taxpayers and consumers we represent, we urge you to oppose the bill. The legislature presents deep constitutional issue from its mandate for device manufacturers or app store to estimate or verify their user's age. Although well intentioned, the bill would create substantial privacy risks, and violate clear Supreme Court precedent with broad age limitations, the user's right to access various digital services.

The constitutionality of age verification legislation remains highly questionable. Supreme Court caselaw on this front stretches back decades.

In the lower courts, NetChoice v. Griffin, 2023, case blocked an Arkansas bill requiring social media platforms to obtain age verification and parental consent to the potential violated the First Amendment.

Similar, age verification laws in other states have run into the same injunctions. Proponents of app store age verification defend age proposals by saying they are about contract law not speech.

They also claim they are content neutral, and therefore immune from constitutional challenge. Neither point withstands scrutiny.

First, they claimed the age verification bills are about contract law, not speech, does nothing to change the fact they would impose a huge burden on the speech rights of adults forced to submit to age verification for accessing apps. These burdens assure that the bill will fail if challenged in court.

Second of all, imposing sufficiently large burdens on speech will be found unconstitutional, even if it is content neutral, illustrated with an extreme example, a law that banned all online speech would certainly be found unconstitutional despite its neutrality.

Further, the parental consent requirements of the bill run into constitutional issues. In Brown v. Entertainment Merchants Association, 2011, Justice Scalia wrote for the majority, "It does not follow that the state has a power to prevent children from hearing or saying anything without their parents prior consent." The possibilities of our government --

CHAIR SEN. BRYAN HUGHES: We'll come

back for questions.  Thanks very much.  Welcome.

Introduce yourself, give us your testimony.

GREYSON GEE:  Thank you, Chairman Hughes, Vice Chair Paxton, members of this Committee.

My name's Greyson Gee with the Texas Public Policy Foundation, and I'm here to testify today in support of Senate Bill 2420, the App Store Accountability Act.

We at the Texas Public Policy Foundation have long advocated for the welfare of children, and the strength of the American family.

As we've studied the intersection of technology and childhood, our research has exposed a concerning reality about kids and their use of technology.

In today's digital landscape, our children are more vulnerable than ever.  Mobile applications have become a gateway to harm, exposing minors to inappropriate content, predatory practices, and unchecked data collection.

This legislation would provide a lifeline for our children's digital wellbeing.

Senate Bill 2420 provides what parents have been desperately asking for, real meaningful protection for their children in the digital world.

It mandates robust age verification, ensuring that app stores know exactly who is using their platforms. But this bill goes further. It protects children's personal data, limiting data collection, and ensuring encryption.

In an era where children's information is constantly at risk, this bill creates a shield against unethical data practices. Some may argue that this is government overreach. I argue that it's government doing its fundamental job, promoting the general welfare of its citizens.

Parents shouldn't have to be cybersecurity experts to keep their kids safe. This bill bridges that gap. It provides a framework of protection, transparency, and accountability.

Thank you for the opportunity to testify today, and I look forward to answering any questions you may have.

CHAIR SEN. BRYAN HUGHES: Thank you for

your testimony.  And I've known you for a while, and I just can't help reverting back to pronouncing your name Gee sometimes.

There was a judge with the same spelling that used that -- but thank you, I apologize.

GREYSON GEE:  It's all right, sir.

CHAIR SEN. BRYAN HUGHES:  And I know how to pronounce your name but I think I did it wrong.  Bart, welcome.  Introduce yourself and give us your testimony.

BARTLETT CLELAND:  I'll go with what you said, Mr. Chair.  Bart Cleland, I like that. Happy to be here, happy to be back home.  Feels great to testify.  Happy to see you, Senator Paxton and members of the Committee.

I'm Bartlett Cleland.  I'm general counsel for a trade associated called NetChoice. You guys know us, but our mission is to make the internet safe for free enterprise and free expression.

Unfortunately, I have to oppose the legislation today.  We do share your goal of protecting minors and any harmful content online. I personally have been involved in this fight for

over 25 years, serving on a couple different commissions to -- national commission to look exactly at the right way to accomplish this end.

We do ask you, that is the committee, to oppose this legislation. The Supreme Court and other federal courts have ruled that age verification mandates block access to the exercise of First Amendment rights, and that is unconstitutional.

Age verification laws have recently failed in states California, Utah, Ohio, Arkansas, and Mississippi. And I would not like to have Texas to be part of that list.

Given that legal landscape, SB 2420's age verification, parental consent requirements, and data related requirements, will not survive judicial review.

But on the chance that they would, unconstitutional age verification laws not only face those legal challenges, but do encroach upon parent's long-established prerogatives in guiding their children's upbringing and online activities.

Many online platforms as we all know, have implemented robust parental control features

Page 46

already, not least of which are iPhones and iPads, area of which I am -- particularly understood that I chose to protect my children as a matter of fact.

A one size fits all government mandate will give users a false impression of security, and will flatten the offerings for youth safety in the future.

And in the end, I'm a conservative and I believe in personal accountability. Those pedaling questionable content -- we heard about some earlier today -- they should be the ones called to account, not others. Thank you very much.

CHAIR SEN. BRYAN HUGHES: Thanks for your testimony. Welcome. Introduce yourself and go ahead.

DEBORAH SIMMONS: Thank you. I'm Deborah Simmons and I am for Senate Bill 2420 to require age verification for app store downloads and purchases.

In January, the Supreme Court heard oral arguments in the free speech coalition case against the state of Texas. The petitioner's attorney representing the porn industry

complained that Texas should've empowered and equipped parents to trust content filters rather than taking the "very chilling step" of requiring age verification for porn sites.

The porn industry, service providers, application developers, and device companies point fingers, blaming each other, exploiting legal loopholes and declaring that states should adopt solutions other than something that requires each of them to protect children.

And then finally, the attorney scapegoated all responsibility with the declaration that parents should do better. All because they refuse to proactively share in the responsibility to protect the young and the vulnerable in society.

At one point in their oral arguments, Justice Alito asked the porn industries' attorney, "Do you know a lot of parents who are more tech savvy than their 15-year-old children?"

The adult entertainment industry attorney eventually conceded that access should be up to a parent to decide what's appropriate for their minor. We agree. Access should be up to the parent.

Texas legislature is again supporting parents involved and uninvolved by blocking the downloading of applications and purchases on devices, unless a minor has parental consent.

It is unacceptable that the tech and content providers avoid responsibility and burden parents. This is a good bill with good intentions and an excellent mechanism to protect children and support parents.

This legislation is one of the many bills that provides a common-sense solution that honors parental consent, supports the State's compelling interest to protect children, and provides necessary safeguards that the industry and their allies refuse to do voluntarily.

We applaud the efforts of the 89th legislature to pass each and every legislation to that end. Please pass Senate Bill 2420. Thank you.

CHAIR SEN. BRYAN HUGHES: Thank you for your testimony. Mr. Mann, get close to the microphone. Introduce yourself and go ahead.

TOM MANN: Thank you, Mr. Chair. Good morning, my name is Tom Mann. I'm here today representing the Computer and Communications

Case 2:55-cv-07760-PD Document 583 15 Page 130 10 Date Filed 05/26/2026

Industry Association, in opposition to Senate Bill 2420. CCIA is an international not for profit trade association representing a broad cross-section of communications and technology firms.

First, we want to thank the sponsor for their openness to feedback on this bill, and we fully support your goal in protecting children online. But we'd also like to offer some thoughts today on age verification methodology. Current tools like facial age estimation are still a work in progress.

The National Institute of Standards and Technology recently published a report evaluating six software-based age estimation and age verification tools, that estimate a person's age based on the physical characteristics evident in a photo of their face.

The report notes that facial age estimation accuracy is strongly influenced by algorithm, sex, image quality, region of birth, age itself, and interactions between those factors, with false positive rates varying across demographics, generally being higher in women compared to men.

CCIA encourages lawmakers to consider the current technological limitations in providing reliably accurate age estimation tools across all demographic groups.

Additionally, if age estimation is not used, and individuals must provide their license or personal information, that means collecting more personal data, which might worry families who value privacy as much as they value safety.

Recent state legislation that would implement online age verification or estimation and parental consent measures is currently facing numerous constitutional challenges. And federal judges have placed many of those laws on hold until these challenges can be fully reviewed.

For these reasons and the reasons listed in my written comment, CCIA asks for an unfavorable report. And I appreciate the opportunity to testify today.

CHAIR SEN. BRYAN HUGHES: Thanks for your testimony. Mr. Mann, were you here for Ms. Fitzpatrick's testimony on the first panel?

TOM MANN: I was.

CHAIR SEN. BRYAN HUGHES: Did you hear the description she read about an app that was

Case 2:25-cv-07760-PD Document 58-2 Filed 05/26/2006 Page 132 of 183

approved for ages 12 and up on the app store?

CHAIR SEN. BRYAN HUGHES:  Did that sound to you like an app that's appropriate for ages 12 and up?

TOM MANN:  I'm not here to comment on the appropriateness --

CHAIR SEN. BRYAN HUGHES:  Well you are now.  I'm asking --

TOM MANN:  -- individual app.

CHAIR SEN. BRYAN HUGHES:  You are now. I want to know your position, I want to know CCIA's position on whether that app available today without this law, is appropriate for a 12-year-old?

TOM MANN:  Our position here today, with all due respect Mr. Chair, is that the age verification technology that would be used to verify a minor's age to get into the app store is faulty.  And that's what the reports are showing right now, that it can't be accurately verified. If it can't be accurately verified through some of these different technologies, it has to be verified some other way.  So what will that other way be?  Our position is that whatever that other

way will be will require that minor to relinquish some more of their personal data.

CHAIR SEN. BRYAN HUGHES:  So then --

VICE CHAIR SEN. ANGELA PAXTON:  Mister --

CHAIR SEN. BRYAN HUGHES:  -- just a second.  Just a second, Senator.  I'd like to know -- and thanks for your -- we're listening, it's all being taken down, we want to get the details right.

If you can't tell me today, I would like in writing from you, CCIA's position, your client's position -- I'm curious about yours too but you're here on behalf of your client.

You and your client's position on whether the app that the witness described is appropriate for the age level that she described. Can you give that to us in writing?

TOM MANN:  We're happy to follow up with you.

CHAIR SEN. BRYAN HUGHES:  Will you give us an answer in writing on that question?

TOM MANN:  Yes, Mr. Chair.

CHAIR SEN. BRYAN HUGHES:  Very good, thank you.  Mr. Cleland, I know you're a lawyer,

we've known each other for a long time, we've talked about free speech a little bit.

I think we all agree, but let's make sure we're clear. I hope it is not NetChoice's position that the First Amendment prevents the government from protecting children. Is that NetChoice's position? I don't think it is, I just want to get that on the record.

BARTLETT CLELAND: No, that's not it at all.

CHAIR SEN. BRYAN HUGHES: I know, I know.

BARTLETT CLELAND: It's actually kind of in the reverse. The First Amendment protects everybody. And then you know as well from law school, there are all kinds of permutations to that.

CHAIR SEN. BRYAN HUGHES: And do we also recognize that under the First Amendment, there is speech that is appropriate for adults, but that the government is allowed under the First Amendment to limit for children? Do we agree on that?

BARTLETT CLELAND: Absolutely. In fact, most famously pornography for example.

CHAIR SEN. BRYAN HUGHES:  I beg your pardon.

BARTLETT CLELAND:  I said most famously for pornography for example.  Just one of a couple different categories.

CHAIR SEN. BRYAN HUGHES:  So speech that would be allowed under the First Amendment for an adult, but for children, the rules are different.

BARTLETT CLELAND:  In some cases, that is correct.

CHAIR SEN. BRYAN HUGHES:  And that's because if we're going to impinge on a First Amendment right, wouldn't you say that the government has to show that we have a compelling state interest and they're using the lease restrictive means to achieve that interest.  Is that close to the test as you understand it?

BARTLETT CLELAND:  You said it well.  That's close to the test as I understand.  I'm not going to hold myself out as a First Amendment expert, but yes, those are some of the conditions.

CHAIR SEN. BRYAN HUGHES:  Were you here for Ms. Fitzpatrick's testimony?

BARTLETT CLELAND: I'm sorry. What was --

CHAIR SEN. BRYAN HUGHES: Were you here for Ms. Fitzpatrick's testimony?

BARTLETT CLELAND: Yes.

CHAIR SEN. BRYAN HUGHES: The lady that --

BARTLETT CLELAND: Yes.

CHAIR SEN. BRYAN HUGHES: -- talked about her experience. Did you hear her describe an app? And she read the description of it in the app store, and which said it was for ages 12 and up.

She mentioned it in her testimony and then Senator Paxton asked her about it again incase we didn't hear it. Did you hear that testimony?

BARTLETT CLELAND: I did.

CHAIR SEN. BRYAN HUGHES: Do you believe the app she described is appropriate for ages 12 and up?

BARTLETT CLELAND: As described, my answer is no. I don't know that app though so I can't really speak from first-hand experience.

CHAIR SEN. BRYAN HUGHES: What is the

position of NetChoice on whether the app she described is appropriate for ages 12 and up?

BARTLETT CLELAND:  Well without absolutely confirming it, I think I can speak for them and say the same as my answer, which is as described, we would not find that appropriate for 12 years old.

