# United States Court of Appeals for the Fifth Circuit

No. 25-51073

United States Court of Appeals
Fifth Circuit

**FILED**

June 4, 2026

Lyle W. Cayce
Clerk

STUDENTS ENGAGED IN ADVANCING TEXAS;
M. F., *by and through next friend* VANESSA FERNANDEZ;
Z. B., *by and through next friend* S.B.,

*Plaintiffs—Appellees*,

*versus*

KEN PAXTON, *in his official capacity as the Texas Attorney General*,

*Defendant—Appellant*,

CONSOLIDATED WITH

No. 26-50001

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff—Appellee*,

*versus*

KEN PAXTON, *in his official capacity as Attorney General of Texas*,

*Defendant—Appellant*.

1

No. 25-51073
c/w No. 26-50001

———————————————————

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:25-CV-1662
USDC No. 1:25-CV-1660

———————————————————

PUBLISHED ORDER

Before Smith, Haynes, and Oldham, *Circuit Judges*.

Per Curiam:[*]

The Texas Legislature enacted Senate Bill 2420[1] ("SB2420"), the App Store Accountability Act, with bipartisan support to help parents direct and supervise children's downloads of apps and in-app purchases. The Act accomplishes those goals by requiring age verification; parental consent; and age rating and content display.

The district court issued universal preliminary injunctions against SB2420 after applying strict scrutiny. The State of Texas seeks a stay pending appeal. We grant the opposed motion because Texas has met its burden under *Nken v. Holder*.[2]

Texas has made a strong showing that it is likely to succeed on the

———————————————

[*] Judge Haynes concurs in the sentence of the order granting the stay pending appeal.

[1] 89th Leg., R.S., ch. 200, Tex. Gen. Laws 385–90, codified at Tex. Bus. & Com. Code ch. 121. Unless indicated otherwise, all statutory citations are to the Texas Business & Commerce Code. Chapter 121 citations are to SB2420.

[2] 556 U.S. 418, 434 (2009) ("[T]hose legal principles have been distilled into consideration of four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'") (citation omitted).

No. 25-51073
c/w No. 26-50001

merits of its claim that the district court committed several reversible errors.

*First*, the district court likely erred in applying strict scrutiny to significant parts, if not all, of the Act. At most, SB2420 regulates speech that "proposes a commercial transaction,"[3] which is subject to intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980) ("*Central Hudson*").[4] App store transactions are commercial in nature.[5] After all, users browsing an app store can see a catalog of applications, obtain additional information, and download or purchase an application. App listings propose commercial transactions, regardless of whether any monetary payment is made. In fact, the "payment" for apps that are purportedly "free" is access to user data and private information.

---

[3] *See Bd. of Trs. v. Fox*, 492 U.S. 469, 482 (1989) (emphasis omitted); *e.g.*, Tex. Bus. & Com. Code § 121.022(f)(1)(D) (requiring app stores to disclose "the nature of any collection, use, or distribution of personal data that would occur because of the software application or purchase"); *id.* § 121.025 (imposing duties that include "limiting the collection and processing of personal data to the minimum amount necessary" to accomplish enumerated tasks and "transmitting personal data using industry-standard encryption protocols that ensure data integrity and confidentiality"); *id.* § 121.026(a)(1) (noting that an app store violates the Act if it "enforces a contract or a provision of a terms of service agreement against a minor that the minor entered into or agreed to without consent under Section 121.022").

[4] *See also Fox*, 492 U.S. at 476–79 (noting that "government restrictions upon commercial speech may be no more broad or no more expansive than 'necessary' to serve its substantial interests"; "refrain[ing] from imposing a least-restrictive-means requirement" on commercial speech; and clarifying that "[i]n requiring that to be 'narrowly tailored' to serve an important or substantial state interest . . . we have not insisted that there be no conceivable alternative, but only that the regulation not 'burden substantially more speech than is necessary to further the government's legitimate interests'") (citing, *inter alia*, *Cent. Hudson*, 447 U.S. at 566).

[5] *See also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression.") (citation and internal quotation marks omitted).

