Nos. 25-51073 & 26-50001

# In the United States Court of Appeals for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F. BY AND THROUGH NEXT FRIEND, VANESSA FERNANDEZ; Z.B. BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs–Appellees,*

*v.*

KEN PAXTON, in his official capacity as Attorney General of Texas,

*Defendant–Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff–Appellee,*

*v.*

KEN PAXTON, in his official capacity as Attorney General of Texas,

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Western District of Texas

**American Center for Law & Justice *Amicus* Brief in Support of Defendant–Appellant and Reversal**

Garrett A. Taylor
**AMERICAN CENTER**
  **FOR LAW & JUSTICE**
625 Bakers Bridge Ave.
St. 105-121.
Franklin, TN 37067
(615) 599-5572

Liam R. Harrell
**AMERICAN CENTER FOR**
  **LAW & JUSTICE**
201 Maryland Ave. NE
Washington, DC 20002
(202) 546-8890

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal. In addition to the persons and entities identified in the briefs of Appellant Ken Paxton and Appellees in each consolidated case, the following persons may have an interest in the outcome of this case:

The **American Center for Law & Justice** (*amicus curiae*), a non-profit organization incorporated in the Commonwealth of Virginia.

Mr. Garrett A. Taylor (counsel for ACLJ, Tennessee)

Mr. Liam R. Harrell (counsel for ACLJ, Washington, DC)

Dated: June 3, 2026                                     Respectfully submitted,

                                                        /s/ Liam R. Harrell

i

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.......................................................... i

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES................................................................................. iii

INTEREST OF *AMICUS CURIAE* .......................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ..........................................................................................................5

   I. SB 2420 channels decision-making authority to parents, not legislators or bureaucrats. ..........................................................................6

   II. Rather than regulating speech, SB 2420 regulates a minor's ability to enter into contracts. ................................................................11

   III. SB 2420 imposes no undue burden on adults .....................................14

   IV. The State of Texas has compelling interests that justify SB 2420.........16

CONCLUSION .....................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. ACLU II*, 542 U.S. 656 (2004)........................................................16, 17

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ...........................................4

*Askey v. Williams*, 74 Tex. 294, 11 S.W. 1101, 1102 (1889)..................................11

*Barber v. Rounds*, No. 25-20125 (5th Cir. 2026) ......................................................1

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011)..................3, 9, 10

*Cummings v. Powell*, 8 Tex. 80 (1852) ......................................................................11

*Erznoznik v. Jacksonville*, 422 U.S. 205 (1975). .................................................3, 12

*Free Speech Coal. v. Paxton*, 606 U.S. 461 (2025) .................................................14

*Ginsberg v. New York*, 390 U.S. 629 (1968). ....................................................4, 9, 16

*McConnell v. FEC*, 540 U.S. 93 (2003)........................................................................1

*Meyer v. Nebraska*, 262 U.S. 390 (1923)..............................................................2, 6

*Parham v. J.R.*, 442 U.S. 584 (1979)....................................................................5, 10

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925).........................................2, 6, 7, 10

*Prudential Building & Loan Ass'n v. Shaw*, 119 Tex. 228, 26 S.W.2d 168, 171

   (1930) ........................................................................................................................11

*Troxel v. Granville,* 530 U.S. 57 (2000). ..........................................................3, 8

*Trump v. Anderson,* 601 U.S. 100 (2024) ................................................................1

*Wisconsin v. Yoder,* 406 U.S. 205 (1972) ...........................................................7, 8

**Statutes**

Tex. Bus. & Com. Code § 121.022 ......................................................................10

Tex. Family Code § 151.001(a)(6).......................................................................11

Tex. Family Code § 33.002 .................................................................................12

Tex. Family Code § 33.0021 ...............................................................................12

Tex. Finance Code § 34.305................................................................................11

Tex. Trans. Code § 521.145 ................................................................................11

**Other Authorities**

U.S. Dep't of Health & Human Servs., *Social Media and Youth Mental Health:*

*The U.S. Surgeon General's Advisory,*

https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-

media-advisory.pdf (2023) ...........................................................................16

**INTEREST OF *AMICUS CURIAE***

The American Center for Law & Justice is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have appeared often before the Supreme Court and this Court as counsel for parties, *e.g. Trump v. Anderson*, 601 U.S. 100 (2024); *McConnell v. FEC*, 540 U.S. 93 (2003); *Barber v. Rounds*, No. 25-20125 (5th Cir. 2026), as well as *amici*. The ACLJ specializes in First Amendment litigation as well as parental-right advocacy, the heart of this case.

