**Nos. 25-51073 & 26-50001 (cons.)**

# U.S. Court of Appeals for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND VANESSA FERNANDEZ; Z.B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant,*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee,*

*v.*

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS,

*Defendant-Appellant.*

On Appeal from the U.S. District Court for the Western District of Texas, Austin Division

**RESPONSE BRIEF FOR APPELLEES
STUDENTS ENGAGED IN ADVANCING TEXAS, ET AL.**

Adam S. Sieff
Haley B. Zoffer
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, CA 90071

Abigail B. Everdell
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020

Ambika Kumar
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104

David M. Gossett
Celyra I. Myers
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005

*Counsel for Appellees Students Engaged in Advancing Texas, et al.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- Plaintiffs-Appellees in No. 25-51073:

    o Students Engaged in Advancing Texas (SEAT). SEAT is a Texas nonprofit corporation with IRS 501(c)(3) tax status. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

    o M.F., by and through his next friend, Vanessa Fernandez

    o Z.B., by and through her next friend, S.B.

- Counsel for Plaintiffs-Appellees in No. 25-51073:

    o Davis Wright Tremaine LLP

    o Adam S. Sieff, Esq.

    o Ambika Kumar, Esq.

    o David M. Gossett, Esq.

i

- o Abigail B. Everdell, Esq.

- o Haley B. Zoffer, Esq.

- o Celyra I. Myers, Esq.

- Plaintiff-Appellee in No. 26-50001:

  - o Computer & Communications Industry Association

- Counsel for Plaintiff-Appellee in No. 26-50001:

  - o Haynes and Boone, LLP

  - o Michael J. Lambert, Esq.

  - o Edward P. Percarpio, Esq.

  - o William R. Pillifant, Esq.

  - o Laura L. Prather, Esq.

  - o Catherine L. Robb, Esq.

  - o Wilson Sonsini Goodrich & Rosati

  - o Brian M. Willen, Esq.

- Defendant-Appellant:

  - o Ken Paxton, Attorney General, State of Texas

- Counsel for Defendant-Appellant:

  - o Ken Paxton, Esq.

  - o William R. Peterson, Esq.

o Jeffrey A. Stephens, Esq.

o Brent Webster, Esq.

/s/  *Adam S. Sieff*
Adam S. Sieff

Attorney of Record for
Plaintiffs-Appellees in No. 25-51073

iii

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, Plaintiffs-Appellees in 25-51073 agree with the State that oral argument is appropriate in these consolidated cases. These cases raise complex, cutting-edge constitutional issues. Oral argument may assist the Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................iv

INTRODUCTION.................................................................................. 1

STATEMENT OF JURISDICTION........................................................3

ISSUES PRESENTED ..........................................................................3

STATEMENT OF THE CASE ...............................................................4

    A.   Apps Disseminate Media, Information, and Ideas, and Provide Fora for Unlimited Human Expression. ............4

    B.   Existing Tools Enable Parental Regulation of Minors' App Store Activity. ..................................................................5

    C.   Texas Enacts SB 2420 to Limit Minors' Access to First Amendment Protected Speech. ......................................7

    D.   Plaintiffs-Appellees Challenge the Act................................10

    E.   The District Court Enjoins the Challenged Provisions. .................................................................... 12

SUMMARY OF THE ARGUMENT ....................................................14

STANDARD OF REVIEW...................................................................17

ARGUMENT ......................................................................................17

I.   Appellees' First Amendment Claims Are Likely To Succeed ........................................................................................17

    A.   The Challenged Provisions Restrict Access to Fully Protected Speech, Not Conduct. ........................................19

    B.   The Challenged Provisions Regulate Far More Than Commercial Speech............................................................22

    C.   The State Has Not Satisfied the First Amendment.............25

        1.   Strict scrutiny applies to the challenged provisions. ......................................................................26

a.     The challenged provisions create a system of prior restraint. ................................. 26

b.     The challenged provisions cannot be justified without reference to content ................. 30

c.     The challenged provisions are content-based because of the Act's coverage definition. ............ 34

2.     The challenged provisions fail any level of First Amendment scrutiny ................................... 37

a.     The challenged provisions are not necessary to achieve any real compelling interest ............. 38

b.     The challenged provisions are not narrowly tailored. .......................................... 42

c.     The challenged provisions fail even intermediate scrutiny. ...................................... 43

3.     Facial relief is proper. ............................................... 47

a.     Appellees showed that *Moody* is satisfied. .......... 47

b.     The State's arguments on appeal fail. ................ 50

D.     The Act's "Material Change" Provision Is Unconstitutionally Vague. .................................. 53

II.     The Remaining Factors Support The Injunction ........................ 56

III.     The Challenged Provisions Are Not Severable ........................... 59

IV.     The Injunction's Scope Is Proper. ................................. 60

CONCLUSION ................................................................. 62

CERTIFICATE OF SERVICE ................................................. 64

CERTIFICATE OF COMPLIANCE ........................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023)................................................................23, 24

*Am. Acad. of Implant Dentistry v. Parker,*
  860 F.3d 300 (5th Cir. 2017)................................................46

*Am. Ass'n of Pol. Consultants, Inc. v. FCC,*
  923 F.3d 159 (4th Cir. 2019)................................................36

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021)................................................................48

*Anderson v. City of Hermosa Beach,*
  621 F.3d 1051 (9th Cir. 2010)................................................22

*Arcara v. Cloud Books, Inc.,*
  478 U.S. 697 (1986)................................................................25

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
  564 U.S. 721 (2011)................................................................38

*Ark. Writers' Project, Inc. v. Ragland,*
  481 U.S. 221 (1987)................................................................34

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)................................................................30

*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002)................................................................49

*Baggett v. Bullitt,*
  377 U.S. 360 (1964)................................................54, 55, 56

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963)................................................................26, 28

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020)..........................................................................35, 36

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)...............................................................................20

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989)...............................................................................23

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983).................................................................................23

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ...........................................................50, 58

*Boos v. Barry*,
    485 U.S. 312 (1988)...............................................................................30

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)....................................................................... *passim*

*Builder Recovery Servs., LLC v. Town of Westlake*,
    650 S.W.3d 499 (Tex. 2022) .................................................................59

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009)................................................................17

*CEATS, Inc. v. TicketNetwork, Inc.*,
    71 F.4th 314 (5th Cir. 2023) ...........................................................35–36

*Chi. Women in Trades v. Trump*,
    778 F. Supp. 3d 959 (N.D. Ill. 2025)...................................................62

*Chiu v. Plano Indep. Sch. Dist.*,
    339 F.3d 273 (5th Cir. 2003)................................................................29

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)...............................................................................33

*Citizens United v. FEC*,
    558 U.S. 310 (2010)...............................................................................22

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015)......................................................................49

*Computer & Commc'ns Indus. Ass'n v. Uthmeier,*
    --- F. Supp. 3d ---, 2025 WL 1570007 (N.D. Fla. June 3, 2025).... 21–22

*Corley v. United States,*
    556 U.S. 303 (2009)......................................................................56

*Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.,*
    603 U.S. 799 (2024)......................................................................56

*Counterman v. Colorado,*
    600 U.S. 66 (2023)........................................................................55

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019)......................................................................51

*Edenfield v. Fane,*
    507 U.S. 761 (1993)......................................................................44

*Elrod v. Burns,*
    427 U.S. 347 (1976)..................................................................56–57

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023) ..........................................................4

*Ex parte Young,*
    209 U.S. 123 (1908)......................................................................61

*Express Oil Change, LLC v. Miss. Bd. of Lic. for Pro. Eng'rs &*
    *Surveyors,*
    916 F.3d 483 (5th Cir. 2019)..........................................................46

*FEC v. Cruz,*
    596 U.S. 289 (2022)......................................................................39

*Free Speech Coal., Inc. v. Rokita,*
    738 F. Supp. 3d 1041 (S.D. Ind. 2024).............................................29

*Free Speech Coal., Inc. v. Paxton,*
    606 U.S. 461 (2025)..............................................................*passim*

iv

*Greater New Orleans Broad. Ass'n v. United States,*
    527 U.S. 173 (1999)...............................................................45

*Gresham v. Picker,*
    705 F. App'x 554 (9th Cir. 2017)......................................36

*Hines v. Pardue,*
    117 F.4th 769 (5th Cir. 2024) ...........................................20

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010).......................................................... 54, 56

*Hunter v. Underwood,*
    471 U.S. 222 (1985)............................................................33

*Interstate Cir., Inc. v. City of Dallas,*
    390 U.S. 676 (1968)................................................ 27–28, 54

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022)............................................................18

*Lamont v. Postmaster Gen.,*
    381 U.S. 301 (1965)............................................................62

*LIA Network v. City of Kerrville,*
    163 F.4th 147 (5th Cir. 2025) ..........................................46

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025)...........................................................58

*McConnell v. FEC,*
    540 U.S. 93 (2003)............................................... 22, 23, 32

*McCullen v. Coakley,*
    573 U.S. 464 (2014)..................................................... 45, 46

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.,*
    460 U.S. 575 (1983)..................................................... 28, 34

*Mitchum v. Foster,*
    407 U.S. 225 (1972)...................................................... 60–61

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024)...................................................... *passim*

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
  429 U.S. 274 (1977)...................................................... 33

*N.Y. Times Co. v. United States,*
  403 U.S. 713 (1971)...................................................... 27

*NAACP v. Button,*
  371 U.S. 415 (1963)...................................... 47, 52, 54, 56

*Neb. Press Ass'n v. Stuart,*
  427 U.S. 539 (1976)...................................................... 26

*NetChoice, LLC v. Bonta,*
  113 F.4th 1101 (9th Cir. 2024) ................................ 28, 42

*NetChoice, LLC v. Carr,*
  789 F. Supp. 3d 1200 (N.D. Ga. 2025)......................... 21

*NetChoice, LLC v. Yost,*
  778 F. Supp. 3d 923 (S.D. Ohio 2025) ......................... 21

