No. 25-51073 & No. 26-50001

# United States Court of Appeals
# for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M. F., by and through next friend VANESSA FERNANDEZ; Z. B., by and through next friend S.B.,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, in his official capacity as the Texas Attorney General,

*Defendant-Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee,*

*v.*

KEN PAXTON, in his official capacity as Attorney General of Texas,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF OF AMICUS CURIAE INTERNATIONAL CENTER FOR LAW & ECONOMICS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

R. Benjamin Sperry
INTERNATIONAL CENTER FOR LAW & ECONOMICS
1104 NW 15th Ave., Ste. 300
Portland, OR 97207
(814) 724-5659
bsperry@laweconcenter.org

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal. In addition to the persons and entities identified in the briefs of Plaintiffs-Appellees in each consolidated case, the following persons may have an interest in the outcome of this case:

The **International Center for Law & Economics** (*amicus curiae*).

R. Benjamin Sperry (counsel for *amicus curiae*)

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and Fifth Circuit Rule 28.2.1, it is hereby certified that ICLE is a 501(c)(3) organization, is not publicly traded and has no parent corporations. No publicly traded corporation owns 10% or more of ICLE.

Dated: June 19, 2026

Respectfully submitted,

/s/    R. Benjamin Sperry

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

IDENTITY OF AMICUS CURIAE, INTEREST IN THIS MATTER, AND SOURCE OF AUTHORITY TO FILE ............................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ...................................................................................... 8

    I.   SB 2420 Should be Subject to Strict Scrutiny ............................. 8

    II.  SB 2420 Fails Strict Scrutiny ..................................................16

    III.   SB 2420 Fails Intermediate Scrutiny .......................................21

CONCLUSION...................................................................................23

CERTIFICATE OF SERVICE .............................................................24

CERTIFICATE OF COMPLIANCE .....................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023)...........................5, 12

*Ashcroft v. ACLU*, 542 U.S. 656 (2004)..............................................17

*Bd. of Trs. of State Univ. of New York v. Fox,* 492 U.S. 469 (1989)......12

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011)...................*passim*

*Computer & Commc'ns Indus. Ass'n v. Paxton,*
814 F. Supp. 3d 787 (W.D. Tex. 2025)................................*passim*

*Dex Media West, Inc. v. City of Seattle,*
696 F.3d 952 (9th Cir. 2012)...........................................14, 15

*Erznoznik v. Jacksonville*, 422 U.S. 205 (1975)...............................4, 8

*Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025)......8, 9, 16, 21, 22

*McCullen v. Coakley*, 573 U.S. 464 (2014).......................................16

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)...........................12, 13

*NetChoice v. Carr*, 789 F. Supp. 3d 1200 (N.D. Ga. 2025)...............5, 15

*NetChoice, LLC v. Griffin,*
2025 WL 978607 (W.D. Ark. Mar. 31, 2025).........................5, 15

*NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025)........5, 15

*Ohio v. American Express Co.*, 585 U.S. 529 (2018)..........................13

*Packingham v. North Carolina*, 582 U.S. 98 (2017).........................6, 16

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)...........................9

*Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781 (1988).........12, 14

*Students Engaged in Advancing Texas v. Paxton*,
814 F. Supp. 3d 769 (W.D. Tex. 2025).................................*passim*

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)...........21

**Statutes**

Texas Senate Bill 2420............................................................*passim*

**Rules**

Fed. R. App. P. 29....................................................................1

**Other Authorities**

Ben Sperry, *A Coasean Analysis of Online Age-Verification
and Parental-Consent Regimes*
(ICLE Issue Brief, Nov. 9, 2023)....................................6, 17, 18

Harold Demsetz, *When Does the Rule of Liability Matter?*,
1 J. LEG. STUD. 13 (1972)..............................…..……………..2, 3

## IDENTITY OF AMICUS CURIAE, INTEREST IN THIS MATTER, AND SOURCE OF AUTHORITY TO FILE

The **International Center for Law & Economics** ("ICLE") is a nonprofit, non-partisan global research and policy center that builds intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies and economic learning to inform policy debates and has longstanding expertise in evaluating law and policy.

