Nos. 25-51073 & 26-50001

# In the United States Court of Appeals for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH NEXT FRIEND, VANESSA FERNANDEZ; Z.B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs-Appellees*,

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff-Appellee*,

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

AMICUS BRIEF OF THE ORGANIZATION FOR TRANSFORMATIVE WORKS AND THE WIKIMEDIA FOUNDATION, INC. IN SUPPORT OF PLAINTIFF-APPELLEE CCIA

REBECCA TUSHNET
HARVARD LAW SCHOOL
1575 MASSACHUSETTS AVE.
CAMBRIDGE, MA 02138
(703) 593-6759

*COUNSEL FOR AMICI CURIAE*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

I hereby supplement the certificate of interested persons provided in the briefs of appellants and appellees by naming the following persons who have an interest in the outcome of this litigation. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici**: The Organization for Transformative Works is a non-profit organization with no parent corporation. No publicly held corporation owns 10% or more of its stock or other interest in the organization.

The Wikimedia Foundation, Inc. is a non-profit organization with no parent corporation. No publicly held corporation owns 10% or more of its stock or other interest in the organization.

**Counsel for Amici**: Rebecca Tushnet, Harvard Law School[1]

---

[1] Institutional affiliations are provided solely for purposes of identification.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 2

I. Apps Are a Fully Protected Speech Delivery Medium .......................3

II. S.B. 2420 Unconstitutionally Burdens These First Amendment

Rights ..................................................................................................9

A. Chill to Users .................................,................................................9

B. Chill for Developers ..................................................................14

III. The Protection of Minors Does Not Justify Sweeping Restrictions

on All Apps ......................................................................................... 18

CONCLUSION ................................................................................... 23

CERTIFICATE OF COMPLIANCE ..................................................... 24

CERTIFICATE OF SERVICE .............................................................. 25

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis,* 600 U.S. 570 (2023) ................................... 12

*ACLU v. Gonzales,*
478 F. Supp. 2d 775 (E.D. Pa. 2007) ............................................. 13

*Am. Amusement Machine Ass'n v. Kendrick,* F.3d 954 (7th Cir. 2001).. 22

*Am. Booksellers Found. v. Dean,* 342 F.3d 96 (2d Cir. 2003) ................... 13

*Bd. of Educ. v. Pico,* 457 U.S. 853 (1982) .............................................. 12

*Book People, Inc. v. Wong,* 91 F.4th 318 (5th Cir. 2024) .................. 15

*Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959
(10th Cir. 1996) ............................................................................. 9

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
447 U.S. 557 (1980) ..................................................................... 12

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ....................................................................... 9

*Communications Industry Association v. Paxton,* 814 F.Supp.3d 787
(W.D. Tex. 2025) ...................................................................... 14-15

*Ent. Software Ass'n v. Chicago Transit Auth.,*
696 F. Supp. 2d 934 (N.D. Ill. 2010) ........................................... 21

*Ent. Software Ass'n v. Hatch,* 443 F. Supp. 2d 1065 (D. Minn. 2006),
aff'd sub nom. *Ent. Software Ass'n v. Swanson,* 519 F.3d 768 (8th Cir.
2008) ............................................................................................ 22

Erznoznik v. Jacksonville, 422 U.S. 205 (1975) .................................... 20

*Free Speech Coalition v. Paxton,* 606 U.S. 461 (2025) ........................ 20

*Highfields Capital Management, L.P. v. Doe,* 385 F. Supp. 2d 969 (N.D.
Cal. 2005) .................................................................................... 16

*Interactive Digit. Software Ass'n v. St. Louis Cnty.,*
Mo., 329 F.3d 954 (8th Cir. 2003) ............................................... 12

*Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495 (1952) .............................. 8

*Matsumoto v. Labrador,* 122 F.4th 787, 813 (9th Cir. 2024) ................ 20

*McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334 (1995) .................... 13

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,*
460 U.S. 575 (1983) ..................................................................... 11

*Moody v. NetChoice, LLC,* 603 U.S. 707 (2024) .................................... 10

*NetChoice, LLC v. Bonta,* 770 F. Supp. 3d 1164 (N.D. Cal. 2025) .......... 8

*Packingham v. North Carolina,* 582 U.S. 98 (2017) ................................ 9

