Nos. 25-51073 & 26-50001

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., BY AND THROUGH
NEXT FRIEND, VANESSA FERNANDEZ; Z.B., BY AND THROUGH NEXT
FRIEND S.B.,

*Plaintiffs-Appellees*,

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY
GENERAL,

*Defendant-Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION

*Plaintiff-Appellee*,

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY
GENERAL,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

**BRIEF OF *AMICUS CURIAE* NATIONAL COALITION AGAINST
CENSORSHIP IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX  75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

*Attorneys for Amicus Curiae National Coalition Against Censorship*

# <u>SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS</u>

1. Nos. 25-51073 & 26-50001.

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellees' Certificate of Interested Persons and in the Certificates of Interested Persons of the other *Amici Curiae*—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus Curiae***
National Coalition Against Censorship

***Attorneys for Amicus Curiae***
Peter B. Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX  75275-0116

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305

Pursuant to Fed. R. App. P. 26.1(a), the undersigned counsel certifies that National Coalition Against Censorship is not a publicly held corporation, does not have a parent corporation, and no publicly held corporation owns 10 percent or more of any corporation's stock.

*/s/ Peter B. Steffensen*
*Counsel of Record for Amicus Curiae*
*National Coalition Against Censorship*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ......................3

TABLE OF AUTHORITIES ...............................................................................6

STATEMENT OF AMICUS CURIAE.................................................................9

SUMMARY OF ARGUMENT ........................................................................10

ARGUMENT ..................................................................................................12

    I. *Free Speech Coalition* Has Not Fundamentally Altered the Key Holdings of First Amendment Law. ...................................................................................12

    II. SB 2420 Triggers Traditional First Amendment Scrutiny...........................19

        a. New Forms of Media and Technology Do Not Alter the Traditional Bounds of First Amendment Law. ................................................................19

        b. The Distribution of Information on the Internet is Still Fully Protected by the First Amendment. ..................................................................................24

    III. SB 2420 Triggers Strict Scrutiny because its Justifications are Related to the Suppression of Free Speech. .......................................................................27

        a. The State's Justifications Implicate the Associational Rights of Minors..27

        b. The State's Justifications Implicate the Right to Anonymous Speech......30

CONCLUSION ...............................................................................................33

CERTIFICATE OF SERVICE..........................................................................34

CERTIFICATION UNDER ECF FILING STANDARDS ...................................35

CERTIFICATE OF COMPLIANCE .................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)......................................................................................28

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)................................................................................25, 32

*Brown v. Ent. Merch. Assoc.*,
564 U.S. 786 (2011)..............................................................................passim

*Butler v. Michigan*,
352 U.S. 380 (1957)......................................................................................12

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942)......................................................................................14

*Commonwealth v. Delacey*,
171 N.E. 455 (Mass. 1930)..........................................................................21

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975)......................................................................................17

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025)..............................................................................passim

*Ginsberg v. New York*,
390 U.S. 629 (1968)................................................................................11, 15

*Griswold v. Connecticut*,
381 U.S. 479 (1965)......................................................................................19

*Johnson v. City of Opelousas*,
658 F.2d 1065 (5th Cir. Unit A 1981) .........................................................28

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952)..........................................................................12, 22, 27

*Justice for All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) .......................................................................30

*Lamont v. Postmaster General*,
381 U.S. 301 (1965)..........................................................................14, 26, 32

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) (en banc) ......................................................26

*Marcus v. Search Warrants*,
367 U.S. 717 (1961)....................................................................................21

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995)....................................................................................30

*Miller v. California*,
413 U.S. 15 (1973).................................................................9, 13, 15, 16

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)............................................................................19, 27

*Mutual Film Corp. v. Indus. Comm'n of Ohio*,
236 U.S. 230 (1915)....................................................................................22

*NAACP v. Button*,
371 U.S. 415 (1963)..............................................................................12, 13

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)....................................................................................32

*NetChoice v. Fitch*,
145 S. Ct. 2658 (Aug. 14, 2025)................................................................18

*NetChoice v. Murrill*,
812 F. Supp. 3d 594 (M.D. La. 2025), *appeal filed*, No. 26-30016 (5th Cir.).....29

*Packingham v. North Carolina*,
582 U.S. 98 (2017)......................................................................................19

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980)......................................................................................10

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................................................................................16

*Regina v. Hicklin*,
3 LRQB 360 (1868) ....................................................................................21

*Reno v. ACLU*,
521 U.S. 844 (1997)..............................................................................25, 29

*Roth v. United States*,
354 U.S. 476 (1957)....................................................................................15

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989)..............................................................................12, 24

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)....................................................................................20

*U.S. v. Stevens*,
    559 U.S. 460 (2010)....................................................................................16

*United States v. Playboy Enter. Grp., Inc.*,
    529 U.S. 803 (2000)......................................................................24, 30, 33

