**No. 25-51073 & 26-50001**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**Students Engaged in Advancing Texas; M.F., By and Through Next Friend, Vanessa Fernandez; Z.B., By and Through Next Friend S.B.,**
*Plaintiffs-Appellees,*
v.
**Ken Paxton, in his official capacity as the Texas Attorney General,**
*Defendant-Appellant*

*consolidated with*
**Computer & Communications Industry Association,**
*Plaintiff-Appellee*,
v.
**Ken Paxton, in his official capacity as the Texas Attorney General,**
*Defendant-Appellant.*

_____

**On Appeal from the U.S. District Court for the Western Division of Texas, Austin Division**

**BRIEF OF AMICUS CURIAE ASSOCIATION FOR COMPETITIVE TECHNOLOGY (ACT) IN SUPPORT OF PLAINTIFFS-APPELLEES**

Peter D. Kennedy
Texas Bar No. 11296650
pkennedy@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
512-480-5674 (Phone)

*Counsel of Record for Amicus Curiae*

## Certificate of Interested Persons and
## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rule 29.2, Amicus Association for Competitive Technology (ACT) certifies that, in addition to those listed in the parties' briefs, the following persons have an interest in the outcome of this appeal:

**Association for Competitive Technology (ACT),** *Amicus Curiae*

Association for Competitive Technology has no parent corporation and no publicly held corporation owns 10% or more of its stock.

*/s/ Peter D. Kennedy*
Peter D. Kennedy

2

# Table of Contents

Certificate of Interested Persons & Corporate Disclosure Statement ........................ 2

Table of Contents ................................................................................................. 3

Index of Authorities ............................................................................................. 4

Statement of Identity and Interest of Amicus Curiae ............................................. 7

Fed. R. App. P. 29(A)(4)(e) Statement ................................................................. 8

Summary of the Argument .................................................................................... 9

Argument ............................................................................................................. 10

    I.       S.B. 2420 imposes substantial burdens on app stores and app developers ................................................................................................... 10

    II.      S.B. 2420's interaction with federal COPPA creates unintended consequences and potential liability ................................................... 13

Conclusion ........................................................................................................... 20

Certificate of Compliance ..................................................................................... 22

Certificate of Service ........................................................................................... 22

## Index of Authorities

**Cases**            **Page**

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
2025 WL 3754045 (W.D. Tex. Dec. 23, 2025)................................................9

*Smith v. California*, 361 U.S. 147 (1959) ...............................................10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)................................................................................9

**Statutes and Rules**

16 C.F.R. § 312.3 ...........................................................................14

16 C.F.R. § 312.5 ...........................................................................14

16 C.F.R. § 312.8 ...........................................................................14

15 U.S.C. §§ 6501-6505 .....................................................................13

Tex. Bus. & Com. Code § 17.50...............................................................13

Tex. Bus. & Com. Code § 121.001, *et seq.* .................................................7

Tex. Bus. & Com. Code § 121.021.............................................................11

Tex. Bus. & Com. Code § 121.022.............................................................11

Tex. Bus. & Com. Code § 121.022(d).........................................................11

Tex. Bus. & Com. Code § 121.022(e)(2)......................................................11

Tex. Bus. & Com. Code § 121.023.................................................................11

Tex. Bus. & Com. Code § 121.051...........................................................10, 11

Tex. Bus. & Com. Code § 121.052.................................................................12

Tex. Bus. & Com. Code § 121.053.................................................................12

Tex. Bus. & Com. Code § 121.054.................................................................13

Tex. Bus. & Com. Code §§ 121.051-054 .........................................................9

Tex. Bus. & Com. Code § 121.055.................................................................13

Tex. Bus. & Com. Code § 121.055(b).............................................................17

Tex. Bus. & Com. Code §§ 121.101...............................................................13

**Other Authorities**

American Action Forum, COPPA 2.0: The Costs of Layering on Liability,
(May 18, 2023), *available at*
https://www.americanactionforum.org/insight/coppa-2-0-the-costs-of-
layering-on-liability/. ..................................................................................15

Bloinka! Apple.com,
https://apps.apple.com/us/developer/bloinka/id542674320 ...................................18