CHAIR SEN. BRYAN HUGHES:  Like I asked Mr. Mann, I'm going to ask you to review the testimony and respond to us in writing with NetChoice's position on whether that app is appropriate for those ages.

BARTLETT CLELAND:  I couldn't hear. What was the app's name?  Do you guys know what it was?

CHAIR SEN. BRYAN HUGHES:  Exposed 2 is what my notes indicated.

BARTLETT CLELAND:  Sorry.  Exposed.

CHAIR SEN. BRYAN HUGHES:  Exposed 2 is what my notes indicate.  That's right.

BARTLETT CLELAND:  2.

CHAIR SEN. BRYAN HUGHES:  But again, you can go back and watch the video.  And she mentioned it twice.  Mr. Kampis, you probably know what's coming.

JOHNNY KAMPIS:  Yes, sir.

CHAIR SEN. BRYAN HUGHES:  Did you hear Ms. Fitzpatrick's testimony?

JOHNNY KAMPIS:  Yes.

CHAIR SEN. BRYAN HUGHES:  What did you think about that?

JOHNNY KAMPIS:  That that was very compelling.

CHAIR SEN. BRYAN HUGHES:  What'd you think about the app that she described, and she read it was approved for ages 12 and up?  Did that sound right to you?

JOHNNY KAMPIS:  Based on what I've heard, I would that was very questionable for minors.  I add that as a parent of a 15-year-old son and 11-year-old daughter -- and my son is autistic so he's particularly vulnerable -- I'm very much about personal responsibility as a parent to teach my children, you know, what is appropriate and what is not appropriate.

And I feel like, you know, as a parent, my children would know that something like that is not appropriate for them.

CHAIR SEN. BRYAN HUGHES:  Does the Taxpayers Protection Alliance have a position on

whether that app she described is appropriate for ages 12 and up?

JOHNNY KAMPIS: I would think that as Mr. Cleland said, based on the description of it, does not seem appropriate to me. No.

CHAIR SEN. BRYAN HUGHES: Will you review the testimony and respond to the Committee in writing, whether your organization believes that app described by the witness, is appropriate for ages 12 and up?

JOHNNY KAMPIS: Yes.

CHAIR SEN. BRYAN HUGHES: Very well. Senator Paxton.

BARTLETT CLELAND: Quick question. On that letter, I just want to make sure that we're okay. Given as it's described, I'm not sure I'm super comfortable reviewing the app personally. But can we respond to you as described? Is that okay? Or do you want us to actually look at the app?

CHAIR SEN. BRYAN HUGHES: Counsel, we're talking about your clients here. I mean, that's an unusual position to take for NetChoice to say, I'm not sure I want to look at apps by people that I represent.

Case 25-55107 Document 58-2 Page 140 Date Filed 05/26/2026

BARTLETT CLELAND: I don't think that app is my client. Absolutely not.

CHAIR SEN. BRYAN HUGHES: We'd like know what -- whether NetChoice believes the app she described as she described it, is appropriate for ages 12 and up.

BARTLETT CLELAND: As she described it. That's fine. Perfect.

CHAIR SEN. BRYAN HUGHES: Members, any other questions for this panel? Thanks for your testimony. Chair calls Kouri Marshall, Andrea Sparks, Vanessa Sivadge.

You have some written materials for us?

KOURI MARSHALL: I do.

CHAIR SEN. BRYAN HUGHES: Give it to the lady right over there and she'll (indiscernible).

And so we're looking -- looks like we have Kouri Marshall, Andrea Sparks, and then we're still looking for Vanessa Sivadge. Give her one more chance. All right.

We'll start on my left, your right. And Ms. Sparks, welcome back. Introduce yourself, give us your testimony.

ANDREA SPARKS: Thank you, Chairman

Hughes, Committee members. My name is Andrea Sparks, and I'm testifying in favor of SB 2420. Thank you, Senator Paxton, for filing this bill.

I'm here on behalf of a non-profit I co-founded called Not On Our Watch Texas. Not On Our Watch is an initiative of Texas women in business and our mission is to engage women in business to educate themselves and others on protecting children from online harms.

When we were growing up and playing outside, we all knew to stay away from the white van, the one without the windows. When we saw one of these, we ran home to tell our mom, and we tried not to think about the dangers inside.

The smartphone is the new white van. But we give these to our children at about 11 years old. And instead of being afraid, our children become addicted to them. Apps are our children's gateway to the digital world, and unfortunately, increasingly a gateway for predators to our children.

We think we can keep our children safe by telling them to stay away from dangerous apps. But the reality is, once they are in the van on the phone, it's unrealistic to expect kids to

protect themselves.

I want to share with you just a few of these apps that I found. And instead of reading what I think about them, I'm going to share what the kids themselves rated them.

So these are kids who are literally begging someone to protect them. One app is called the Perp app. It's for 12 and up. It's described as make new friends, meet and chat with real people.

Kid says, "This is all full of pedophiles. This app is for teens, but I can't do this anymore. It makes my anxiety go crazy. I'm 14 and shouldn't feel unsafe on an app made for my age group. Please figure out a way to separate minors from adults."

A second app called the Buzz app. Again, 12 and up. It's described as make friends, swipe, meet, chat. There are many apps like this one here. And so I just want to thank you all for filing this bill.

Senator Paxton, it's very important. It's a common-sense solution to this problem and protect our kids.

CHAIR SEN. BRYAN HUGHES: Thanks for

your testimony.  Mr. Marshall, welcome.

Introduce yourself and go ahead.

KOURI MARSHALL:  Thank you, sir.  Good morning, Chairman and to the distinguished members of this Committee.  I am Kouri Marshall with the Chamber of Progress in respectful opposition to SB 2420.

The Chamber of Progress is a tech industry coalition working to advance the future of technology and inclusive access to that future.

As written, SB 2420 would effectively require covered manufacturers to verify the identity and age of all users.  In fact, estimating the age of a user would require the collection of more data.

I heard Utah mentioned.  It is my opinion that Utah is a one-way ticket to litigation.  I know the members of this committee are fervent supporters of protecting children.  As a dad of a baby boy, I am too.  I just don't think that this bill is that route to where we're trying to go.

This bill would absolve some companies from their shared responsibility to protect

children online, while placing the burden on the shoulders of a few.

This bill as it is drafted treats app stores like gated communities, and developers like the residents. Instead of making each resident individually check IDs at the door, the community gatekeeper is responsible for verifying the age and identity of everyone in the neighborhood.

I don't know about you, but I'd like to make the decision on who can enter my home, not someone else.

Finally, I want to underscore concerns raised by US District Judge Beth Freeman in California, when evaluating similar legislation. She remarked, "It's always interesting when I read the legislative history and see legislators saying we took this idea from the United Kingdom. But here's the key difference, the United Kingdom doesn't have a First Amendment. In America, we do. And that's not just a detail. It's a cornerstone of our democracy. And it's a right we must protect."

SB 2420 shifts the burden of responsibility from online safety from where it

belongs and places it instead on app store developers.  For these reasons, we respectfully urge you to oppose.

CHAIR SEN. BRYAN HUGHES:  Thanks for your testimony.  Senator Paxton, you have the panel.

VICE CHAIR SEN. ANGELA PAXTON:  Thank you.  Sir, do you have a phone?  A cellphone.

KOURI MARSHALL:  I definitely do.

VICE CHAIR SEN. ANGELA PAXTON:  Do you have an iPhone?  Or an -- I don't know what you have.  What kind of phone do you have?

KOURI MARSHALL:  Senator, I have an iPhone.

VICE CHAIR SEN. ANGELA PAXTON:  I have an iPhone also.  When I set up my iPhone, part of setting up my Apple ID was my -- putting my birthday in there.  Did you do that?

KOURI MARSHALL:  I believe I did.

VICE CHAIR SEN. ANGELA PAXTON:  Okay. So I'm just going to say, anyone that has an iPhone -- I believe that this is true of any phone.  You put your birthday in when you set up your ID.  They know how old you are.

There's no -- there's nothing extra

required of Apple or Google to determine the age of the phone that this is assigned to. Now if I give my phone to one of my kids, that's kind of on me. And it has my 62-year-old age attached to it.

But this does not require anything extra that the companies are not already doing, and this protects kids. Again, when people do not care, individuals have no sense of care or are indifferent about harm that their actions cause, we call those people sociopaths.

And companies that do that are corporate sociopaths. It is time for that to end. It is time for the tech companies to be responsible with information they already have to protect children. Thank you for your testimony.

Andrea, thank you for being here. You were going to describe a couple of more apps. I wonder if you could just give us a couple more examples.

ANDREA SPARKS: Sure.

VICE CHAIR SEN. ANGELA PAXTON: And what the children themselves were saying.

ANDREA SPARKS: I'm going to apologize in advance. I tried to screen out the ones with

the explicit language, but this was just me on my phone yesterday looking around and getting ready for today.

And I'm just baffled. I mean if these reviews are in public and I can find them, surely the app stores can find them and do something about it, and these apps still exist.

So one was called the Fizz app. It's rated 9 and up. Teen chat, chat, meet new friends. The reviews are, "Very dangerous for children." This is one review. Another review says, "This is creepy." And there's some more explicit language that I'm not including.

Another one was the Buzz app for -- rated age 12 and up. Make friends. "I'm a young teen. He asked me what I was wearing and asked for that type of pic, and I said no thanks. He sent a pic of himself and said he was horny, and said see you soon. I'm quite scared."

So the app store sees these reviews, and there's so many. I mean these are just from kids who are saying, help me, I'm scared. Can you take down this app? Can you do something to protect us?

I think this App Store Accountability

Case 2:55-07760-PD Document 583 Page 148 Date Filed 05/28/2026

Act is a very -- just a common-sense way to fix this.  And like you said, the technology exists, I don't know why tech companies are opposed except follow the money.

They can tell our age to send us all kinds of ads on things that they think we want to buy.  You know, you think of a pair shoes and suddenly it's on your phone.  That happens to me all the time.  So, thank you.

VICE CHAIR SEN. ANGELA PAXTON:  Well and I don't know if you were in the chamber at the beginning during the bill layout, but children are a huge consumer market.

And their spendable income.  Because they're children, it comes from their parents, right?  So that's another note to parents, pay attention.  But children's income is almost exclusively discretionary.

They don't have other drags on the money they have, their allowance or whatever.  And so they're tremendously appealing to companies that want to market to them.

And there is a lot of money in it, that's for sure.  I don't think it's -- comes as a big shock to anyone that our children are being

harvested for profit in all kinds of ways.

And this is one way that we can make a difference and protect kids. And I don't hear a lot of speech censorship happening there. And this bill wouldn't get rid of that app.

It would just create transparency for parents about what's there. Thank you, Andrea. I appreciate it. Thank you for both being here.

KOURI MARSHALL: Thank you, Senator.

VICE CHAIR SEN. ANGELA PAXTON: Thank you, Mr. Chairman.

CHAIR SEN. BRYAN HUGHES: Thank you, Senator Paxton. Members, any other questions for these witnesses? Thank you both for being here --

KOURI MARSHALL: Thank you.

CHAIR SEN. BRYAN HUGHES: -- very much. You're excused. Those are the witnesses we have registered to testify on, for, or against Senate Bill 2420. Is there anyone else present wishing to testify on, for or against Senate Bill 2420?

Seeing hearing none, public testimony's closed. Bill's left pending at this time.

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  July 2, 2025

**[1 - addicted]**

**1**

**1** 9:10,10
**10** 20:5 38:25
**11** 19:6 39:1
57:16 60:16
**11501** 69:14
**12** 19:14 22:6
25:11,15,19,19
26:5,7 27:22
51:1,5,14
55:12,21 56:2
56:7 57:11
58:2,10 59:6
61:8,18 66:15
**12151** 69:8
**13** 11:13
**14** 11:13 20:24
61:14
**15** 47:20 57:15
**1698** 4:13
**17** 11:2,4,11
**18** 21:9 38:15
**1970** 21:23

**2**

**2** 22:5 25:19
56:16,19,21
69:16
**2010** 36:24
37:20
**2011** 41:20
**2019** 21:6
**2022** 21:7

**2023** 40:17
**2025** 1:15 9:10
69:16
**2026** 9:10
**2420** 1:14 2:2,2
3:10 5:10 10:3
10:6 14:21
18:13 39:8
42:8 43:1
46:19 48:18
49:2 60:2 62:7
62:12 63:24
68:20,21
**2420's** 45:14
**25** 21:9 38:15
45:1

**3**

**30** 10:22
**300** 69:13
**31** 1:15 19:11
19:12 20:5
23:2
**330** 69:12

**6**

**6** 36:24 37:20
**60** 10:18
**62** 65:4

**7**

**7** 16:21

**8**

**89th** 48:16

**9**

**9** 66:9

**a**

**ability** 30:7
**able** 12:23
17:10
**above** 27:23
**absolutely**
53:24 56:4
59:2
**absolve** 62:24
**acceptable** 28:2
**acceptance**
23:1
**access** 4:1 7:12
8:4 13:22
15:25 16:17
28:17 40:10
45:7 47:22,24
62:10
**accessing** 7:14
16:10 28:6
41:9
**accomplish**
45:3
**account** 7:4,6,7
46:13
**accountability**
6:11,16 14:18
18:13 24:15,20