No. 25-51073
c/w No. 26-50001

Any minor who downloads an app must accept its terms of service, including agreements about how the minor's data is used. Some terms require minors to waive the right to sue by agreeing to "arbitration pr[o]visions that no child can understand."[6] Detailed user data, including that of minors, is the lifeblood of the app store monetization ecosystem. Because, at most,[7] intermediate scrutiny applies to this commercial speech, Texas need only establish a "reasonable fit" between its goal and corresponding restrictions without needing to satisfy "a least-restrictive-means requirement."[8]

*Second*, assuming *arguendo* that we should analyze SB2420 as commercial speech, Texas has likely shown that the SB2420 survives intermediate scrutiny because the Act "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially

_____

[6] ROA.26-50001.225–26 ("[The terms of service contracts] give permission to the tech companies to follow the child around. And date stamping moment by moment, where the child is in longitude and latitude so that [companies] can monetize that data, target[ting] them with ads. And sometimes, predators find that information and harm happens. And if harm happens, . . . the child is not allowed to sue for the harm in federal court. [Users] waive[] that right through arbitration pr[o]visons that no child can understand.").

[7] SB2420 may not regulate speech at all, given that it does not target any substantive content but instead regulates commercial conduct with an incidental relationship to speech.

[8] *See Fox*, 492 U.S. at 480–81 ("Moreover, since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require. By declining to impose, in addition, a least-restrictive-means requirement, we take account of the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires, and provide the Legislative and Executive Branches needed leeway in a field (commercial speech) 'traditionally subject to government regulation[.]' Far from eroding the essential protections of the First Amendment, we think this disposition strengthens them. 'To require a parity of constitutional protection for commercial and non-commercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech.'") (citations omitted).

No. 25-51073
c/w No. 26-50001

more speech than necessary to further those interests."[9]  Requiring age verification, parental consent, and app-related content ratings likely directly and materially advances Texas's substantial interest in protecting children's data, safety, and privacy in a digital world.  Thus, there is likely a "reasonable fit" between SB2420's methods and goals allowing parents to direct and supervise children's downloads of apps and in-app purchases.[10]  That some works protected by the First Amendment may be the object of app downloads or in-app purchases does not categorically exempt them from ordinary regulations governing commercial transactions.  Otherwise, any company involved in proposing a commercial transaction could trigger strict scrutiny by incidentally including speech as part of the transaction.[11]  Creatively repackaging content-neutral commercial regulations as content-specific ones proposes too general a level of analysis.[12]

------

[9] *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 495–96 (quoting *Turner Broad. Sys., Inc. v. FCC*, 522 U.S. 180, 189 (1997)).

[10] *See* Tex. Const. art. 1, § 37 ("[A] parent has the responsibility to nurture and protect the parent's child and the corresponding fundamental right to exercise care, custody, and control of the parent's child, including the right to make decisions concerning the child's upbringing."); *see Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (discussing the strong interest the state has in protecting children); *see also Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (recognizing parents' "fundamental interest" to direct their children's upbringing).

[11] *See Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 67–68 (1983) ("We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech.") (quoting *Cent. Hudson*, 447 U.S. at 563 n.5; *see also Fox*, 492 U.S. at 474–75 ("Including these home economics elements no more converted AFS' presentations into educational speech, than opening sales presentations with a prayer or a Pledge of Allegiance would convert them into religious or political speech.").

[12] *See Fox*, 492 U.S. at 482 (noting the "importan[ce]" of "being clear about the difference between commercial and noncommercial speech").  We recognize that the converse may also be true, namely that an enterprising litigant may exploit the distinction between commercial and noncommercial speech to get a more favorable level of scrutiny.

No. 25-51073
c/w No. 26-50001

*Third*, the district court likely improperly deemed two exceptions[13] to the parental-consent provisions to be "coverage definitions" that would affect the scope and application of all of SB2420's provisions.[14]  SB2420's emergency-services exception is not likely content-based but, instead, focuses on why the service is needed, not what is being communicated. "[E]mergency calls serve the vital purpose of protecting the safety and welfare of Americans."[15]  Section 121.022(h)(1) directly addresses data and privacy concerns by requiring that the emergency services app "limit[] data collection to information" that is "collected in compliance with" the Children's Online Privacy Protect Act ("COPPA")[16] and "necessary for the provision of emergency services."[17]  Users do not need to create an account to access and use the emergency service app.  *Id.* § 121.022(h)(1)(C).  The emergency-services exception likely does not run afoul of constitutional

---

In either circumstance, courts should rightly exercise caution when determining the appropriate level of scrutiny.