**CONSENT OF PARTIES**

Counsel for Amicus Curiae has contacted counsel for all parties, and they indicated that they consent to the filing of this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In the digital age, where smartphones serve as gateways to vast oceans of information, entertainment, and social connection, children and teenagers often navigate these spaces with minimal oversight, frequently to devastating effect. A mounting body of evidence links unrestricted access to

1

mobile apps with surging rates of youth anxiety, depression, suicidal ideation, addictive behaviors, predatory exploitation, and privacy invasions. Yet the response cannot be heavy-handed government censorship that overrides family autonomy or chills protected expression for all users.

Texas Senate Bill 2420, the App Store Accountability Act, charts a different path: one that restores meaningful parental authority over children's media consumption while respecting constitutional limits. Rather than dictating what content is "suitable" for minors—a role the Supreme Court has repeatedly reserved for parents—the law requires app stores to verify user ages using commercially reasonable methods, categorize users accordingly, and obtain explicit parental consent before minors can download apps or make in-app purchases. This framework empowers parents to decide what enters their children's digital lives, prevents unauthorized commercial transactions by those lacking contractual capacity, and addresses documented harms without broadly suppressing speech.

SB 2420 is fully consistent with longstanding Supreme Court precedent and survives constitutional scrutiny for four interlocking reasons:

First, the statute channels decision-making authority to parents, not legislators or bureaucrats, vindicating the fundamental liberty interest in directing children's upbringing recognized in cases from *Meyer v. Nebraska*, 262 U.S. 390 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) through *Troxel v. Granville*, 530 U.S. 57 (2000). By requiring parental affiliation and consent for minor accounts, SB 2420 gives practical effect to parents' "high duty" to raise their children, *Pierce*, 268 U.S. at 535, distinguishing it from laws struck down in *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) that substituted state judgment for parental choice.

Second, SB 2420 regulates minors' ability to enter into contracts and conduct commercial transactions, not speech content itself. Texas, like every state, has long deemed minors' contracts voidable and restricted their capacity in areas from marriage and medical consent to purchases of alcohol, tobacco, and firearms. Conditioning app downloads and in-app purchases on parental involvement falls squarely within this traditional domain of state authority over minors' commercial conduct, with any incidental effect

on expression permissible under precedents like *Erznoznik v. Jacksonville*, 422 U.S. 205 (1975).

Third, the law imposes no undue burden on adults. Age verification is a routine, accepted practice in countless commercial contexts: buying alcohol or tobacco, opening bank accounts, starting jobs, entering contracts, or accessing restricted venues. App stores already collect similar data (name, date of birth, etc.) during account creation. Privacy-protective methods abound (credit card checks, third-party services, biometric estimation), and the statute demands only "commercially reasonable" approaches. Adult access to any app or content remains entirely unimpaired.

Fourth, Texas pursues compelling state interests: shielding children from well-documented harms of addictive app design, predatory monetization, exposure to inappropriate material, cyberbullying, and data exploitation, while bolstering parental authority as a governmental interest the Court has expressly endorsed. *See, e.g., Ginsberg v. New York*, 390 U.S. 629 (1968). Even cases limiting direct content restrictions, like *Ashcroft v. Free*

4

*Speech Coalition*, <u>535 U.S. 234</u> (2002), acknowledge room for narrowly tailored protections against minors' access to harmful materials.