*NIFLA v. Becerra,*
  585 U.S. 755 (2018)...................................................... 22

*Nken v. Holder,*
  556 U.S. 418 (2009)...................................................... 58

*Packingham v. North Carolina,*
  582 U.S. 98 (2017)........................................................ 48

*Pak Foods Hou., LLC v. Garcia,*
  433 S.W.3d 171 (Tex. App. 2014)................................. 33

*Pub. Citizen Inc. v. La. Att'y Disc. Bd.,*
  632 F.3d 212 (5th Cir. 2011)..................................... 46–47

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)............................................. 35, 36, 37

*Reno v. ACLU,*
   521 U.S. 844 (1997) ................................................. 17, 49, 50

*Rest. L. Ctr. v. U.S. Dep't of Lab.,*
   66 F.4th 593 (5th Cir. 2023) ........................................ 17

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) ................................................. 57

*Rubin v. Coors Brewing Co.,*
   514 U.S. 476 (1995) ................................................ 45

*Sable Commc'ns of Cal., Inc. v. FCC,*
   492 U.S. 115 (1989) ................................................ 49

*Simon & Schuster, Inc. v. N.Y. Crime Victims Bd.,*
   502 U.S. 105 (1991) ................................................ 24

*Smith v. California,*
   361 U.S. 147 (1959) ................................................ 23

*Smith v. Daily Mail Publ'g Co.,*
   443 U.S. 97 (1979) ................................................. 26

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) .............................................. 18, 51

*Se. Promotions, Ltd. v. Conrad,*
   420 U.S. 546 (1975) ................................................ 28

*Spirit Aerosystems, Inc. v. Paxton,*
   142 F.4th 278 (5th Cir. 2025) ...................................... 50

*Stahl v. City of St. Louis,*
   687 F.3d 1038 (8th Cir. 2012) ...................................... 55

*Tex. VFW of U.S. v. Tex. Lottery Comm'n,*
   760 F.3d 427 (5th Cir. 2014) .................................... 41–42

*TikTok Inc. v. Garland,*
   604 U.S. 56 (2025) ................................................. 44

vii

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .............................................................. 50

*Troxel v. Granville,*
530 U.S. 57 (2000) ............................................................... 58

*Trump v. CASA,*
606 U.S. 831 (2025) ................................................. 17, 60, 61

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) .............................................................. 43

*United States v. Lauderdale Cnty.,*
914 F.3d 960 (5th Cir. 2019) ............................................... 55

*United States v. Overton,*
834 F.2d 1171 (5th Cir. 1987) ............................................. 32

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) ...................................................... *passim*

*United States v. Williams,*
553 U.S. 285 (2008) ......................................................... 53–54

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001) ................................................ 51

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
425 U.S. 748 (1976) .............................................................. 62

*Vance v. Universal Amusement Co.,*
445 U.S. 308 (1980) .............................................................. 28

*Virginia v. Am. Booksellers Ass'n, Inc.,*
484 U.S. 383 (1988) .............................................................. 52

*Welty v. Dunaway,*
791 F. Supp. 3d 818 (M.D. Tenn. 2025) .............................. 61

**Constitutional Provisions**

U.S. Const. amend. I ................................................................ *passim*

**Statutes**

15 U.S.C.
    § 6501 ....................................................................................... 6
    § 6502 ....................................................................................... 6
    § 6503 ....................................................................................... 6
    § 6504 ....................................................................................... 6
    § 6505 ....................................................................................... 6

18 U.S.C. § 2710 ................................................................... 24

42 U.S.C. § 1983 ............................................................... 17, 60

Tex. Alc. Bev. Code § 106.03 ............................................... 49

Tex. Bus. & Com. Code
    § 121.002 ............................................................................ 7, 51
    § 121.021 ........................................................................ *passim*
    § 121.022 ........................................................................ *passim*
    § 121.024 ........................................................... 9, 11, 19, 62
    § 121.026 ........................................................................ *passim*
    § 121.051 ............................................................................... 7
    § 121.052 ............................................................................... 9
    § 121.053 ........................................................................ *passim*
    § 121.054 ........................................................... 9, 11, 19, 62
    § 121.056 ............................................................... 11, 19, 62
    § 541.001 ........................................................... 7, 33, 43, 49
    § 541.005 ......................................................................... 7, 33
    § 541.051 ......................................................................... 7, 33
    § 541.101 ......................................................................... 7, 33
    § 541.105 ......................................................................... 7, 33

Tex. Civ. Prac. & Rem. Code § 129B.002 ................ 6, 38, 49, 50

Tex. Health & Safety Code § 161.082 .................................. 49

Tex. Penal Code § 43.24 ....................................................... 49

**Other Authorities**

Ash Turner, *How Many Apps Are on the App Store*, BankMyCell, perma.cc/TJ5R-YKNC (last updated Jan. 5, 2025)............................53

*Attorney General Ken Paxton Secures Major Victory Protecting Children Online by Requiring Age Verification and Parental Approval for Minors' App Downloads* (June 1, 2026), https://perma.cc/5D9V-2DBT .......................................................................................... 1, 34

E. Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173 (2025) ....................29

H.J. of Tex., 89th Leg. (May 8, 2025).......................................... 7, 32, 51

Similarweb*, iOS Apple App Store Statistics and Trends 2026*, perma.cc/5F2K-YHSB (last visited June 10, 2026)...........................53

## INTRODUCTION

The Texas App Store Accountability Act (SB 2420) restricts all Texans, and presumptively bans Texas youth, from accessing speech protected by the First Amendment. Officials responsible for drafting, enforcing, and now defending SB 2420 have made no secret that the law exists "to stop" Texas youth "from accessing harmful or inappropriate content."[1] The Act requires everyone in Texas to prove their age before accessing information disseminated through mobile app stores, banning teenagers from accessing even political and educational material unless they first clear state-mandated age gates and obtain parental permission. Parents and guardians must prove their authority to provide that permission. And parents who grant permission are forced to review and approve the content their child sees, even if—like Plaintiff-Appellee M.F.'s mother—they believe such government-ordered surveillance undermines parent-child relationships.

The Act violates the First Amendment on its face. Defying the Supreme Court's repeated admonition that governments have no "free-

---

[1] *Attorney General Ken Paxton Secures Major Victory Protecting Children Online by Requiring Age Verification and Parental Approval for Minors' App Downloads* (June 1, 2026), https://perma.cc/5D9V-2DBT.

floating power to restrict the ideas to which children may be exposed,” *Brown v. Ent. Merchs. Ass’n,* 564 U.S. 786, 794–95 (2011), unrebutted record evidence shows—and the State’s counsel *admitted* at the hearing in the district court—that Texas enacted the law to prevent minors from accessing protected but, in the State’s view, harmful materials online. The Act thus imposes transparently content-justified prior restraints on speech that replace *parents’ freedom* to moderate their children’s access to information with “what the State thinks parents *ought* to want.” *Id.* at 804. It violates the rules that speech “neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them,” and that the government has no “power to prevent children from hearing or saying anything *without their parents’ prior consent.*” *Id.* at 795 n.3 (citation and quotation marks omitted). Just as the State could not compel a bookstore to screen patrons and stop minors from buying books without their parents’ permission, the State cannot ban minors from downloading apps without such consent.

The district court correctly enjoined the Act’s challenged age-verification, parental-identification, and parental-consent provisions.

The challenged provisions are subject to strict scrutiny, fail any level of heightened First Amendment review, and are independently invalid because they rest in part on unconstitutionally vague requirements.

This Court should affirm. Although a motions panel preliminarily agreed with Texas's attempt to recast SB 2420 as a mere regulation of minors' abilities to contract, the Supreme Court rejected an identical characterization in *Brown*, 564 U.S. at 791, and that is not the Act's direct effect. SB 2420 erects immediate barriers to accessing and disseminating fully protected speech. That makes the Act different and far more suppressive than the pornography law upheld in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025), which restricted access only to speech obscene as to minors. SB 2420 by contrast presumptively bars access to fully protected expression in all but a narrow set of content-based carveouts. The preliminary injunction should be affirmed.

## STATEMENT OF JURISDICTION

Appellees agree with the State's jurisdictional statement.

## ISSUES PRESENTED

1.     Whether Appellees are likely to succeed on the merits of their First Amendment claims seeking facial relief.

2.    Whether the other preliminary injunction factors favor an injunction.

3.    Whether the challenged provisions are severable from the remainder of SB 2420.

4.    Whether the district court had equitable power to enter an injunction prohibiting any enforcement of the challenged provisions.

## STATEMENT OF THE CASE

### A.    Apps Disseminate Media, Information, and Ideas, and Provide Fora for Unlimited Human Expression.

App stores allow anyone with a smartphone and an internet connection to access the accumulated sum of virtually all recorded human knowledge. Through Apple's iOS App Store alone, more than 1 billion people have access to tens of millions of apps, published by more than 30 million app developers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023). Some applications, like internet browsers, are tools to search for and discover information online, while others, like Kindle, Netflix, and Spotify, provide users access to vast libraries of expressive content. Social media and content sharing platforms such as Instagram, Substack, Discord, and TikTok serve as town squares wherein users may exchange art and ideas.

Mobile phones and apps are the dominant vehicles for young people's speech and communication. ROA.25-51073.109–21; ROA.25-51073.494–98 ¶¶ 3–5, 18; ROA.25-51073.485 ¶¶ 3–4. Teens use apps for political advocacy, education, community, and creative expression. ROA.25-51073.122–28; ROA.25-51073.494–95 ¶¶ 4–11; ROA.25-51073.486–87 ¶¶ 5–11; ROA.25-51073.477–78 ¶¶ 5–9. Many apps provide training grounds for citizenship. ROA.25-51073.122–28; ROA.25-51073.494 ¶ 8; ROA.25-51073.477–80 ¶¶ 6, 8–9, 11–12. Others offer an essential medium for young people to send and receive messages. ROA.25-51073.477–83 ¶¶ 4–9, 11–17; ROA.25-51073.494–95 ¶¶ 4–5, 8–9. And some apps enable young people to find purpose and community. ROA.25-51073.300–03; ROA.25-51073.490 ¶ 19.