ICLE has an interest in ensuring that First Amendment law promotes the public interest by remaining grounded in sensible rules informed by sound economic analysis. ICLE scholars have written extensively on issues related to the First Amendment, protecting minors online, and age-verification and parental-consent laws, including white papers, law journal articles, regulatory comments, and amicus briefs.

ICLE is authorized to file this brief by Fed. R. App. P. 29(a)(2) because all parties have consented to its filing. No party's counsel authored any part of this brief. No other party's counsel authored any part of this brief or contributed money intended to fund the brief's preparation or submission.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Smartphones are ubiquitous, even for minors. Parents have largely chosen to purchase and activate smartphones for their children, even though such a decision comes with costs as well as benefits. The revealed preferences of both parents and their children is that the benefits of smartphones far outweigh their cost on net. Smartphones, including through the use of apps downloaded through app stores, enable minors to participate in the marketplace of ideas by receiving information and ideas, as well as speaking themselves.

Nonetheless, it is true that there are potential harms from using particular apps, including for minors. The question from a law & economics perspective is who are the "least-cost avoider(s)" of those harms. Liability should be imposed upon the party or parties best positioned to deter the harms in question, such that the costs of enforcement do not exceed the social gains realized. *See* Harold Demsetz, *When Does the Rule of Liability Matter?*, 1 J. LEG. STUD. 13, 28 (1972) ("A deeper analysis [of cases assigning liability] may reveal that that they generally make sense from an economic viewpoint of placing the liability on that party who can, at least cost, reduce the

probability of a costly interaction happening."). One of the major costs of imposing the duty to avoid harm upon the wrong party in cases involving speech is that doing so could result in collateral censorship.

Texas Senate Bill 2420, the App Store Accountability Act ("SB 2420"), was designed to enhance parental authority by requiring app stores to verify the age of all users and obtain parental consent for downloads and purchases by minors. This shifts the burden to app stores, in the first instance, to avoid the harms associated with smartphone usage by imposing liability if they do not age-gate access to apps by restricting the ability of minors to download or purchase them without obtaining individualized parental consent. This results in collateral censorship because it restricts minors from 1) accessing protected speech on apps, and 2) engaging in speech of their own on apps. For instance, a minor couldn't download an app to learn about current events from *The New York Times*, check the weather on The Weather Channel, look up a word in the Mirriam-Webster Dictionary, read the Bible on YouVersion, play Paw Patrol Rescue Academy, or create speech of their own on YouTube or Instagram—without parental approval first.

This is a broad restriction upon speech that can't be squared with the First Amendment. "Minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznozik*, 422 U.S. at 213-14).

SB 2420 goes far beyond these narrow and well-defined circumstances because it restricts minors' access to First Amendment-protected speech. As the District Court rightly put it, "The Act is akin to a law that would require every bookstore to verify the age of every customer at the door, and for minors, require parental consent before the child or teen could enter and again when they try to purchase a book." *Students Engaged in Advancing Texas v. Paxton*, 814 F. Supp. 3d 769, 777 (W.D. Tex. 2025) ("SEAT"); *Computer & Commc'ns Indus. Ass'n v. Paxton*, 814 F. Supp. 3d 787, 794 (W.D. Tex. 2025) ("CCIA").

4

Texas asserts that SB 2420 is a mere regulation on commercial speech which should be subject to intermediate scrutiny at most. Like states defending age-verification and parental-consent requirements to create a social media profile, Texas argues that SB 2420 regulates the ability of minors to enter into contracts with app stores and developers without parental consent. For good reason, federal courts have consistently rejected this argument. *See, e.g.*, *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 950 (S.D. Ohio 2025) ("[A] law prohibiting minors from contracting to access [] a plethora of protected speech cannot be reduced to a regulation of commercial conduct."); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *8 (W.D. Ark. Mar. 31, 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1221 (N.D. Ga. 2025).

On the contrary, profit-driven firms involved in the creation or distribution of speech are protected by the First Amendment. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) ("[T]he First Amendment extends to all persons engaged in expressive conduct, including those who seek profit."). And minors have a right to participate in the marketplace of ideas, including as purchasers and receivers of speech, like apps. *See Brown*, 564 U.S. at 794-95

5

(government has no "free-floating power to restrict ideas to which children may be exposed"). Accessing speech through apps on a smartphone is part of the modern marketplace of ideas. *See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (describing the Internet as "the modern public square" where citizens can "explor[e] the vast realms of human thought and knowledge"). When a law is designed to restrict access to protected speech, intermediate scrutiny is inappropriate. The District Court correctly applied strict scrutiny.