*PSINET, Inc. v. Chapman,* 167 F. Supp. 2d 878 (W.D. Va. 2001) .......... 14

*Smith v. California*,  361 U.S. 147 (1959)..............................................9
*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................7
*Students Engaged in Advancing Texas v. Paxton*, --- F.4th ----, 2026 WL 1615178 (5th Cir. Jun. 4, 2026)..........................................................11
*Talley v. California*, 362 U.S. 60 (1960)..............................................13
*United States. v. United Foods, Inc.*, 533 U.S. 405 (2001) ......................9
*Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 327 (S.D.N.Y. 2000) ................................................................................8
*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976),  ..................................................................................12
*Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004).............................................21

**Statutes**

Tex. Bus. & Com. Code § 121. 054 ..........................................................17
Tex. Bus. & Com. Code § 121.021 ..........................................................22
Tex. Bus. & Com. Code § 121.022 ..........................................................22
Tex. Bus. & Com. Code § 121.053 ............................................................7
Tex. Bus. & Com. Code § 121.101 ..........................................................17
Tex. Bus. & Com. Code § 121.1053 ........................................................16
Texas Data Privacy and Security Act, Tex. Bus. & Com. Code Ann. § 541.001 et seq ..........................................................................................18

**Rules**

Federal Rule of Appellate Procedure 32(a) .............................................25

**Other Authorities**

Lyrissa B. Lidsky & Thomas F. Cotter, Authorship, Audiences, and Anonymous Speech, 82 Notre Dame L. Rev. 1537, 1572–73 (2013)....16
Yanzi Lin et al., Measuring User Responses to Online Age Verification Mechanisms Through A Deceptive Experiment, https://conpro26.ieee-security.org/papers/lin-conpro26.pdf (2026) .......................................14

STATEMENT OF INTEREST[2]

Wikimedia is a nonprofit charitable foundation based in San Francisco, California on a mission to "keep knowledge free." It accomplishes that goal through advocacy work and by hosting thirteen free-knowledge platforms (the "Wikimedia Projects"), including Wikipedia.  The Wikimedia Projects host factual and educational content that is created, edited, and moderated by over 275,000 volunteer contributors per month worldwide. Volunteer editors determine whether a topic is notable enough to deserve its own page, confirm that content remains accurate, and ensure that pages are notable, neutral, and cited by reliable sources. Wikimedia mobile applications further expand the reach of Wikimedia content. Volunteers may develop apps for certain mobile platforms or different Wikimedia projects.[1] All Wikimedia projects run on a free and open source software called MediaWiki, which is also developed collaboratively.

The Organization for Transformative Works ("OTW") is a nonprofit organization established to protect and defend fans and

---

[2] The parties have consented to the filing of this brief. Amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person other than the amici contributed money that was intended to fund the preparation or submission of this brief.

fanworks from commercial exploitation and legal challenge. Creators make and share works commenting on and transforming existing works—from reworking a film from the perspective of the "villain" to using storytelling to explore racial and gender dynamics in media. The OTW's nonprofit, volunteer-operated website, AO3, has over 11 million users and hosts over 12.9 million unique works. Many AO3 users strongly value pseudonymity, preferring to keep their creative habits distinct from their official identities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The laws at issue suppress speech for everyone by installing a censor who will demand identity verification and content rating at the point of access to any app-delivered speech. A substantial amount of app-delivered speech is noncommercial, including for-profit speech and the noncommercial speech hosted by Amici, and gating access to such speech goes far beyond a regulation of commercial speech.

The age rating, age verification, and parental consent mandates would be particularly challenging for small and mission-driven developers to implement, Tex. Bus. & Com. Code §§ 121.053-.054, and cannot survive the strict scrutiny required for blanket restrictions on

speech. Applied to developers of apps that prioritize accessibility and anonymity, like those made to access Wikipedia, the Act requires more costly and invasive operations than are viable. Wikipedia-related information tools are particularly valuable speech because "[f]acts … are the beginning point for much of the speech that is most essential to advance human knowledge." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

## I.    Apps Are a Fully Protected Speech Delivery Medium

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Texas seeks to deny its residents access to those spaces unless both individuals and app developers comply with age verification and rating schemes, regardless of whether the content of apps poses any risk of harm to minors.