**Statutes**

47 U.S.C. § 223(a)............................................................................................25

47 U.S.C. § 223(e)(5)........................................................................................25

47 U.S.C. § 231 ................................................................................................25

47 U.S.C. § 231(a)(1)........................................................................................25

47 U.S.C. § 231(c)(1)........................................................................................25

47 U.S.C. § 231(e)(6)........................................................................................25

47 U.S.C. § 303c ..............................................................................................23

Tex. Bus. & Com. Code § 121.021(a).............................................................13

Tex. Bus. & Com. Code § 121.022 .................................................................14

Tex. Bus. & Com. Code § 121.022(d)(3).........................................................14

Tex. Bus. & Com. Code § 121.022(h) .............................................................14

Tex. Civ. Prac. & Rem. Code § 129B.001 ......................................................15

Tex. Civ. Prac. & Rem. Code § 129B.002(a).............................................15, 17

**Other Authorities**

Helen Nissenbaum, *The Meaning of Anonymity in an Information Age*, 15 Info.
    Soc'y 141 (1999).........................................................................................31

Paul M. Dennis, *Chills and Thrills: Does Radio Harm Our Children? The
    Controversy Over Program Violence During the Age of Radio*, 34 J. Hist.
    Behavioral Sci. 33 (1998) ...........................................................................22

Plato, *Phaedrus* (Benjamin Jowett trans., Proj. Gutenberg 2008) ..............20

Senator Angela Paxton, *It's Time to Hold Big Tech Accountable and Equip Parents
    to Protect their Children* (Apr. 16, 2026)...................................................12

Surgeon Gen.'s Sci. Advisory Comm. on Television & Soc. Behav., *Television and
    Growing Up: The Impact of Televised Violence: Report to the Surgeon General,
    United States Public Health Service* (1972) ...............................................23

## STATEMENT OF AMICUS CURIAE[1]

The National Coalition Against Censorship (NCAC) is an alliance of more than 50 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC was founded in 1974 in response to the United States Supreme Court's landmark decision *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to promote freedom of thought, inquiry and expression and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of authors, readers, publishers, booksellers, teachers, librarians, artists, students, and others. NCAC has long recognized—and opposed—attempts to censor or limit access to reading material, including great works of literature and art, under the guise of labeling it as obscene, pornographic, or sexually explicit. It therefore has a longstanding interest in assuring the continuance of robust First Amendment protections for all, including minors. The positions advocated for in this brief do not necessarily reflect the views of NCAC's member organizations.

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), no party opposes the filing of this brief. Additionally, no party's counsel authored this brief in whole or in part; no party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than amicus curiae or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E), (b)(4).

## SUMMARY OF ARGUMENT

Consider a mall—once the quintessential place for people of all ages to shop, to eat, to gather, to catch a movie, and even to speak. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 77 (1980). Before the internet, a mall's key features were its convenience and accessibility: people could come and go as they please in order to take advantage of the shopping, entertainment, and other activities on offer. Though oriented around commerce, malls had the hallmarks of a traditional public forum— they were open to all and served as communal spaces for people of any age. Today, though many malls have shuttered due to the explosion of e-commerce, they live on in pop culture as erstwhile symbols of community and togetherness.

But imagine a reality where your access to a mall was conditioned on the State requiring you to prove your age or establish that you have parental permission to wander its halls, plazas, and food courts. Security guards posted at every entrance check the ID of each person who desires entry, write down their personal information, and keep a record of every person who has ever walked through the mall's doors. Moreover, every child under 18 is assigned a government-issued minder who follows them into every store and makes them call a parent or guardian to get their permission to do anything that resembles a transaction: buy a ticket to a PG movie, taste a free sample at the ice cream shop, listen to a CD at the music store, try on some new clothes, or rent a lane at the bowling alley with friends. How does

10

the State justify this kind of intrusive surveillance? Well, because a small section of a bookstore—one of dozens of stores in the mall—sells nude magazines.

Texas seeks to do the precise digital equivalent of this via the Texas App Store Accountability Act ("SB 2420" or "the Act"). By requiring age verification and parental consent before downloading any app, the Act burdens an entire medium of communication. The State attempts to justify these burdens under the Supreme Court's recent ruling in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025). But unlike the statute in that case, SB 2420 is in no way triggered by, reliant on, or limited by obscenity. These are not mere limitations on the sale of nude magazines to minors, as in *Ginsberg v. New York*, or on the sale of violent video games struck down in *Brown v. Entertainment Merchants Association. See Ginsberg v. New York*, 390 U.S. 629, 634 (1968); *Brown v. Ent. Merch. Assoc.*, 564 U.S. 786, 799 (2011). This is a government-imposed restriction on access to an entire platform for speech, regardless of age or content—emphatically what the Supreme Court has said it will not permit.