Cobun Zweifel-Keegan, "A view from DC: The FTC is serious about kids'
privacy," Int'l Assoc. of Privacy Professionals, (Sept. 5, 2025), *available at*
https://iapp.org/news/a/a-view-from-dc-the-ftc-is-serious-about-kids-privacy ......18

Fed. Trade Comm'n, "Protecting children watching YouTube videos: Lessons
learned from FTC's settlement with Disney," (Sept. 2, 2025), *available at*

https://www.ftc.gov/business-guidance/blog/2025/09/protecting-children-watching-youtube-videos-lessons-learned-ftcs-settlement-disney ........................... 18

Federal Trade Commission, Children's Online Privacy Protection Rule: A Six-Step Compliance Plan for Your Business, www.ftc.gov, https://www.ftc.gov/business-guidance/resources/childrens-online-privacy-protection-rule-six-step-compliance-plan-your-business ......................................... 17

Federal Trade Commission, Complying with COPPA: Frequently Asked Questions, https://www.ftc.gov,business-guidance/resources/complying-coppa-frequently-asked-questions ...................................................................... 14

Mama's Pizza (TX), Apple.com, https://apps.apple.com/us/app/mamas-pizza-tx/id1113648322 ..................................................................................... 16

State of the App Economy, ACT | The ACT (2023), *available at* https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf. ........................................................................................................ 7

Testimony of Morgan Reed, President ACT | The App Association, Before the U.S. House of Representatives Judiciary Committee, Subcommittee on Commerce, Manufacturing, and Trade (2025), *available at* https://actonline.org/wp-content/uploads/2025-03-24-ACT-SFR-EC-Online-Harms-FINAL.pdf ............................................................................................ 8

**Statement of Identity and Interest of Amicus Curiae**

The Association for Competitive Technology (ACT) is a global policy trade association for the small business technology developer community.[1]  Where Plaintiff-Appellee Computer & Communications Industry Association ("CCIA") is a non-profit trade association whose members operate mobile software application ("app") stores, including Google, Amazon, and Apple, that are targeted by S.B. 2420, the Texas law at issue in this case,[2] Amicus ACT is a non-profit advocacy and education organization representing app developers, particularly the small business developer, innovator, and entrepreneur community that creates countless software applications used on mobile devices and in enterprise systems.  The software application economy ACT represents is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[3]

---

[1] Pursuant to this Court's Rule 37.2, all parties with counsel listed on the docket received notice of the *amicus curiae*'s intention to file this brief.  Per Rule 37.6, *amicus curiae* affirms that no counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

[2] *See* S.B. 2420, 89th Leg., R.S. (Tex. 2025), the App Store Accountability Act, Tex. Bus. & Com. Code § 121.001 *et seq.*

[3] State of the App Economy, ACT | The ACT (2023), *available at* https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf.

ACT members are dedicated to improving the safety and security of products and services in the digital economy. Protecting children from harmful material on the internet is an important government interest, but as ACT has consistently explained—including before Congress[4]—regulations like S.B. 2420 that put the onus for children's safety on app stores, app developers, and businesses with apps that are not directed to children and that do not present age-related risks do not effectively protect vulnerable internet users; they simply shift compliance costs and potential liability to the companies least able to bear the burden.

This burden shift compels ACT to support CCIA's motion for preliminary injunction. The heavy burdens S.B. 2420 would impose on ACT's members, particularly small app developers and the small businesses they serve, should be held at bay while the important First Amendment arguments raised by CCIA are resolved on the merits.

### Fed. R. App. 29(a)(4)(E) Statement

No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and

---

[4] *See* Testimony of Morgan Reed, President ACT | The App Association, Before the U.S. House of Representatives Judiciary Committee, Subcommittee on Commerce, Manufacturing, and Trade (2025), ("ACT Congressional Testimony"), *available at* https://actonline.org/wp-content/uploads/2025-03-24-ACT-SFR-EC-Online-Harms-FINAL.pdf.

no person other than the amicus curiae, its members, or its counsel, contributed money intended to fund preparing or submitting this brief.