24:22 25:1
28:20,21 42:9
43:21 46:10
66:25
**accountable**
14:13 17:20
**accounts** 7:2
**accuracy** 49:20
**accurate** 50:3
69:4
**accurately** 7:25
51:21,22
**achieve** 54:17
**achieved** 21:6
**act** 5:18 6:11
6:16 9:6,7
14:18 15:10
17:19,21 18:14
42:9 67:1
**acting** 9:3
**action** 5:17
29:23
**actions** 9:8
65:10
**activities** 45:23
**actually** 6:12
12:10 15:9
27:6 29:19
53:13 58:19
**add** 21:3 57:15
**addicted** 4:25
5:1,2,4 19:23
20:22 23:4
60:18

| addiction 4:16 | afraid 60:17 | alcohol 3:2 | 65:24 68:7 |
|---|---|---|---|
| 4:17,21,22 | age 3:1,2 4:24 | 16:15 18:23 | angela 2:5 6:6 |
| addictions 4:16 | 5:11,19 6:18 | 19:13,15 20:23 | 23:13 25:9,25 |
| addictive 4:12 | 6:20,23 7:16 | 21:19 23:5 | 26:3 28:22 |
| 5:5 15:5 16:7 | 8:4,8,21,23 9:4 | 34:8 | 29:2,9 30:8 |
| 16:10 19:4 | 14:25 15:12 | algorithm | 31:12 32:3,19 |
| 21:18,19 27:9 | 16:11,21 17:3 | 49:21 | 35:6,15 36:20 |
| addition 4:15 | 17:5 18:21,25 | alito 47:18 | 52:4 64:7,10 |
| additional 5:23 | 26:5,16 27:10 | alliance 10:17 | 64:15,20 65:22 |
| additionally | 40:7,10,12,18 | 40:1 57:25 | 67:10 68:10 |
| 4:10 50:5 | 40:21,23,24 | allies 48:15 | anheuser 16:19 |
| address 25:16 | 41:4,8 43:5 | allow 9:11 | answer 52:22 |
| 26:14 | 45:6,10,15,19 | allowance | 55:23 56:5 |
| adds 8:18 9:6 | 46:20 47:4 | 67:20 | answering |
| adopt 47:9 | 49:10,11,15,15 | allowed 11:5 | 43:23 |
| ads 11:23 67:6 | 49:16,19,22 | 12:1 53:21 | anxiety 61:13 |
| adult 13:2 | 50:3,5,11 | 54:7 | anybody 33:24 |
| 47:21 54:8 | 51:17,19 52:17 | allowing 10:24 | anymore 19:17 |
| adults 3:25 | 61:15 62:14,15 | allows 13:9 | 37:14 38:2 |
| 17:5 22:12 | 63:8 65:1,4 | alluded 15:21 | 61:13 |
| 32:5 41:8 | 66:15 67:5 | allure 15:3 | apologize 44:6 |
| 53:20 61:16 | aged 27:22 | alters 8:17 | 65:24 |
| advance 62:9 | agent 21:19 | amendment | app 5:10,13,14 |
| 65:25 | ages 22:6 25:19 | 13:17,22,24 | 5:21 6:11,16 |
| advertisements | 51:1,5 55:12 | 16:5 40:20 | 6:17,18,21 7:2 |
| 8:19 | 55:21 56:2,12 | 45:8 53:5,14 | 7:4,8,9,10,13 |
| advisor 18:15 | 57:11 58:2,10 | 53:19,22 54:7 | 7:14,18,19,21 |
| advocated | 59:6 | 54:14,21 63:20 | 7:23 8:2,3,22 |
| 42:11 | agree 47:24 | amends 6:10,17 | 8:23 9:3 12:6,8 |
| affairs 1:13 | 53:3,23 | america 63:20 | 12:12,13,16 |
| affected 35:16 | ahead 14:5 | american 42:12 | 14:17 15:21 |
| affiliated 7:3,6 | 18:5 24:18 | andrea 39:14 | 16:11,23 17:4 |
| afoul 13:17 | 46:17 48:22 | 59:11,19,25 | 17:6,8,15,19 |
| 16:4 | 62:2 | 60:1 65:17,21 | 18:13 22:8 |

24:22 25:3,11 25:14,18,20,21 26:7,15,21,21 26:22 27:12,15 27:17,19,21 28:16,19 29:20 30:1,2 40:6,23 42:8 43:6 46:20 50:25 51:1,4,10,13,19 52:16 55:11,12 55:20,23 56:1 56:11 57:10 58:1,9,17,20 59:2,4 61:7,8 61:12,14,17,17 63:3 64:1 66:6 66:8,14,20,23 66:25 68:5

**app's** 8:15,19 56:14

**appealing** 20:1 21:17 67:21

**applaud** 48:16

**apple** 11:4,4 12:13 15:24 19:3,21 27:15 64:17 65:1

**application** 7:17 47:6

**applications** 8:12 42:20 48:3

**appreciate** 28:23 31:13 32:25 50:18 68:8

**approach** 24:7

**appropriate** 12:9 26:7 31:9 47:23 51:4,14 52:17 53:20 55:20 56:2,6 56:12 57:20,20 57:23 58:1,5,9 59:5

**appropriaten...** 5:20 51:7

**approved** 51:1 57:11

**apps** 8:13 11:5 22:5,8,14 27:12,16,19 41:9 58:24 60:18,23 61:3 61:19 65:18 66:7

**arbitration** 12:3

**area** 36:25 46:2

**argue** 43:13,14

**argument** 13:16

**arguments** 46:23 47:17

**arkansas** 40:17 45:12

**asked** 47:18 55:15 56:8 66:16,16

**asking** 43:2 51:9

**asks** 50:17

**aspect** 33:3,6

**assenting** 30:4

**assess** 26:4

**assigned** 65:2

**associate's** 21:7

**associated** 30:4 44:18

**association** 41:20 49:1,3

**assure** 41:9

**attached** 65:4

**attention** 33:25 34:11 67:17

**attitudes** 33:15

**attorney** 14:15 46:25 47:11,19 47:22

**august** 36:23 37:20

**author** 2:3 10:2

**autistic** 57:17

**available** 51:13

**avoid** 13:22,23 48:6

**aware** 33:14,14

**awareness** 20:10 35:24

| b |
| --- |

**baby** 62:21

**back** 21:22 29:16 35:8 38:10,20 40:15 42:1 44:2,14 56:23 59:23

**backend** 13:5

**baffled** 66:4

**banks** 30:17

**banned** 41:15

**bart** 39:9 44:10 44:13

**bartlett** 44:12 44:17 53:9,13 53:24 54:3,10 54:19 55:1,5,8 55:18,22 56:3 56:13,18,21 58:14 59:1,7

**based** 8:5 14:21 18:17 22:12 27:5 49:15,17 57:13 58:4

**basically** 27:8

**bathroom** 19:16

**befriend** 22:23 22:23

**beg** 54:1

**begging** 61:7

**beginning** 67:12

behalf 40:2 52:14 60:4
behavioral 4:16
believe 46:10 55:20 64:19,22
believes 58:8 59:4
belongs 64:1
benefit 12:20
best 3:6 9:13,15
bet 23:20
beth 63:14
bettencourt 6:3 6:8
better 5:22 27:4 28:13 32:21 33:23 37:15 38:9 47:13
bible 30:2
big 5:7 11:3 14:12 15:6 36:4 67:25
bill 2:2 3:10 4:12,13 5:10 6:10,25 10:3,3 10:6 11:1 14:2 14:19 18:13 21:2,14,22 24:1 26:9,13 27:6 28:24 31:7 39:8 40:4 40:8,17 41:10

41:18 42:8 43:1,7,12,19 46:19 48:7,18 49:2,7 60:3 61:21 62:22,24 63:3 67:12 68:5,20,21
bill's 68:23
billboards 27:13
bills 13:14 38:2 38:18 41:5 48:11
binds 11:7
birth 49:21
birthday 64:18 64:23
bit 3:22 53:2
blaming 47:7
blind 9:22
blindly 29:12
block 45:7
blocked 40:17
blocking 48:2
board 32:24
boy 62:21
brain 4:21
branch 34:20 34:21
brick 2:25 28:2
bridges 43:19
bring 35:8
bringing 26:24

broad 40:9 49:3
brothels 34:20 34:21
brown 41:19
brush 33:16
bryan 2:1 6:2 9:25 14:3 17:25 23:10 24:16 36:7 39:4,21 41:25 43:25 44:8 46:15 48:20 50:20,24 51:3 51:8,11 52:3,6 52:21,24 53:11 53:18 54:1,6 54:12,24 55:3 55:6,9,19,25 56:8,16,19,22 57:2,5,9,24 58:6,12,21 59:3,9,15 61:25 64:4 68:12,17
bug 29:19
burden 41:7 48:6 63:1,24
burdens 41:9 41:12
bus 38:10
busch 16:19
business 60:7,8

buy 67:7
buzz 61:17 66:14

c

c 69:1,1
california 45:11 63:15
call 32:16 65:11
called 22:5 25:19 44:18 46:13 60:5 61:8,17 66:8
calling 39:13
calls 10:6 39:8 59:11
car 4:5,5 38:18
card 13:5
care 10:19 29:22 65:9,9
carr 28:14
case 40:17 46:23
caselaw 40:14
cases 54:10
castanita 10:7 10:8 18:6,10 24:12,19 25:17 26:2 32:18 33:2 35:14 36:18,22 38:24
catching 21:17

Case 25-0730, Document 581, 15 Filed 05/26/2026, Page 155 of 183

| | | | |
|---|---|---|---|
| **categories** 8:16 9:4 54:5 | 50:20,24 51:3 51:8,11,17 | 34:1 | 30:10 31:16,18 31:19,21,24 |
| **category** 5:11 6:23 8:23 13:20 | 52:3,4,6,21,23 52:24 53:11,18 54:1,6,12,24 | **changing** 33:15 34:5 | 32:4,15 33:14 33:23 35:4,11 |
| **cause** 5:17 32:16 65:11 | 55:3,6,9,19,25 56:8,16,19,22 | **changings** 33:16 | 35:13,18 36:13 41:22 42:12,19 |
| **ccia** 49:2 50:1 50:17 | 57:2,5,9,24 58:6,12,21 | **characteristic** 4:2 | 43:3 46:3 47:10,20 48:9 |
| **ccia's** 51:13 52:12 | 59:3,9,11,15 61:25 64:4,7 | **characteristics** 49:17 | 48:13 49:8 53:6,22 54:8 |
| **cellphone** 64:8 | 64:10,15,20 65:22 67:10 | **chat** 61:9,19 66:9,9 | 57:19,22 60:9 60:16,18,21,22 |
| **cellphones** 32:9 | 68:10,12,17 | **check** 16:14 63:6 | 62:20 63:1 |
| **censorship** 68:4 | **chairman** 2:6 6:1 9:23 10:24 | **chicago** 19:6 | 65:16,23 66:11 67:13,15,25 |
| **center** 18:16 | 14:6 23:14 28:13 36:6 | **child** 3:7 7:12 11:15,20,21 | **children's** 17:17 42:25 |
| **certainly** 31:23 35:24 41:15 | 42:3 59:25 62:4 68:11 | 12:1,4,8 17:13 19:8 25:4,6 | 43:8,11 45:22 60:19 67:17 |
| **certify** 69:3 | **chairs** 10:10 | 29:13 31:10 33:18 34:5,13 | **chilling** 47:3 |
| **cetera** 11:17 | **challenge** 41:3 | 34:23 36:3 | **choice** 29:14 |
| **chaiman** 6:7 | **challenged** 41:10 | **child's** 17:7 31:9 | **choke** 28:15 |
| **chair** 2:1,1,5 6:2,6 9:25 10:6 | **challenges** 45:20 50:13,15 | **childhood** 10:17 42:15 | **chokeholds** 28:12 |
| 14:3 17:25 23:10,13 24:16 | **chamber** 62:6,8 67:11 | **children** 2:24 3:14,22,23 4:1 | **chose** 19:2 46:3 |
| 25:9,25 26:3 28:22 29:2,9 | **chance** 38:8 45:18 59:21 | 4:12 5:8 9:13 10:19,21 11:8 | **cigarettes** 3:3 16:15 |
| 30:8 31:12 32:3,19 35:6 | **change** 41:6 | 13:15 15:7 16:10 17:21 | **citizens** 3:9 9:19 43:16 |
| 35:15 36:7,20 39:4,8,21 | **changed** 31:6 | 19:21 21:20 22:15,22,23 | **claim** 41:1 |
| 41:25 42:4 43:25 44:8,13 | **changes** 5:13 8:11,19 9:9 | 24:2 25:2 | **claimed** 41:4 **clarifies** 8:12 8:22 |
| 46:15 48:20,23 | | | |