[13] The two standalone exceptions, for emergency services and apps provided by an entity that develops standardized tests for use in postsecondary education, are recited in and apply only to the parental-consent provisions in section 121.022.  Neither exception is located in the "definitions" in section 121.002.

[14] The district court improperly inverted its analysis.  *See Free Speech Coal.*, 606 U.S. at 498 ("[U]nder intermediate scrutiny, 'the First Amendment imposes no freestanding under inclusiveness limitation' and Texas 'need not address all aspects of a problem in one fell swoop.'") (quoting *TikTok Inc. v. Garland*, 604 U.S. 56, 76 (2025)); *see also United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) (refusing to require the government to "make progress on every front before it can make progress on any front").

[15] *Am. Ass'n of Pol. Consultants Inc. v. FCC*, 923 F.3d 159, 171 (4th Cir. 2019), *aff'd sub nom. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020) (distinguishing "a call made for emergency purposes" while severing and holding invalid problematic aspects of a robocall restriction and government-debt exception).

[16] 15 U.S.C. § 6501 *et seq.*

[17] Tex. Bus. & Com. Code § 121.022(h)(1)(B).

No. 25-51073
c/w No. 26-50001

concerns.

We need not conclusively resolve the question of the other exception for an app that "is operated by or in partnership with" a regulated nonprofit organization that "develops, sponsors, or administers [] standardized test[s]." That standalone exception, which focuses on the identity of the speaker, does not necessarily reflect a content preference,[18] but rather the reality that students often need to take tests "used for purposes of admission to or class placement in a postsecondary educational institution or a program within a postsecondary educational institution." Tex. Bus. & Com. Code § 121.022(h)(2). The speaker-based distinction appears to be content-neutral, not content-based, in discriminating among ideas or viewpoints. And section 121.022(h)(2)(B) mitigates data-privacy concerns, requiring that the non-profit "is subject to" separate laws prohibiting certain uses of student information. *E.g.*, Tex. Educ. Code § 32.152. In any event, that limited standalone exception can be severed consistently with SB2420's strong severability provision and severability principles,[19] because

_____

[18] *Cf. Barr*, 591 U.S. at 619–20 ("[T]he fact that a distinction is speaker based does not automatically render the distinction content neutral. Indeed, the Court has held that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.") (citations and internal quotations omitted).

[19] We do not suggest that there are any problematic provisions of SB2420 and merely follow the law's unambiguous textual severability command. ROA.26-50001.388-89; *see Barr*, 591 U.S. at 629 ("The text of the severability clause squarely covers the unconstitutional government-debt exception and requires that we sever it."); *see, e.g.*, *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844–45 (Tex. 1990) (equivalent).

Insofar as there may be any unconstitutional application of SB2420, the district court failed to conduct a proper facial-invalidity analysis under *Moody v. NetChoice*, 603 U.S. 707 (2024). Plaintiffs who bring facial challenges must demonstrate that "the ratio of unlawful-to-lawful applications is . . . lopsided enough to justify the strong medicine of facial invalidation." *United States v. Hansen*, 599 U.S. 762, 784 (2023) (internal quotation omitted). Put another way, Plaintiffs must show that "the law's unconstitutional applica-

No. 25-51073
c/w No. 26-50001

the remainder of SB2420 is "capable of functioning independently" and is "fully operative as a law."[20] The district court likely erred in failing faithfully to apply the severability clause.

*Fourth*, SB2420's terms are likely not unconstitutionally vague.[21] The district court likely erred in concluding that SB2420 does not provide meaningful guidance about how to determine an app's age rating. Section 121.022(f)(1) requires app stores to provide certain information in obtaining parental consent, referring to ratings and content in section 121.052 that are determined by the developer. Therefore, an app store cannot "knowingly misrepresent[]" age rating or content information under section 121.026(a)(2). Instead, SB2420 contemplates "good faith" reliance on information obtained from a developer, which is not liable for an incorrect age rating if it "uses widely adopted industry standards to determine the rating and specific content" and "applies those standards consistently and in good faith." Tex. Bus. & Com. Code § 121.056(b).