## **ARGUMENT**

Texas Senate Bill 2420 represents a carefully calibrated effort to address a genuine public health and family crisis in the mobile ecosystem without trampling First Amendment rights or parental prerogatives. The law does not ban or censor speech; it simply restores the natural gatekeeping role that parents have always played in children's lives—a role technology has eroded by enabling instant, unsupervised access to apps and in-app transactions. By requiring age verification and parental consent only at the point of commercial engagement (account creation, downloads, and purchases), SB 2420 aligns with bedrock constitutional principles: parents, not the state or tech platforms, hold primary responsibility for directing their children's upbringing and development. This approach honors decades of Supreme Court jurisprudence affirming parental rights as fundamental while advancing Texas's compelling interest in protecting vulnerable youth from

addictive designs, exploitative commerce, and other documented digital harms.

## I.    SB 2420 channels decision-making authority to parents, not legislators or bureaucrats.

"The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.*, 442 U.S. 584 (1979). Rooted in the Due Process Clause of the Fourteenth Amendment, the United States Supreme Court has long held that parents— not the state—have a consitutional right to direct the upbringing of their children.

Over a century ago, in *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Supreme Court struck down a state law prohibiting the teaching of foreign languages to young children. The Supreme declared that the "liberty" guaranteed by the Due Process Clause of the Fourteenth Amendment includes the right of parents "to control the education of their own" children. *Id.* at 400-01. Critically, the parent's protected liberty interest is not simply freedom from restraint but an affirmative duty to make decisions about their

child's development. *Id.* at 400 ("Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station of life.").

Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), the Supreme Court relied on *Meyer* quashing an Oregon law that required children to attend public schools. The Court held that parents, rather than the government, have the right to decide where to send their children to school and direct the upbringing and education of their children. *Id.* at 535 ("The fundamental theory of liberty . . . excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only."). The Court emphasized "the child is not a mere creature of the state." *Id.* Parents have both "the right, coupled with the high duty" to raise their children, which includes sending them to a religious education institution. *Id.*

The Supreme Court then expanded the principles of *Meyer* and *Pierce* in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), by recognizing that the Free Exercise Clause protects against a state interfering with a parent's right to

control the religious upbringing of their children. In *Yoder*, an Amish family, pursuant to their sincerely held religious beliefs, objected to sending children to school after the eighth grade and were ultimately convicted under a state law that required children to attend school until reaching sixteen years old. *Id.* at 207. The Supreme Court would go on to hold, "secondary schooling, by exposing Amish children to worldly influences in terms of attitudes, goals, and values contrary to beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child." *Id.* at 218. The Court also emphasized parents have the right to control the upbringing of their children which includes "moral standards, religious beliefs, and elements of good citizenship. " *Id.* at 233.

In *Troxel v. Granville*, 530 U.S. 57 (2000), the Court struck down a Washington law that violated the due process rights of parents by allowing virtually any person to petition for child visitation rights if a court deemed

8

it in the child's best interest. The Court emphasized that, "[t]he liberty interest at issue in this case–the interest of parents in the care, custody, and control of their children–is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65. There is "no reason for the State to interject itself in the private realm of the family." *Id.* at 69.

These principles extend to a parent's ability to control their children's media consumption and access to information. In *Ginsberg v. New York*, 390 U.S. 629 (1968), the Supreme Court upheld a New York statute that required age verification to access content that is obscene to minors. The Court specifically emphasized that legislatures can "properly conclude that parents. . . who have [the] primary responsibility for [their] children's well-being are entitled to support of laws designed to aid discharge of that responsibility." *Id.* at 639. Thus, *Ginsberg* reinforced critical parental rights and established that states may assist parents in exercising their authority over what materials they can access—precisely what SB 2420 does in the digital context.