## B. Existing Tools Enable Parental Regulation of Minors' App Store Activity.

App stores, mobile devices, and apps already give parents tools to monitor and tailor their children's online experiences. *See* ROA.25-51073.256 ¶ 22, ROA.25-51073.262 ¶ 8, ROA.25-51073.281–83 ¶ 13. App stores can require parental consent for some or all app downloads, device makers permit parents to manage children's use of apps, *see id.*, and apps enable parents to control access to social media and other accounts,

ROA.25-51073.379–87; ROA.25-51073.343–77. With these tools, families are well-equipped to guide their children's app usage. *See* ROA.25-51073.501–02 ¶¶ 3–4; ROA.25-51073.489–90 ¶¶ 15, 17; ROA.25-51073.379–428 (scientific research).

Texas also already regulates children's access to content that lacks First Amendment protection. Since September 2023, HB 1181 has required age verification on websites where more than one-third of the content is sexual material harmful to minors. Tex. Civ. Prac. & Rem. Code § 129B.002(a). Although the Supreme Court upheld that law because it applied to adult content, it made clear that online age-screening requirements are *always* subject to First Amendment scrutiny because they "necessarily" burden the "right to access speech." *Free Speech Coal.*, 606 U.S. at 495.

Existing laws also already give parents tools to manage their children's personal information when they download app store content. The federal Children's Online Privacy Protection Act (COPPA) imposes heightened data collection and use restrictions when apps and app stores direct their services to minors, 15 U.S.C. §§ 6501–6505, for example, and Texas just enacted comprehensive rules restricting how online services

may enter agreements to collect, use, sell, share, or otherwise monetize minors' data, including by requiring parental consent. Tex. Bus. & Com. Code §§ 541.001(17), 541.001(29)(C), 541.005, 541.051(a), 541.101(b)(4), 541.105(a)(4).

## C.    Texas Enacts SB 2420 to Limit Minors' Access to First Amendment Protected Speech.

Texas passed SB 2420 in response to concerns that children would access "stuff we don't want our kids to see," including "addictive and harmful content." H.J. of Tex., 89th Leg., R.S. 3577–78 (May 8, 2025) (Reps. Bryant and Fairly), https://perma.cc/D96L-UP95. The Act imposes sweeping regulations on mobile app stores, defined as any website, software, or other electronic service "that distributes software applications" to mobile device users, Tex. Bus. & Com. Code § 121.002(2), and on "software application developers" that offer software to users in Texas "through an app store," *id.* § 121.051.

The Act prohibits minors from downloading any apps or paid content within apps without parental consent. *Id.* §§ 121.021–.022. It applies only to apps users download to their mobile devices and to paid in-app purchases, not to pre-installed apps, software available through web browsers, or apps on non-mobile devices like televisions. It also

7

exempts apps that provide users "direct access to emergency services" and those "operated by or in partnership with a nonprofit" that "develops, sponsors, or administers a standardized test used for" admission to or placement "in a postsecondary educational institution." *Id.* § 121.022(h)(2)(A). These exceptions leave test-prep apps published by nonprofit test administrators—like College Board's Bluebook app or ACT Online Prep—unregulated, yet impose compliance obligations on other test-prep nonprofits, like the Khan Academy app.

***Age-verification and parent-identification mandates.*** Before anyone in Texas may download apps from an app store or access paid content within an app, the Act requires that the store use "a commercially reasonable method" to "verify the individual's age category." *Id.* § 121.021(a). If the store determines that the user is under eighteen, it must deny her access to the content until she "affiliate[s] with a parent account belonging to [her] parent or guardian." *Id*. § 121.022(a).

To that end, app store owners must use "a commercially reasonable method" to verify that the prospective parent account in fact belongs to an adult with "legal authority to make a decision on behalf of the minor."

*Id.* §§ 121.021(a), 121.022(b)(1)–(2). The Act does not explain what information is sufficient to prove legal parental authority.

***Parental-consent mandate.*** Each time teenagers seek to download an app or buy content within an already-downloaded app, they must "obtain consent" from their verified parent. *Id.* §§ 121.022(d)(1)–(3). That consent process requires disclosing to the parent the app's state-mandated "age rating," based on one of several state-defined "age categories," as well as the "content or other elements" underlying the rating. *Id.* §§ 121.022(f)(1)(A)–(E), 121.052. Teens who cannot obtain consent are banned from accessing the app or content. *Id.* App stores also must share this consent information with app developers, *id.* § 121.024(1), who in turn must bar teens from accessing their apps or paid content absent consent, *id.* § 121.054.

Parents must separately consent to "each individual download or purchase sought by the minor." *Id.* § 121.022(e)(1). They are prohibited from granting "blanket consent to authorize multiple downloads or purchases," even if that is their preference. *Id.* § 121.026(a)(3). App stores must seek consent anew whenever there is a "material[] change[]" to the

9

application's content ratings, "functionality," or "user experience." *Id.* §§ 121.022(g), 121.053(b).

Appellees will be burdened by both the age-verification and parental consent requirements. ROA.25-51073.489–91 ¶¶ 12–18; ROA.25-51073.496–97 ¶¶ 12–15; ROA.25-51073.476–83 ¶¶ 1–17.

### D.   Plaintiffs-Appellees Challenge the Act.

Plaintiffs-Appellees are Texas-based individuals and organizations, including teenagers and an organization consisting of and seeking to communicate with teens, whose speech would be abridged were the Act to take effect.

Students Engaged in Advancing Texas (SEAT) is a coalition of students who use mobile apps to teach other teenagers how to get involved in policymaking. ROA.25-51073.476 ¶¶ 1–3. M.F. is a high school student who uses mobile apps to learn about current events, discover music, publish photography, and conduct research for his debate team. ROA.25-51073.493–96 ¶¶ 1–11. Z.B. is a high school student journalist and content creator who uses mobile apps to gather news for her school paper, publish reports, study, and share commentary with her large teen audience. ROA.25-51073.485–88 ¶¶ 1–11.

Appellees sued to enjoin SB 2420 on October 16, 2025, because the Act threatens their expressive activity. The Complaint challenged the Act's age-verification and parent-identification mandates, Tex. Bus. & Com. Code §§ 121.021, 121.022(a)–(b), 121.024(1), 121.026(b)(1)(A), 121.054(a)(1), and its parental-consent requirements, *id.* §§ 121.022(d)–(g), 121.024(2), 121.026(a)(3), 121.026(b)(1)(B), 121.053, 121.054(a)(2), 121.056(c), on the grounds that the Act restricts protected speech in violation of the First Amendment and is unconstitutionally vague. Appellees sought declaratory and injunctive relief barring Texas from enforcing those provisions on their face, or to the extent applied to certain categories of apps. ROA.25-51073.44–45 ¶¶ 97a, d.

Appellees wish to use mobile apps to socialize, engage in political activity, pursue creative hobbies, and further their education. *See* ROA.25-51073.485–88 ¶¶ 1–11; ROA.25-51073.493–96 ¶¶ 1–11; ROA.25-51073.476–83 ¶¶ 1–17. The mobile apps they rely on to engage in this protected conduct and access associated protected information would continue to allow them to do so, but for the Act's age-verification and parental-consent requirements. *See* ROA.25-51073.489–91 ¶¶ 12–18; ROA.25-51073.496–97 ¶¶ 12–15; ROA.25-51073.476–83 ¶¶ 1–17.

11

The Computer & Communications Industry Association (CCIA) filed a complaint challenging the Act on behalf of its app store and developer members the same day. That suit challenged the same provisions, as well as the Act's requirements that developers assign and display age ratings to apps and all purchases available within an app. In addition to the First Amendment and vagueness arguments similar to those asserted by SEAT, CCIA argued the Act unconstitutionally burdens interstate commerce.

### E.   The District Court Enjoins the Challenged Provisions.

The district court entered a preliminary injunction on December 23, 2025. ROA.25-51073.670–89. As to Appellees' motion, it found that SB 2420's parental consent (§§ 121.022(a), 121.022(e)(1)) and age-verification (§ 121.021(a)) requirements were content-based and subject to strict scrutiny because the record—and the State's own admissions in the litigation—showed they were intended to "shield minors from certain speech the State deems objectionable or harmful," ROA.25-51073.679–80 (internal quotations and citations omitted). It also found that the challenged provisions were content-based and subject to strict scrutiny for another independent reason: the Act's coverage definition exempts

certain categories of mobile apps depending on their subject matter, causing the challenged provisions to burden speech based "entirely on the communicative content a service provides." ROA.25-51073.678.

The district court held that the challenged provisions do not survive strict scrutiny. It concluded that Texas had failed to show a compelling interest in preventing minors' access to every category of speech the law restricts, and that the law's blanket age-verification and parental consent requirements on all apps—rather than just any subset of apps containing harmful material minors could not lawfully access—was neither narrowly tailored nor the least restrictive alternative to achieve any legitimate interest the State has in preventing harm to minors. ROA.25-51073.681–84. The court further held that, even if intermediate scrutiny applied, the challenged provisions would still fail because "Texas has not offered any evidence connecting the Act's goals to its methods." ROA.25-51073.683. It also held that the "materially changes" provision in § 121.053(a) is impermissibly vague. ROA.25-51073.684–85.

Applying the two-step First Amendment overbreadth standard affirmed in *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024), the court held that the challenged provisions were facially invalid. It compared the

13

challenged provisions' "constitutional … and unconstitutional applications," *id.*, and found that because the provisions "exclusively target speech, only a small portion of which falls outside First Amendment coverage," and because the provisions' applications to protected speech could not be justified, the vast majority of the challenged provisions' applications were unconstitutional. ROA.25-51073.687–88. Since under Texas law the facially invalid challenged provisions could not be severed from the Act's remaining interdependent parts, the district court enjoined the Act as a whole. ROA.25-51073.683. It issued a similar order in CCIA's case. ROA.26-50001.1153–72.