Parents and minors are the least-cost avoiders of harms from smartphone usage, as they can already use technological and practical means to avoid or limit the use of particular apps they judge to be harmful. *Cf.* Ben Sperry, *A Coasean Analysis of Online Age-Verification and Parental-Consent Regimes* (ICLE Issue Brief, Nov. 9, 2023).[1] But SB 2420 goes far beyond enhancing parental authority by instead imposing "*governmental* authority, subject only to a parental veto." *Brown,* 564 U.S. at 795, n.3 (emphasis in original). "Restrict[ing] almost all apps and content within apps" in order to "prevent minors from

---

[1] *Available at* https://laweconcenter.org/wp-content/uploads/2023/11/Issue-Brief-Transaction-Costs-of-Protecting-Children-Under-the-First-Amendment-.pdf.

accessing the subset of apps which contain harmful material" is not the "least restrictive means" to stop minors from accessing harmful material. *SEAT*, 814 F. Supp. 3d at 783; *CCIA*, 814 F. Supp. 3d at 801. This would likely lead to considerable collateral censorship not only for minors, but also adults who do not wish to provide the necessary means to have their age verified. The law is also under-inclusive because minors could still access the same purportedly dangerous content available through apps by pre-loaded browsers like Safari or Chrome. *Cf. Brown*, 564 U.S. at 802.

A less speech-restrictive approach to protecting minors would be to promote voluntary content filters and application blockers and to educate parents and minors on how to use such tools to avoid harms from particular apps. *SEAT*, 814 F. Supp. 3d at 783; *CCIA*, 814 F. Supp. 3d at 801. This would promote the ability of parents and minors to avoid or mitigate harm from particular apps at a much lower social cost than restricting access to protected speech for minors. Demand for such tools in the marketplace has led app stores to already provide substantial resources for parents to use. Accordingly, the District Court

correctly found that age-verification and parental-consent requirements were not the least restrictive means to protecting minors.

For the same reasons, SB 2420 would also fail intermediate scrutiny. It is clear there is no justification for the law unrelated to speech, and it burdens substantially more speech than necessary.

The District Court should be affirmed.

## ARGUMENT

### I.    SB 2420 Should be Subject to Strict Scrutiny

Under the First Amendment, minors have a right to participate in the marketplace of ideas. While they may not have all the rights to access speech that adults do, they receive a "significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). It is true that age-verification requirements to access speech may not *always* trigger strict scrutiny—for instance, if the speech is unprotected as to minors, like obscenity, that would be one of those narrow and well-defined circumstances. *See Free Speech Coal., Inc. v. Paxton,* 606 U.S. 461, 482 (2025). But if the speech is *protected* as to minors, a content-

8

based law is subject to strict scrutiny. *See id.* at 493 n.12 (agreeing with the dissent that "for *fully protected speech*, the distinction between bans and burdens makes no difference to the level of scrutiny.") (emphasis in original).

A law can be content-based either "'on its face' or in its justification." *Id.* (quoting *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015)). The District Court correctly found SB 2420 was content-based for both reasons.

First, SB 2420's coverage definition excludes certain apps based on content. It exempts from parental-consent requirements apps that provide "direct access to emergency services," and apps operated by a nonprofit that administers a standardized college-admission test. A statute that gates a minor's access to *The New York Times* app but waves through an SAT-prep app is regulating based upon particular subject matter as well as function or purpose. *SEAT*, 814 F. Supp. 3d at 781; *CCIA*, 814 F. Supp. 3d at 799 (Minors "would not face a barrier accessing an app from the College Board and would be unable to access an app from a newspaper."); *cf. Reed*, 576 U.S. at 163. These carve-outs also defeat any effort to recast the Act as a neutral regulation of

9

commercial conduct: a genuine commercial regulation would not turn on whether an app delivers emergency information or college-entrance testing. The defect is thus not that Texas seeks to empower parents, but that the mechanics it chose create favored (and disfavored) categories of protected speech.