Apps, like other forms of delivering speech, are protected by the First Amendment. In *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011), the Supreme Court recognized that video games were a new form of the same kind of speech that it had long protected:

[V]ideo games qualify for First Amendment protection. . . . Like

3

the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection. And whatever the challenges of applying the Constitution to ever-advancing technology, "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary" when a new and different medium for communication appears.

*Id.* at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)); *see also NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1186 (N.D. Cal. 2025) (recognizing that apps are a protected medium of expression); *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 327 (S.D.N.Y. 2000) ("all modes by which ideas may be expressed [...] are within the area of First Amendment concern").

In the present moment, many speakers and audiences prefer to access the Internet using apps, which therefore have taken on the breadth of the Internet itself, allowing them to "explor[e] the vast realms of human thought and knowledge" online. *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Some apps are sold for profit; others are free to download but sell access to additional content; others are advertising-supported; and some are sales platforms. Only that last category involves commercial speech—that is, promotion for some non-

4

expressive product or service.

Commercial speech is usually defined as speech that does no more than propose a commercial transaction. *United States. v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). By contrast, speech that is itself the expressive product being sold is noncommercial for First Amendment purposes, even when sold for profit. *See, e.g., Brown*, 564 U.S. at 790 (video games); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."); *Smith v. California*, 361 U.S. 147, 150 (1959) (same); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996) ("Cardtoons' trading cards . . . are not commercial speech—they do not merely advertise another unrelated product. Although the cards are sold in the marketplace, they are not transformed into commercial speech merely because they are sold for profit.").

Under this unbroken line of precedent, both charitable apps created by nonprofits,[3] as well as for-profit apps that offer games,[4]

---

[3] See, e.g., https://www.redcrossblood.org/blood-donor-app.html (blood donation).

news,[5] books and magazines,[6] social media,[7] hobby content,[8] religious content,[9] interesting facts,[10] and a nearly infinite variety of other types of speech are fully protected by the First Amendment. As the Supreme Court recently reaffirmed, for-profit apps that aggregate third-party speech are fully protected in their selection of speech, *Moody v. NetChoice, LLC,* 603 U.S. 707, 728 (2024). Thus, both app developers and their users have First Amendment interests in providing and accessing the speech that others wish to share on apps.

App developers can engage in commercial speech when promoting their apps, and their terms of service may be treated as commercial speech for purposes of disclosure rules. The laws at issue here, however,

---

[4] See, e.g., https://www.nytimes.com/crosswords/apps (New York Times games);

[5] See, e.g., https://apps.apple.com/us/app/nytimes-us-and-global-news/id284862083 (New York Times); https://www.washingtontimes.com/washtimesapp/ (Washington Times).

[6] See, e.g., https://www.amazon.com/b?ie=UTF8&node=16571048011 (Kindle reader).

[7] See, e.g., https://apps.apple.com/us/app/x/id333903271 (X social media).

[8] See, e.g., https://play.google.com/store/apps/details?id=com.enhancient.android.ravit&hl=en_US (for crochet and knitting).

[9] See, e.g., https://apps.apple.com/us/app/pray-com-bible-daily-prayer/id1161035371 (Christian prayer).

[10] See, e.g., https://apps.apple.com/us/app/facts-daily-random-trivia/id924977069 (facts of the day).

do not regulate app advertising or mandate disclosures in the terms of service: they control who may have access to the speech contained in the apps. Because the laws are not limited to commercial speech, they must survive strict scrutiny to be upheld.

This Court was therefore mistaken to suggest, in its opinion allowing the laws at issue to go into effect, that the law restricted only (at most) commercial speech. *Students Engaged in Advancing Texas v. Paxton*, --- F.4th ---- 2026 WL 1615178, at *1 (5th Cir. Jun. 4, 2026). This Court reasoned that the speech available in apps was commercial because people "pay" for access to apps with their data. Although this premise is often factually incorrect—many apps do not collect such data—exchanging data for access does not make apps into "commercial speech."[11]

Full protection of speech that is sold for profit in the marketplace has been a foundation of First Amendment law since before there was a

---

[11] Even the assumption that soliciting data is the same thing as asking people to pay money for purposes of identifying "commercial speech" may well be unsound. Among other things, it would convert much political advertising—targeted based on data about people—into commercial speech. *Cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011) (invalidating restrictions on medical data sharing by for-profit entities; applying strict scrutiny and rejecting commercial speech analysis).