The State's reliance on *Free Speech Coalition* to impose a medium-wide access barrier on a modern form of communication is a red herring. The Supreme Court has never held that an entire medium of communication may be burdened in the ways the State attempts through SB 2420. To the contrary, the Court has affirmed time and again that the government may not, consistent with the First Amendment,

11

restrict access to an entire medium merely because of its *potential* to cause harm.

*See, e.g.*, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952); *Butler v. Michigan*, 352 U.S. 380, 383 (1957); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 131 (1989); *Brown*, 564 U.S. at 799.

That principle holds strong despite the State's attempt to dress up SB 2420 as a data privacy law that merely burdens commercial speech. For one, the State "cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963). But even taking those justifications at face value, they are still not "unrelated to the suppression of free speech." *Free Speech Coalition*, 606 U.S. at 471. That necessitates the application of strict scrutiny here, which SB 2420 cannot satisfy. On that basis, and as explained further below, the district court's preliminary injunctions in No. 25-51073 and No. 26-50001 should be affirmed.

## ARGUMENT

### I. *Free Speech Coalition* Has Not Fundamentally Altered the Key Holdings of First Amendment Law.

SB 2420 violates the First Amendment. The Act claims to protect minors from speech that the State has concluded is harmful.[2] In practice, however, SB 2420 is not

---

[2] Senator Angela Paxton, a sponsor of the bill, argued that SB 2420 is "about protecting kids" and is necessary because "even the most attentive parent can be blindsided by misleading age ratings or changes to apps that open the door to harmful and inappropriate content." Senator Angela Paxton, *It's Time to Hold Big Tech Accountable and Equip Parents to Protect their Children*,

a thoughtfully tailored law designed to protect children. Instead, the Act vastly exceeds the constitutional limits of the speech it purports to regulate. *See Button*, 371 U.S. at 438 ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.").

As to the underlying content which SB 2420 restricts, the State cannot argue in good faith that AccuWeather, the New York Times, Audible, DuoLingo, or thousands of other apps caught in its dragnet are devoid of "serious literary, artistic, political, or scientific value for minors." *Free Speech Coalition*, 606 U.S. at 474. Nor does the vast majority of their content contain any sexual element at all, and certainly not of the "hard core" variety that obscenity law demands. *Miller*, 413 U.S. at 27. Yet SB 2420 makes no attempt at all to limit its coverage to apps which are obscene or provide access to obscene content.

Instead, its core mechanisms place access barriers walling off *all* content on an app store in order to limit the potential for minors to access a tiny sliver of that content—obscenity—which the State could legitimately proscribe. Pertinent here, the law requires the owner of an app store to verify the age of every user before they may create an app store account. Tex. Bus. & Com. Code § 121.021(a) (requiring age verification "[w]hen an individual in this state creates an account with an app

---

https://www.angelapaxton.com/news/its-time-to-hold-big-tech-accountable-and-equip-parents-to-protect-their-children (Apr. 16, 2026).

store"). In addition, minors must affiliate their accounts with an account belonging to a parent or guardian, and must obtain parental consent prior to downloading any app. *Id*. § 121.022. Minors then must obtain consent from a parent or guardian to make any download or purchase within an app. *Id*. § 121.022(d)(3). These repeated instances of age verification and parental consent significantly burden the freedom of speech and right to access information for both minors and adults. *See Lamont v. Postmaster General*, 381 U.S. 301, 305 (1965) (prohibiting government-imposed restriction on receipt of content through the mail by requiring recipient to take an affirmative act to access the desired information). Barring SB 2420's few exceptions, anyone, *regardless of age*, must provide identification before downloading *any* app, even those as innocuous as the weather or as vital as the news. *See* Tex. Bus. & Com. Code § 121.022(h).

The speech regulated by SB 2420 covers far more than the "well defined and narrowly limited" categories of speech that lack First Amendment protection. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). Those categories of speech receive no protection because "such utterances are no essential part of any exposition of ideas, and are of such slight social value" that the Government's interest in protecting the general public is sufficiently strong to justify their regulation. *Id*. at 572.

Obscenity is one such area. *Roth v. United States*, 354 U.S. 476, 485 (1957). The Supreme Court has long acknowledged that "the States have a legitimate interest in prohibiting dissemination or exhibition of obscene material when the mode of dissemination carries with it a significant danger of offending the sensibilities of unwilling recipients or of exposure to juveniles." *Miller*, 413 U.S. at 18. It reiterated this interest last year in *Free Speech Coalition v. Paxton*, emphasizing that "States have a specific interest in protecting *children* from sexually explicit speech." *Free Speech Coalition*, 606 U.S. at 473.

To effectuate that specific interest, "States can impose greater limits on children's access to sexually explicit speech than they can on adults' access." *Id*. Those greater limits are nonetheless constrained to the carefully defined standard for speech that is obscene from the perspective of a minor, as laid out in *Ginsberg v. New York* and confirmed in *Free Speech Coalition*. *See id.* at 474.