## Summary of the Argument

The district court properly granted a preliminary injunction blocking S.B. 2420 from taking effect. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[5] The district court properly held that CCIA established all four elements. Of particular interest to ACT's members, the court correctly recognized that S.B. 2420's requirements may deter app developers from updating their privacy policies or terms of service, making safety and functionality updates, and making new content offerings, thus chilling speech and imposing irreparable harm.[6]

ACT writes : (1) to explain how Subchapter C of S.B. 2420, entitled "Duties of Software Application Developers,"[7] imposes onerous, and in some cases, impossible compliance obligations on all companies, schools, non-profits, and individuals that make a mobile app available in Texas, and all developers

---

[5] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[6] *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 2025 WL 3754045 at *9 (W.D. Tex. Dec. 23, 2025).

[7] Tex. Bus. & Com. Code §§ 121.051-054.

distributing apps in Texas; (2) to underscore the significant new liability S.B. 2420 would impose on app developers and businesses due to its incompatibility with the federal Children's Online Privacy Protection Act (COPPA); and (3) to provide a voice to the many small app developers who rely on app stores and lack capacity to absorb the cost and uncertainty S.B. 2420 creates.[8]

## Argument

## I.    S.B. 2420 imposes substantial burdens on app stores and app developers.

S.B. 2420 drastically changes how app stores operate.    Subchapter B of S.B. 2420[9] requires app store owners to verify the age of all Texans who create an account with the store and to designate every such account holder as a "child" (under 13), a "younger teenager" (between 13 and 15), an "older teenager" (between 16 and

---

[8] While this brief focusses on the relative burden factor, ACT agrees that S.B. 2420 must be reviewed using strict scrutiny because of its impact on core First Amendment-protected speech, not a lower standard applied to regulation of commercial speech.  While the panel's decision on Appellee's motion to stay suggests all free apps gain access to or sell private user data and are therefore less deserving of First Amendment protection, this is incorrect; many free apps provide complementary services such as delivery platforms, scheduling tools, internet of things control tools, or loyalty programs.  Many others are supported by advertising, offered for free by government entities, or are noncommercial passion projects.  Many apps collect no data at all.  In any case, First Amendment protections apply to the apps' content and the software that underlies them, even if commercially supported.  We are aware of no legal precedent holding that the manner of *distribution* can render speech "commercial."  No court has held that the need to pay for a book at a bookstore or create an account to borrow a library book renders books "commercial speech." Nor has any court held that selling television advertising renders news broadcasts "commercial speech."  It is firmly established that "it is of course no matter that the dissemination takes place under commercial auspices." *Smith v. California*, 361 U.S. 147, 150 (1959).  A search for the word "Bible" in Apple's App Store returns dozens of apps, but surely these apps are not subject to lesser First Amendment protection depending on whether they are free.

[9] Tex. Bus. & Com. Code § 121.051.

17), or an "adult" (18 or older).[10]  The app store must "affiliate" every minor's account with a parent or legal guardian's account.[11]  With few exceptions, the app store must obtain consent from the parental account each time the minor wants to download an app, and each time the minor wants to make an in-app purchase.[12]  If a parent "revokes consent through a parent account," the app store must "notify the developer of each applicable software application."[13]  The app store must display its own "age rating or other content notice" and "an explanation of the mechanism," if it has one, and if it does not, it must display the rating assigned by the statute and explain the "specific content or other elements that led to the rating."[14]

S.B. 2420 will force app owners to spend large sums of money to comply or exclude their app from Texas.  Subchapter C of S.B. 2420 imposes a set of duties on ACT's members—software developers and businesses who make their apps available on an app store in Texas.[15]  Importantly, brick-and-mortar stores—in Texas and around the world—with apps on those  stores often outsource the development of those apps to third parties like ACT members.  The app itself, along with the logo, typically belongs to the brick-and-mortar stores, while the developer is responsible

---

[10] Tex. Bus. & Com. Code § 121.021.

[11] Tex. Bus. & Com. Code § 121.022.

[12] Tex. Bus. & Com. Code § 121.022(d).

[13] Tex. Bus. & Com. Code § 121.022(e)(2).

[14] Tex. Bus. & Com. Code § 121.023.