Case 25557-00730-PBocument 5832 15age 156 10ate25iled 05/20/2026

| | | | |
|---|---|---|---|
| clarify 7:2 | collection 30:6 | communities | confirming |
| clear 2:13 3:8 | 42:23 43:9 | 63:4 | 56:4 |
| 40:9 53:4 | 62:16 | community | congratulations |
| clearly 7:25 | come 4:20 | 63:7 | 23:15 |
| cleland 39:9 | 18:18 20:10 | companies 3:8 | consent 5:12,15 |
| 44:12,13,17 | 41:25 | 3:13 9:18 11:4 | 5:20 6:25 7:5 |
| 52:25 53:9,13 | comes 67:15,24 | 11:18,20 12:23 | 7:11 8:9,14 9:4 |
| 53:24 54:3,10 | comfortable | 13:1,8 15:18 | 9:5 11:9 40:19 |
| 54:19 55:1,5,8 | 10:10 58:17 | 32:20 47:6 | 41:17,24 45:15 |
| 55:18,22 56:3 | coming 21:10 | 62:24 65:7,12 | 48:4,12 50:12 |
| 56:13,18,21 | 36:5 38:8,23 | 65:14 67:3,22 | conservative |
| 58:4,14 59:1,7 | 56:25 | compared | 46:9 |
| cleveland 19:7 | comment 50:17 | 49:25 | consider 13:15 |
| client 52:14 | 51:6 | compelling | 35:21 50:1 |
| 59:2 | commercially | 48:13 54:15 | considering |
| client's 52:13 | 6:22 | 57:8 | 15:11 17:16 |
| 52:15 | commission | complained | conspicuously |
| clients 58:22 | 45:2 | 47:1 | 7:25 |
| close 18:2 22:3 | commissions | completely 3:4 | constantly |
| 34:19 39:18 | 45:2 | 4:3,6 | 43:12 |
| 48:21 54:18,20 | commitment | compliance | constitute 3:23 |
| closed 68:23 | 12:9 | 8:10 28:7 | constitutional |
| closely 6:10 | committee 1:13 | comports 16:2 | 40:5 41:2,18 |
| closer 24:17 | 2:7 5:25 6:3,9 | computer | 50:13 |
| closing 21:24 | 6:14 7:17 8:12 | 48:25 | constitutional... |
| coalition 46:23 | 10:25 14:1 | conceded 47:22 | 40:12 |
| 62:9 | 18:9 42:5 | concerning | consumer 3:24 |
| cocaine 21:18 | 44:16 45:4 | 42:16 | 17:13 67:13 |
| codifies 5:19 | 58:7 60:1 62:5 | concerns 63:13 | consumer's 3:1 |
| colleague 15:20 | 62:19 | conditions | consumers 40:3 |
| collect 8:5 | common 48:11 | 54:23 | contact 11:17 |
| collected 8:16 | 61:23 67:1 | conduct 15:16 | contending |
| collecting 50:7 | communicati... | 29:4,16 | 15:3 |
| | 48:25 49:4 | | |

| | | d | declaration |
|---|---|---|---|

content  7:24
8:17 15:16
28:25 29:3,5
29:15,21,22
41:1,13 42:21
44:24 46:11
47:2 48:6
context  28:3
contract  11:7
12:1,7 15:22
30:16 40:24
41:5
contracts  5:15
11:12 13:19
15:19 17:15
29:25
control  17:10
45:25
convenience
16:13
conversations
22:11 25:24
cornerstone
63:22
corporate  3:9,9
9:18 32:23
65:13
corporations
15:5
correct  54:11
cost  17:4
counsel  44:18
58:21

country  69:12
couple  45:1
54:5 65:18,19
court  12:2 16:3
40:9,14 41:10
45:5 46:22
courts  13:25
40:16 45:6
covered  62:13
cox  6:12
crazy  61:13
create  40:8
68:6
creates  43:12
creating  5:9
credit  13:5
creepy  66:12
crisis  15:2
critical  15:11
cross  49:4
culture  2:10
curious  52:13
current  16:3
49:11 50:2
currently  3:3
50:12
customer  5:9
cvs  16:21
cybersecurity
43:18
cycle  34:1

**d**

dad  62:21
dads  14:25
daily  35:5
dallas  18:11,18
36:24 38:16
dangerous
60:23 66:10
dangers  60:14
dark  25:7
data  8:1,3,4,5,8
8:16 11:23
30:5 42:22
43:8,9,13
45:16 50:8
52:2 62:16
data's  11:8
date  9:9 11:20
13:3 69:16
daughter  57:16
day  20:13,15
days  37:12
dc  14:17 18:18
dealing  33:4
deborah  39:9
46:18,19
decades  40:15
deceptive  5:17
decide  12:6,8
29:12 47:23
deciding  31:11
decision  29:5
63:11

declaration
47:13
declaring  47:8
deep  40:4
defend  40:23
defending
12:22
defense  3:7
9:13
definitely  64:9
degree  21:7
delete  8:3
democracy
63:22
demographic
50:4
demographics
3:24 49:24
deny  7:13
department
10:22
describe  25:11
55:10 65:18
described
52:16,17 55:20
55:22 56:2,6
57:10 58:1,9
58:16,18 59:5
59:5,7 61:9,18
describing  2:9
description
25:14 50:25
55:11 58:4

descriptions 8:17 26:10

deserve 20:3,11 37:15

design 15:14

designed 13:18 13:23

desirable 4:2,8

desperately 43:2

despite 41:16

detail 63:21

details 52:10

determine 65:1

determined 38:6

detox 4:21

develop 8:24 14:20

developed 17:1

developer 7:10 7:11 26:16

developers 8:22 9:3 13:12 17:6 47:6 63:4 64:2

development 17:18

device 17:8 19:3 28:17 40:5 47:6

devices 7:14 17:11 19:22,24 21:15 24:23

48:4

difference 2:23 19:3 32:10 36:4 63:19 68:3

different 16:24 34:14 45:1 51:23 54:5,9

differently 26:4

difficult 31:18

difficulties 31:23

digital 3:4 4:20 10:17 14:16,25 15:12 27:10 30:1,19 40:11 42:18,25 43:3 60:19

digitally 30:7

diploma 37:22

direction 3:16

director 39:25

disassociation 33:10,11

discretionary 4:3,7 67:18

diseases 37:10

disorder 33:10 33:11

display 7:16,22 7:24

displaying 7:19

distinguished 62:4

district 63:14

doctor 33:21

doctors 33:22 33:23

doing 9:15 16:2 26:21 31:9 34:3 37:1 38:9 38:11 43:15 65:7

dollar 15:18

doom 31:1

door 34:18 63:6

doors 22:1

dovetails 16:24

download 7:8 11:5

downloaded 12:13

downloading 48:3

downloads 46:20

dr 3:21

drafted 63:3

drags 67:19

draw 17:15

draws 24:25

dressing 34:3

drink 22:20

driver's 13:6

dropped 20:19

drugs 18:23 19:1,13,15

20:23 23:4 34:7 38:21

due 51:17

duties 6:17

duty 35:10

**e**

e 69:1

earlier 46:12

easy 13:9 31:19 37:17

eat 22:20

ecosystem 16:23 28:16

educate 60:8

effective 9:9

effectively 62:12

effects 2:8,11 32:13,15

efforts 48:16

eight 37:4

either 7:8 38:9

eleven 16:21

embody 4:2

emphasis 28:10

empower 12:5

empowered 47:1

enable 36:2

encouragement 23:16

encourages 50:1

encroach 45:20
encryption 43:10
enforceable 13:24
enforcement 5:16,24
enforcing 5:14
engage 60:7
engineered 15:4
english 28:9
ensure 7:11 16:3,20
ensuring 15:11 43:6,9
enter 13:5 15:19 63:11
entered 5:15 13:3
entering 15:22
enterprise 44:20
entertainment 41:19 47:21
entities 10:19 12:19
epstein 3:21
equip 5:22
equipped 47:2
equipping 2:23
era 43:11
escalated 22:16 22:17

especially 13:5 17:16 25:13 30:5
essential 17:22
essentially 28:4
established 45:21
estimate 40:6 49:16
estimating 62:15
estimation 49:11,15,20 50:3,5,11
et 11:17
evaluating 49:14 63:15
eventually 47:22
everybody 53:15
evidence 15:8
evident 49:17
exactly 38:11 43:6 45:3
example 22:4 41:14 53:25 54:4
examples 25:18 27:20 65:20
excellent 48:8
except 67:4
exclusive 9:7

exclusively 67:18
excuse 7:20
excused 39:6 68:18
exercise 45:8
exist 20:6 38:1 66:7
existing 17:2
exists 67:2
expansive 3:4
expect 60:25
expectations 3:12
expected 11:13
experience 8:20 28:6 35:17 55:10,24
experiences 36:12
expert 54:22
experts 43:18
explain 2:3 6:4
explaining 25:18
explicit 66:1,13
exploitation 18:16
exploited 19:11 25:4
exploiting 23:4 47:7
exposed 22:5 25:19 42:16

56:16,18,19
exposing 42:21
exposure 4:24
expression 44:21
extensive 37:24
extent 26:11
extra 31:22 64:25 65:7
extreme 41:14
eye 9:22 19:25 21:17

**f**

f 69:1
face 22:18,18 45:20 49:18
facial 49:11,19
facility 4:18
facing 50:12
fact 19:22 27:15 29:20 41:6 46:4 53:25 62:14
factor 6:23
factors 49:23
fail 41:10
failed 45:11
faith 9:3 36:23
fall 17:20
false 46:6 49:23
families 9:16 17:22 32:6 50:8

family 20:8 21:4 42:13
family's 7:14
famously 53:25 54:3
fan 14:9
far 21:15
farmer's 34:20 34:21
faulty 51:20
favor 14:17 60:2
fcc 28:13
feature 29:19
features 5:20 8:18 45:25
federal 12:2 45:6 50:13
feedback 49:7
feel 29:13 57:21 61:14
feels 44:14
felonies 37:24
fend 15:1
fervent 62:20
fight 44:25
fighting 39:3
figure 61:15
figures 22:22
figuring 28:11
filing 60:3 61:21
filters 47:2

finally 9:9 13:14 47:11 63:13
find 11:24 19:7 27:14 33:19 56:6 66:5,6
fine 10:12 59:8
fingers 47:7
firms 49:5
first 3:6 4:24 9:12 13:17,22 13:23 15:15 16:5 17:22 18:6 21:23 27:11 35:8,23 36:23 39:20 40:20 41:4 45:8 49:6 50:22 53:5,14 53:19,22 54:7 54:13,21 55:24 63:20
fits 46:5
fitzgerald 30:13
fitzgerald's 30:21
fitzpatrick 10:7 10:8 18:1,6,10 23:11 24:3,9 24:12,19 25:17 26:2 32:18 33:1,2 35:14 36:11,18,22

fitzpatrick's 50:22 54:25 55:4 57:3
five 2:14 18:21
fix 67:1
fizz 66:8
flatten 46:7
fly 38:14
focusing 13:18
follow 11:20 25:10 41:21 52:19 67:4
following 6:15
follows 5:3
forced 41:8
foregoing 69:4
foremost 35:9
forgot 32:13
forward 23:23 43:23
found 41:12,15 61:3
foundation 42:7,11
founded 60:5
four 2:14
framework 5:23 14:20 15:14 16:25 43:20
frankly 17:11
free 44:20,20 46:23 53:2

freeman 63:14
friend 28:13
friends 61:9,19 66:10,15
front 40:15
fronts 35:22
fruit 31:22
full 14:24 61:11
fully 49:8 50:15
functionality 8:20
fundamental 43:15
further 7:4,13 41:17 43:8
future 2:19 46:8 62:9,11

**g**

game 4:17 20:20 37:18
games 22:11 25:24
gap 43:19
gate 16:11,22
gated 63:4
gatekeeper 63:7
gateway 42:20 60:19,20
gating 17:3
gee 39:10 42:3 42:6 44:3,7

general 3:23 43:16 44:17
generally 49:24
gentlemen 24:6 26:25
getting 27:10 27:15 66:2
girl 18:21 19:17 38:7,23
girls 35:2 37:2
give 10:14 11:19 26:9,13 26:20 36:16 38:22 39:22 42:2 44:11 46:6 52:18,21 59:15,20,24 60:16 65:3,19
given 17:12 29:10 45:14 58:16
gives 31:7
giving 19:15 24:14,15,22
glad 18:5 21:25
go 12:17 14:5 15:21 16:1 18:4 20:2 24:10,17 27:16 30:17 33:8 34:9 35:2,25 36:21 37:21 38:3,20 44:12 46:17 48:22

56:23 61:13 62:2,23
goal 44:23 49:8
god 20:23 36:23 37:3,6,9 37:15 38:12
goes 43:7
going 12:15 13:15,21 18:20 21:22 26:5 27:13 28:18 29:12,15 31:5 31:10 33:18,19 34:19 36:2,13 38:14 39:2 54:13,21 56:9 61:4 64:21 65:18,24
good 3:9 9:3,18 28:13 39:11,23 48:7,7,23 52:24 62:3
google 11:4 12:14,17 15:24 65:1
government 9:14 41:24 43:14,15 46:5 53:6,21 54:15
governor 6:12
grace 20:23
grade 20:20
graduate 20:18

graduated 21:5
grandchildren 31:17
grandkids 2:17
grandmother 2:14
grassroots 10:19
grateful 2:21 18:8
great 12:20 14:11 44:15
greyson 39:10 42:3,6 44:7
griffin 40:17
grocery 34:9
groom 19:22 22:15,22
grooming 18:24 22:16 34:4
group 61:15
groups 50:4
grow 20:16
growing 60:10
grown 19:18 21:6
guardian 7:3,6 7:10
guardrails 3:5
guess 22:23
guiding 45:21
guys 44:19 56:14