The district court also likely erred in determining that the terms "new opportunities to make a purchase" and "material[] changes" in section 121.053(b) are unconstitutionally vague.[22] For one, "a change is significant

_____

tions substantially outweigh its constitutional ones" to prevail in "a facial suit [] based on the First Amendment." *Moody*, 603 U.S. at 723–24. It is highly unlikely that Plaintiffs have met this "rigorous standard." *See id.* at 723.

[20] *See Barr*, 591 U.S. at 628 (noting that "it is fairly unusual for the remainder of a law not to be operative").

[21] *See Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty in our language.").

[22] Section 121.053 requires developers to provide notice to app stores before making significant changes to an app's terms of service or privacy policy.

8

if it" "adds new monetization features," including "new opportunities to make a purchase." This phrase's plain and ordinary language outlines its straightforward meaning, and the phrase's additional context relates to the terms of service or privacy policy of the app. The other phrase describes that a change is significant if it "materially changes the functionality or user experience" of the app. TEX. BUS. & COM. CODE § 121.053(b)(4). And in the context of updates needed for informed parental consent, a "material[] change[]" is one that has the capacity to influence whether the parent allows a minor to continue to use an app. *Id.* § 121.022(g). Courts routinely interpret "material[] change[]" in other contexts, and its meaning is well established and easily understood. Regardless, any of these phrases can be severed because the rest of SB2420 is "capable of functioning independently" and "fully operative."[23] Even so, on a first pass, we observe no legitimate justification for enjoining enforcement of the entire Act.

*Fifth*, the district court's universal preliminary injunctions likely "fall[] outside the bounds of a federal court's equitable authority" in barring Texas from enforcing SB2420 against anyone. *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). Though we express great skepticism that Plaintiffs are entitled to relief, any such relief, if warranted, would be an injunction limited to enforcement against the Students Engaged in Advancing Texas ("SEAT") plaintiffs and any identified members of the Computer & Communications Industry Association ("CCIA"). In any event, a blanket prohibition on SB2420's enforcement is likely inappropriate. *See id.*

Texas has also made a strong showing on the other stay factors. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey*

---

[23] *See Barr*, 591 U.S. at 628; *see also Rose*, 801 S.W.2d at 844–45.

No. 25-51073
c/w No. 26-50001

*v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam) (citations omitted).
The remaining factors—the balance of equities and public interest factors—
merge where an injunction affects a State. *Nken*, 556 U.S. at 435. The
interests of Texas and the public interest coincide. Texas has a substantial,
if not compelling, interest in protecting children, and parents need to have
the necessary information to make informed choices affecting their chil-
dren's upbringing.[24]

The need to protect children is intensified in the digital world, where
app stores have violated existing consumer protection and child privacy laws
for years, despite a federal consent decree.[25] Absent SB2420, parents' ability
to protect their children is imperiled because app stores have encouraged
minors to download applications and make in-app purchases without giving
parents accurate content information or obtaining their informed consent.
Any purported burden on app stores and developers is minimal because
SB2420 requires only "commercially reasonable" verification methods and
allows developers to use "widely adopted industry standards" in determin-
ing age ratings and those related to corresponding content. The balance of
equities and public interest are clearcut in Texas's favor.

IT IS ORDERED that the opposed motion for stay of the universal

---

[24] *See* Tex. Const. art 1, § 37; *Ginsberg* 390 U.S. at 640 (1968); *Yoder*, 406 U.S.
at 232.

[25] *See, e.g.*, ROA.26-50001.845–85 (Amici Curiae Brief of the National Center on
Sexual Exploitation and The Digital Childhood Institute); ROA.26-50001.849 ("The
consequences are substantial. As documented in public reports, thousands of children have
been sextorted, targeted with illegal drugs, contacted by traffickers, exposed to dangerous
viral challenges, or encouraged toward self-harm by chatbots, often inside apps that app
stores present as appropriate and safe for young teenagers.") (internal footnote citations
omitted).

No. 25-51073
c/w No. 26-50001

preliminary injunctions pending appeal is GRANTED.[26]

_____

[26] This order supersedes this panel's order granting an administrative stay.