9

Even in *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011), which struck down a California statute that banned the sale of violent video games to minor children under eighteen, the Supreme Court acknowledged that "the state has the power to enforce parental prohibitions" and left "undisputed that parents have traditionally had the power to control what their children hear and say." *Id.* at 795 n.3. The critical distinction between the California statute in *Brown* and SB 2420, is that the California statute overrode the authority of parents as "its entire effect is only in support of what the state *ought* to want." *Id.* at 804. The is not what the state thinks is unsuitable for children; that decision must be left to parents. The Supreme Court's jurisdprudence has "consistently reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. *Parham*, 442 U.S. at 602.

SB 2420 affirms these principles by placing constitutional authority with parents to decide what their children can access—not tech companies or the state. The question at the heart of this case is: who decides what content minors may access? SB 2420 channels that authority to parents. For

10

example, a minor must affiliate their app store account with a parent and the parent must consent before any app is downloaded or any in-app purchases are made. Tex. Bus. & Com. Code §121.022. This approach avoids the constitutionally dubious undertaking of putting the government in charge of what speech minors can access. Instead, it empowers parents to exercise their fundamental right and "high duty" to direct their children's upbringing. *Pierce*, 268 U.S. at 535.

## II.    Rather than regulating speech, SB 2420 regulates a minor's ability to enter into contracts.

All states, including Texas, severely limit the enforceability of contracts entered into by minors. Texas has long recognized that a contract executed by a minor is voidable. *Cummings v. Powell*, 8 Tex. 80 (1852); *Askey v. Williams*, 74 Tex. 294, 11 S.W. 1101, 1102 (1889); *Prudential Building & Loan Ass'n v. Shaw*, 119 Tex. 228, 26 S.W.2d 168, 171 (1930). As a result, minors generally cannot enter into binding contracts, and in many instances, need parental consent to do so.

Various Texas statutes reflect this principle across numerous contexts. For example, parents have a right to consent to their minor child's marriage.

Tex. Family Code § 151.001(a)(6). A parent must sign a minor's application for a vehicle license. Tex. Trans. Code § 521.145. Moreover, parents can control minors' use of bank accounts. Tex. Finance Code § 34.305(c). In the medical context, parents have a right to consent to medical, dental, psychiatric, psychological, and surgical treatment and must consent for a child to be vaccinated as well. Tex. Family Code § 151.001(a)(6); Tex. Family Code § 32.101. Furthermore, Texas law also prohibits a minor from having an abortion without notice to the parent and consent by the parent. Tex. Family Code § 33.002 and § 33.0021.

This principle extends to federal law as well. Military enlistment by minors requires parental consent. 10 U.S.C. § 505(a). Historically, minors who enlisted without parental consent could be returned home on writs of *habeas corpus*. *United States v. Anderson*, 24 F. Cas. 813 (C.C.D. Tenn. 1812); *Commonwealth v. Callan*, 6 Binn. 255 (Pa. 1814). These statutes support the principles that the State has the authority to restrict, or even prohibit, the contracting power of minors.

Even in non-contractual commercial transactions this power holds; minors cannot purchase alcohol, tobacco, or nicotine products, adult magazines, firearms, and numerous other items. None of this is construed by courts as restricting children's First Amendment, or other, rights. So, while it is true that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975), SB 2420's regulation of minors' commercial transactions is decidedly different, and well within Texas's police power.

When a minor downloads an app, they enter into license agreements, accept terms of service, create an account establishing a commercial relationship, and often agree to data-sharing agreements. Many apps also involve in-app purchases constituting financial transactions. All of these instances are contractual undertakings traditionally left to the consent of parents. SB 2420 simply applies these well-established principles to the digital marketplace.

**III.    SB 2420 imposes no undue burden on adults.**

On the topic of restricting minors' access to certain materials, age verification is routine in commercial contexts. There is no serious claim that age verification poses a constitution-offending privacy invasion in the fields of alcohol and tobacco sales, opening bank accounts, starting jobs, entering into contracts, or myriad other legally significant commercial relationships. Adults routinely verify age and identity for purchasing alcohol or tobacco, opening financial accounts, beginning employment, entering contracts, accessing age-restricted venues, and obtaining licenses and permits. Revealing such information to an employer, banker, or store clerk to verify identification or sufficient age is a normal, accepted way of conducting business in the modern world. None of this changes in the online world; the Supreme Court has weighed in and found no constitutional violation for mandatory age verification for pornographic websites. *Free Speech Coal. v. Paxton*, 606 U.S. 461 (2025).