The cases were consolidated for purposes of this appeal.

## SUMMARY OF THE ARGUMENT

This Court should affirm the decision below.

I.     Appellees will succeed on the merits of their First Amendment claims. The First Amendment applies because the Act's challenged provisions restrict Texans' access to information, expressive works, and means to publish their own speech. Such restrictions regulate speech, not conduct, even when that speech is provided pursuant to some kind of transaction. *See* Part I.A. The State is also wrong that the challenged

provisions restrict at most commercial speech. The Act burdens Texans'
ability to access fully protected news, commentary, music, movies, other
forms of entertainment, and indeed every form of human communication
that exists online, not just—or even in substantial part—speech that
proposes commercial transactions. It makes no difference that the speech
is sold, leased, or purportedly provided pursuant to some other kind of
consideration (like in exchange for "data"). *See* Part I.B.

Strict scrutiny applies to the challenged provisions because they
impose a system of prior restraint; are undisputedly and admittedly
justified by reference to averting the impact of online content on children;
and because the statute's coverage definition—which restricts the
dissemination of apps depending on their subject matter—renders
application of the challenged provisions content-based. *See* Part I.C.1.

The challenged provisions fail any level of First Amendment review
because the State has not presented *any* evidence to defend them.
Nothing in the record, therefore, permits a conclusion that the challenged
provisions are narrowly tailored to advance any sufficiently important
state interest, much less necessary and the least restrictive means to
achieve a compelling one. *See* Part I.C.2. Unrebutted evidence, by

15

contrast, shows the Act fails to meaningfully protect children from non-speech harms online, while suppressing a significant range of protected speech. *Id.* Because virtually all the challenged provisions' applications are to restrict speech, and only a small subset restrict either unprotected speech or hypothetically non-expressive conduct, their unconstitutional sweep is substantial and facial relief is the proper remedy. *See* Part I.C.3. The "material change" provision is also facially invalid because it is vague and invites arbitrary, speech-chilling enforcement. *See* Part I.D.

II.    The other preliminary injunction factors support affirming the injunction. The State does not dispute that the loss of First Amendment rights for any period of time is an irreparable injury. And equity and the public interest support injunctive relief because protecting First Amendment rights is always in the public interest, while the State has no interest in enforcing an unconstitutional law. *See* Part II.

III.    The Act's severability clause does not rescue it. The challenged provisions are so interconnected with the Act's remaining provisions that severing them would render the Act meaningless and without any practical effect. *See* Part III.

IV.    The injunction's scope is also proper and within the district

16

court's power to issue equitable remedies under 42 U.S.C. § 1983. Even under *Trump v. CASA*, 606 U.S. 831 (2025)—which is inapplicable because the equity powers afforded by the Judiciary Act of 1789 are not at issue—the statewide injunction would be appropriate because it is necessary to provide complete relief to the individual user Appellees. *See* Part IV.

## STANDARD OF REVIEW

This Court reviews preliminary injunctions for abuse of discretion, reviewing the district court's legal conclusions de novo and its factual findings for clear error. *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). Whether First Amendment free speech rights have been infringed is a mixed question of law and fact, reviewed de novo. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

## ARGUMENT

**I.    Appellees' First Amendment Claims Are Likely To Succeed**

The First Amendment protects the rights to create, disseminate, and access ideas and expression. *See Brown*, 564 U.S. at 792 & n.1. These protections apply equally to online media, *Reno v. ACLU*, 521 U.S. 844, 852–53 (1997), including information and ideas communicated through mobile applications distributed through app stores. *Moody*, 603 U.S. at

718–19. They also apply to minors, who "are entitled to a significant measure of First Amendment protection," and whose rights to engage in *fully protected* speech "cannot be suppressed." *Brown*, 564 U.S. at 794–95.

These foundational principles require First Amendment scrutiny of the challenged provisions, which "necessarily" burden Texans' "right to access speech" by placing the media and information contained in apps behind an age-gate until their identities can be verified. *Free Speech Coal.*, 606 U.S. at 495. The government "bears the burden of proving the constitutionality" of any regulation that abridges these protections, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000), under some form of heightened First Amendment scrutiny, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 565 (2011); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524, 532 (2022).

The Act here is fundamentally unlike the law upheld in *Free Speech Coalition* because it targets and restricts access to "fully protected" materials, not adult content minors have no First Amendment right to access. 606 U.S. at 482–85, 490–92 & n.12. Strict scrutiny thus applies because the Act's age-verification and parent-identification mandates,

18

Tex. Bus. & Com. Code §§ 121.021, 121.022(a)–(b), 121.024(1), 121.026(b)(1)(A), 121.054(a)(1), and its parental-consent mandate, *id.* §§ 121.022(d)–(g), 121.024(2), 121.026(a)(3), 121.026(b)(1)(B), 121.053, 121.054(a)(2), 121.056(c), are content-based prior restraints. *Playboy*, 529 U.S. at 813. And these challenged provisions fail that or any other First Amendment standard.

The district court applied the required analysis. It correctly held the challenged provisions restrict protected speech; that the State could not justify those restrictions under any level of First Amendment scrutiny; that the challenged provisions are facially invalid because nearly all of their applications "exclusively" restrict protected speech while only a "vast minority of applications" reach "unprotected speech not addressed by other laws"; and that provisions of the Act are vague. ROA.25-51073.677–87. This Court should affirm.

### A.    The Challenged Provisions Restrict Access to Fully Protected Speech, Not Conduct.

The undisputed intent and effect of the Act's challenged provisions is to restrict human communication. Despite basically admitting that the challenged provisions regulate speech, Brief for Appellant (Br.) 17, Texas suggests the First Amendment might not apply at all because the Act

19

predominantly bars "app stores and developers from proposing or entering into [] contracts with minors without parental consent." *Id.* at 19. The State casts that as a "restriction[] directed at commerce or conduct" that only incidentally burdens speech. *Id.* at 18. And the motions panel similarly suggested that the Act's challenged provisions "may not regulate speech at all." Dkt. 91-1 at 4 n.7. That is incorrect.

Time and again, governments restrict speech and call it conduct—but that does not make it so. "State labels cannot be dispositive of the degree of First Amendment [p]rotection" that applies to a given regulation. *Hines v. Pardue*, 117 F.4th 769, 775–78 (5th Cir. 2024) (quotation omitted). A court must rather "consider a restriction's effect, as applied, in a very practical sense" to determine whether a regulated "course of action involve[s] speech." *Id.* at 777 (quotations omitted).

Under that standard, the Act plainly restricts speech because it burdens "acts of 'disclosing' and 'publishing' information" to audiences trying to access it. *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). The plain text of the challenged provisions restrict all Texans—and presumptively ban teens like Appellees—from accessing every imaginable type of speech disseminated through app stores' online

20

libraries. *See* Tex. Bus. & Com. Code § 121.022(d), (e) (age verification and verified parental consent required "for each individual download" "before allowing" a minor "to … download" content).

Speech is not commercial conduct just because its dissemination takes the form of a transaction. The Supreme Court rejected an identical argument in *Brown*, holding that restricting "the sale or rental" of content restricts speech, not conduct, 564 U.S. at 792 n.1, and denying California's claim that its law restricting the sale of video games without parental consent "cover[ed] only commercial transactions entered into by minors outside the presence of parents," Pet.'s Reply Br., *Brown v. Ent. Merchs. Ass'n*, 2010 WL 4034925, at *3–4, 11–18 (U.S. filed Oct. 8, 2010).

The district court correctly applied *Brown* to hold that the Act's "restrictions on what content can be bought and sold" burden speech, ROA.25-51073.679, joining other courts holding that "prohibiting minors from contracting to access [a] plethora of protected speech cannot be reduced to a regulation of commercial conduct." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 950 (S.D. Ohio 2025); *see NetChoice, LLC v. Carr*, 789 F. Supp. 3d 1200, 1221 (N.D. Ga. 2025); *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, --- F. Supp. 3d ---, 2025 WL 1570007, at *11–

12, 12 n.17, 17 (N.D. Fla. June 3, 2025).

Enforcing this distinction between speech and conduct regulation is essential to liberty. *See NIFLA v. Becerra*, 585 U.S. 755, 767–68 (2018). If the process of disseminating speech could be "disaggregate[d]" and "reduced to [its] constituent acts, and thus described as conduct," it would expand the government's power to restrict the free flow of disfavored information and ideas. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010) (Bybee, J.). The First Amendment thus protects every link "in the speech process," *Citizens United v. FEC*, 558 U.S. 310, 336 (2010), recognizing that governments committed to suppressing speech could otherwise exploit the "division of labor" inherent in publishing to attack different "levels of the production and dissemination of ideas," *McConnell v. FEC*, 540 U.S. 93, 251–52 (2003) (Scalia, J., dissenting in part).

## B. The Challenged Provisions Regulate Far More Than Commercial Speech.

The State's argument that the Act regulates at most commercial speech, Br. 2, 17–23, defies the Supreme Court's repeated admonitions that speech is not commercial just because it is sold or monetized. The district court correctly held that the Act's blanket restraint on the

dissemination of *all kinds of information*—including news, commentary, advocacy, entertainment, and everything in between—regulates non-commercial speech. ROA.25-51073.679–80.

Commercial speech is speech that "does *no more than* propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (emphasis added). The State's own authority recognizes that the sale of "speech for a profit" does far more than that. *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 482 (1989). And the Supreme Court recently reaffirmed that distributing "speech for pay" and "with an expectation of compensation" makes no difference. *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023) (citing cases); *see Smith v. California*, 361 U.S. 147, 150 (1959) (First Amendment protected bookstore's distribution of books).