Second, the justification for SB 2420 is to "shield minors from certain speech the State deems objectionable or harmful (as Texas acknowledged at the hearing)." *SEAT*, 814 F. Supp. 3d at 781; *CCIA*, 814 F. Supp. 3d at 799. Texas's attempt to rebrand SB 2420 as privacy legislation fails on its face. SB 2420 does not regulate the terms and conditions of app stores or apps on data collection or use. It only restricts how those entities can use age-verification data, which is an implicit admission that age verification itself comes with privacy issues.

At base, SB 2420 restricts First Amendment-protected speech for minors by requiring age verification and parental consent for each app download or in-app purchase. *SEAT*, 814 F. Supp. 3d at 777; *CCIA*, 814 F. Supp. 3d at 794 ("The Act is akin to a law that would require every bookstore to verify the age of every customer at the door, and for minors, require parental consent before the child or teen could enter

10

and again when they try to purchase a book."). These restrictions violate the rights of minors to participate in the marketplace of ideas, both as purchasers and receivers of speech in apps. *See Brown*, 564 U.S. at 794-95 (government has no "free-floating power to restrict ideas to which children may be exposed").

On appeal, Texas asserts that SB 2420 only regulates speech that proposes a commercial transaction, and therefore the District Court was wrong to apply strict scrutiny. The argument is that app stores are commercial in nature because they require users to agree to terms of service, which include privacy and data collection policies that may allow such data to be monetized either by app stores or by the apps under their own terms of service. SB 2420 is therefore only regulating the ability of minors to enter into these contracts and should be subject to intermediate scrutiny. In sum, they argue app stores can't avoid reasonable regulation to protect minors from potentially harmful contracts simply because they condition access to speech in apps on accepting those contracts.

This is wrong for two fundamental reasons.

First, the fact that app store transactions are commercial in nature does not, by itself, reduce First Amendment protections in the marketplace of ideas. A bookstore does not forfeit First Amendment protection because it sells books, nor does a newspaper because it sells subscriptions; an app store is no different merely because some apps are distributed for a price. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) ("[T]he First Amendment extends to all persons engaged in expressive conduct, including those who seek profit."). Commercial speech is speech that "proposes a commercial transaction." *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 482 (1989). But this doctrine has never been expanded into a blanket classification that subjects every business distributing protected speech for profit to diminished scrutiny. *Cf. Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988) (noting it is "not clear" that "speech is necessarily commercial whenever it relates to that persons' financial motivation for speaking.").

On the supply side of this marketplace, app stores have the right of editorial discretion over which third-party apps they include. *Cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("Deciding on the

12

third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product."). On the demand side, minors have the right to contract for protected speech that can only be overcome when the government satisfies strict scrutiny. *See Brown*, 564 U.S. at 794 (rejecting an invitation to apply intermediate scrutiny to a whole "new category of content-based regulation… only for speech directed at children"). Together, this means that money or data being exchanged for access to content does *not* reduce First Amendment scrutiny on restrictions to protected speech.

Second, this argument fundamentally misunderstands the nature of multi-sided platforms like app stores. The Supreme Court has recognized that multi-sided platforms require an intermediary (like an app store) to balance the interests of each side to maximize the platform's value. *See Ohio v. American Express Co.*, 585 U.S. 529, 534-537 (2018). This may mean, for many apps, that they can offer free or reduced-price downloads to users *because* of the data collection that

13

empowers targeted advertising. This is to the benefit of users, including minors, who would otherwise have to pay more for apps.

Sometimes, commercial speech can be "inextricably intertwined" with fully protected speech, making a restriction subject to strict scrutiny. *See Riley*, 487 U.S. at 796; *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012). This is precisely the case here where data collection for targeted advertising is inextricably intertwined with providing free or reduced-price access to speech in apps.

For instance, in *Dex Media West*, the Ninth Circuit considered yellow page directories and found that the protected speech of the phonebooks (i.e. telephone numbers) was inextricably intertwined with the advertisements that help fund it. *See* 696 F.3d at 956-65. The court found the "[e]conomic reality" that "yellow pages directories depend financially upon advertising does not make them any less entitled to protection under the First Amendment." *Id.* at 963-64. The court rejected the district court's conclusion that "economic dependence was not sufficient to intertwine commercial and noncommercial elements of the publication," *id.* at 964, as the same could be said of television

14

stations or newspapers as well, but they clearly receive full First Amendment protection for their speech. *Id.* at 965.