7

commercial speech doctrine. Books and newspapers are regularly sold for money; they are not commercial speech. Websites may ask audience members to register—that is, provide data—before they can read the contents; again, this does not make the sites' contents commercial. Regulations of means of speaking thus constitute speech restrictions, rather than content-neutral economic laws of general application. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) (a tax on the sale of supplies like newsprint and ink placed a disproportionate burden on newspapers' expressive rights).

App developers who produce for-profit speech are in the same position as booksellers and other speakers who wish to be remunerated for their speech. *See 303 Creative*, 600 U.S. 570 (2023) (finding that for-profit website design was protected speech); *Brown*, 564 U.S. at 790 ("the basic principles of freedom of speech and the press […] do not vary when a new and different medium for communication appears") (internal quotations omitted); *cf. Interactive Digit. Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 857 (8th Cir. 2003) (narratives conveyed through video games are not disqualified as speech "simply because they are constructed to be interactive"). App users therefore have "the right to receive" information and ideas through apps, as it "is a

8

necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982).

Indeed, truthful commercial speech receives substantial constitutional protection given its benefits for informing the public of relevant information. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). While states may regulate commercial speech in the interests of protecting consumers in transactions, they may not do so merely because the government fears the effects of the messages they are receiving. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 579 (1980) (Stevens, J., concurring) ("it is important that the commercial speech concept not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed.") (footnote omitted).

## II.   S.B. 2420 Unconstitutionally Burdens These First Amendment Rights

### A. Chill to Users

Under the Act, app stores are forced to bar access to apps when a

user creates an account, tries to download an app, and again at every in-app purchase unless the user accepts age verification using a method approved by the state. §§ 121.021(a), 121.022(d). Such intrusive measures prevent access—both for minors seeking access to speech that is not obscene as to minors, and also to substantial numbers of adults who are chilled by concerns about their privacy and security.

The rights to anonymity and unfettered free speech go hand in hand, since "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Talley v. California*, 362 U.S. 60, 65 (1960); *see McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341-42 (1995) (foregoing anonymity "undeniably impedes protected First Amendment activity"). Forcing app users to provide sensitive information to every developer and app store they engage with will chill speech by turning away users concerned about data privacy and personal security. *See ACLU v. Gonzales,* 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) ("a significant number of adult web-users are unwilling or unable to use such verification systems"); *PSINET, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001) (fear of hacking "may chill the willingness of some adults to

participate in the 'marketplace of ideas'" online). Such identification

requirements therefore "tend to restrict freedom to distribute

information and thereby freedom of expression." *Talley,* 362 U.S. at 64.

The magnitude of deterrence is not small. In one recent study of

age verification, even with reassurance about data handling, most users

refused to provide their government IDs (only 23-27% accepted this

requirement); many rejected email-based age estimation, and half

rejected AI facial estimation. Follow-ups revealed concerns about

privacy, surveillance, and data security. As the authors concluded,

"technically robust verification methods may be ineffective in practice if

users systematically decline to comply." Yanzi Lin et al., Measuring

User Responses to Online Age Verification Mechanisms Through A

Deceptive Experiment, https://conpro26.ieee-security.org/papers/lin-

conpro26.pdf (2026).[12] Even the willing may be unable to provide ID:

around 9% of adults reported lacking a photo ID in 2023.[13] Non-adults

---

[12] See also Taylor Barkley, *Poll: Americans Don't Want To Share Their Photo ID To Tweet,* The Center for Growth and Opportunity at Utah State University, (Feb. 1, 2023), https://www.thecgo.org/benchmark/poll-americans-dont-want-to-share-their-photo-id-to-tweet/ (last visited Nov. 9, 2025).
[13] Michael J. Hanmer, Samuel B. Novey & Jillian Andres Rothschild, *Who Lacks ID in America Today?*, University of Maryland Center for Democracy and Civic Engagement, (Jan., 2024),

who complied would then be subject to repeated parental consent barriers and activity surveillance, again regardless of whether the speech they sought was obscene as to them.