In *Free Speech Coalition*, the Supreme Court considered HB 1181, another Texas law, which requires digital providers to verify the age of users before they may access content deemed "sexual material harmful to minors," defined using the *Ginsberg* test. *Id*. at 465; *see* Tex. Civ. Prac. & Rem. Code §§ 129B.001, 129B.002(a). HB 1181's limitation to obscene content was central to the Court's decision to uphold the law, because it merely prevents minors from viewing content they "have no First Amendment right to access." *Free Speech Coalition*, 606 U.S. at

15

482. And although adults *do* have the right to access speech that is obscene to minors, the burden of age verification is "only incidental." *Id*. at 483. The Court therefore applied intermediate scrutiny and upheld the law. *Id*.

Speech is obscene as to minors only if it meets the Supreme Court's narrow test, meaning that when "(a) taken as a whole, and under contemporary community standards, [it] appeal[s] to the prurient interest of minors; (b) depict[s] or describe[s] specifically defined sexual conduct in a way that is patently offensive for minors, and (c) taken as a whole, lack[s] serious literary, artistic, political, or scientific value for minors." *Free Speech Coalition*, 606 U.S. at 474 (citing *Miller*, 413 U.S. at 24; *Ginsberg*, 390 U.S. at 635, 638). Writing for the majority in *Free Speech Coalition*, Justice Thomas indicated that the test creates a higher bar than may appear upon first blush because "it cannot conceivably be read to cover, say, a PG–13 or R-rated movie" and "may well call for assessing obscenity from the perspective of an adolescent" rather than a young child. *Id*. at n.7.

Still, the Court in *Free Speech Coalition* was clear that the regulation of protected speech, "either 'on its face' or in its justification," triggers strict scrutiny. *Id*. at 482 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163–164 (2015)). States only have the power to impose content-based restrictions, including age verification, "*where the speech in question is unprotected*." *Id*. at 492 (emphasis added) (citing *U.S. v. Stevens*, 559 U.S. 460, 468 (2010)). But when the State imposes age

verification requirements that are not tethered to the regulation of unprotected speech, those requirements are subject to the highest form of review.

SB 2420 fails to tie its coverage only to obscene speech, and that failure should require the application of strict scrutiny here. The Act erects a technological gate—age verification—that all users must pass through in order to access *any* of the content within, obscene or not. That sets SB 2420 miles apart from HB 1181, which applies only to platforms where "more than one-third of [its content] is sexual material harmful to minors[.]" Tex. Civ. Prac. & Rem. Code § 129B.002(a). In other words, not only were HB 1181's justifications directed towards preventing access to obscene speech only, the mechanics of the Act itself ensured that only those platforms which are substantial distributors of obscene content would be reached.

Although Texas may protect children from exposure to obscene speech, it does not possess "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 795. When the State fails to assert a "legitimate proscription," it may not suppress speech "solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975). *Free Speech Coalition* merely reinforces this basic principle.

Because there is no sound basis to extend *Free Speech Coalition*'s application of intermediate scrutiny to a law like SB 2420, the proper approach here is to return

to first principles. That is, laws which are content-based are presumptively unconstitutional and must satisfy strict scrutiny. *See Brown*, 564 U.S. at 799. SB 2420 is a law that is justified on content-based terms, *see* Br. of CCIA at 34–40, and neither serves a compelling government interest nor is narrowly tailored to serve that interest.[3]

And just like California's effort regulate video games in *Brown*, the State's effort to regulate apps here is both vastly underinclusive and overinclusive. While the State purports to help "ensur[e] parental consent for minor children to enter into contracts involving their data and privacy[,]" Br. of Appellant at 24, the Act does not target equivalent contracts for digital services on standard websites that children may access through a web browser rather than an app. And judged in relation to its more transparently content-based justification—the desire to "protect children from harmful materials[,]" *id.*—the Act "wisely" yet fatally declines to limit access to other digital and analog storefronts, such as Amazon, GameStop, or Barnes and Noble, where children could likewise access and purchase the types of harmful content the State disfavors. *See Brown*, 564 U.S. at 801–02. So, too, is the Act's "purported aid to parental authority … vastly overinclusive. Not all of the children

---

[3] Though *Free Speech Coalition* does nothing to cast doubt on *Brown*, at least one Supreme Court justice has explicitly indicated that *Brown* remains binding precedent. *See NetChoice v. Fitch*, 145 S. Ct. 2658 (Aug. 14, 2025) (Kavanaugh, J., concurring from denial of application to vacate stay) (citing *Brown*, 564 U.S. 786, as reason that "the Mississippi law in question would likely violate [NetChoice's] members' First Amendment rights").

who are forbidden to purchase [harmful apps] on their own have parents who *care* whether they purchase [harmful apps]." *Id.* at 804.