[15] Tex. Bus. & Com. Code § 121.051.

for writing the code and creating the technical capabilities of the app. S.B. 2420 does not define "developer of a software application," leaving it unclear whether the obligations apply to the app's owner or the developer who created the app. Given the lack of clarity and crushing potential civil liability, caution dictates that app owners treat the obligations as applying to them. Lacking software expertise, most app publishers would have to hire developers to modify their apps to comply with S.B. 2420. Thus, when this brief describes S.B. 2420's burdens on "developers," we emphasize that the compliance burden likely falls on any firm, individual, non-profit, or even a school, with an app on the stores.

The obligations on developers and entities with apps on the stores are significant and problematic. First, app developers must assign an age rating based on the statute's categories, provide that rating to the app stores, and explain "the specific content or other elements that led to each" such rating.[16] Second, app developers must notify the app store before making "any significant change" to the app's terms of service, privacy policy, or functionality.[17] Third, the app developers must create and implement their own age verification and parental consent systems to confirm that every download or purchase by a minor has been approved by the

---

[16] Tex. Bus. & Com. Code § 121.052.

[17] Tex. Bus. & Com. Code § 121.053.

affiliated parent account.[18]  App developers may use personal data to verify age and parental consent but must delete that data after completing the required verification.[19]  Any violation of S.B. 2420 constitutes an actionable deceptive trade practice "in addition to any other action or remedy provided by law."[20]  By providing a private right of action,[21] S.B. 2420 creates an incentive for plaintiffs' attorneys to create sue-and-settle enforcement programs targeting small businesses, thus worsening the statute's already-onerous and ill-defined compliance burdens.

## II.   S.B. 2420's interaction with federal COPPA creates unintended consequences and potential liability.

Intentionally or not, S.B. 2420 puts app developers between a new rock and an existing hard place: the federal Children's Online Privacy Protection Act of 1998 (COPPA)[22] and its regulations.  If implemented, besides immediately placing all Texas entities that have published apps on the app stores, of whatever size and regardless of audience, under a strict, costly compliance regime, S.B. 2420 would also put many of those businesses immediately out of compliance with COPPA, unless they do not create an age verification system, which would put them out of

---

[18] Tex. Bus. & Com. Code § 121.054.

[19] Tex. Bus. & Com. Code § 121.055.

[20] Tex. Bus. & Com. Code § 121.101.

[21] Tex. Bus. & Com. Code § 17.50.

[22] 15 U.S.C. §§ 6501-6505.

13

compliance with S.B. 2420.

Enacted in 1998, COPPA imposes strict data-collection limitations on commercial websites and online services (including mobile apps) that are (1) directed to children under 13 or (2) directed to general audiences, but where the company has actual knowledge it is collecting, using, or disclosing personal information of children under 13.[23]   Once covered by COPPA, operators must comply with a number of requirements, including providing a mechanism for verifiable parental consent (VPC) for collecting and processing their child's data; creating a way for parents to access or delete their child's data and revoke VPC; restricting data sharing to third parties; and complying with data retention and security requirements.[24]

COPPA does not apply to general audience apps that are not directed to children under 13 when they do not have actual knowledge of users under 13.[25] General audience apps therefore typically are not built with COPPA-compliant systems.  S.B. 2420, however, would disrupt this status quo by requiring app stores to obtain parental consent for any minor downloading virtually any app, and then to notify the app developer when approval for a download is obtained.  If the user is

---

[23] 16 C.F.R. § 312.3 (2025).

[24] *Id*. §§ 312.3, 312.5, 312.8.

[25] Federal Trade Commission, Complying with COPPA: Frequently Asked Questions, https://www.ftc.gov,business-guidance/resources/complying-coppa-frequently-asked-questions.

under 13, this S.B. 2420 notification could be construed as "actual knowledge" under COPPA that a minor is using an app. If the minor initiates the download, the app would necessarily begin collecting data on the minor, such as IP address and device ID, which is personally identifiable information under COPPA. If the app was not already COPPA-compliant, including means of securing VPC, the app owner could immediately be in violation of federal law because the consent flag in S.B. 2420 only signals parental consent to download an app, not consent to collect personal information about a child under 13, which COPPA requires.

Because S.B. 2420 does not grandfather in existing apps or exempt general audience apps, it forces all businesses with an app available in Texas to choose between two options:

1)    Completely shut off children's access to their services by refusing to permit the download of their app, even with express parental consent, to avoid triggering COPPA; or

2)    Expend considerable resources to modify (if possible) their app to meet COPPA's onerous compliance regime – even though, in the absence of S.B. 2420, COPPA would not apply.