**h**

hand 55:24
handled 16:7
hands 3:11 21:11 29:6,17 36:1
hanging 31:21
happen 24:5
happening 19:20 34:17,17 34:24,25 68:4
happens 11:24 11:25 22:24 67:8
happy 44:14,14 44:15 52:19
hard 20:21 31:4
harder 13:21
harm 11:24,25 12:2 13:12 32:16 42:20 65:10
harmful 2:11 32:12,14 44:24
harmonize 28:5
harms 15:7 60:9
harvested 68:1
havoc 27:25
head 34:10

| | | | |
|---|---|---|---|
| **health** 15:2 17:17,18 30:25 33:3 | **higher** 49:24 | 52:21,24 53:11 53:18 54:1,6 | **implement** 9:11 50:11 |
| **hear** 12:21 18:3 24:17 30:22 39:19 50:24 55:10,16,16 56:13 57:2 68:3 | **highlighting** 26:18 | 54:12,24 55:3 55:6,9,19,25 56:8,16,19,22 57:2,5,9,24 58:6,12,21 59:3,9,15 60:1 61:25 64:4 68:12,17 | **implementati...** 6:24 9:1 **implemented** 45:25 **implications** 30:6 |
| **heard** 2:8 3:16 23:24 33:2 46:11,22 57:14 62:17 | **highly** 4:2 40:13 **history** 15:5 31:20 63:17 **hit** 11:6 **hitchhiked** 19:6 | **human** 18:12 20:11 | **important** 2:16 3:10,13 11:1 30:10 31:14 61:22 |
| **hearing** 1:13 41:22 68:22 | **hold** 16:16 50:14 54:21 | **hundreds** 27:20 | **impose** 12:23 41:7 |
| **heart** 18:20 | **holds** 17:19 | **hurt** 14:13 | **imposing** 41:11 |
| **heck** 30:2 | **home** 34:17 44:14 60:13 63:11 | **hyde** 69:3 | **impression** 46:6 |
| **held** 12:18 14:13 | **homeless** 23:3 | **i** | **inappropriate** 42:21 |
| **help** 2:22,24 21:9 26:22 27:1 31:10 32:24 35:21 36:13 37:6,6 38:4 44:2 66:22 | **honors** 48:12 **hope** 18:9 30:22 53:4 **horny** 66:18 **house** 19:14 **huge** 14:9 41:7 67:13 | **idea** 12:22 36:16 63:18 **identity** 62:14 63:8 **ids** 63:6 **illinois** 19:7 **illness** 33:9 | **incase** 55:16 **including** 66:13 **inclusive** 62:10 **income** 67:14 67:17 **incorporates** 6:9 |
| **helped** 14:19 15:14 | **hughes** 2:1 3:19 6:2 9:25 14:3 17:25 23:10,14 24:16 36:7 39:4,21 41:25 42:4 43:25 44:8 46:15 48:20 50:20,24 51:3 51:8,11 52:3,6 | **illustrated** 41:14 **image** 49:21 **imagine** 19:20 **immune** 41:2 **impacting** 10:21 **impinge** 54:13 | **increasingly** 60:20 **indicate** 56:20 **indicated** 56:17 **indifferent** 15:6 29:21 32:12,14,15 65:10 |
| **helping** 23:22 **hey** 25:1 **high** 17:16 20:18 21:5 37:22 | | | |

Case 2:55-cv-00730 Document 583 Page 163 Date Filed 05/28/2026

**indiscernible** 13:16 29:8 59:17
**individual** 51:10
**individual's** 6:20
**individually** 63:6
**individuals** 50:6 65:9
**industries** 47:18
**industry** 9:20 12:12 46:25 47:5,21 48:14 49:1 62:9
**industry's** 15:1
**influenced** 49:20
**information** 8:23,25 11:16 11:24 13:1,12 36:1 43:11 50:7 65:15
**infrastructure** 17:2
**initially** 24:4
**initiative** 60:6
**injunctions** 40:22
**input** 6:10
**inside** 60:14

**insight** 31:8
**inspiration** 23:16
**instances** 8:13
**institute** 14:16 49:13
**intentionally** 17:20
**intentioned** 40:7
**intentions** 48:8
**interact** 13:7
**interaction** 27:11 31:2
**interactions** 49:22
**interest** 48:13 54:16,17
**interesting** 63:16
**international** 49:2
**internet** 17:9 44:20
**intersection** 42:14
**intervention** 5:3
**introduce** 10:14 14:4 18:4 39:22 42:2 44:10 46:16 48:22 59:23 62:2

**introduced** 18:23
**investing** 23:17
**invited** 10:5
**involved** 44:25 48:2
**ipads** 46:2
**iphone** 12:15 64:11,14,16,16 64:22
**iphones** 46:1
**issue** 12:20 40:5
**issues** 30:25 41:19

**j**

**january** 2:7 9:10 46:22
**job** 43:15
**jobs** 38:19
**joel** 10:6,7 14:6 14:14 27:3 29:1,7,18 32:2
**john** 10:6,7,16 10:16 15:20 30:12
**johnny** 39:12 39:24 57:1,4,7 57:13 58:3,11
**joint** 2:7
**joy** 35:10
**judge** 28:25 29:3,15 44:4

63:14
**judges** 50:14
**judging** 29:4
**judicial** 45:17
**july** 69:16
**jury** 12:19
**justice** 10:23 41:20 47:18

**k**

**kampis** 39:12 39:20,23,24 56:24 57:1,4,7 57:13 58:3,11
**keep** 16:6 43:18 60:22
**keeping** 8:10
**keeps** 39:2
**kept** 19:15
**key** 63:19
**kick** 22:1
**kid** 17:10 29:11 34:9 61:11
**kiddos** 33:4
**kids** 2:16 9:21 9:23 13:10,13 14:13,24 15:6 16:17,20 17:5 19:24 20:3,11 20:17 21:9 22:13 24:11,14 26:21,22,23 27:2,10 30:4 30:16,23 32:25

33:7,23 38:10
42:16 43:18
60:25 61:5,6
61:24 65:3,8
66:22 68:3
**kind** 10:10
31:14 53:13
64:12 65:3
**kinds** 3:15,17
53:16 67:6
68:1
**kingdom** 63:18
63:19
**knew** 22:25
60:11
**know** 3:19 4:5
4:21 13:2
18:17 20:1,8
20:15 21:13
22:4 24:14,21
24:24 25:5,6,7
25:8 27:8,13
29:10,14 30:16
32:4,7,8 33:4,5
33:6,8,10,12,13
33:14,16,17,23
34:11,24 35:2
35:4,7,8,12
36:2,19 37:2
37:25 38:11,22
43:6 44:8,19
45:24 47:19
51:12,12 52:8
52:25 53:11,12

53:15 55:23
56:14,25 57:19
57:21,22 59:4
62:19 63:10
64:11,24 67:3
67:7,11
**knowing** 31:4
**knowingly**
26:16
**known** 44:1
53:1
**knows** 7:12
**kouri** 39:13
59:11,14,19
62:3,5 64:9,13
64:19 68:9,16

**l**

**lack** 31:1
**lady** 55:6 59:16
**laid** 4:13
**lancaster** 37:4
**landscape**
42:18 45:14
**language** 6:17
7:1 8:2 66:1,13
**large** 17:6
41:12
**largest** 3:24
**latitude** 11:22
**law** 6:12 9:8
30:16 40:25
41:5,14 51:14
53:15

**lawmakers**
50:1
**laws** 17:14
40:21 45:10,19
50:14
**lawyer** 10:23
52:25
**lawyers** 11:3
**layout** 67:12
**lays** 2:2
**leader** 14:8
**learned** 4:19
38:10
**learning** 20:6
**lease** 54:16
**ledanski** 69:3
**left** 15:1 39:16
59:22 68:23
**legal** 14:20
15:17 16:9
45:14,20 47:8
69:11
**legalese** 11:14
**legislates** 12:10
**legislation** 2:22
6:15 17:23
40:13 42:24
44:23 45:5
48:10,17 50:10
63:15
**legislative**
63:17
**legislators**
63:17

**legislature** 40:4
48:1,17
**letter** 58:15
**level** 52:17
**leverages** 16:8
**liable** 16:16
**license** 13:6
50:6
**lies** 28:21
**life** 5:9 19:1,2
20:3,6,12,17,24
37:14,19 38:2
38:8,17,20
**lifeline** 42:25
**lift** 13:9
**light** 12:11
**likely** 4:24 5:2
12:17
**limit** 53:22
**limitations**
40:10 50:2
**limiting** 43:9
**line** 3:7 9:13
17:15
**list** 11:17 45:13
**listed** 27:21,22
50:17
**listen** 11:2
25:12,14
**listening** 21:14
52:8
**literally** 2:15
4:18 61:6

| | | | |
|---|---|---|---|
| **litigation** 62:19 | **low** 31:21 | 52:19,23 56:9 | **mechanism** |
| **little** 3:21 19:17 | **lower** 40:16 | **manufacturers** | 5:16 48:8 |
| 24:16 53:2 | **lucrative** 3:14 | 40:6 62:13 | **media** 2:8,10 |
| **live** 20:3,6,12 | **m** | **march** 1:15 | 22:15 27:18 |
| 31:19 37:13 | | **market** 4:8 5:5 | 30:1 40:18 |
| 38:1 | **made** 61:14 | 5:7 30:1 67:13 | **meet** 61:9,19 |
| **lived** 20:4 | **maintains** 8:7 | 67:22 | 66:9 |
| **living** 37:16 | **major** 16:25 | **marketed** 4:11 | **members** 2:6 |
| **loan** 30:17 | **majority** 41:21 | **marketing** 3:22 | 10:1 42:4 |
| **long** 8:4 35:25 | **make** 2:22 9:17 | **marshall** 39:14 | 44:16 59:9 |
| 42:11 45:21 | 12:20 14:12 | 59:11,14,19 | 60:1 62:5,19 |
| 53:1 | 15:20 17:1 | 62:1,3,5 64:9 | 68:13 |
| **longer** 5:1,4 | 19:2 25:3,5 | 64:13,19 68:9 | **men** 49:25 |
| 7:12 22:18 | 28:8 30:17 | 68:16 | **mental** 17:17 |
| 23:6 | 32:21 36:4 | **material** 8:15 | 30:25 33:3,9 |
| **longitude** 11:22 | 37:9 44:19 | **materially** 8:19 | **mention** 26:8 |
| **look** 16:21 27:9 | 53:3 58:15 | **materials** 59:13 | **mentioned** |
| 27:24 33:18 | 61:9,18 63:11 | **matter** 20:22 | 13:11 25:10 |
| 34:6 43:23 | 66:15 68:2 | 23:21 29:25 | 55:14 56:24 |
| 45:2 58:19,24 | **makes** 4:7 | 32:11 38:20,21 | 62:17 |
| **looked** 23:19 | 61:13 | 46:4 | **mentor** 22:13 |
| **looking** 2:17 | **making** 23:21 | **maximally** 15:5 | 22:14 38:8 |
| 39:12 59:18,20 | 29:5 63:5 | **mean** 27:11,20 | **merchants** |
| 66:2 | **man** 19:15 | 27:21 28:8 | 41:19 |
| **looks** 59:18 | 34:12 | 31:17 37:23 | **method** 6:22 |
| **loopholes** 47:8 | **mandate** 7:18 | 58:22 66:4,21 | **methodology** |
| **lost** 38:19 | 7:21 40:5 46:5 | **meaningful** 5:3 | 49:10 |
| **lot** 13:14 22:14 | **mandated** 11:9 | 43:2 | **mic** 36:19 |
| 27:18 30:18 | **mandates** 43:5 | **means** 9:17 | 39:18 |
| 33:8 34:14 | 45:7 | 29:20 50:7 | **microphone** |
| 37:18 47:19 | **mann** 39:9,10 | 54:17 | 18:3 24:17 |
| 67:23 68:4 | 48:21,23,24 | **measure** 2:4 | 48:22 |
| **love** 23:1 | 50:21,23 51:2 | **measures** 50:12 | **millions** 40:2 |
| | 51:6,10,16 | | |

mind 15:15 16:6
mindful 35:4
minds 2:11
mineola 69:14
minor 3:23 5:12 7:2,7,13 13:2 47:24 48:4 52:1
minor's 7:5,7 7:10 51:19
minors 2:8 3:3 6:19 11:5 12:24 15:20 30:18 42:21 44:24 57:15 61:16
mirror 6:11
misguided 26:11
misrepresent 26:16
misrepresent... 26:12
mission 44:19 60:7
mississippi 45:12
mistake 15:20
mister 52:4
mobile 28:16 28:17 42:19
model 27:5

modernization 26:25
modernize 24:11 27:1 30:10
modernizes 30:16
modernizing 24:1,7
modes 22:10 25:23
modification 8:15
molested 18:21
mom 19:7,8 20:9 34:13 60:13
moment 11:21 11:21
moms 14:25 22:12
monetization 8:18
monetize 11:22
monetized 11:17
monetizing 9:22
money 4:1,6 38:3 67:4,20 67:23
monitoring 8:10

monopoly 12:18
mood 33:15
morning 3:17 4:11 39:23 48:24 62:4
morris 16:19
mortar 2:25 28:2
mother 2:14 19:1 22:21
movement 20:25 21:2 37:19
multi 15:18