Moreover, this practice is now common custom. App stores already collect the information necessary for age verification. The same "invasion"

of privacy already occurs in the ordinary course of creating an account with a typical application store. To create an Apple ID or Google Account, one must provide his or her full name, date of birth, email address, and phone number. SB 2420, at most, creates a minimal additional burden. In effect, the only change here is that the application store provider must work to actually confirm the details with information they already have rather than accept unconfirmed user inputs. No new data collection burden is imposed.

Furthermore, there are numerous minimally invasive verification techniques that can be used to preserve important privacy concerns. Modern age verification can employ credit card verification, government ID verification with privacy protections, third party verification services that don't retain data, biometric age estimation technology, or knowledge-based authentication. The statute requires commercially reasonable methods, allowing app stores flexibility to implement privacy-protective approaches. This standard ensures verification is effective without being unduly invasive.

Notably adult access remains unimpaired. Adults can download any app without restriction, create accounts, make purchases freely, and access content without interference. SB 2420 affects only minor users' ability to transact without parental consent. No adult's First Amendment rights are burdened beyond the minimal verification already required for app store accounts.

## IV.    The State of Texas has compelling interests that justify SB 2420.

The evidence of harm to minors from unrestricted app access is substantial and growing. The U.S. Surgeon General has issued warnings documenting correlations between social media and app usage and increased anxiety, depression, and suicidal ideation among youth. U.S. Dep't of Health & Human Servs., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf (2023).

Apps employ features specifically designed to exploit neurological vulnerabilities in developing brains, creating addictive design patterns and compulsive usage. *Id.* at 9. Children also face significant safety risks

16

including exposure to explicit content, cyberbullying, and contact with drug dealers and child predators through messaging features. *Id.* at 8, 9. ii.

Technology has eliminated natural parental checkpoints. SB 2420 restores the gatekeeping function that *Ginsberg* assumed would exist, giving practical effect to constitutional parental rights. As *Ginsberg* recognized, supporting parental authority constitutes a compelling government interest. *Ginsberg*, 390 U.S. at 639-40. Parents have fundamental rights under *Pierce*, *Meyer*, *Troxel*, and *Parham*, and the state has compelling interests in ensuring parents can exercise those rights effectively.

Even in *Ashcroft v. ACLU II*, 542 U.S. 656 (2004), which struck down a different internet regulation, left room for proper regulation. The Supreme Court noted, "[o]n a final point, it is important to note that this opinion does not hold that [the government] is incapable of enacting any regulation of the Internet designed to prevent minors from gaining access to harmful materials." *Id.* at 672-73.

\* \* \*

17

## **CONCLUSION**

Given the pressing need to address documented harms to children and the careful crafting of this law to respect both First Amendment principles and parental rights, SB 2420 should be upheld.

Respectfully submitted,

Liam R. Harrell
**AMERICAN CENTER
FOR LAW & JUSTICE**
201 Maryland Ave. NE
Washington, DC 20002
(202) 546-8890

Garrett A. Taylor
**AMERICAN CENTER
FOR LAW & JUSTICE**
625 Bakers Bridge Ave.
Ste. 105-121.
Franklin, TN 37067
(615) 599-5572

*Counsel for* Amicus Curiae

18

## **CERTIFICATE OF SERVICE**

I certify that on June 3, 2026, this document was served on all parties

or their counsel of record through the CM/ECF system.

Dated: June 3, 2026                                    Respectfully submitted,

                                                       /s/ Liam R. Harrell

                                                       *Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. Appl. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 2,916 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype.

Dated: June 3, 2026                     Respectfully submitted,

                                        /s/ Liam R. Harrell

                                        *Counsel for* Amicus Curiae