Creating, disseminating, and accessing speech requires speakers and listeners to "make use of the services of others." *McConnell*, 540 U.S. at 251 (Scalia, J., dissenting in part). The right to receive protected speech "would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." *Id.* at 252. The State's theory would strip First Amendment protections from

23

newspapers and bookstores because sales of newspapers and books are governed by commercial terms. *303 Creative*, 600 U.S. at 594, 600. And it would dilute Appellees' rights to access media simply because they are obtained through commercial transactions. *See Brown*, 564 U.S. at 792 n.1 (buying or renting video games is non-commercial speech).

*Brown* is dispositive. Although the State argues that the dissemination of apps is unlike selling or renting video games in *Brown* because the price of accessing apps is "data," Br. 20–21, selling or renting video games also requires providing personal data. *See* 18 U.S.C. § 2710 (regulating disclosure of personal information by video game retailers). Even if it did not, the fact that "compensation" for content may take the form of something other than money does not make it "commercial" speech or conduct. *303 Creative*, 600 U.S. at 594. The data exchanged for access to app store content is no different, even if it is monetized. Restricting the terms upon which non-commercial speech may be monetized regulates non-commercial speech—not conduct or commercial speech. *See Simon & Schuster, Inc. v. N.Y. Crime Victims Bd.*, 502 U.S. 105, 108, 115–18 (1991) (restricting how distributors profit from non-commercial speech regulates non-commercial speech).

24

The State's other analogies have nothing to do with the commercial speech test. *See* Br. 21–22. A food truck sells lunch, not speech, so unlike here, restricting how it collects data from sales to minors regulates commercial conduct. The Act is also nothing like a prohibition on usury by bookstores. The State *can* regulate non-expressive conduct through general laws. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705–07 (1986). A usury law—or Texas's general data privacy statute—is a good example. But when, as here, the State restricts "conduct that has an expressive element," like the dissemination of books or apps themselves, it regulates not just speech but non-commercial speech. *Id.* at 703–04.

## C.    The State Has Not Satisfied the First Amendment.

Because the Act burdens speech, it is the State's burden to prove that the challenged provisions are constitutional. *Playboy*, 529 U.S. at 816. Strict scrutiny applies for several independent reasons, and the State—which presented no evidence below "connecting the Act's goals to its methods," ROA.25-51073.683—cannot satisfy that or any other First Amendment standard.

25

### 1. Strict scrutiny applies to the challenged provisions.

The district court held that the Act's blanket restraint on the dissemination of all kinds of information—including news, commentary, advocacy, entertainment, and everything in between—is subject to strict scrutiny. ROA.25-51073.677–80. That judgment was correct: because the challenged provisions impose prior restraints, justified on the basis of the content they restrict, and applicable only to the dissemination of information based on its subject matter, strict scrutiny applies.

#### a. The challenged provisions create a system of prior restraint.

Strict scrutiny applies because the challenged provisions create a presumptively unconstitutional system of prior restraint. A prior restraint is any government action that prevents or deters speech without a prior judicial determination "that such publications may lawfully be banned." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70–71 (1963). Prior restraints present "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979).

To survive review, a prior restraint must supply the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude—a standard more stringent than strict scrutiny. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same).

The district court had no need to decide whether the Act imposes a system of prior restraint after finding it unconstitutional on several other grounds. *See* ROA.25-51073.687. And neither the State nor the motions panel of this Court addressed Appellees' arguments that strict scrutiny independently applies for this reason. But the Act's plain text and operation make clear that the challenged provisions establish several separate and interlocking prior restraints that individually and collectively trigger strict scrutiny.

The Act's overall age-verification, content-classification, and preclearance regime imposes a prior restraint by requiring app stores and developers to classify protected speech into suitable "age categories," Tex. Bus. & Com. Code § 121.021, and restrict how that content is disseminated. That mirrors the ordinance in *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 678–88 (1968), which required theaters to

classify films as "suitable for young persons" before screening them, as well as the regulation in *Southeast Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 n.8 (1975), where the mere existence of a state-ordered classification system "stood as a warning" that effectuated an informal prior restraint against hosting third-party speech. *See also Bantam Books*, 372 U.S. at 67–69 (informal classification regime created prior restraint). The Ninth Circuit enjoined a similar law in *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024), holding that forcing online intermediaries to classify and block potentially harmful content unconstitutionally "deputize[d] private actors into censoring speech."

Each set of challenged provisions also independently constitutes a prior restraint. The age-verification and parent-identification mandates compel users—teens and adults—to document their age and parental authority "as a condition of engaging in protected activity." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 n.9 (1983); *see Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316–17 (1980) (statutory precondition was prior restraint). Many Texans would stop using apps rather than provide ID, and some parents would rather deny their children access to apps than provide proof of parental authority. In

28

fact, 66 percent of Americans "are not comfortable sharing their identification documents or biometric information with online platforms," and 70 percent are "uncomfortable with their children using such methods." *Free Speech Coal., Inc. v. Rokita*, 738 F. Supp. 3d 1041, 1049 (S.D. Ind. 2024) (alterations omitted), *vacated on other grounds*, 2025 WL 2027434 (7th Cir. 2025). Their reluctance is understandable. *See* E. Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173, 205 n.129, 206–08 (2025) (privacy risks of age verification cause self-censorship). These state-imposed "pre-clearance" requirements are prior restraints. *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 277, 283 (5th Cir. 2003).

The parental-consent mandate adds another layer of prior restraint by establishing a state-backed "parental veto" over the information teens may access. *Brown*, 564 U.S. at 795 n.3. Appellees have a constitutional right to access non-obscene content in app stores' libraries but are banned from doing so by default. *See* ROA.25-51073.503 ¶¶ 7–9. This makes the Act akin to the law in *Brown*, 564 U.S. at 794–95, which banned minors from buying or renting video games without their parents' permission, not the law in *Free Speech Coalition*, which "regulates only speech that

is obscene to minors," 606 U.S. at 482. As in *Brown*, the Act's preclearance mandate unlawfully burdens the fully protected speech both of teens and those (like SEAT) who wish to speak with them.

### b. The challenged provisions cannot be justified without reference to content.

Strict scrutiny also applies because the challenged provisions are justified only by reference to the content they regulate. "A law can regulate the content of protected speech, and thereby trigger strict scrutiny, either 'on its face' or in its justification." *Free Speech Coal.*, 606 U.S. at 482. The latter category includes laws that are justified by "the direct impact that speech has on its listeners." *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Playboy*, 529 U.S. at 811–12 (same). The district court correctly held the challenged provisions content-based under this test because "SB 2420 specifically sought to shield minors from certain speech the State deems objectionable or harmful." ROA.25-51073.678–79.

The Act's overall premise—that teens like Appellees must be stopped from accessing protected but supposedly "inappropriate" information—is focused on content. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (strict scrutiny applies to laws "designed to protect minors from viewing harmful materials" (citing *Playboy*, 529 U.S. at 811–12)).

And Texas indisputably passed the Act for this reason. *See* ROA.25-51073.130–34 (committee report claims the Act addresses "growing concerns" that "pervasive[]" access to apps harms "children and teens"); ROA.25-51073.138 (bill author states the Act aims "to protect our children from inappropriate" and "dangerous content"); ROA.25-51073.136 (Texas Republican Party characterizing the Act as "closing loopholes that expose kids to harmful material"); ROA.25-51073.236 (witnesses and supporters praised the Act for "cracking down" on teens' "expos[ure]" to "inappropriate content" and "harmful material").

Admissions in this litigation—including in open court—confirm that content justification. The State conceded in its briefs that the Act exists to shield minors from protected but supposedly "unsuitable," "objectionable," or potentially "harmful" information, ROA.25-51073.578–80, 583–84, and admitted at the preliminary injunction hearing that the challenged provisions seek to "prevent minors from accessing addictive and harmful content without parental consent," referencing "social media websites" and "mobile gaming." ROA.25-51073.799:24–800:2, ROA.25-51073.802:15–22. The district court found this record "support[s] the conclusion" that the Act is content based,

31

ROA.25-51073.678–79, and that finding of government purpose is subject to deference, *United States v. Overton*, 834 F.2d 1171, 1178 (5th Cir. 1987).

Recognizing the constitutional defects of its content-based justification, Texas now argues the Act was primarily justified by a desire to prevent minors from "entering contracts with app stores and developers without parental consent." Br. 18–19. But the *first words* in the legislative history it cites confirm *the reason* it wants to regulate those contracts is because "[r]ight now, minors can easily access addictive and harmful content without parental consent." H.J. of Tex., 89th Leg., R.S. 3577. The ensuing debate focused on stopping the dissemination of "stuff we don't want our kids to see." *Id.* at 3578–83 (discussing how to prevent kids from accessing "age inappropriate" materials). No one *uttered* the word "contract," much less stressed their concerns for regulating them. *Id.* at 3579–90. The Act targets content, and regulating app store transactions is simply a way of restricting it. *See McConnell*, 540 U.S. at 251 (Scalia, J., dissenting in part).

Even if eliminating unsupervised contracts—or even unsupervised online service contracts governing data collection and use—*were* the

32

State's actual justification, it would not spare the Act from strict scrutiny. Once the government announces a constitutionally impermissible basis for regulation, the government can avoid the presumption of invalidity only if it can show that it "would have reached the same decision" absent the improper motive. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).[2]

It is not plausible that a legislature concerned *solely* with protecting minors from supposedly exploitative online service contracts would have passed a law applicable *only when* minors seek access to speech. That is particularly so because Texas already gives parents a veto by permitting children to disaffirm *any* of their contracts, *Pak Foods Houston, LLC v. Garcia*, 433 S.W.3d 171, 176–77 (Tex. App. 2014), and it comprehensively regulates how online services may enter agreements to collect, use, sell, share, or otherwise monetize minors' data, including by requiring parental consent, *see* Tex. Bus. & Com. Code §§ 541.001(17), 541.001(29)(C), 541.005, 541.051(a), 541.101(b)(4), 541.105(a)(4). If

---

[2] The *Mt. Healthy* framework applies fully to legislative enactments, not just individual government actions. *See, e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 539–40 (1993); *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Texas believed any aspect of its existing contract or data privacy laws were inadequate to prevent the exploitation of minors' personal data through online agreements, it would have amended *those* laws. It admittedly passed SB 2420 because its real aim was to "stop" children from "accessing harmful or inappropriate content." *Supra* note 1.