Here, this means the court should consider the interconnected nature of the free or reduced-price access to the speech in apps empowered by data collection for targeted advertising. App stores are, in this sense, indistinguishable "from newspapers, magazines, television programs, radio shows, and similar media…" that curate "noncommercial content in order to reach a broader audience and attract more advertising." *Id.*

Moreover, it is worth noting that federal courts have consistently rejected the "contract regulation" argument in the context of social media age-verification and parental-consent requirements. *See, e.g.,* *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 950 (S.D. Ohio 2025) ("[A] law prohibiting minors from contracting to access [] a plethora of protected speech cannot be reduced to a regulation of commercial conduct."); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *8 (W.D. Ark. Mar. 31, 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200, 1221 (N.D. Ga. 2025).

There is no principled basis for distinguishing app stores providing access to speech from social media platforms. On the contrary, accessing speech through apps on a smartphone is part of the modern marketplace of ideas. *See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (describing the Internet as "the modern public square" where citizens can "explor[e] the vast realms of human thought and knowledge").

SB 2420 restricts minors' access to protected speech; therefore intermediate scrutiny is inappropriate. The District Court application of strict scrutiny should be affirmed.

## II.   SB 2420 Fails Strict Scrutiny

Under strict scrutiny, a law must be "the least restrictive means of achieving a compelling state interest." *Free Speech Coal.*, 606 U.S. at 471 (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

To be a compelling interest, the state must "specifically identify an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799 (internal citation omitted). In *Brown*, the Supreme Court found that California's evidence linking exposure to violent video games and harmful effects on children was "not compelling" because it did "not prove that violent

video games *cause* minors to act aggressively." *Id.* at 800 (emphasis in original).

The same is true here. "[N]othing suggests Texas's interest in preventing minors from accessing a wide variety of apps that foster protected speech (such as the Associated Press, the Wall Street Journal, Substack, or Sports Illustrated) is compelling." *SEAT*, 814 F. Supp. 3d at 782; *CCIA*, 814 F. Supp. 3d at 800.

But even assuming there is a compelling state interest in protecting minors from harms associated with app store usage, SB 2420 is not "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Scholars have argued Supreme Court precedent considering speech regulation to protect children has followed a least-cost avoider analysis, specifically when evaluating whether the government has employed the least restrictive means to achieve a compelling government interest. *See* Ben Sperry, *A Coasean Analysis*, *supra*, at 6 ("[T]he Court appears implicitly to have used Coasean analysis in understanding who should bear the burden of avoiding harms associated with speech platforms.").

17

In brief, the Coase Theorem states 1) that the problem of externalities is bilateral; 2) in the absence of transaction costs, resources will be allocated efficiently, as the parties bargain to solve the externality problem; 3) in the presence of transaction costs, the initial allocation of rights does matter; and 4) In such cases, the burden of avoiding the externality's harm should be placed on the lowest-cost avoider, while taking into consideration the total social costs of the institutional framework. *Id.* at 3.

Here, this means that there are negative externalities due to minors using apps downloaded from an app store—which exist because minors have smartphones. If there were no transaction costs, it wouldn't matter if the app stores have a duty to gain parental consent first or not because the bargain would come out the same. But in the real world, there are transaction costs, even if they are push notifications on a phone. Thus, placing the burden on app stores to gain parental consent before the download of each individual app will result in some degree of collateral censorship for minors, likely even beyond the desires of the parent. In sum, if parents and minors can avoid the harms associated with particular apps at lower cost through using

available technology and other means, then there is no basis for imposing age-verification and parental-consent laws.

Texas justifies SB 2420 on the basis empowering parents to make decisions on behalf of their children. But SB 2420 goes far beyond enhancing parental authority by instead imposing "*governmental authority, subject only to a parental veto.*" *Brown*, 564 U.S. at 795, n.3 (emphasis in original). Restricting minors' access to *all* apps is dangerously close to "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech"—which the Supreme Court has determined is *not* "a proper governmental means of aiding parental authority." *Id.* at 802 (emphasis in original). This is because "[n]ot all of the children who are forbidden" from downloading apps "on their own have parents who *care*" whether they download those apps. *Id.* at 804 (emphasis in original).