This deterrence is, when it comes to speech, a profound chilling effect. Users perceive age verification as posing a risk to them—and they are not wrong to do so, given the prevalence of security breaches, including but not limited to among app stores and developers.[14] Americans know that data breaches happen all the time, including for

---

https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%2 02024%20%281%29.pdf; *see also Highway Statistics 2022*, Department of Transportation, Federal Highway Administration https://www.fhwa.dot.gov/poalicyinformation/statistics/2022/dl220.cfm (last visited Nov. 9, 2025) (showing that many teens do not have a driver's license; of the 21.4 million 15 to 19-year-olds in 2022, only about 40% of them were licensed.)

[14] See, e.g., Roman Loyola, Shocking security breach of 16 billion logins includes Apple IDs, Macworld, Jun. 18, 2025, https://www.macworld.com/article/2820280/shocking-security-breach-of-16-billion-logins-includes-apple-ids.html; Emanuel Maiberg & Joseph Cox, Women Dating Safety App 'Tea' Breached, Users' IDs Posted to 4chan, 404 Media, (Jul. 25, 2025), https://www.404media.co/women-dating-safety-app-tea-breached-users-ids-posted-to-4chan/; Amanda Silberling & Zack Whittaker, TeaOnHer, a Rival Tea App for Men, Is Leaking Users' Personal Data and Driver's Licenses, TechCrunch, (Aug. 6, 2025), https://techcrunch.com/2025/08/06/a-rival-tea-app-for-men-is-leaking-its-users-personal-data-and-drivers-licenses/.

data collected for age verification.[15] The Texas laws at issue require persistent retention of user data, making an even more tempting target for hackers. The fear of exposure—whether by government monitors or wrongdoers—will have a profound deterrent effect on the willingness to speak.

For that very reason, the Supreme Court has long protected the ability of speakers to remain unidentified. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995); *see also, e.g.*, *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969, 980 (N.D. Cal. 2005) (recognizing pseudonymous speaker's First Amendment right to be unidentified online); Lyrissa B. Lidsky & Thomas F. Cotter, Authorship, Audiences, and Anonymous Speech, 82 Notre Dame L. Rev. 1537, 1572–73 (2013) (discussing speakers' demand for pseudonymity).

Texas's law takes this ability away from all app users. Wikipedia and AO3 users prove the wisdom of *McIntyre*'s strong protection for pseudonymous speech; they understand that pseudonymity can allow debate, experimentation, exploration, and play with meaning.

---

[15] See, e.g., Osmond Chia, ID photos of 70,000 users may have been leaked, Discord says, BBC.com, Oct. 9. 2025, https://www.bbc.com/news/articles/c8jmzd972leo.

Removing that from speech on apps would chill this powerful channel of expression.

## B. Chill for Developers

Worsening matters, the Act also fails to provide guidance to app developers on how to assign an age rating or determine what content is appropriate for each age category, increasing the burden on developers to determine how to effectively comply with the law. *See Computer & Communications Industry Association v. Paxton*, 814 F.Supp.3d 787, 802-03 (W.D. Tex. 2025) (*CCIA*); *see also Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (invalidating a book-rating requirement as unconstitutionally compelled speech; "The statute requires vendors to undertake contextual analyses, weighing and balancing many factors to determine a rating for each book. Balancing a myriad of factors that depend on community standards is anything but the mere disclosure of factual information."). Compounding the difficulty is the vague provision that a "significant change" to an app, its terms of service, or its privacy policy reactivates the parental consent obligation. §§ 121.1053(a), 121.022(g). Wikipedia's content is constantly changing;

14

Wikipedia-based apps may therefore change substantially depending on the acts of different speakers who use Wikipedia, but app developers will not know what constitutes a "significant" change until they are confronted with a legal demand. *See CCIA*, 814 F.Supp.3d at 803.

The chilling effect thus operates on both sides of the app: the users who want to speak using it and the developers who wish to provide them with speech. Small and mission-oriented developers, in particular, will have make difficult decisions between updating their app's capabilities (for fear of triggering the law's vague requirement of "substantial" change) or retaining outdated, but uninterrupted, app usership. Either way, the user experience gets disrupted or deteriorates, further impacting developers' capacity to engage with audiences.

A multitude of developers with mission-driven operational models, like Wikipedia's non-profit digital encyclopedia, will need to invest in the unaffordable and complex systems required by the Act or pay steep fines. § 121.101. The Act instructs developers to "create and implement" a system to integrate with app stores to confirm (1) a users' assigned age category and, for minors, (b) receipt of parental consent. § 121.