What's left is a law that flies in the face of the Supreme Court's jurisprudence on age verification. To hold otherwise would dramatically "contract the spectrum of available knowledge" by imposing roadblocks on the dissemination and receipt of speech which occurs via app—a technology otherwise so accessible and ubiquitous that it is literally at our fingertips. *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). SB 2420, like other responses to media panics that came before it, attempts to treat the Internet as the boogie man, and the Supreme Court has repeatedly declined those entreaties. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024). "Cyberspace" remains one of "the most important places (in a spatial sense) for the exchange of views," *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). But today, apps have become the windows and doors through which those views flow. The State's effort to force app stores to install a government-imposed lock cannot and should not succeed.

## II. SB 2420 Triggers Traditional First Amendment Scrutiny.

### a. *New Forms of Media and Technology Do Not Alter the Traditional Bounds of First Amendment Law.*

Applying ordinary First Amendment principles to SB 2420 would accord with how courts have confronted emerging media at the turn of each new technological era. Indeed, though the ways in which we exchange ideas have evolved at a dizzying

rate, the First Amendment has consistently weathered all forms of societal pressures, including (and especially) technological ones. That has been especially true in times when government officials are motivated by an "undifferentiated fear or apprehension of disturbance" to cut off free expression at its source. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

History is rife with examples of efforts to limit new and emerging forms of expression due to an "undifferentiated fear" of how those mediums might undermine certain social values or, more to the point here, harm children. When emerging technologies alter our lives in novel ways, those changes are frequently met with calls to limit the "harmful" effects of those technologies by restricting fundamental rights. But history shows that kind of alarmism is misplaced.

Consider, for example, Plato's *Phaedrus*, where Socrates, in dialogue with Phaedrus, recounts the story of the Egyptian god Theuth showing his invention— "the use of letters," or writing—to the god Thamus. Theuth claims to Thamus that his invention will "make the Egyptians wiser and give them better memories[.]" To which Thamus responds that writing will "create forgetfulness in the learners' souls, because they will not use memories; they will trust to external written characters and not remember of themselves." Plato, *Phaedrus* (Benjamin Jowett trans., Proj. Gutenberg 2008).[4] Socrates uses this exchange between Theuth and Thamus to

---

[4] *Available at* https://www.gutenberg.org/files/1636/1636-h/1636-h.htm.

caution how writing as a communication form could fundamentally impact how people engage with the world around them, particularly as it mattered to Socrates, through oration.

This story echoes in the many periods when new forms of communication and new types of content emerge and are met with apprehension and repression. In the mid-to-late 1800s, dime novels, or "penny dreadfuls," were believed by many to make children more prone to petty larceny and other crimes. As a result, penny dreadfuls were frequently deemed obscene and seized by English law enforcement following the enactment of the Obscene Publications Act of 1857. The Act itself never defined "obscene" material, instead leaving longstanding common law definitions untouched. *See Marcus v. Search Warrants*, 367 U.S. 717, 733 n.26 (1961). That eventually led to the 1868 case of *Regina v. Hicklin*, a watershed decision in early obscenity law, where Chief Justice Cockburn of the Court of the Queen's Bench defined obscene material in a way that focused on the effect that material had on children: as material having a tendency "to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall." *Regina v. Hicklin*, 3 LRQB 360 (1868).[5]

---

[5] The *Hicklin* test shaped early American obscenity laws and led to the ban of classic works of literature. For example, in *Commonwealth v. Delacey*, a Massachusetts obscenity law banning material containing "obscene, indecent, or impure language, or manifestly tending to corrupt the morals of youth" was applied to uphold the conviction of a defendant who sold D.H. Lawrence's *Lady Chatterley's Lover* in his book shop. *Commonwealth v. Delacey*, 171 N.E. 455 (Mass. 1930).

Penny dreadfuls were then replaced by moving pictures as the newest source of moral outrage over their depictions of violence and sexuality. And their *potential* effects on children initially justified restrictions on their distribution. *See Mutual Film Corp. v. Indus. Comm'n of Ohio*, 236 U.S. 230, 242 (1915). This reasoning stood for nearly forty years, until the Supreme Court overruled *Mutual Film Corp.* in *Joseph Burstyn, Inc.* There, the Court retracted its view that a medium of expression can be regulated simply because of its potential to "possess a greater capacity for evil, particularly among the youth of a community[.]" *Joseph Burstyn, Inc.*, 343 U.S. at 502.

Then came radio. Its wide accessibility and mass appeal caused its detractors to question whether it had addictive effects, and what those effects might have on children who they feared were spending too much of their time consumed by the content transmitted over the airwaves. Concerns over children's exposure to the violent content of "radio thrillers" prompted protests and mass letter-writing campaigns. Paul M. Dennis, *Chills and Thrills: Does Radio Harm Our Children? The Controversy Over Program Violence During the Age of Radio*, 34 J. Hist. Behavioral Sci. 33, 36 (1998) ("[E]xpression of public concern regarding the radio thriller was to become standard fare for years to come in newspaper stories and editorials, magazine articles, and the activities of women's clubs.").