COPPA compliance costs estimates range from $60,000 to $290,000.[26] In addition to the VPC compliance costs, the Act's interaction with COPPA would require the app developer to maintain a paper trail on parents' consent to simply

---

[26] American Action Forum, COPPA 2.0: The Costs of Layering on Liability, (May 18, 2023), *available at* https://www.americanactionforum.org/insight/coppa-2-0-the-costs-of-layering-on-liability/.

download the app.    Under S.B. 2420, the app store's initial parental consent notification only covers the initial download.    But COPPA does not govern "downloads," it governs information collection—two separate, but related, actions. Parents often revoke consent, but under S.B. 2420, this revocation must be effectuated between the parent and the developer, because app stores cannot delete software from an individual's device.    Currently, parents can revoke permission by simply deleting the app and declining permission for future downloads.    But S.B. 2420 would make the app developer into record-keeper for the entire age verification-predicated parental consent mechanism, even though deleting the app is a far easier method, and even though S.B. 2420 and COPPA are intended to limit the gathering and storage of information on minors, not increase it.

For example, a parent may want their 12-year-old to use the delivery app for Mama's Pizza, a Texas restaurant chain, to order pizza on their own.[27]  The Mama's Pizza app must collect location data so the restaurant knows where to deliver. Today, that app is not covered by COPPA because it is not directed to children under 13.  But because S.B. 2420 applies to *any* app a minor tries to download, Mama's Pizza would be notified by the app store that a minor under 13 has (with parental permission) downloaded its app.  This would give Mama's Pizza "actual knowledge" that a minor was using its app, thus triggering COPPA.  Although the parent may

---

[27] Mama's Pizza (TX), Apple.com, https://apps.apple.com/us/app/mamas-pizza-tx/id1113648322.

think their consent applies to both the app's download and use, this is not so.  The S.B. 2420 consent would be only for the download.  Now, because of S.B. 2420, Mama's Pizza would have to obtain COPPA-compliant parental consent, which COPPA requires to collect personal information such as the user's location.  S.B. 2420 would, therefore, require three separate parental consents just to order a pizza: consent to download the app; consent to make a purchase using the app; and consent to collect the personal information necessary for the app to function.  This redundant requirement would be frustrating and confusing for parents.

Even worse, COPPA requires that businesses honor parents' requests to revoke consent, which requires them to keep records associating the child with their parent.[28]  Since S.B. 2420 triggers the need for COPPA compliance for all apps offered in Texas, all such apps paradoxically must now track known users under 13, frustrating the intended purpose of the state law, and indeed all privacy laws, including Texas's Data Privacy and Security Act:  to reduce the amount of data about individuals that businesses collect.  And, because S.B. 2420 mandates that Mama's Pizza delete personal identifying information after verifying the child's age,[29]

---

[28] Federal Trade Commission, Children's Online Privacy Protection Rule: A Six-Step Compliance Plan for Your Business, www.ftc.gov, https://www.ftc.gov/business-guidance/resources/childrens-online-privacy-protection-rule-six-step-compliance-plan-your-business ("If a parent asks, you must … give them a way to revoke their consent and refuse the further use or collection of personal information from their child").

[29] Tex. Bus. & Com. Code § 121.055(b).

Mama's Pizza must choose between complying with COPPA and facing state-court civil lawsuits, or complying with S.B. 2420 and facing FTC enforcement. This is not a trivial issue given that the FTC aggressively enforces even tangential COPPA violations.[30]

Therefore, virtually all Texas entities that publish apps on the stores—from barber shops to pizza parlors and local gyms—would likely have to have their apps modified to comply with both S.B. 2420 and COPPA, regardless of their content or intended audience. This is outside the expertise and usual course of business for a pizza restaurant, so many businesses will have to contract with third-party developers or face crushing civil liability. But even preexisting apps developed by third parties will not guarantee an easy transition. For example, the Mama's Pizza app was developed by Bloinka!, which appears to no longer be in business, making the upgrades necessary to comply with the new S.B. 2420/COPPA system more difficult, if not impossible; many small companies would likely have to develop new apps from scratch.[31]

Moreover, because Texas businesses would have to maintain records on the

---

[30] Cobun Zweifel-Keegan, "A view from DC: The FTC is serious about kids' privacy," Int'l Assoc. of Privacy Professionals, (Sept. 5, 2025), *available at* https://iapp.org/news/a/a-view-from-dc-the-ftc-is-serious-about-kids-privacy; Fed. Trade Comm'n, "Protecting children watching YouTube videos: Lessons learned from FTC's settlement with Disney," (Sept. 2, 2025), *available at* https://www.ftc.gov/business-guidance/blog/2025/09/protecting-children-watching-youtube-videos-lessons-learned-ftcs-settlement-disney.