**n**

n 69:1
name 10:16 14:14 18:7,10 39:24 44:3,9 48:24 56:14 60:1
name's 42:6
national 18:15 45:2 49:13
natural 3:6 9:12
navigate 3:3
ncose 18:16,17 21:1
necessarily 16:17

necessary 48:14
need 8:3 9:17 22:19 23:8 24:1 32:20,23 32:24 33:22
needed 22:25 38:18
neighborhood 63:9
neither 41:3
netchoice 40:16 44:18 56:1 58:23 59:4
netchoice's 53:4,7 56:11
network 7:15
neutral 41:2,13
neutrality 41:16
never 33:17
new 8:13,18,24 60:15 61:9 66:9
ngl 18:17
nicotine 4:14
night 37:1
non 18:17 21:8 38:13 60:4
normal 22:9 25:22
north 4:18
note 14:14 67:16

noted 4:10
notes 49:19 56:17,20
notice 7:24
notify 5:12 7:9
numerous 50:13
ny 69:14

**o**

o 69:1
obligate 11:15
obligation 12:7
obtain 5:11 7:5 8:24 40:18
obtained 9:5
obtaining 8:9
obviously 4:25 30:15
offer 49:9
offerings 46:7
office 14:9
oh 20:13
ohio 19:7 45:11
okay 18:6 24:19 29:11,12 33:20 58:16,19 64:20
old 11:13 18:22 18:22 19:6 26:7 34:23 38:25 39:1 47:20 51:15 56:7 57:15,16

60:17 64:24 65:4 69:12
olds 21:9 38:15
once 17:8 20:20 22:22 60:24
ones 46:12 65:25
ongoing 33:9
online 34:25 41:15 44:24 45:22,24 49:9 50:11 60:9 63:1,25
onus 16:11
open 10:2,5 14:1 26:20 39:7
openness 49:7
opinion 62:18
opportunities 2:19
opportunity 4:20 20:17 43:22 50:19
oppose 40:3 44:22 45:5 64:3
opposed 67:3
opposition 49:1 62:7
options 22:10 25:23
oral 46:23 47:17

order 7:7
organization 10:18 58:8
outside 37:5 60:11
overall 17:18
overcoming 23:15
overreach 43:14
own 8:6 15:1 19:1 21:8 32:4

**p**

paid 38:19
pair 67:7
pairs 37:4
panel 23:12 39:13 50:22 59:10 64:6
parallel 24:5
pardon 54:2
parent 7:3,5,6 7:10 8:9 9:4 12:7 15:12 17:7,9 25:13 26:4 29:10 31:4,11,24 33:21 35:23 47:23,25 57:15 57:19,21
parent's 24:21 29:14 45:21

parental 5:11 5:15,20 6:25 8:14 9:5 11:9 40:19 41:17 45:15,25 48:4 48:12 50:12
parented 31:25 35:13
parenting 35:10
parents 2:23 3:6,11 5:13,23 9:12 12:6 13:10 15:11 16:1 17:5 26:10,13,20 29:6,17 31:3,8 31:23 33:5,13 35:9,22,23 36:1 41:23 43:1,17 47:2 47:13,19 48:2 48:7,9 67:15 67:16 68:7
parker 4:13
part 9:16,21 11:2 26:9,19 28:11 32:22 45:13 64:16
particular 13:20
particularly 46:2 57:17

| | | | |
|---|---|---|---|
| **parties** 15:25 | **pedophiles** | 66:2 67:8 | **policy** 14:20 |
| **partisan** 18:17 | 61:12 | **phones** 19:21 | 17:14 39:25 |
| **pass** 48:17,18 | **pending** 68:23 | 21:11 34:2 | 42:7,10 |
| **passing** 17:13 | **people** 19:10 | **photo** 49:18 | **porn** 46:25 |
| 17:21 | 32:15,16 34:22 | **physical** 17:17 | 47:4,5,18 |
| **past** 3:20 | 37:14 58:25 | 49:17 | **pornography** |
| **path** 38:4 | 61:10 65:8,11 | **physically** | 16:16 53:25 |
| **patron** 16:15 | **perfect** 59:8 | 34:24 | 54:4 |
| **paxton** 2:3,5 | **permission** | **pic** 66:17,18 | **position** 2:21 |
| 6:4,6 10:4,25 | 11:19 | **pick** 10:11 | 51:12,13,16,25 |
| 13:11 14:7 | **permutations** | **picking** 37:2 | 52:12,13,15 |
| 18:8 21:1 22:2 | 53:16 | **pictures** 24:24 | 53:5,7 56:1,11 |
| 23:12,13 25:9 | **perp** 61:8 | **pixel** 12:16 | 57:25 58:23 |
| 25:25 26:3 | **perpetuating** | **placed** 50:14 | **positioned** |
| 28:22 29:2,9 | 15:9 | **places** 64:1 | 14:19 |
| 30:8 31:12 | **person's** 49:16 | **placing** 17:3 | **positive** 49:23 |
| 32:3,19 34:15 | **personal** 8:1,3 | 63:1 | **possibilities** |
| 35:6,15 36:8 | 43:8 46:10 | **platforms** | 41:24 |
| 36:20 42:4 | 50:7,8 52:2 | 40:18 43:7 | **potential** 5:8 |
| 44:16 52:4 | 57:18 | 45:24 | 40:20 |
| 55:15 58:13 | **personally** | **play** 12:14,17 | **pouring** 37:5 |
| 60:3 61:22 | 44:25 58:17 | 22:9 25:22 | **power** 29:5,16 |
| 64:5,7,10,15,20 | **perspective** | **playing** 60:10 | 31:8 41:22 |
| 65:22 67:10 | 24:10 | **please** 37:6 | **powerful** 15:4 |
| 68:10,13 | **pervasiveness** | 48:18 61:15 | 30:14,22 |
| **pay** 4:4 33:25 | 2:10 | **plus** 22:6,12 | **practices** 5:18 |
| 34:11 38:2 | **petitioner's** | 25:11,15,19 | 42:22 43:13 |
| 67:16 | 46:24 | **point** 26:12 | **prayed** 37:3 |
| **paying** 23:22 | **philip** 16:19 | 28:15 29:19 | 38:6 |
| **payment** 4:6 | **phone** 11:16 | 31:14 41:3 | **precedent** 16:3 |
| **pdi** 36:25 37:7 | 13:3,7 14:9 | 47:7,17 | 40:9 |
| 37:8 | 19:3 24:4 | **police** 19:8 | **precisely** 27:5 |
| **pedaling** 46:11 | 60:25 64:8,12 | **policies** 8:6 | **precursor** 4:14 |
| | 64:23 65:2,3 | 15:24 | |

predators
  11:24 20:2
  22:14,21 31:22
  60:21
predatory
  42:22
prerogatives
  45:21
prescription
  16:9
present  68:20
presents  40:4
president  14:15
pretty  24:24
prevent  16:9
  41:22
prevents  53:5
previsions  12:3
price  27:9
principle  15:18
  16:25
principles
  15:15
prior  41:23
privacy  8:6
  12:25 13:10
  15:24 40:8
  50:9
private  5:17
proactively
  47:14
probably  56:24
problem  15:9
  61:23

problems  38:17
proceedings
  69:5
process  11:6
  33:9
product  16:12
  16:18
products  3:2,18
  4:11,14 5:6
  15:4,8,25 16:8
  16:17,20 28:7
professor  28:9
profit  21:8
  38:14 49:3
  60:4 68:1
profitable  5:5
program  36:25
progress  14:16
  49:12 62:6,8
prohibitions
  30:18
prohibits  5:14
  13:11
promoting
  12:25 43:16
pronounce
  44:9
pronouncing
  44:3
proponents
  40:23
proposal  16:8
proposals
  40:24

protect  2:24
  9:15 13:10,15
  14:24 21:11,20
  21:21 25:2
  27:1 32:24
  46:3 47:10,15
  48:8,13 61:1,7
  61:24 62:25
  63:23 65:16
  66:24 68:3
protecting  2:16
  9:21 17:21
  24:2,11 44:24
  49:8 53:6 60:9
  62:20
protection  8:1
  17:13 30:10
  40:1 43:3,20
  57:25
protects  43:8
  53:14 65:8
proud  17:23
  20:25 21:25
  23:6
provide  42:24
  50:6
provided  9:8
providers  47:5
  48:6
provides  4:19
  5:16 7:22 9:2
  43:1,19 48:11
  48:14

providing  5:23
  50:3
provision  6:19
public  39:7
  42:7,10 66:5
  68:22
publicly  5:21
published
  49:14
purchase  3:1
  7:8
purchases
  16:15 46:21
  48:3
purchasing
  16:20 27:9
purposes  8:5
pushed  19:16
  27:15
put  10:18 13:21
  22:17 25:3
  64:23
puts  3:10 29:4
  30:19
putting  17:22
  28:8,20 29:16
  36:1 64:17

q

quality  49:21
question  12:21
  12:24 13:22
  25:10 52:22
  58:14

| | | | |
|---|---|---|---|
| **questionable** 40:14 46:11 57:14 | 63:17 **reading** 61:3 **reads** 30:12 | **records** 8:10 **reduces** 17:4 **refuse** 47:14 | **report** 49:14,19 50:18 **reports** 51:20 |

questionable 40:14 46:11 57:14

questions 10:1 13:24 14:1 36:9 42:1 43:24 59:10 68:13

quick 58:14

quickly 13:25

quite 66:19

quote 22:8

quoting 25:21

**r**

r 69:1

radar 16:1

raining 37:5

raise 20:10 26:22,23 31:18

raised 63:14

ran 60:13

rated 25:11,15 25:19 61:5 66:9,15

rates 22:6 49:23

rather 47:2

rating 7:16,19 7:19,22,23,24 8:17 26:16,17

read 10:6,7,16 10:16 50:25 55:11 57:11

63:17

reading 61:3

reads 30:12

ready 10:13 12:8 66:2

real 43:2 61:10

reality 9:24 14:24 42:16 60:24

really 24:24 28:4 31:9 32:11,25 35:7 55:24

reason 17:14 26:17 30:9

reasonable 3:11 6:22

reasons 50:16 50:16 64:2

receive 8:22 9:3

recent 50:10

recently 45:10 49:14

recognize 3:13 4:22 31:15,17 53:19

recognized 6:4

recognizes 2:2

reconnected 21:5

record 17:12 37:24 53:8 69:5

records 8:10

reduces 17:4

refuse 47:14 48:15

regarding 4:14 6:16 7:16 8:1 8:11,21 9:2

region 49:21

register 13:4

registered 68:19

regulate 15:16

regulating 29:24

reign 14:12

reinvent 17:2

relate 6:18

related 45:16

relatively 12:11

reliably 50:3

relies 15:17

relinquish 52:1

rely 16:19

remains 40:13

remarked 63:16

remedies 9:6,8

remember 3:20

remove 6:19

removes 7:18 7:21 8:2

rent 4:4

rephrases 7:1

report 49:14,19 50:18

reports 51:20

represent 3:14 40:3 58:25

representing 46:25 48:25 49:3

request 6:20

requesting 6:19

require 16:14 46:20 52:1 62:13,15 65:6

required 8:14 65:1

requirements 3:12 41:18 45:15,16

requires 5:10 6:21,25 7:4,9 8:8 47:10

requiring 6:20 8:2 40:18 47:3

rescued 36:23

research 4:23 42:15

resident 63:6

residents 63:5

respect 51:17

respectful 62:6

respectfully 64:2

respond 56:10 58:7,18

| | | | |
|---|---|---|---|
| **responsibilities** 17:4 | 39:16 40:10 44:7 45:3 51:21 52:10 54:14 56:20 57:12 59:16,21 59:22 63:22 67:16 | 63:25 | **second** 16:25 41:11 52:7,7 61:17 |
| **responsibility** 35:9 47:12,15 48:6 57:18 62:25 63:25 | | **sale** 16:7 | **section** 7:1 49:4 |
| | | **samsung** 12:16 | **security** 46:6 |
| | | **sat** 11:10 | **see** 9:14 18:23 19:24,25 24:5 27:25 34:1,9 38:7 44:15 63:17 66:19 |
| | | **saved** 36:25 | |
| **responsible** 63:7 65:15 | | **savvy** 47:20 | |
| **restate** 7:20 | **rightly** 28:18 | **saw** 60:12 | |
| **restricted** 3:2 | **rights** 41:7 45:8 | **saying** 13:19 23:25 40:24 41:23 63:18 65:23 66:22 | |
| **restrictive** 54:17 | | | **seeing** 68:22 |
| | **risk** 43:12 | | **seem** 58:5 |
| **retailers** 3:15 | **risks** 40:8 | **says** 4:23 25:15 27:16 28:15 61:11 66:12 | **seen** 2:13 |
| **revenue** 3:15 | **road** 37:4 69:12 | | **sees** 17:11 66:20 |
| **reverse** 53:14 | | | **sen** 2:1,5 6:2,6 9:25 14:3 17:25 23:10,13 24:16 25:9,25 26:3 28:22 29:2,9 30:8 31:12 32:3,19 35:6,15 36:7 36:20 39:4,21 41:25 43:25 44:8 46:15 48:20 50:20,24 51:3,8,11 52:3 52:4,6,21,24 53:11,18 54:1 54:6,12,24 55:3,6,9,19,25 56:8,16,19,22 57:2,5,9,24 |
| **reverting** 44:2 | **robust** 43:5 45:25 | **sb** 1:14 14:21 45:14 60:2 62:7,12 63:24 | |
| **review** 45:17 56:9 58:7 66:11,11 | **role** 2:20 9:14 | | |
| | **route** 62:22 | **scalia** 41:20 | |
| | **ruled** 45:6 | **scapegoated** 47:12 | |
| **reviewed** 50:15 | **rules** 54:8 | | |
| **reviewing** 58:17 | **run** 16:4 40:22 41:18 | **scared** 66:19,22 | |
| | | **scenes** 20:2 | |
| **reviews** 66:5,10 66:20 | **runs** 13:16 | **schizophrenia** 33:12 | |
| | s | **school** 20:18,19 21:5 34:3 35:2 37:21,22 53:16 | |
| **revokes** 7:11 | | | |
| **rid** 68:5 | **sad** 14:24 | | |
| **ride** 38:10 | **sadly** 35:12 | **screen** 4:16 65:25 | |
| **right** 12:3 18:9 21:12,20 23:20 24:15 25:15 28:7,9,10,10 29:4 32:1,18 34:17 35:14 37:24 39:10,14 | **safe** 36:13 43:18 44:20 60:22 | | |
| | | **scrolling** 30:25 31:1 | |
| | **safeguards** 48:14 | **scrutiny** 41:3 | |
| | **safety** 17:13 46:7 50:9 | **seat** 10:9 39:14 | |