In fact, even were the State's new data-protection rationale the Act's *only* asserted justification, strict scrutiny would still apply because the Act singles out speech through a particular medium. Both *Minneapolis Star*, 460 U.S. at 592–93, and *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231–31 (1987), for example, rejected arguments that a content-neutral need to raise revenue justified taxes singling out certain media. The taxes' structures raised suspicions that their objectives were actually the *suppression of ideas*, even absent evidence of illicit motives. Such motives are explicit here, *supra* pp. 30–32, but for these reasons, strict scrutiny would apply regardless.

### c.    The challenged provisions are content-based because of the Act's coverage definition.

The Act's arbitrary, content-based exemptions—excluding apps operated by nonprofits that provide "direct access to emergency services," "standardized test[s]," or support applications for "admission to" or

34

placement "in a postsecondary educational institution," Tex. Bus. & Com. Code § 121.022(h)(2)(A)—mean the challenged provisions are also content-based *on their face* because their application "depend[s] entirely on the communicative content" a service provides. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Texas teens face no barriers accessing the College Board's BigFuture School app, but need parental approval to play *Fortnite*, watch videos on the YouTube app, or stream music on Spotify. Because the Act thus "defin[es] regulated speech by particular subject matter" and "singles out specific subject matter for differential treatment," *id.* at 163, 169, its every application triggers strict scrutiny. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619–21 (2020) (plurality op.) (coverage definition rendered law content-based).

The motions panel agreed with Texas, *see* Br. 27–28, that the emergency services exception is not content based because it "focuses on why the service is needed rather than what is being communicated," and that the standardized test exception is content-neutral because it "focuses on the identity of the speaker and the need for students to be able to take tests." Dkt. 91-1 at 6–7. Texas forfeited these arguments "by failing to press [them] in the district court." *CEATS, Inc. v.*

35

*TicketNetwork, Inc.*, 71 F.4th 314, 326 (5th Cir. 2023). But even if it had not, each fails on its merits.

The State's attempt to dismiss the emergency services exception rests on wordplay. There is no meaningful difference between a law targeting speech "made for" a particular purpose—what *Barr* held is a content-based regulation, 591 U.S. at 619—and a law targeting speech because of its need. The reason for regulation in both instances is the *subject matter* addressed. *Reed*, 576 U.S. at 169. And although the Fourth Circuit suggested that the Telephone Consumer Protection Act's emergency services exemption did *not* render that law content-based, *Am. Ass'n of Pol. Consultants, Inc. v. FCC*, 923 F.3d 159, 169 (4th Cir. 2019) (cited in Br. 28), the Supreme Court did not address, much less adopt, that part of the Fourth Circuit's decision, and the plurality's reasoning squarely forecloses it. *See also Gresham v. Picker*, 705 F. App'x 554, 557 (9th Cir. 2017) (assuming without deciding that emergency-services exemption to California's automated call ban triggered strict scrutiny under *Reed*).

The standardized tests exception likewise cannot be ignored. Its speaker preference reflects an admitted "content preference" for speech

36

the State supports (studying for college exams) as opposed to other kinds of speech (video games, social media, streaming entertainment) it disfavors. *Reed*, 576 U.S. at 170. Even if studying for the SAT is for many Texans more useful and rewarding than playing video games, binge-watching videos, or streaming music, "these cultural and intellectual differences are not constitutional ones." *Brown*, 564 U.S. at 796 n.4. Speech is not protected just because it passes a government "test that weighs the value of a particular category of speech against its social costs." *Id.* at 792 (cleaned up). Apps providing purportedly mindless entertainment "are no less forms of speech than The Divine Comedy, and restrictions upon them must survive strict scrutiny." *Id.* at 796 n.4.

### 2. The challenged provisions fail any level of First Amendment scrutiny.

"Strict scrutiny is unforgiving." *Free Speech Coal.*, 606 U.S. at 484. A law subject to strict scrutiny is presumptively invalid unless the government shows it is necessary to achieve a compelling interest and uses the least restrictive means. *See Playboy*, 529 U.S. at 813, 817. The district court correctly held that the State failed to carry its burden under this test, or even under intermediate scrutiny. ROA.25-51073.680–81.

### a. The challenged provisions are not necessary to achieve any real compelling interest.

Texas has not shown that either of the Act's asserted justifications present real compelling interests, much less that the challenged regulations' suppression of speech is necessary to accomplish them. *Brown*, 564 U.S. at 799.

***Harmful materials justification.*** The State suggests it has an interest in "protecting children from harmful materials." Br. 24. But that interest is valid only to the extent that the State restricts access to speech minors have *no* right to receive. *Brown*, 564 U.S. at 799. "[C]orrect[ing] the mix" of fully protected speech teens may access is an impermissible basis to restrict speech. *Moody*, 603 U.S. at 740. As to *unprotected* content, the State has proffered no evidence showing that minors' access to it is an "actual problem in need of solving." *Brown*, 564 U.S. at 799 (quotation omitted). Texas *already* has a law—upheld in *Free Speech Coalition*—requiring online services to screen minors from accessing such content. Tex. Civ. Prac. & Rem. Code § 129B.002(a). Given that regulation, "it is hard to imagine" how the Act is necessary. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 752 (2011).

38

Even if limiting kids' access to protected but objectionable content were constitutional (it is not), the State has not even established that interest. The record shows "no consistent or measurable associations" between minors' wellbeing and access to app-based media, ROA.25-51073.389–90, and "no evidence establishing a cause-and-effect relationship," ROA.25-51073.436–48, ROA.25-51073.392–429, ROA.25-51073.392–413, ROA.25-51073.426–29, ROA.25-51073.454–75. In fact, unrebutted evidence shows that restricting teens' access to app-store content will, for many, do more harm than good. *See* ROA.25-51073.498 ¶ 18; ROA.25-51073.486, 490 ¶¶ 5, 7–8, 18–19; ROA.25-51073.435, ROA.25-51073.447–48. At any rate, strict scrutiny requires "more than anecdote and supposition." *Playboy*, 529 U.S. at 822. The State needed to present "record evidence" that showed a purported problem was real. *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (cleaned up). It presented nothing at all.

***Parental authority justification.*** The State also claims the Act helps parents oversee their children's online activities. Br. 24. That may be compelling in the abstract, but *Brown* rejected the notion that it "is a proper governmental means of aiding parental authority" to "punish[]

third parties for conveying protected speech to children *just in case* their parents disapprove." 564 U.S. at 802. Parental-consent requirements do not further an interest "in aid of parental authority." *Id.* They "impose governmental authority, subject only to a parental veto." *Id.* at 795 n.3. Even if it were appropriate to construct a regime predicated on parental preference and consent, the Act *defies* that interest as it not only overrides parents by making the State's choices the default, *id.*, but forbids even willing parents from providing "blanket consent," Tex. Bus. & Com. Code § 121.026(a)(3). Texas agrees, Br. 2, that app stores *already* allow parents to regulate their children's access to apps, ROA.25-51073.501–05, undercutting any suggestion that the Act is necessary to solve any real problem. *Brown*, 564 U.S. at 799.

Texas presented no evidence showing that parents required the State's assistance, much less in this form. In fact, the only record evidence shows *the opposite*. Some parents (like M.F.'s) trust their children to access any apps available to them. ROA.25-51073.502–04 ¶¶ 5, 7–9. Others might give blanket access to certain trusted app publishers with content and data practices they support. Still others may prefer to approve only news and sports apps where kids can learn about

40

the midterm elections or watch Spurs highlights. Forcing parents to surveil their children and provide repeated consent on *the State's terms* burdens young people's rights to access content their parents deem harmless, *Brown*, 564 U.S. at 805, and undermines parents' ability to manage their families, ROA.25-51073.502–03, 504 ¶¶ 5–6, 10.

In any event, as to either justification, the Act's underinclusivity "raise[s] serious doubts about whether the [State] is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802 (citing cases). As in *Brown*, the Act focuses on a subset of media—non-native mobile apps disseminated through app stores, and paid content within apps—but excludes native apps, free content within apps, paid content available online but not in mobile apps, and content available through physical media. The same flaw pervades the State's newly asserted contract interest. Minors accept the same contractual terms without parental consent whether they access speech through a web-based browser, a television-based app, or a mobile app, yet the Act regulates only one of those channels. That the Act leaves significant influences bearing on the State's putative interest unregulated suggests that is not its interest at all. *See Tex. VFW of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th

Cir. 2014) (this type of defect required invalidation even under intermediate scrutiny).

### b.    The challenged provisions are not narrowly tailored.

Even if the State had raised compelling interests, it has not shown that the challenged provisions are the "least restrictive" means to serve those interests. ROA.25-51073.683 (citing *Playboy*, 529 U.S. at 827).

The district court recognized that Texas "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, or (2) educating children and parents on the importance of using such tools." ROA.25-51073.681 (quoting *Bonta*, 113 F.4th at 1121). The State admits that app stores and developers already provide such tools "to help parents direct and supervise children's downloads of apps and in-app purchases." Br. 2. And Appellees' families use them. *See* ROA.25-51073.501–05. The State was required to prove that these "alternative[s] will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.

For the first time on appeal, Texas argues the Act burdens no more speech than necessary because "all apps require acceptance of terms of

42

service and data collection practices" that, it claims, parents should have opportunities to review. Br. 25. But the challenged provisions are not limited to regulating contracts, commercial terms, or data practices—practices Texas already regulates. *See* Tex. Bus. & Com. Code §§ 541.001 et seq.; *supra* p. 33. If that were the State's concern, it could have amended this regulation without adding new speech regulations.

### c.    The challenged provisions fail even intermediate scrutiny.

The district court independently found that the challenged provisions could not survive intermediate scrutiny because Texas "has not offered any evidence connecting the Act to its methods." ROA.25-51073.679. That holding was correct.