The District Court correctly found that "[r]estrict[ing] almost all apps and content within apps" in order to "prevent minors from accessing the subset of apps which contain harmful material" is not the "least restrictive means" to stop minors from accessing harmful material. *SEAT*, 814 F. Supp. 3d at 783; *CCIA*, 814 F. Supp. 3d at 801.

19

The means chosen by Texas are both seriously over- and under-inclusive. *Cf. Brown*, 564 U.S. at 805 (when a government end is legitimate but they affect "First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive.").

As mentioned above, restricting access to all apps, even those which only contain protected speech as to minors, is seriously overinclusive. This doesn't even consider that adults who do not wish to provide the necessary means to have their age verified would also be restricted from gaining access to apps. But the law is also seriously underinclusive because minors could still access the same purportedly dangerous content available through apps by pre-loaded browsers like Safari or Chrome. *Cf. Brown*, 564 U.S. at 802.

A less speech-restrictive approach to protecting minors would be to promote voluntary content filters and application blockers and to educate parents and minors on how to use such tools while using their smartphones. *SEAT*, 814 F. Supp. 3d at 783; *CCIA*, 814 F. Supp. 3d at 801. This would promote the ability of parents and minors to avoid

20

harm from particular apps at a much lower social cost than restricting minors' access to *all* apps.

Age-verification and parental-consent requirements are not the least restrictive means to protecting minors from particular apps. The District Court's finding that SB 2420 fails strict scrutiny should be affirmed.

### III.   SB 2420 Fails Intermediate Scrutiny

SB 2420 also fails even under intermediate scrutiny. Under intermediate scrutiny, "a law will survive review 'if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Free Speech Coal.*, 606 U.S. at 471 (quoting *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997)). Here, the law does *not* advance an important government interest unrelated to the suppression of free speech, *and* it also burdens substantially more speech than necessary.

First, as discussed above, the attempt to recast SB 2420 as contract regulation or a privacy bill must fail. The admitted justification of Texas is to "shield" minors from disfavored First Amendment-

21

protected speech. *See SEAT*, 814 F. Supp. 3d at 781; *CCIA*, 814 F. Supp. 3d at 799. This makes it very different than obscenity or other speech unprotected as to minors. *Cf. Free Speech Coal.*, 606 U.S. at 496 ("Texas's interest in shielding children form sexual content is important, even 'compelling.'").

Second, the age-verification and parental-consent requirements burden substantially more speech than necessary. While *Free Speech Coalition* makes clear that the least restrictive means test does not apply under intermediate scrutiny, *cf. id.* at 497-99, the speech interests present for minors here are fundamentally different than those of minors in that case. In *Free Speech Coalition*, the question was whether age verification burdened *adults'* speech more than necessary because minors have no First Amendment right to access pornography. *See id.* at 496 ("[Age verification] ensures than an age-based ban is not ineffectual, while at the same time allowing adults full access to the content in question after the modest burden of providing proof of age."). Here, minors do have a right to access protected speech in apps that is burdened far more than necessary by age-gating.

The transaction costs of obtaining parental consent for every single app download or in-app purchase is not zero, which means there will be times where minors are restricted from speech that is not only lawful for them to access, but also that their parents or guardians would likely not oppose. This is, by definition, burdening substantially more speech than necessary.

The District Court's finding that SB 2420 fails intermediate scrutiny should be affirmed.

## CONCLUSION

Empowering parents to protect their children online is a worthy goal. But the means for doing so must still be consistent with the First Amendment. For the foregoing reasons, District Court should be affirmed.

Dated: June 19, 2026

Respectfully submitted,

/s/ R. Benjamin Sperry

R. Benjamin Sperry
INTERNATIONAL CENTER FOR LAW
& ECONOMICS
1104 NW 15th Ave., Ste. 300
Portland, OR 97207
(814) 724-5659
bsperry@laweconcenter.org

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically on June 19, 2026 using the Court's CM/ECF system, which will serve notice of this filing on all counsel of record.


Dated June 19, 2026                          Respectfully submitted,


                                             /s/    R. Benjamin Sperry

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and because it contains 4,321 words, excluding the parts of the Brief exempted by FRAP 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word.

This Brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century font.

Dated: June 19, 2026                          /s/    R. Benjamin Sperry