054(a)-(b), but gives no guidance as to how this is to be done.

The costs per small business to update and comply with app age verification laws have been estimated to be at least $80,000,[16] and other estimates have put basic costs of developing age verification technology in the $25,000-50,000 range[17]— exceeding what many small, nonprofit, or mission-driven developers have spent building their actual apps.

These developers, precisely because they make apps for a reason rather than for a profit, are the ones who will be priced out of the market, and their lack of profitability means that app stores will have no incentive to make things easier for them. While Meta can afford to build its own age verification, and midsized for-profits may be able to bear the ongoing cost of subscribing to a third-party verification service (with its associated security risks), none of that is feasible for smaller organizations with operating budgets in the low six figures. Entities like Wikimedia and OTW, who have designed their services to preserve

---

[16] *The Huge Costs for Small Businesses of App Store Age Verification Bills,* Trust Engine, (May 27, 2025) https://trustedfuture.org/the-huge-costs-for-small-businesses-of-app-store-age-verification-bills/ (last visited Nov. 9, 2025).

[17] *More Than Just A Number: How Determining User Age Impacts Startups* 8, Engine, (Feb. 22, 2024) https://static1.squarespace.com/static/571681753c44d835a440c8b5/t/65d8b6ab876bfd5b70f8795e/1708701355604/ FINAL+-+2024+More+Than+Just+A+Number.pdf.

user privacy, could have to rethink the back end software to reverse those privacy protections and maintain user-identifying information to avoid having perfectly lawful content blocked for adults in Texas. For such entities, ironically, Texas's law demands more data collection—contrary to other provisions of Texas law that require data minimization. See Texas Data Privacy and Security Act, Tex. Bus. & Com. Code Ann. § 541.001 et seq.

The breadth of these requirements therefore threatens nonprofit apps such as StoryCorps (run by a non-profit aimed at making digital storytelling and preservation more accessible), Food Rescue Hero (connecting volunteers and food organizations to counter food insecurity), NewForm (free addiction recovery support and community app), and more.

These chilling effects based on increasing the cost of speech have already occurred. Under a Mississippi age verification law, the open source online journal community Dreamwidth and social media platform Bluesky chose to block the jurisdiction over relinquishing user data privacy or paying massive noncompliance fines.[18] This occurred

---

[18] *See* Denise Paolucci, *Mississippi legal challenge: beginning 1 September, we will need to geoblock Mississippi IPs*, Dreamwidth, (Aug.

without any showing that any minors were using these speech platforms to access content that was obscene as to them. Mississippians—adults and minors both—therefore lost the ability to use both sites as means to engage with speech online.

Even if a developer could shoulder the costs of implementing infrastructure compliant with the Act, retaining personal information on users may be fundamentally at odds with the developer's principles. Organizations like Wikimedia and OTW maintain strong privacy practices to protect speakers from constant scrutiny or persecution. On Wikipedia, this means that contributors and editors may update peer-reviewed information on events, places, and people; on AO3, this means that creators may share their works with other fans without the fear of surveillance or loss of privacy.

Under Texas's law, however, no app developer can maintain the

---

26, 2025) https://dw-news.dreamwidth.org/44429.html (last visited Mar. 5, 2026) ("[W]e don't want to [give up user privacy]. Even if we wanted to, though, we can't: the resources it would take for us to build the systems that would let us do it are well beyond our capacity").; *Our Response to Mississippi's Age Assurance Law*, Bluesky, (Aug. 22, 2025) https://bsky.social/about/blog/08-22-2025-mississippi-hb1126 (last visited Mar. 5, 2026) ("we're a small team focused on building decentralized social technology that puts users in control" and are "committed to building an open social ecosystem that protects users while preserving choice and innovation").

trust and security of users central to mission- and community-driven organizations hoping to foster open expression and access. This represents a heavy burden on speech.

### III. The Protection of Minors Does Not Justify Sweeping Restrictions on All Apps.

"[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." Erznoznik v. Jacksonville, 422 U.S. 205, 212–213 (1975) (citation omitted) (quoted in *Brown*, 564 U.S. at 795). Protected speech does not simply "lose that protection" because it may be "expressed to minors." *Matsumoto v. Labrador*, 122 F.4th 787, 813 (9th Cir. 2024).