So, too, did the rise of television prompt many to express concern at the potential effects that violent images broadcast directly into the home could have on children and their development. A 1972 report to the U.S. Surgeon General noted that "there is much public concern about the possible harmful effects of television entertainment[,]" particularly around the "possibility that particular aspects of television viewing will overstimulate the child, lead to disturbed sleep and nightmares, or incite the child to aggressive behavior." Surgeon Gen.'s Sci. Advisory Comm. on Television & Soc. Behav., *Television and Growing Up: The Impact of Televised Violence: Report to the Surgeon General, United States Public Health Service* 61 (1972), https://profiles.nlm.nih.gov/101584932X543.

But the resulting efforts to mitigate those effects prioritized tools which collectively empowered the television industry to establish "voluntary guidelines designed to alleviate the negative impact of violence in telecast material." *See* 47 U.S.C. § 303c (granting an antitrust shield to achieve those goals). On the other hand, efforts by Congress to directly regulate television to protect children ran headlong into the First Amendment. For example, the Supreme Court struck down a provision of the Telecommunications Act of 1996 which required cable television providers airing sexually explicit content to fully scramble that content or to limit the hours during which that content aired to times when children would be least likely to view it. *United States v. Playboy Enter. Grp., Inc.*, 529 U.S. 803, 806 (2000).

The Court in *Playboy* treated the provision as a content-based restriction subject to strict scrutiny. Though it accepted that the government did not need to be "indifferent to unwanted, indecent speech that comes into the home without parental consent," *id.* at 814, the Court found that the provision was not the least restrictive means of achieving its goals—it concluded that another provision of the Act authorizing parents to contact cable companies to block sexually explicit channels entirely, as well as the availability of "market-based solutions such as programmable televisions, VCR's, and mapping systems" supported the trial court's finding that there were other, less restrictive means available. *Id.* at 821–22. *See also Sable Commc'ns*, 492 U.S. at 130–31 (feasibility of technological tools which could limit children's access to "dial-a-porn" services made ban on those services for adults and children unconstitutional).

### b. *The Distribution of Information on the Internet is Still Fully Protected by the First Amendment.*

Finally, with the rise of the internet age and explosion of information available to people with a computer and an internet connection, Congress acted swiftly to enact legislation which would ostensibly shield children from accessing inappropriate or harmful content on those platforms, too. And like Congress's earlier attempts to restrict the delivery of other non-obscene material to children on other communication mediums, the resulting legislation posed direct First Amendment problems.

Thus, in *Reno v. ACLU*, 521 U.S. 844 (1997), the Court addressed the constitutionality of the Communications Decency Act of 1996 (CDA). The CDA imposed criminal penalties on the knowing transmission of "obscene" or "indecent" content on the Internet to minors, but made it an affirmative defense if the content provider engaged in age verification. 47 U.S.C. § 223(a), (e)(5). Because the Government both failed to define the term "indecent" and omitted from its definition of "obscene" content the final prong of *Miller v. California* that the content "lack serious literary, artist, political or scientific value," the Court struck down the CDA. *Reno*, 521 U.S. at 865. By its very terms, "the CDA effectively suppresse[d] a large amount of speech that adults have a constitutional right to receive and to address to one another." *Id*. at 874.

After *Reno*, the Court in *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (*Ashcroft II*) considered the Child Online Protection Act (COPA), 47 U.S.C. § 231, which Congress passed in a similar attempt to prevent minors from viewing harmful content on the Internet. That statute imposed criminal penalties for knowingly posting, for "commercial purposes," content that is "harmful to minors." 47 U.S.C. § 231(a)(1). This time, the statute's definition of "harmful to minors" incorporated the *Ginsberg* test for junior obscenity. *See* 47 U.S.C. § 231(e)(6). Again, Congress created an affirmative defense to those who use age verification to prevent minors from accessing covered material. 47 U.S.C. § 231(c)(1). Assessing the District

Court's grant of a preliminary injunction against enforcement of COPA, the Court in *Ashcroft II* found that the Government failed to show that its ban on speech constitutionally protected for adults was the least restrictive means of achieving its goal. *Ashcroft II*, 542 U.S. at 673. It could have, for example, used blocking and filtering technology to the same effect but without burdening constitutionally protected speech. *Id*. at 667.