[31] Bloinka! Apple.com, https://apps.apple.com/us/developer/bloinka/id542674320.

users under 13 that they allow to use their app, and also the children they reject, the costs of compliance will not be a one-time expense. According to one estimate, developers expect that it would cost $20,000-$80,000 per app, just in the first year, to build new systems and come into compliance with developer obligations like those in S.B. 2420, not including the costs associated with creating COPPA-compliant systems. Add COPPA compliance to the already-significant cost associated with S.B. 2420's direct mandates and overall compliance is far more expensive and riskier than initially meets the eye for small businesses in Texas and other entities that may be subject to S.B. 2420's developer obligations. And all of this is compounded by the fact that compliance with S.B. 2420 must begin simultaneously for app stores and app developers, even though the app stores are only just beginning to introduce their compliance tools. Developers building products on a typical 6- to 9-month production cycle are highly likely to fall out of compliance with S.B. 2420, COPPA, or both in 2026, if S.B. 2420 is not enjoined.

Even allowing for the possibility that parents might want to limit their child or teen's access to a pizza delivery app, these burdens will apply to every app in the stores, many of which are completely unrelated to the core purposes of S.B. 2420. Kansas company AGCO, for example, manufactures combines, hay and forage equipment, and planters; it has also produced a suite of apps: several that run telemetry systems for their various agricultural machines, an interactive parts

19

catalog, and a dealer-facing app to facilitate sales. These and other agricultural apps such as those that help with grain silo management and livestock monitoring are entirely irrelevant to the concerns of parents or the interest of children. But any one of them could hypothetically be downloaded by an account labeled as belonging to a minor at potentially any time. If S.B. 2420 goes into force, the developers of these apps and many more like them will have to spend millions of dollars across the ecosystem to add a feature that is meaningless to parents, meaningless to children, and, other than the liability they will face, meaningless to businesses.

## Conclusion

The obligations S.B. 2420 imposes directly on developers, along with those obligations' interaction with federal law, make S.B. 2420 so difficult to comply with that it most likely will result in barring access to protected speech while also placing unacceptable and unintended burdens on small businesses and other entities that may be subject to S.B. 2420's developer obligations. Indeed, whether compliance with both S.B. 2420 and COPPA is even possible is an open question, given that S.B. 2420 appears to require app developers to delete personal information that COPPA requires them to retain. If S.B. 2420 goes into effect, the compliance burden on Texas businesses will be immense and ongoing. And given that the ultimate fate of the law depends on the outcome of these proceedings, the possibility that all this cost and effort will have to be changed or undone if this Court later overturns some or all

20

requirements adds even more uncertainty and potential burden. It is therefore entirely appropriate for the Court to restore the district court's grant of Plaintiff-Appellee's motion for a preliminary injunction while the important constitutional questions raised by S.B. 2420 are fully litigated.

For these reasons, and those in Plaintiff-Appellee's motion, the Court should affirm the district court's grant of a preliminary injunction prohibiting Defendant-Appellant's enforcement of S.B. 2420.

Respectfully submitted,

*/s/ Peter D. Kennedy*
Peter D. Kennedy
Texas Bar No. 11296650
pkennedy@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
512-480-5674 (Phone)

## Certificate of Compliance

This brief complies with the type-volume limitations of Fed. R. App. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains 3,548 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Peter D. Kennedy*
Peter D. Kennedy

## Certificate of Service

I certify that on June 24, 2026, I caused the foregoing Brief of Association for Competitive Technology as Amicus Curiae in support of Plaintiffs-Appellees to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

*/s/ Peter D. Kennedy*
Peter D. Kennedy