58:6,12,21
59:3,9,15
61:25 64:4,7
64:10,15,20
65:22 67:10
68:10,12,17
**senate** 1:13 2:2
3:10 4:13 5:10
10:2,5 14:11
18:13 39:7
42:8 43:1
46:19 48:18
49:1 68:19,21
**senator** 2:3,21
3:19 4:13 6:2,4
6:7 10:1,3,25
13:11 14:7
18:8 21:1 22:1
23:12 27:3
28:18 34:15
36:8,8 44:15
52:7 55:15
58:13 60:3
61:22 64:5,13
68:9,13
**send** 67:5
**sends** 6:3
**sense** 30:20
48:11 61:23
65:9 67:1
**sent** 66:18
**separate** 61:16
**separately** 8:25

**september** 9:10
**service** 8:16
11:7 12:1,24
15:23 30:3
47:5
**services** 16:10
40:11
**serving** 45:1
**set** 64:16,23
**setting** 64:17
**seven** 34:23,23
**several** 22:10
25:23 33:3
**sex** 49:21
**sexual** 18:16
22:10 25:23
**sexually** 23:3
**share** 44:23
47:14 61:2,4
**shared** 8:17
24:6 62:25
**sharing** 23:14
**she'll** 59:16
**shield** 43:12
**shifts** 63:24
**shock** 67:25
**shoes** 67:7
**short** 17:20
**should've** 47:1
**shoulders** 63:2
**show** 24:24,25
54:15
**showing** 24:20
51:20

**side** 16:4 21:1
24:21 37:4
**sided** 11:12
**sign** 11:7
**signature** 69:8
**signed** 6:12
**signs** 34:11
36:3
**similar** 40:21
63:15
**simmons** 39:9
46:18,19
**simple** 30:20
**simplify** 6:24
9:1
**simply** 17:7
24:1
**single** 3:24
28:15 29:20
**sir** 30:9 39:21
44:7 57:1 62:3
64:8
**sit** 22:18
**sites** 47:4
**situation** 35:19
**sivadge** 39:8
59:12,20
**six** 49:15
**sixth** 20:19
**size** 46:5
**small** 17:6
**smartphone**
60:15

**smartphones**
32:9
**social** 2:10
22:15 27:18
30:1 31:1
40:18
**society** 34:8
47:16
**sociopaths**
32:17,23 65:11
65:13
**socks** 37:5
**software** 7:17
8:11 49:15
**solution** 48:11
61:23
**solutions** 47:9
69:11
**solve** 12:20
**somebody**
18:25 21:22
**son** 57:16,16
**sonya** 69:3
**soon** 66:19
**sophisticated**
15:19
**sorry** 24:20
35:16 55:1
56:18
**sort** 5:2 23:25
24:6
**sound** 26:5,6
51:4 57:12

| | | | |
|---|---|---|---|
| source 3:14 | stakes 17:16 | store 6:11,16 | study 2:8 |
| space 30:2 | stamping 11:21 | 6:18 7:4,9,18 | stuff 34:4 37:3 |
| sparks 39:14 | stand 20:25 | 7:19,22,23 8:5 | 38:19 |
| 59:12,19,23,25 | 23:7 25:1 | 12:13,14,16,18 | submit 41:8 |
| 60:2 65:21,24 | standard 15:17 | 14:18 15:21 | substance 4:15 |
| speak 10:24 | 16:9 | 16:11,13,14,16 | substantial |
| 14:19 55:24 | standards | 17:8 18:13 | 5:13 40:8 |
| 56:4 | 49:13 | 22:8 25:21 | substitute 5:25 |
| speaking 18:11 | start 10:13 | 27:12 34:9 | 6:3,5,9,14 7:18 |
| specifically | 15:13 24:9 | 40:6,23 42:9 | 8:12 |
| 6:14 26:13,21 | 38:21 39:15 | 46:20 51:1,19 | suddenly 67:8 |
| 28:24 | 59:22 | 55:12 64:1 | sue 12:2 |
| speech 13:20 | started 23:3 | 66:20,25 | suffering 15:7 |
| 40:25 41:6,7 | starting 21:8 | stored 8:16 | 30:23 |
| 41:12,15 46:23 | 32:5 38:13 | stores 2:25 5:10 | sufficiently |
| 53:2,20 54:6 | starts 34:4,5 | 5:14,21 6:17 | 41:11 |
| 68:4 | state 1:13 2:20 | 6:21 7:2 8:2,3 | suite 15:25 |
| spelling 44:5 | 35:21 41:21 | 8:23 17:4,15 | 69:13 |
| spend 4:1 | 46:24 50:10 | 17:19 24:22 | sum 17:19 |
| spendable | 54:16 | 27:15,17 28:16 | summer 3:20 |
| 67:14 | state's 31:11 | 28:19 43:6 | 3:20 |
| spending 4:3 | 48:12 | 63:4 66:6 | super 58:17 |
| spent 10:22 | stated 34:15 | story 23:15 | supermarkets |
| spicy 22:9,9 | states 40:22 | strength 42:12 | 16:21 |
| 25:22,22 | 45:11 47:8 | stretches 40:15 | supplier 16:18 |
| sponsor 49:6 | stay 5:2 38:6,6 | strong 15:8 | support 9:16 |
| sponsoring | 60:11,23 | 17:12 | 11:1 14:2 |
| 10:25 | step 9:21 16:4 | strongly 14:2 | 17:23 18:12 |
| stage 37:23 | 17:22 35:23 | 49:20 | 42:8 48:9 49:8 |
| stages 22:16 | 47:3 | structured | supporters |
| stakeholder | stick 33:20 | 12:12 15:16 | 62:20 |
| 6:10 | stop 12:5 14:24 | students 2:18 | supporting |
| stakeholder's | 21:12 27:19 | studied 42:14 | 48:1 |
| 17:1 | | | |

supports 48:12
supreme 16:3
  40:9,14 45:5
  46:22
sure 9:17 14:12
  17:1 25:3,5
  28:8 37:9 53:4
  58:15,16,24
  65:21 67:24
surely 66:5
surveilled 30:7
survive 45:16
survivor 18:12
sweep 37:1,8,8
swipe 61:19
syllable 28:10
system 8:24

**t**

t 69:1,1
table 39:18
take 33:21 38:3
  39:10 58:23
  66:23
taken 52:9
takes 29:20
talked 3:21
  36:11,15 53:2
  55:9
talking 58:22
target 11:23
  31:20
taxpayers 40:1
  40:2 57:25

teach 57:19
teacher 2:17
tech 9:20 11:3
  11:18,19 12:22
  13:1,8 14:12
  15:1,6 47:20
  48:5 62:8
  65:14 67:3
technological
  50:2
technologies
  51:23
technology 3:8
  3:12 9:18
  10:20 32:14,20
  42:15,17 49:4
  49:14 51:18
  62:10 67:2
teen 66:9,16
teenagers 31:2
  31:5
teens 61:12
telecom 39:25
tell 19:5 22:13
  52:11 60:13
  67:5
telling 60:23
ten 18:22,25
term 8:4 11:6
  32:13
terms 8:15
  11:25 12:23
  15:23 30:3

terrific 30:13
test 54:18,20
testify 14:17
  36:5 42:7
  43:23 44:15
  50:19 68:19,21
testifying 60:2
testimony 3:16
  3:21 10:2,5,15
  14:4 18:1
  23:11 28:23
  30:14,21,22
  32:25 39:5,7
  39:22 42:2
  44:1,11 46:16
  48:21 50:21,22
  54:25 55:4,14
  55:17 56:10
  57:3 58:7
  59:11,24 62:1
  64:5 65:16
testimony's
  68:22
texan 21:25
texas 1:13 2:20
  18:11,19 30:17
  38:16 42:6,10
  45:13 46:24
  47:1 48:1 60:5
  60:6
texas's 17:12
thank 2:6,6 6:6
  6:7 9:25 10:3
  10:23 14:3,6,7

17:23,25 18:7
23:8,10,13,14
23:23 25:25
26:18,24 28:22
30:8 31:12
35:5,6,7 36:5,6
36:7 37:9 39:4
39:5,6,23 42:3
43:22,25 44:5
46:13,18 48:18
48:20,23 49:6
52:25 59:25
60:3 61:20
62:3 64:7
65:16,17 67:9
68:7,8,9,10,12
68:14,16
thankful 36:10
thanks 20:23
  23:11 42:1
  46:15 50:20
  52:8 59:10
  61:25 64:4
  66:17
thayer 10:7,8
  14:6,15 27:3
  29:1,7,18 32:2
theories 15:14
thing 20:9
  29:10 33:7
  36:11,18,22
  38:15
things 2:12
  19:23,25 21:15

21:16 23:24 28:5 31:25 32:8,21 34:14 35:8,19 67:6

**think** 12:21 14:22 16:24 19:12 20:14 24:2 26:19 27:22 29:10 31:13 32:21 35:20,25 36:3 44:9 53:3,7 56:4 57:6,10 58:3 59:1 60:14,22 61:4 62:22 66:25 67:6,7,24

**thinking** 32:7 32:20

**third** 15:24

**thoughts** 26:25 30:9 49:10

**thumb** 13:21

**ticket** 62:18

**tied** 13:25

**tiktok** 27:21,24

**time** 9:11,20,24 11:11 17:24 18:22 19:5 23:20 31:18 38:7 53:1 65:13,14 67:9 68:23

**times** 32:22 33:3

**tired** 37:14

**titles** 6:15

**today** 12:22 15:11 16:8 20:14 28:6 30:23 31:23 34:8 36:6,16 38:1,2 42:8 43:23 44:23 46:12 48:24 49:10 50:19 51:14,16 52:11 66:3

**today's** 42:18

**together** 10:18

**told** 19:8,16

**tom** 39:9 48:23 48:24 50:23 51:2,6,10,16 52:19,23

**took** 37:9 63:18

**tool** 3:10

**tools** 2:23 49:11,16 50:3

**top** 3:25

**touch** 12:11

**touting** 5:22

**track** 17:12

**trade** 5:17 44:18 49:3

**traditionally** 16:6

**trafficked** 20:14 25:7

**traffickers** 19:10 20:1

**trafficking** 18:12 20:11 30:24 33:7

**tragedy** 23:17

**transaction** 29:24

**transcript** 69:4

**transparency** 5:24 43:20 68:6

**trauma** 33:8

**treats** 63:3

**tremendously** 67:21

**tried** 60:14 65:25

**trillion** 15:18

**triple** 22:9 25:22 26:6

**troubles** 38:17

**true** 64:22 69:4

**truly** 18:7 33:19

**trust** 47:2

**trying** 14:12 62:23

**turned** 18:22 19:6 27:7

**turning** 9:22

**twelve** 37:12

**twice** 56:24

**two** 12:19 15:15 19:19 28:5,7,19 34:20,20 37:7 38:19

**type** 7:23 66:17

**typically** 27:14

**u**

**unacceptable** 48:5

**unchanged** 17:9

**unchecked** 42:22

**uncomfortable** 10:11

**unconstitutio...** 41:13,16 45:9 45:19

**under** 9:7 16:1 53:19,21 54:7

**underlying** 15:13

**underneath** 35:3

**underscore** 63:13

**understand** 11:13 12:4 33:6 54:18,20

understood 46:3
unethical 43:13
unfavorable 50:18
unfortunately 44:22 60:20
uniform 35:3,3
uninvolved 48:2
united 63:18,19
unrealistic 60:25
unsafe 61:14
unseen 2:13
unusual 58:23
upbringing 45:22
urge 40:3 64:3
use 6:22 13:6 17:1 22:14,21 42:17
used 8:8 11:8 19:13 23:1 32:13 44:5 50:6 51:18
user 4:24 5:1,4 8:20 22:7 25:20 28:6 62:15
user's 5:11 40:7 40:10
users 5:12,12 22:9 25:22

46:6 62:14
using 13:12 37:14 38:21 43:7 54:16
usually 16:1
utah 6:13 45:11 62:17,18

**v**

v 40:16 41:19
value 50:9,9
van 60:12,15 60:24
vanessa 39:8 59:12,20
vapes 21:16
vaping 3:17
various 40:11
varying 49:23
verification 8:4 8:9,21 17:5 40:13,19,21,23 41:5,8 43:5 45:7,10,15,19 46:20 47:4 49:10,16 50:11 51:18
verified 51:21 51:22,24
verifies 6:18 17:7
verify 3:1 5:11 6:22 9:4 13:4 40:6 51:19