A speech restriction can survive intermediate scrutiny only if the government proves the law (1) serves a "real" and "not merely conjectural" government interest "unrelated to the suppression of free expression," (2) "will in fact" serve that interest in "a direct and material way," and (3) is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) (cleaned up). Each of these

43

requirements must be established with direct evidence. *See Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).

*No evidence the challenged provisions achieve a state interest.* For all the reasons set forth above, the State has not shown the Act serves a real interest unrelated to suppressing expression. To the contrary, the State's primary asserted interest—preventing kids from accessing certain types of protected but inappropriate content—is directly "related to the suppression of free expression" and thus impermissible. *Moody*, 603 U.S. at 740. And the State has no evidence that the Act advances either this (impermissible) interest or its claimed interest in protecting children from agreeing to predatory contract provisions. Instead, Texas argues that intermediate scrutiny does not require "specific evidence." Br. 23. That is wrong. Even intermediate scrutiny requires "reasonable factual findings supported by evidence." *TikTok Inc. v. Garland*, 604 U.S. 56, 78 (2025) (cleaned up).

Equally fatal is the Act's arbitrary exemption of similar or even identical media depending on whether an app is native to a device or not. While intermediate scrutiny does not impose a "freestanding under inclusiveness limitation," Br. 27 (quoting *Free Speech Coal.*, 606 U.S. at

44

498), a law cannot advance the government's interests if it "undermine[s] and counteract[s]" its goals, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995), or "is so pierced by exemptions and inconsistencies" that it permits the very evils it purports to prevent, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 190 (1999). Appellees' testimony and scientific evidence show that restricting access to apps and paid content will, for many, cause harm. ROA.25-51073.681 (citing ROA.25-51073.442). And unlike in *Free Speech Coalition*, Texas has no "reasonable basis for excluding" native apps or paid content available outside of apps. 606 U.S. at 498.

***No evidence of narrow tailoring.*** Even when a regulation advances a substantial government interest, "the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (cleaned up). The Act violates that rule by indiscriminately restricting access to all information published through app stores, including protected speech. For the reasons explained above, *supra* § I.C.2.b, the State has *not even attempted* to show that burdening all speech available through app stores is necessary to

45

regulate the content of contracts or otherwise protect minors. *See LIA Network v. City of Kerrville, Texas*, 163 F.4th 147, 166–69, 167 n.82 (5th Cir. 2025) (evidence is required to satisfy narrow tailoring component of intermediate scrutiny).

The State likewise never explains why the "less restrictive alternatives" identified above, *supra* § I.C.2.b, would not accomplish its interest. *See McCullen*, 573 U.S. at 490–96 (buffer zone statute burdened more speech than necessary when state failed to consider narrower laws adopted by other jurisdictions, or enforcing its existing laws). That failure is fatal. Texas was required to show "that it seriously undertook to address the problem with less intrusive tools readily available to it," and that it "considered different methods that other jurisdictions have found effective." *Id.* at 494. It has done nothing like that.

This Court has consistently enjoined speech regulations—even under intermediate scrutiny—when the government fails to show "why alternative, less-restrictive means," *Express Oil Change, LLC v. Miss. Bd. of Lic. for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 493 (5th Cir. 2019), and "less-burdensome" regulations, *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 311 (5th Cir. 2017), would not serve its ends. *Pub.*

46

*Citizen Inc. v. La. Att'y Disc. Bd.*, 632 F.3d 212, 223–24 (5th Cir. 2011).

### 3. Facial relief is proper.

The State acknowledges the challenged provisions' unconstitutional applications to speech but contends that facial relief is unavailable under *Moody* unless Appellees canvass the provisions' application to each of the millions of apps available in every covered app store and confirm that most or all of them convey protected speech. Br. 32–35. This misreads *Moody* and inverts the overbreadth doctrine by rewarding sprawling speech regulations that eschew the "precision" that "must be the[ir] touchstone." *NAACP v. Button*, 371 U.S. 415, 438 (1963). In any case, the Act's predominant applications restrict speech without constitutional justification. Facial relief was the appropriate remedy.

### a. Appellees showed that *Moody* is satisfied.

First Amendment facial challenges are subject to a "less demanding" standard to "provide breathing room for free expression." *Moody*, 603 U.S. at 723 (cleaned up). A speech regulation is facially invalid if "a substantial number of [its] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Id.*

*Moody* described this longstanding test as a two-step process. Courts first determine a challenged law's "full range" of applications—i.e., whether it regulates speech in some, most, or all cases. *Id.* at 726. They next decide which of the laws' speech applications "violate the First Amendment," and compare the constitutional and unconstitutional applications. *Id.* at 725. When the pertinent facts "are the same across the board" and the substantial effect of a law is to regulate protected speech without justification, the law is facially invalid. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618–19 (2021).

The district court correctly applied this analysis. ROA.25-51073.686–87. At *Moody's* first step, Appellees showed—and the State conceded below, ROA.25-51073.572, 578, 580—that *every* application of the challenged provisions "necessarily" burdens Texans' "right to access speech" by placing the media and information contained in apps behind an age-gate. *Free Speech Coal.*, 606 U.S. at 495. App stores indisputably provide access to "a wide array of protected First Amendment activity." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017). At the second step, Appellees showed—and the State again confirmed, ROA.25-51073.576, 583—that while a narrow subset of content available on apps

48

(like obscenity) may be unprotected, laws that "torch a large segment" of protected speech to filter out potential unprotected materials are categorically overbroad. *Reno*, 521 U.S. at 882 (citing *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 127 (1989)). Such prophylactic, dragnet speech regulation "turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

That prohibition applies with particular force here because many, if not most, of the Act's incidental and purportedly constitutional applications are irrelevant. A range of Texas laws—from the age verification provisions of Tex. Civ. Prac. & Rem. Code § 129B.002(a), to the data privacy and parental consent protections of Tex. Bus. & Com. Code §§ 541.001 et seq., to longstanding prohibitions on obscenity, Tex. Penal Code § 43.24, alcohol, Tex. Alc. Bev. Code § 106.03, and tobacco, Tex. Health & Safety Code § 161.082, among others—*already* prohibit providing unprotected content and illegal commodities to minors online, and app stores from exploiting minors' personal data without parental consent. *See City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (facial challenges only concern applications not already legitimately authorized

49

by other laws); *Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 286–87 (5th Cir. 2025).[3]

### b.   The State's arguments on appeal fail.

The State responds—for the first time on appeal—that a reviewing court must consider the possibility that the Act *also* restricts access to apps that supposedly convey no speech. Br. 34. That argument is forfeited, so the Court must not consider it. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 434 n.6 (2021); *Book People, Inc. v. Wong*, 91 F.4th 318, 334 n.103 (5th Cir. 2024).

The argument does not immunize the Act from facial invalidation, in any case. At the outset, it is incredulous to suggest that the Act's indisputably content-motivated speech regulations should escape remedy because Appellees were required to identify and explain every possible incident of non-speech regulated conduct the legislature cared nothing about. It is common-sense that a law restricting how an "electronic

---

[3] The State suggests Tex. Civ. Prac. & Rem. Code § 129B.002(a) is insufficient because it would not require age verification to access a general purpose website that has even one piece of adult content circulating. But that just proves the point: the *possibility* that minors might encounter stray unprotected content is not license to lock down an entire service with 99% fully protected speech. *Reno*, 521 U.S. at 882.

service … distributes software applications," Tex. Bus. & Com. Code § 121.002(2), principally restricts the dissemination of information protected by the First Amendment. *See Sorrell*, 564 U.S. at 570 (disseminating information is speech); *e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) (distributing decryption software was speech even if restriction was justified). That is *why* the State targeted them. *See* H.J. of Tex., 89th Leg., R.S. 3581–83 (targeting app stores is a means to force "over a million applications" purveying potentially objectionable material to verify age). The Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (cleaned up).

*Moody* itself is not to the contrary. The facial challenge there involved the scope of online platforms' right to moderate the third-party content that others posted to their platforms, so the platforms were required to show that each of the services covered by the challenged laws actually engaged in such editorial activity. 603 U.S. at 725–26. There is no question here, by contrast, that distributing and accessing apps is predominantly—if not entirely—protected First Amendment activity.

51

The granular census the State suggests *Moody* requires would drastically expand the government's power to suppress speech by perversely encouraging sweeping legislation with applications that are difficult to quantify, and thus challenge, in a pre-enforcement posture. Pre-enforcement relief is *favored* in the First Amendment context precisely because the harms of speech regulation "can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). The State's argument would enable a government to restrict teenagers' attendance at political rallies by drafting a statute requiring parental consent to attend "events," and then arguing it cannot be facially invalidated because no plaintiff could prove that the "full range of events" involve protected activity. *Cf. Brown*, 564 U.S. at 795 n.3 (such a law would be facially invalid). Affected plaintiffs would have to bring individual suits for every event, but many would no doubt stay home—and some events may never even happen. *See Button*, 371 U.S. at 432–33.

The evidence, in all events, supports the district court's conclusion that *most* of the challenged provisions' applications burden protected speech. The Apple App Store, for example, currently distributes

approximately 2,370,808 apps. *See* Similarweb*, iOS Apple App Store Statistics and Trends 2026*, perma.cc/5F2K-YHSB (last visited June 10, 2026). Of those, about **54.9%** alone involve games, news, music, books, entertainment, sports, education, social media, health or fitness instructions, travel information and reviews, photography, lifestyle, and reference apps like Wikipedia. *See* Ash Turner, *How Many Apps Are on the App Store*, BankMyCell, perma.cc/TJ5R-YKNC (last updated Jan. 5, 2025). And even that figure excludes categories like "Business," "Navigation," and "Food and Drink" that include First Amendment protected apps like LinkedIn, Google Maps, and the *New York Times* Cooking and Epicurious recipe apps. *Id.*

## D. The Act's "Material Change" Provision Is Unconstitutionally Vague.

The mandate that app stores revoke minors' access to an application whenever its content rating, "functionality," or "user experience" undergoes a "material[] change[]," Tex. Bus. & Com. Code §§ 121.022(g), 121.053(b), is independently invalid because it is unconstitutionally vague. *See* ROA.25-51073.684–86.