Unlike commercial pornography sites, *Free Speech Coalition v. Paxton*, 606 U.S. 461, 482-83 (2025), app stores may have minimal or no content that is obscene as to minors. Apps are even less likely to have such content, given the breadth of apps available, and the State has made no showing that an average or typical app is likely to do so. Given that *Paxton* itself establishes a less restrictive means of protecting minors from speech that is obscene as to them, across-the-board age

verification and mandatory rating is unjustified.

Nonetheless, the law at issue precludes access for anyone—adult or minor—without age verification or rating. Given the importance of apps to the current Internet, this is the equivalent of imposing age verification and rating every time a person enters a neighborhood that has bookstores—without even determining whether any of the bookstores has any content that is obscene as to minors. This kind of "fire first, aim after" overbreadth is exactly what First Amendment doctrine has condemned for decades. "[P]unishing third parties … *just in case* their parents disapprove" of certain speech is not a "proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802.

Nothing in the law is tied to speech that is obscene as to minors. Protected speech "cannot be suppressed solely to protect the young from ideas or images [deemed] unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-14 (1975). Much narrower previous laws regulating a class of protected speech in the name of protecting children have been held "overbroad, ineffectual, and not narrowly tailored." *Ent. Software Ass'n v. Chicago Transit Auth.*, 696 F. Supp. 2d

934, 947 (N.D. Ill. 2010); *see Video Software Dealers Ass'n v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004) (the "regulation of speech at issue here is not limited to the ultra-violent or patently offensive and is far broader than what would be necessary to keep [certain video games] out of the hands of children"). Even in the offline context, which raises fewer concerns about surveillance and data security, barring minors from purchasing an entire class of speech that is not obscene as to them is overbroad. *See Ent. Software Ass'n v. Hatch*, 443 F. Supp. 2d 1065 (D. Minn. 2006), aff'd sub nom. *Ent. Software Ass'n v. Swanson*, 519 F.3d 768 (8th Cir. 2008) (restricting minors from renting or buying video games with particular ratings was not narrowly tailored to the interests in preventing harm to minors); *Am. Amusement Machine Ass'n v. Kendrick*, 244 F.3d 954 (7th Cir. 2001) (holding requirement of parent or guardian permission for children under 17 to play games depicting certain mature activities unconstitutional). But, under Texas law, a fifth grader learning a new language on ABC Duolingo and a 17-year-old who wants to use a study app must verify their identity and get parental consent—if those apps remain available. §§ 121.021(a), 121.022(d)-(e).

These problems also affect developers. Consider Quizlet, an extremely popular flash cards and study tool, which the creator developed as a sophomore in high school.[19] Or Get Involved In Service Hours, a philanthropic app created by a 13-year old who wanted to help students log community service hours.[20] The law's imposition of hurdles on app development, maintenance, and continuity limits expressive activity that furthers and facilitates knowledge across all age groups. Even intermediate scrutiny would not find a reasonable relationship between the breadth of the law and the legitimate aims of the legislature.

## CONCLUSION

The district court was entirely correct: Texas's law is vague, overbroad, and unjustified because it does not even pretend to target speech that is obscene as to minors.  Its decision should be affirmed.

---

[19] *R/IAMA: Hi, I'm the founder of Quizlet, the most popular online learning service in the US. Ask Me Anything!*, Reddit, (2016), https://www.reddit.com/r/IAmA/comments/576qhq/hi_im_the_founder_of_quizlet_the_most_popular/ (last visited Nov. 9, 2025).
[20] *See Apple App Store,* Get Involved in Service Hours, https://apps.apple.com/us/app/get-involved-service-hours/id1540009232 (last visited Nov. 8, 2025).

Respectfully submitted,

REBECCA TUSHNET
COUNSEL FOR AMICUS

CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I also certify that service will be accomplished on all registered CM/ECF users by the appellate CM/ECF system, that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13, and that the document has been scanned and is free of viruses.

Dated: June 24, 2026

/s/ Rebecca Tushnet
Rebecca Tushnet
*Counsel for Amicus*

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with Federal Rule of Appellate Procedure 32(a): The foregoing motion is in 14-point, proportionally-spaced serif font (Century Schoolbook) and contains 4346 words, excluding the parts of the document exempted by Rule 32(f).

Dated: June 24, 2026

/s/ Rebecca Tushnet
Rebecca Tushnet
*Counsel for Amicus*