SB 2420 patently fails the tailoring requirements that doomed the statutes at issue in *Reno* and *Ashcroft II*, and thus the only way the Act could possibly survive is under a lower tier of scrutiny which excuses its lack of precision. But the Act should not be treated as anything other than a regulation of pure speech on a private platform to which strict scrutiny should apply, even if that platform functions as a marketplace.[6] On that understanding, the Supreme Court has reaffirmed, over and over again, that basic First Amendment principles "do not vary" when applied to "ever-advancing technology[.]" *NetChoice*, 603 U.S. at 733 (quoting *Brown*, 564 U.S. at 790). For good reason, too. "Those principles have served the Nation well over many years, even as one communications method has given way to another."

---

[6] The motions panel was thus wrong to assess the entirety of SB 2420 as a regulation of commercial speech. *See* No. 25-51073, ECF No. 91-1 at 3–5. The age verification and parental consent provisions place a direct burden on access to private speech by placing age gates and parental locks on all apps, full stop. Just as "the *government* … cannot stop *you* from receiving a book," the First Amendment protects the public's right to download apps. *Little v. Llano County*, 138 F.4th 834, 845 (5th Cir. 2025) (en banc) (emphasis in original) (citing *Lamont*, 381 U.S. at 306).

*Id.* at 733–34. No matter what, "freedom of expression [is] the rule." *Joseph Burstyn, Inc.*, 343 U.S. at 503. *Free Speech Coalition* has not fundamentally altered any of these key principles of First Amendment law, and as discussed above, would require a massive extension of its explicitly limited holding to find SB 2420 constitutionally sound. The Court should decline to make that extension here.

### III. SB 2420 Triggers Strict Scrutiny because its Justifications are Related to the Suppression of Free Speech.

#### a. *The State's Justifications Implicate the Associational Rights of Minors.*

SB 2420 is unconstitutional for the additional reason that the State's justifications for the Act are not "unrelated to the suppression of free speech." *Free Speech Coalition*, 606 U.S. at 471. The State asserts an interest in "ensuring parental consent for minor children to enter into contracts involving their data and privacy." Br. of Appellant at 24. But those interests, even if legitimate, require the application of strict scrutiny to SB 2420 for two reasons.

<u>First</u>, on its own terms, the State's interests target the expressive and associational rights of minors. Its focus on preventing application developers from obtaining data from children, which may reveal details about their identities, cuts to the core of the associational rights minors have to decide when, where, and with whom to share information about themselves. The State's solution to that concern is SB 2420's parental consent requirement, which requires parents to authorize their

27

child to download an app. But while that may ensure greater parental control over the information app developers obtain about their children, the associational problems remain, because the Act's terms effectively impose a "compelled disclosure regime[]" forcing minors to reveal to their parents the apps and information with which they desire to associate. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021).

The First Amendment rights to which minors are entitled "undoubtedly also entail the right to associate freely, which, like the right of adults, is not limited to political associations but includes associations for social, legal, or economic purposes." *Johnson v. City of Opelousas*, 658 F.2d 1065, 1072 (5th Cir. Unit A 1981) (internal citation omitted). By justifying SB 2420 as a regulation which protects the privacy and data of minors, the State effectively concedes that it is using SB 2420 to superintend the ability of minors to decide for themselves which apps to affiliate with and with whom they desire to share their data.

The State's decision to insert itself into these decisions cannot be excused just because the State is merely requiring children to disclose app download decisions to their parents in advance. For one, that does not change the fact that the State is still inserting itself into the intimate relationship between parent (or guardian) and child by: (1) forcing the child to provide information to the parent, and (2) forcing the parent to take some affirmative act (authorizing or denying the download). But

equally fatal to the State's argument is that its justification does not actually serve the goals it sets out to achieve. *See id.* at 1073–74 (noting that the challenged ordinance "inhibits rather than promotes the parental role in child-rearing"); *Brown*, 564 U.S. at 804 (act is overinclusive on same basis). The State's "interest in allowing parents the opportunity to consent to their minor children accepting terms of service and data collection practices," Br. of Appellant at 24, interferes with parents' ability to decide to offer their children privacy in their online activities. From that lens, SB 2420's parental consent requirements *deprive* parents of a crucial choice in the way they raise their children—the choice to let them be children. *See also NetChoice v. Murrill*, 812 F. Supp. 3d 594, 651 (M.D. La. 2025) (holding a law requiring age verification and parental consent for minors to access social media failed intermediate and strict scrutiny), *appeal filed*, No. 26-30016 (5th Cir.).

<u>Second</u>, in explaining the nature of its interest, the State, in the very next sentence of its brief, connects it to a related interest—and what is arguably the State's true goal here—in "protecting children from <u>harmful materials</u>." Br. of Appellant at 24 (citing *Reno*, 521 U.S. at 849) (emphasis added). That should slam the door shut on intermediate scrutiny, because it connects the data privacy and parental consent mechanisms in the Act directly to a desire to deploy those mechanisms to prevent children from accessing content objectionable to the State.