62:13
verifying 63:7
veritext 69:11
version 8:13
vice 2:5 6:6 23:13 25:9,25 26:3 28:22 29:2,9 30:8 31:12 32:3,19 35:6,15 36:20 42:4 52:4 64:7 64:10,15,20 65:22 67:10 68:10
video 4:17 56:23
violate 40:9
violated 40:20
violation 9:6 26:15
violations 9:2
voluntarily 48:15
vowed 37:15
vulnerable 9:15 42:19 47:16 57:17

**w**

waived 12:3
wake 20:13,14
walk 16:13 20:25 34:13 37:22

walking 34:10 34:12
want 4:8 10:23 18:7 19:9 20:9 20:15 21:3,24 25:1,12,13 26:8,23 35:22 37:13,13 49:6 51:12,12 52:9 53:8 58:15,19 58:24 61:2,20 63:13 67:6,22
wanted 22:3 26:12 37:21,21 37:22 38:12
washington 14:16 18:18
watch 33:25 36:3 56:23 60:5,6
watching 32:4
way 2:15 12:11 13:6 16:2 19:18 26:14,23 27:1 30:11 35:25 37:16 45:3 51:24,25 52:1 61:15 62:18 67:1 68:2
ways 23:25 24:1 68:1
we've 3:15 42:14 53:1,1

| | | x |
|---|---|---|
| | | **x** 22:9 25:22 26:6 |
| | | **y** |

**wearing** 66:16
**web** 25:7
**week** 6:13
**weeks** 19:14,19 37:7
**welcome** 14:4 18:1,4 26:2 42:1 44:10 46:16 59:23 62:1
**welfare** 42:11 43:16
**wellbeing** 2:18 42:25
**went** 36:14
**what'd** 57:9
**wheel** 17:3
**white** 60:11,15
**win** 5:7 17:11 17:11
**window** 26:10 26:20
**windows** 60:12
**wings** 38:14
**wish** 21:21 37:24
**wishing** 68:20
**withstands** 41:3
**witness** 2:9,9 52:16 58:9
**witnesses** 36:9 68:14,18

**woman** 19:18 21:6 34:12
**women** 22:14 22:21 49:24 60:6,7
**wonder** 24:8 28:1 65:19
**wonders** 11:3
**words** 16:18
**work** 2:22 14:11 49:12
**working** 62:9
**world** 3:4 28:1 30:19 31:6,18 32:10 43:4 60:19
**worlds** 31:3
**worried** 10:20
**worry** 50:8
**worse** 15:6
**worth** 12:6
**worthless** 23:20
**wreaked** 27:25
**wreck** 38:18
**writing** 52:12 52:18,22 56:10 58:8
**written** 50:17 59:13 62:12
**wrong** 44:10
**wrote** 41:20

**yeah** 32:2
**year** 11:13 21:9 26:7 38:15,25 39:1 47:20 51:15 57:15,16 65:4
**years** 10:22 11:2,4,11 14:1 18:22,22 19:6 19:11,12 20:5 20:24 23:2 34:23 45:1 56:7 60:17
**yesterday** 66:2
**young** 2:11 21:9 38:7 47:15 66:15
**younger** 4:23 4:25
**youngest** 34:22
**youth** 2:10 4:20 46:7

Veritext Legal Solutions
212-267-6868　　　　www.veritext.com　　　　516-608-2400

# EXHIBIT E-2

**BILL ANALYSIS**

Senate Research Center                                                                            S.B. 2420
                                                                                                By: Paxton
                                                                                             State Affairs
                                                                                                 7/8/2025
                                                                                                 Enrolled

**AUTHOR'S / SPONSOR'S STATEMENT OF INTENT**

Growing concerns regarding the rise of social media and its pervasiveness in the lives of children and teens leave parents in the position of grasping for the best ways to protect their children. Unlike brick and mortar stores which must verify a consumer's age before the purchase of age restricted products such as alcohol and cigarettes, minors are currently able to navigate through the digital world without such parameters.

The App Store Accountability Act remedies this by requiring app stores to gain consent from parents to consent to the use of mobile applications by their minor children and, additionally, to provide information from the app developers regarding the app's rating and the reasoning for the rating. App stores have touted that they already employ age verification, so this simply provides additional framework, transparency, and enforcement to protect the children of Texas.

(Original Author's/Sponsor's Statement of Intent)

S.B. 2420 amends current law relating to the regulation of platforms for the sale and distribution of software applications for mobile devices.

**RULEMAKING AUTHORITY**

This bill does not expressly grant any additional rulemaking authority to a state officer, institution, or agency.

**SECTION BY SECTION ANALYSIS**

SECTION 1. Amends Subtitle C, Title 5, Business & Commerce Code, by adding Chapter 121, as follows:

CHAPTER 121. SOFTWARE APPLICATIONS

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 121.001. SHORT TITLE. Authorizes this chapter to be cited as the App Store Accountability Act.

Sec. 121.002. DEFINITIONS. Defines "age category," "app store," "minor," "mobile device," and "personal data."

SUBCHAPTER B. DUTIES OF APP STORES

Sec. 121.021. DUTY TO VERIFY AGE OF USER; AGE CATEGORIES. (a) Requires the owner of an app store, when an individual in this state creates an account with the app store, to use a commercially reasonable method of verification to verify the individual's age category under Subsection (b).

(b) Requires the owner of an app store to use certain age categories for assigning a designation.

Sec. 121.022. PARENTAL CONSENT REQUIRED. (a) Requires the owner of the app store, if the owner determines under Section 121.021 that an individual is a minor who belongs to an age category that is not "adult," to require that the minor's account be affiliated with a parent account belonging to the minor's parent or guardian.

(b) Requires the owner of an app store, for an account to be affiliated with a minor's account as a parent account, to use a commercially reasonable method to verify that the account belongs to an individual who the owner of the app store has verified belongs to the age category of "adult" under Section 121.021 and has legal authority to make a decision on behalf of the minor with whose account the individual is seeking affiliation.

(c) Authorizes a parent account to be affiliated with multiple minors' accounts.

(d) Requires the owner of an app store, except as provided by this section, to obtain consent from the minor's parent or guardian through the parent account affiliated with the minor's account before allowing the minor to download a software application, purchase a software application, or make a purchase in or using a software application.

(e) Requires the owner of an app store to obtain consent for each individual download or purchase sought by the minor and notify the developer of each applicable software application if a minor's parent or guardian revokes consent through a parent account.

(f) Authorizes the owner of an app store, to obtain consent from a minor's parent or guardian under Subsection (d), to use any reasonable means to disclose to the parent or guardian certain information, give the parent or guardian a clear choice to give or withhold consent for the download or purchase, and ensure that the consent is given by the parent or guardian and through the account affiliated with a minor's account under Subsection (a).

(g) Requires the owner of an app store, if a software developer provides the owner of the app store with notice of a change under Section 121.053, to notify any individual who has given consent under this section for a minor's use or purchase relating to a previous version of the changed software application and obtain consent from the individual for the minor's continued use or purchase of the software application.

(h) Provides that the owner of an app store is not required to obtain consent from a minor's parent or guardian for the download or purchase of software applications meeting certain criteria.

Sec. 121.023. DISPLAY OF AGE RATING FOR SOFTWARE APPLICATION. (a) Requires the owner of an app store that operates in this state, if the owner has a mechanism for displaying an age rating or other content notice, to make available to users an explanation of the mechanism and display for each software application available for download and purchase on the app store the age rating and other content notice.

(b) Requires the owner of an app store that operates in this state, if the owner does not have a mechanism for displaying an age rating or other content notice, to display for each software application available for download and purchase on the app store the rating under Section 121.052 assigned to the software application and the specific content or other elements that led to the rating assigned under Section 121.052.

(c) Requires that the information displayed under this section be clear, accurate, and conspicuous.

Sec. 121.024. INFORMATION FOR SOFTWARE APPLICATION DEVELOPERS. Requires the owner of an app store that operates in this state, using a commercially available method, to allow the developer of a software application to access current information related to the age category assigned to each user under Section 121.021(b) and whether consent has been obtained for each minor user under Section 121.022.

Sec. 121.025. PROTECTION OF PERSONAL DATA. Requires the owner of an app store that operates in this state to protect the personal data of users by:

> (1) limiting the collection and processing of personal data to the minimum amount necessary for verifying the age of an individual, obtaining consent under Section 121.022, and maintaining compliance records; and

> (2) transmitting personal data using industry-standard encryption protocols that ensure data integrity and confidentiality.

Sec. 121.026. VIOLATION. (a) Provides that the owner of an app store that operates in this state violates this subchapter if the owner enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.022, knowingly misrepresents information disclosed under Section 121.022(f)(1) (relating to certain disclosures to a parent or guardian), obtains a blanket consent to authorize multiple downloads or purchases, or shares or discloses personal data obtained for purposes of Section 121.021, except as required by Section 121.024 or other law.

> (b) Provides that the owner of an app store is not liable for a violation of Section 121.021 or 121.022 if the owner of the app store uses widely adopted industry standards to verify the age of each user as required by Section 121.021 and obtain parental consent as required by Section 121.022 and applies those standards consistently and in good faith.

Sec. 121.027. CONSTRUCTION OF SUBCHAPTER. Provides that nothing in this subchapter is authorized to be construed to:

> (1) prevent the owner of an app store that operates in this state from taking reasonable measures to block, detect, or prevent the distribution of obscene material, as that term is defined by Section 43.21 (Definitions), Penal Code, or other material that may be harmful to minors;

> (2) require the owner of an app store that operates in this state to disclose a user's personal data to the developer of a software application except as provided by this subchapter;

> (3) allow the owner of an app store that operates in this state to use a measure required by this chapter in a manner that is arbitrary, capricious, anticompetitive, or unlawful;

> (4) block or filter spam;

> (5) prevent criminal activity; or

> (6) protect the security of an app store or software application.

SUBCHAPTER C. DUTIES OF SOFTWARE APPLICATION DEVELOPERS

Sec. 121.051. APPLICABILITY OF SUBCHAPTER. Provides that this subchapter applies only to the developer of a software application that the developer makes available to users in this state through an app store.

Sec. 121.052. DESIGNATION OF AGE RATING. (a) Requires the developer of a software application to assign to each software application and to each purchase that can be made through the software application an age rating based on the age categories described by Section 121.021(b).

(b) Requires the developer of a software application to provide to each app store through which the developer makes the software application available:

(1) each rating assigned under Subsection (a); and

(2) the specific content or other elements that led to each rating provided under Subdivision (1).

Sec. 121.053. CHANGES TO SOFTWARE APPLICATIONS. (a) Requires the developer of a software application to provide notice to each app store through which the developer makes the software application available before making any significant change to the terms of service or privacy policy of the software application.

(b) Provides that, for purpose of this section, a change is significant if it:

(1) changes the type or category of personal data collected, stored, or shared by the developer;

(2) affects or changes the rating assigned to the software application under Section 121.052 or the content or elements that led to that rating;

(3) adds new monetization features to the software application, including new opportunities to make a purchase in or using the software application or new advertisements in the software application; or

(4) materially changes the functionality or user experience of the software application.

Sec. 121.054. AGE VERIFICATION. (a) Requires the developer of a software application to create and implement a system to use information received under Section 121.024 to verify for each user of the software application, the age category assigned to that user under Section 121.021(b) and, for each minor user of the software application, whether consent has been obtained under Section 121.022.

(b) Requires the developer of a software application to use information received from the owner of an app store under Section 121.024 to perform the verification required by this section.

Sec. 121.055. USE OF PERSONAL DATA. (a) Provides that the developer of a software application is authorized to use personal data provided to the developer under Section 121.024 only to enforce restrictions and protections on the software application related to age, ensure compliance with applicable laws and regulations, and implement safety-related features and default settings.

(b) Requires the developer of a software application to delete personal data provided by the owner of an app store under Section 121.024 on completion of the verification required by Section 121.054.

(c) Provides that, notwithstanding Subsection (a), nothing in this chapter relieves a social media platform from doing age verification as required by law.

Sec. 121.056. VIOLATION. (a) Provides that the developer of a software application, except as provided by this section, violates this subchapter if the developer enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.054, knowingly

misrepresents an age rating or reason for that rating under Section 121.052, or shares or discloses the personal data of a user that was acquired under this subchapter.

(b) Provides that the developer of a software application is not liable for a violation of Section 121.052 if the software developer uses widely adopted industry standards to determine the rating and specific content required by this section and applies those standards consistently and in good faith.

(c) Provides that the developer of a software application is not liable for a violation of Section 121.054 if the software developer relied in good faith on age category and consent information received from the owner of an app store and otherwise complied with the requirements of this section.

## SUBCHAPTER D. ENFORCEMENT

Sec. 121.101. DECEPTIVE TRADE PRACTICE. Provides that a violation of this chapter is a deceptive trade practice in addition to the practices described by Subchapter E (Deceptive Trade Practices and Consumer Protection), Chapter 17 (Deceptive Trade Practices), and is actionable under that subchapter.

Sec. 121.103. CUMULATIVE REMEDIES. Provides that the remedies provided by this chapter are not exclusive and are in addition to any other action or remedy provided by law.

SECTION 2. Severability clause.

SECTION 3. Effective date: January 1, 2026.