A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Vague laws regulating speech face an even more stringent test because their "uncertain meanings" lead regulated persons "to 'steer far wider of the unlawful zone'" by over-censoring. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010).

Regulations of speech must therefore be precise. *Button*, 371 U.S. at 433, 438. And contrary to the State's assertions, Br. 36, this heightened standard applies to laws "aimed at protecting children from allegedly harmful expression," *Interstate Cir.*, 390 U.S. at 689, and to laws that threaten only civil penalties, since the "threat of sanctions may deter [the] exercise" of First Amendment freedoms just as effectively as criminal penalties, *Button*, 371 U.S. at 429 n.11, 432–33.

The Act's material change provision is void for vagueness because it does not define what changes are "material," nor what aspects of an app relate to its "functionality or user experience." Recognizing that the Act lacks any definitions, the State urges that material changes are comprehensible in the context of what "has the capacity to influence" a parent's decision to allow "a minor to continue use of an app." Br. 37. But

that provides no guidance to app stores, who cannot know what considerations may influence any parent, and in reality, only introduces *more* ambiguity—the subjective standard will vary depending on the minors and parents, increasing uncertainty and the prospect of chilling effects. *See Counterman v. Colorado*, 600 U.S. 66, 77 (2023). As the Eighth Circuit recognized in *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012), for example, a law is vague when avoiding liability requires predicting how third parties will react to speech. In the face of that uncertainty, developers and app stores will be forced to "restrict[] their conduct to that which is unquestionably safe" by broadly revoking access from teenagers like Appellees. *Baggett*, 377 U.S. at 372.

The State's insistence that the provision is clear when viewed "in context" of § 121.053(b)'s three other significant changes does not fix the problem. Section 121.053(a) speaks of "significant" changes to an app's "terms of service or privacy policy," and §§ 121.053(b)(1)–(3) lists changes to "data," "content," "advertisements," "monetization," or "purchase[s]." But these are independent disjunctive clauses from § 121.053(b)(4), and thus cannot give meaning to that independent clause. *See United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 966–67 (5th Cir. 2019). To

55

ensure § 121.053(b)(4) is not redundant, a material change must mean something else. *See Corley v. United States*, 556 U.S. 303, 314 (2009). The question is what, and the law does not say.

Nor does it matter that the phrase "material change" has been used in other contexts. Br. 37. None of the State's examples involved protected speech, which is entitled to heightened protection. *See Holder*, 561 U.S. at 19; *Baggett*, 377 U.S. at 372. Giving the Act "the ordinary meaning of the text that actually applies," *Corner Post, Inc. v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 816 (2024), the provision regulates a significant amount of protected speech. The Court cannot assume enforcement will resolve ambiguities "in favor of adequate protection of First Amendment rights." *Button*, 371 U.S. at 438.

## II.   The Remaining Factors Support The Injunction.

The State says nothing about the irreparable harm Appellees will suffer if the challenged provisions are not enjoined. Br. 42–43.

Unless the preliminary injunction is affirmed, the Act will deny millions of Texas youth access to protected speech and fora for constitutionally protected expression. It is well-settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *accord Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); ROA.25-51073.478–83 ¶¶ 10–18, ROA.25-51073.496–99 ¶¶ 12–16, 18–19, ROA.25-51073.488–91 ¶¶ 12–20, ROA.25-51073.503 ¶¶ 7–9. Each day SB 2420 is in force, minors are denied access to news, educational content, and platforms for creative expression. These lost opportunities for speech, learning, and participation in public discourse can never be restored.

Appellees are among the many suffering these irreparable harms. SEAT represents a coalition of students who seek to increase youth participation in policymaking. In the lead-up to the midterm elections, SEAT members cannot wait to engage in political advocacy and outreach until their parents approve their downloads (if they do so at all) or until they age out of the requirements. Likewise, Z.B., a student journalist and content creator with an audience of over 1 million teens, needs to be able to follow the news, conduct research, and publish content online *now* and *in real time*—not after waiting however long for her parents to consent, and certainly not until after she turns 18 or when final judgment is eventually entered in this case. The preliminary injunction prevents

irreparable deprivation of these freedoms while this case is litigated.

When the government is "the opposing party," consideration of the balance of equities and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Those factors favor affirming the district court. *Book People*, 91 F.4th at 341. Unless this Court upholds the preliminary injunction, SEAT members and teens will suffer immediate First Amendment harms. On the other side of the ledger, Texas has no legitimate interest in enforcing an unconstitutional law. *See Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (enjoining law burdening First Amendment rights "is both equitable and in the public interest").

Just as critical, the preliminary injunction protects *Texas parents' authority* to make decisions about the types of media and information each of their children should be permitted to view and the level of monitoring they will provide. Parents' discretion over "the care, custody, and control of their children" constitutes "perhaps the oldest of the fundamental liberty interests recognized" by our Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Texas pays lip service to this liberty, but supplants it with its own judgment of what "parents ought to want." *Brown*, 564 U.S. at 804. Affirming the preliminary injunction would

protect the balance the Constitution strikes.

## III.  The Challenged Provisions Are Not Severable.

Texas faults the district court for holding that a provision cannot be severed if the remaining provision "would not by itself achieve all the purposes of the statute." Br. 39. But the State cites no authority suggesting that severance is proper where the remaining statute would no longer function, much less as intended.

Severance is unavailable where statutory provisions are "dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other." *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022). The district court correctly found that the parental consent and age verification provisions "could not operate" independently because one triggers the other. ROA.25-51073.683. Once the parental consent provisions are severed, the age verification provisions serve no purpose— they exist only to identify users who must obtain parental consent before downloading apps or paid content.

In any event, severing the parental-consent requirement would not save the Act. Its content-based justification seeks to prohibit the SEAT Appellees' access to speech and communication channels the State deems inappropriate for minors. That is precisely why the Act requires age verification. So long as the State's overbroad age-verification and parental identification requirements remain, the law is unconstitutional.

## IV.   The Injunction's Scope Is Proper.

Texas's argument that *CASA*, 606 U.S. 831, prohibits the district court's injunction is wrong. That decision is irrelevant to this Section 1983 action, and even if it were not, the statewide injunction would be appropriate because it is necessary to provide Appellees complete relief.

***CASA is irrelevant.*** *CASA* involved the equitable authority conferred by the Judiciary Act of 1789, not the remedial authority the district court exercised under 42 U.S.C. § 1983. Nothing in *CASA* purported to construe Section 1983, a Reconstruction statute that makes state actors liable in equity for violations of federal rights. 606 U.S. at 841 n.4; *see also id.* at 868–69 (Kavanaugh, J., concurring). Section 1983 creates a separate "specific and uniquely federal" remedy apart from other sources of judicial power. *Mitchum v. Foster*, 407 U.S. 225, 226,

237–38, 242 (1972). *CASA* does not limit the remedial authority Congress granted in that statute. *See also, e.g.*, *Welty v. Dunaway*, 791 F. Supp. 3d 818, 843 (M.D. Tenn. 2025) (Gibbons, J.) (refusing to apply *CASA* to Section 1983 overbreadth action because "statewide injunctions appear to have more historical support" for this reason) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908))).

***The injunction is needed for complete relief.*** Even if *CASA*'s "complete relief" standard applied, the district court's injunction satisfies it. An injunction as to just Appellees would defeat itself: app stores need to *identify* which of their users are Appellees to allow them to bypass the State's restrictions, imposing the exact gating measure Appellees sued to enjoin. *See Free Speech Coal.*, 606 U.S. at 495 (such screening "necessarily" burdens the "right to access speech"). Because there is "no way to peel off just the portion" of the challenged provisions that applies to Appellees without exposing them to the constitutional injuries the injunction exists to prevent, an indivisible remedy is necessary for the same reason an injunction against a neighborhood nuisance necessarily benefits non-plaintiff neighbors. *CASA*, 606 U.S. at 851–82 (cleaned up).

This is especially true given the nature of the speech interests at stake. Appellees have a constitutional right to engage in protected speech *with other speakers* unencumbered by unjustified government intervention. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756–57 (1976); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305–07 (1965). To afford relief that secures that right, other speakers and the platforms they use—app stores, apps, and other users—must be protected, as well. *See, e.g.*, *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 994 (N.D. Ill. 2025) (explaining that "the nature of the First Amendment right at stake supports a broad preliminary injunction that is not limited" to the plaintiff at bar).

## CONCLUSION

The Court should affirm the district court's preliminary injunction with respect to Sections 121.021, 121.022(a)–(b), 121.022(d)–(g), 121.024, 121.026(a)(3), 121.026(b), 121.053, 121.054, and 121.056(c) of the Act.

Respectfully Submitted,                    June 17, 2026

/s/ *Adam S. Sieff*
    Adam S. Sieff

Adam S. Sieff                              Ambika Kumar
Haley B. Zoffer                            DAVIS WRIGHT TREMAINE LLP
DAVIS WRIGHT TREMAINE LLP                  920 Fifth Avenue, Suite 3300
350 S. Grand Avenue, 27th Floor            Seattle, WA 98104
Los Angeles, CA 90071
                                           David M. Gossett
Abigail B. Everdell                        Celyra I. Myers
DAVIS WRIGHT TREMAINE LLP                  DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas                1301 K Street NW
New York, New York 10020                   Suite 500 East
                                           Washington, DC 20005

*Counsel for Appellees*
*Students Engaged in Advancing Texas, et al.*

## CERTIFICATE OF SERVICE

On June 17, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document per Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Adam S. Sieff*
Adam S. Sieff

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,955 words, excluding the parts of exempted by Rule 32(f). It complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

*/s/ Adam S. Sieff*
Adam S. Sieff