While it is true that the State does not have to be "indifferent" to the potential for children to access indecent content without parental consent, *see Playboy Enter. Grp., Inc.*, 529 U.S. at 814, the interests the State articulates here all but resolve the question of whether intermediate scrutiny is the appropriate standard of review through which to evaluate SB 2420's constitutionality. It is not.

**b. *The State's Justifications Implicate the Right to Anonymous Speech.***

To the extent this Court agrees that SB 2420 operates as a kind of data privacy law for minors, the State's justifications for the law likewise implicate the right to anonymous speech—a right which "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

This Court has recognized that the right to anonymity is not an all-or-nothing proposition. *See Justice for All v. Faulkner*, 410 F.3d 760, 765 (5th Cir. 2005). Thus, even when the State may be able to require identification for some legitimate purpose—there, to require university students to establish their "student" status to access university resources and spaces—people retain "residual anonymity" with respect to others to whom they are not required to identify themselves. *Id.* Protection of anonymity in those spheres is "no less critical to the expression of controversial ideas[.]" *Id.*

30

SB 2420 directly implicates those concerns. While app users must cede some measure of their privacy as a condition of using the apps they download, SB 2420 invades the "residual privacy" interests of minors by forcing them to disclose their app activity to a parent or guardian; and it invades the "residual privacy" interests of adults by forcing them to disclose their identities to a third-party age verification service.

Those interests offer a compelling counterpoint to the State's insistence here that SB 2420 is necessary to safeguard the privacy interests of minors. To the contrary, the levers the State has chosen to pull in service of those goals undermine those privacy interests severely—particularly for those people who rely on the "residual privacy" guarantees of the digital application ecosystem to safeguard their identities and intimate details of their lives. As privacy scholar Helen Nissenbaum explained:

> [T]he value of anonymity lies not in the capacity to be unnamed, but in the possibility of acting or participating while remaining out of reach, while remaining unreachable. Being unreachable means no one will come knocking on your door demanding explanations, apologies, answerability, punishment, or payment.

Helen Nissenbaum, *The Meaning of Anonymity in an Information Age*, 15 Info. Soc'y 141, 142 (1999).

SB 2420 lays the groundwork for a digital application ecosystem that places the government, or at least its specter, in every home and on every digital device.

True, the Act places the onus of enforcement on private actors—the app stores and developers, the verification services, and parents and guardians. But that is cold comfort for app users who understand that regardless of who is asking for that information, the State requires them to reveal it. SB 2420 will thus have a profound chilling effect on app users who are concerned that the Act's disclosure obligations require them to prove to the *government's* satisfaction their entitlement to access First Amendment-protected content to which they have an "unfettered" right. *Lamont*, 381 U.S. at 305 (striking down statute that "requires an official act … as a limitation on the unfettered exercise of the addressees First Amendment rights"); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly[.]").

Whether viewed as a direct and substantially burdensome regulation on the speech of adults or an indirect—albeit no less substantial—regulation on the speech of minors, SB 2420 undermines the ability of app users to keep their identities and affiliations from being forcibly revealed by government fiat. The Act's implications for the right to anonymous speech accordingly demand that strict scrutiny be applied here. And because, at a minimum, the government has less restrictive means available to achieve its goals—for example, by incentivizing parents to install content moderation software on their children's devices, *see Ashcroft II*, 542 U.S. at

669-70 (citing *Playboy Ent. Grp., Inc.*, 529 U.S. at 825)—SB 2420 fails strict scrutiny. The district court's preliminary injunction should therefore be affirmed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should affirm the preliminary injunctions in Nos. 25-51073 & 26-50001.

Dated: June 24, 2026                              Respectfully submitted,

                                                          */s/ Peter B. Steffensen*

Thomas S. Leatherbury                    Peter B. Steffensen
Thomas S. Leatherbury Law, PLLC          SMU DEDMAN SCHOOL OF LAW
Cumberland Hill School Building          FIRST AMENDMENT CLINIC[7]
1901 North Akard Street                  P.O. Box 750116
Dallas, TX 75201-2305                    Dallas, Texas 75275-0116
(214) 213-5004                           (214) 768-4077
tom@tsleatherburylaw.com                 psteffensen@smu.edu

                                         *Attorneys for Amicus Curiae*
                                         *National Coalition Against Censorship*

---

[7] Counsel for amicus curiae are grateful for the contributions of SMU Dedman School of Law students Yussra Hamid, Claire Hill, and Sean Nussbaum to this brief.

# CERTIFICATE OF SERVICE

I certify that on June 24, 2026, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
*Counsel of Record for Amicus Curiae*
*National Coalition Against Censorship*

# **CERTIFICATION UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Peter B. Steffensen*
*Counsel of Record for Amicus Curiae*
*National Coalition Against Censorship*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 32(g), I hereby certify that:

1. This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,994 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Peter B. Steffensen*  
*Counsel of Record for Amicus Curiae*  
*National Coalition Against Censorship*
