Nos. 25-51073 & 26-50001

# In the United States Court of Appeals for the Fifth Circuit

STUDENTS ENGAGED IN ADVANCING TEXAS; M. F., BY AND THROUGH NEXT FRIEND VANESSA FERNANDEZ; Z. B., BY AND THROUGH NEXT FRIEND S.B.,

*Plaintiffs–Appellees,*

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS ATTORNEY GENERAL,

*Defendant–Appellant.*

*consolidated with*

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

*Plaintiff–Appellee,*

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS,

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## REPLY BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

JEFFREY A. STEPHENS
Assistant Solicitor General
Jeff.Stephens@oag.texas.gov

MOHMED I. PATEL
TEVIN J. LONG
Assistant Attorneys General

*Counsel for Defendant–Appellant*

# TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................... ii

Introduction ................................................................................................ 1

Argument .................................................................................................... 3

    I.   The District Court Erred in Determining that Plaintiffs Are
Likely to Succeed in Their Challenges to SB2420. .................................... 3

       A.  SB2420 is not subject to strict scrutiny. ............................................ 3

          1.  SB2420 regulates, at most, commercial speech. ......................... 3

          2.  SB2420 serves purposes unrelated to the content of
software applications. ...................................................... 5

          3.  *Brown* is distinguishable. ...................................................... 7

          4.  The district court erroneously relied on two exceptions to
the parental-consent provisions to apply strict scrutiny. ............... 8

          5.  The Court should not reach alternative arguments on prior
restraint or compelled speech. .................................................. 12

       B.  SB2420 passes intermediate scrutiny. .............................................. 13

          1.  SB2420 advances important governmental interests
unrelated to the suppression of free speech. .............................. 13

          2.  No provision of SB2420 burdens more speech than
necessary to further Texas's interests. ...................................... 16

       C.  The district court failed to conduct the required facial-
invalidity analysis under *Moody*. ................................................. 16

       D.  SB2420's terms are not unconstitutionally vague. ............................ 19

       E.  The injunction orders fail to apply the severability clause. ................ 21

       F.  At a minimum, the district court erred by entering universal
injunctions. ............................................................................... 22

    II.  Plaintiffs Have Not Shown That They Will Be Seriously and
Irreparably Harmed, and Equity Favors Texas. ....................................... 24

Conclusion and Prayer ............................................................................... 26

Certificate of Compliance ........................................................................... 27

# Table of Authorities

**Cases:**

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) .................................................................... 9, 10, 11, 12, 21

*Batiansila v. Advanced Cardiovascular Sys., Inc.*,
952 F.2d 893, 896 (5th Cir. 1992) .................................................................... 22

*Bd. of Trs. v. Fox*,
492 U.S. 469 (1989) .................................................................... 10

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) .................................................................... 13

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .................................................................... 5

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) .................................................................... 7, 8, 11, 16

*Browning v. Kramer*,
931 F.2d 340 (5th Cir. 1991) .................................................................... 12

*CCIA v. Paxton*,
No. 25A1390 (U.S. July 6, 2026) .................................................................... 2, 25

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .................................................................... 11

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) .................................................................... 6, 7

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) .................................................................... 14

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .................................................................... 13, 15

*Gussin v. Nintendo of Am., Inc.*,
62 F.3d 1433 (Fed. Cir. 1995) .................................................................... 14

*Montano v. Texas*,
867 F.3d 540 (5th Cir. 2017) .................................................................... 12

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .................................................................... 11, 17, 19, 26

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................... 24

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) ................................................................ 14

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ............................................................ 5, 9

*SEAT v. Paxton*,
   No. 25A1389 (U.S. July 6, 2026)..................................... 2, 25

*Shuttlesworth v. Connor*,
   291 F.2d 217 (5th Cir. 1961) ................................................ 24

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ................................................................ 4

*TikTok Inc. v. Garland*,
   604 U.S. 56 (2025) .............................................................. 5, 6

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ......................................................... 22, 23

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)........................................................ 6, 7, 13

*Turner Broad. Sys., Inc. v. FCC*,
   520 U.S. 180 (1997)...............................................................13

*United States v. Hansen*,
   599 U.S. 762 (2023) ...............................................................19

*United States v. O'Brien*,
   391 U.S. 367 (1968) ................................................................ 7

*United States v. Vicencio*,
   647 F. App'x 170 (4th Cir. 2016) ......................................... 12

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ................................................................ 5

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ...............................................................15

## Constitutional Provisions and Statutes:

U.S. Const. amend. I....................................................................*passim*

42 U.S.C. § 1983 .................................................................... 23

Act of May 19, 2025, 89th Leg., R.S., ch. 200, § 2,
   2025 Tex. Gen. Laws 385.................................................11

Tex. Const. art. I, § 37 ...............................................................15

Tex. Bus. & Com. Code

§ 121.021 ...............................................................................19, 20

§ 121.022................................................................................ 4, 10

§ 121.025 ..................................................................................... 4

§ 121.026(a)(1) ............................................................................ 4

§ 121.053(b) ............................................................................... 20

§ 121.056(a)(2) .......................................................................... 21

§ 121.056(b) ..............................................................................19

Tex. Educ. Code § 32.151 ............................................................ 10

Tex. Gov't Code

§ 311.032(a).................................................................................11

§ 311.032(c).................................................................................11

**Other Authorities:**

Eldar Haber & Tammy Harel Ben Shahar, *Algorithmic Parenting*,
32 Fordham Intell. Prop. Media & Ent. L.J. 1 (2021) ........................................15

H.J. of Tex., 89th Leg., R.S. 3578 (2025) ................................................. 6

H.J. of Tex. 89th Leg., R.S. 3579 (2025) ................................................. 8

Nila Bala, *Policing Children's Data*,
103 Wash. U.L. Rev. 249 (2025) ....................................................................15

# INTRODUCTION

Plaintiffs attempt to compare SB2420 to "compel[ling] a bookstore to screen patrons and stop minors from buying books without their parents' permission." SEAT Br. 2; *see* CCIA Br. 1. But Plaintiffs' analogy breaks down in at least two key ways. First, SB2420 does not target books or even software applications with speech elements. Second, purchasing a book does not require a child to agree to being monitored by the author or to having the child's private data sold.

In contrast, a minor child who downloads a software application from an app store agrees to contractual terms of service, including whether the child's location will be tracked, whether the child's privacy will be protected, whether information from the child's phone can be sold by the developer, and whether the child waives the right to sue. Before allowing minor children to acquire products from app stores and agree to these terms, Texas requires parental consent, including disclosures to parents about the product and contract terms. With only narrow exceptions (and only for parental consent), these requirements apply to any application available on an app store—from calculators and measuring tools to social media and e-books— regardless of its content and regardless of whether it would receive any First Amendment protection.

In granting Texas's motion to stay the district court's injunctions pending appeal, this Court held, "Texas has made a strong showing that it is likely to succeed on the merits of its claim that the district court committed several reversible errors." No. 25-51073, Dkt. 91-1 at 2-3 ("Stay Order"). SEAT and CCIA each filed applications requesting the Supreme Court of the United States to vacate this Court's stay,

1

but these applications were denied without reported dissent. *SEAT v. Paxton*, No. 25A1389 (U.S. July 6, 2026); *CCIA v. Paxton*, No. 25A1390 (U.S. July 6, 2026).

Plaintiffs' response briefs deflect from the core issues presented by Texas on appeal. Plaintiffs ask the Court to look only at particular software applications and, at the same time, seek to uphold facial invalidation of the entire App Store Accountability Act. Plaintiffs do not attempt to defend some portions of the district court's orders. Plaintiffs also suggest this Court should affirm the injunctions on grounds the district court did not reach, such as prior restraint or compelled speech. Those alternative arguments fail, but even if they had merit, this Court should decline to reach them in the first instance on appeal.

The Court should reverse the district court's preliminary injunction orders on any or all of the grounds presented in the State's opening brief.

# ARGUMENT

The district court erred in granting preliminary injunctions against enforcement of SB2420. Plaintiffs did not demonstrate a likelihood of success in their challenges to SB2420 and none of the other injunction factors support them.

## I. The District Court Erred in Determining that Plaintiffs Are Likely to Succeed in Their Challenges to SB2420.

### A. SB2420 is not subject to strict scrutiny.

#### 1. SB2420 regulates, at most, commercial speech.

As the State's opening brief explained (at 17-23), SB2420 at most regulates commercial speech and is, therefore, subject to no more than intermediate scrutiny. *Cf.* Stay Order 4 n.7. ("SB2420 may not regulate speech at all, given that it does not target any substantive content but instead regulates commercial conduct with an incidental relationship to speech.").

The district court held that "SB 2420 is not a regulation on commercial speech" and that strict scrutiny applies to all provisions of the law. ROA.26-50001.1163; ROA.25-51073.679. The district court's analysis was premised on "targeted advertising requirements," but SB2420 has no such provisions.[1] *See* Appellant Br. 20. Neither SEAT nor CCIA explains the district court's reliance on "targeted advertising" provisions in determining that SB2420 does not regulate commercial speech.

SEAT (at 21-23) and CCIA (at 28-29) attack a strawman in arguing that it is irrelevant that software applications are distributed for profit. The State has not

---

[1] The district court noted that it had previously enjoined HB 18, which does include these provisions. ROA.26-50001.1155.

argued that any expression in software applications is entitled to less protection because those applications are sold for profit. Instead, SB2420 regulates commercial speech because it addresses only speech proposing a commercial transaction.

Plaintiffs do not deny that listing a software application on an app store proposes a commercial transaction with a user and that a user must agree to contractual terms and conditions, potentially waiving important privacy rights, to download a software application. *See* Appellant Br. 18-19; *cf.* Stay Order 3 ("[U]sers browsing an app store can see a catalog of applications, obtain additional information, and download or purchase an application."). SB2420's parental consent provisions are premised on those facts, and SB2420 regulates the conditions on which minors may enter these contracts. Stay Order 3 n.3 (citing §§ 121.022(f)(1)(D), .025, .026(a)(1)).[2]

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). In the same way that the State can deny drivers' licenses to children under sixteen, even though some fourteen-year-olds may wish to drive to a bookstore and purchase a book, the State can restrict children's downloads of software applications to mobile devices as a product category, even if some children may wish to use applications to engage in expressive conduct. *See* Dkt. 62 at 7-8 (Tech Scholars Amicus Br. noting other restrictions on minors, including tattooing). SEAT and CCIA are wrong to suggest that because some software applications disseminate

---

[2] Unless otherwise noted, citations to section 121 are to the App Store Accountability Act, codified at Texas Business & Commerce Code chapter 121.

content protected by the First Amendment, the State cannot regulate the commercial activity between minors, app stores, and developers.

### 2.  SB2420 serves purposes unrelated to the content of software applications.

Plaintiffs misread precedent in arguing that strict scrutiny applies because SB2420 has a "content-based justification." SEAT Br. 30-32; CCIA Br. 34-36. Like the district court, they treat this test as one of legislative intent, suggesting that if a discussion of content can be found in the legislative history, then a "content-based justification" has been offered for the law, so strict scrutiny applies.

As an initial matter, Plaintiffs fail to grapple with the Supreme Court's precedent regarding legislative intent, which concerns "the legislature as a whole." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). Regardless of what a bill's sponsor said, "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents," and courts cannot assume a shared impermissible intent. *Id.*

More significantly, Plaintiffs' use of legislative history misapplies Supreme Court precedent. Strict scrutiny applies to laws that "*cannot be justified* without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (emphasis added; internal quotation marks omitted); *see also TikTok Inc. v. Garland,* 604 U.S. 56, 70 (2025) (per curiam) (same). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

5

On its face, SB2420 serves purposes unrelated to the content of expression: It supports the ability of parents to make decisions regarding the upbringing of their children, which applications children have access to, and the terms on which children enter contracts. H.J. of Tex., 89th Leg., R.S. 3578 (2025). That rationale is content-agnostic: It neither references the content of protected communication through applications nor reflects disagreement with any message conveyed by any application. *TikTok*, 604 U.S. at 72. To the contrary, SB2420 leaves control over applications—including decisions about the content to which children should be exposed—entirely within the hands of parents.

SB2420's content neutrality is confirmed by the fact that software developers cannot avoid the laws' burdens by altering the content of their software. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994) ("[A]n operator cannot avoid or mitigate its obligations under the Act by altering the programming it offers to subscribers."); *id.* at 645 (noting that a burden "extends to all cable programmers irrespective of the programming they choose to offer viewers").

Plaintiffs and the district court err by transforming the Supreme Court's test—whether a regulation *can be* justified without reference to the content of expression—into an inquiry into legislative history. In *City of Renton v. Playtime Theatres, Inc.*, the Supreme Court rejected the proposition that "if '*a motivating factor*' in enacting [an] ordinance was to restrict respondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played." 475 U.S. 41, 47 (1986). To the contrary, *Renton* reaffirmed that "this Court will not strike down an otherwise constitutional statute on the basis of

6

an alleged illicit legislative motive." *Id.* at 48 (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Id.* (quoting *O'Brien*, 391 U.S. at 384); *see also Turner Broad. Sys.*, 512 U.S. at 652 ("Appellants' ability to hypothesize a content-based purpose for these provisions . . . does not cast doubt upon the content-neutral character."). What matters is "[t]he scope and operation of the challenged provisions." *Turner Broad. Sys.*, 512 U.S. at 649. Because the scope and operation of the challenged provisions of SB2420 are justified without any reference to any protected content, they are not subject to strict scrutiny.

### 3. *Brown* is distinguishable.

The State's opening brief (at 20-21) explained why the district court was mistaken to rely on *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), to apply strict scrutiny to SB2420. SEAT argues (at 21) that *Brown* rejected the argument that "[s]peech is . . . commercial conduct just because its dissemination takes the form of a transaction." CCIA argues (at 30) that "*Brown* makes clear that even laws targeting only commercial transactions with minors are subject to strict scrutiny where what is being sold is protected speech." Again, Plaintiffs attack arguments that Texas has not made and ignore that SB2420 does not target the sale of speech, unlike in *Brown*.

*Brown* involved a content-based restriction on "violent" videogames. California attempted to "create a wholly new category of content-based regulation that is permissible only for speech directed at children." 564 U.S. at 794. There was no

"longstanding tradition in this country of specially restricting children's access to depictions of violence." *Id.* at 795. California "impose[d] a restriction on the content of protected speech." *Id.* at 799. Because California applied its rule only to "violent" videogames, its invocation of parental authority was unavailing: The law's content-based "effect [wa]s only in support of what the State thinks parents *ought* to want." *Id.* at 804.

Nothing of the sort is at issue in SB2420. Rather than single out a particular category of software applications for disfavored treatment based on their content, the State evenhandedly applies its regulation to all software applications, regardless of their content (and regardless of whether they convey any protected expression at all). This was a conscious choice by the Texas Legislature, which "d[id] not want to discriminate against apps." H.J. of Tex. 89th Leg., R.S. 3579 (2025). SB2420 does not tell parents what they *ought* to want but supports parents in whatever choices parents make in deciding which software applications their children should have access to and what contracts their children should enter. *Brown* also did not involve requiring a child to agree to being monitored by the video game creator or seller or having the child's private data sold. Unlike the law at issue in *Brown*, SB2420 is content-neutral, subject at most to intermediate scrutiny.

### 4. The district court erroneously relied on two exceptions to the parental-consent provisions to apply strict scrutiny.

The district court erroneously deemed two exceptions to SB2420's consent provisions to be "coverage definitions" to justify labeling the entire law "content-based" and applying strict scrutiny, as explained in the State's opening brief (at 26-

32). *See* ROA.26-50001.1156, ROA.26-50001.1162, ROA.25-51073.673-74, ROA.25-51073.678. Plaintiffs do not defend the district court's mistaken reliance on the concept of "coverage definitions"[3] but nonetheless suggest that these exceptions "trigger strict scrutiny" for the entire law. *See* SEAT Br. 34-37; CCIA Br. 37-40.

Plaintiffs argue the State's explanation for the emergency services exception relies on "wordplay," SEAT Br. 36, or that the Legislature merely "add[ed] a speaker-based component to a content-based provision," CCIA Br. 37, but the vital function of emergency services and the detailed provisions relating to the regulation of user data covered by the exceptions undercut Plaintiffs' arguments that the exceptions are merely disguised content-based exceptions.

**1.** Unlike in *Barr*, the exceptions to SB2420's parental consent provisions do not "focu[s] on whether the [app developer] is *speaking* about a particular topic." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 620 (plurality op.). The exceptions are a far cry from the content-based exceptions at issue in *Barr*. *See id.* at 619 ("This statute singles out calls 'made solely to collect a debt owed to or guaranteed by the United States,' not all calls from authorized debt collectors."). Because the exceptions to SB2420 are not content-based, they are not subject to strict scrutiny. *See id.* at 619–20 (providing that a content-based restriction requires "the legislature's speaker preference [to] reflect[] a content preference" (internal quotation marks omitted)) (quoting *Reed*, 576 U.S. at 170).

---

[3] SEAT's brief (at 12, 15, 34) repeats the same error without explanation.

**2.** Moreover, unlike in *Barr*, the exceptions to the parental-consent requirements do not exempt the two categories entirely but instead apply different burdens. To qualify for the emergency-services exception to parental consent, a software application must (1) "provid[e] a user with direct access to emergency services," (2) strictly limit data collection to particular information; (3) "allow[] a user to access and use the software application without requiring the user to create an account," and (4) be operated by or in partnership with a governmental entity, a non-profit organization, or an authorized emergency service provider. § 121.022(h)(1)(A)–(D). The test-administrator exception requires compliance with strict data privacy laws. *See id.* § 121.022(h)(2)(B) (requiring compliance with Tex. Educ. Code § 32.151, *et seq.*).

In *Barr*, the law at issue "favor[ed] speech made for collecting government debt over political and other speech." *Id.* at 619 (plurality op.). Given the other restrictions on emergency services and test-administrator entities, Plaintiffs cannot show that this speech is "favored." At most, they can say that these software applications are regulated differently, but under intermediate scrutiny, "fit" need only be "reasonable," not "perfect." *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989) ("Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.").

**3.** Even if the exceptions were treated as content-based, under *Barr*, the district court erred by applying strict scrutiny to enjoin enforcement of the statute as a whole (or even the parental-consent provisions as a whole). 591 U.S. at 622–24 (plurality

10

op.). Plaintiffs' briefs do not explain how the district court's analysis is consistent with *Barr*. *See* SEAT Br. 34-37; CCIA Br. 37-40.

First, the emergency-services exception likely survives strict scrutiny, for the reasons given in the State's opening brief (at 28). At a minimum, Plaintiffs have not shown that the emergency-services exception fails strict scrutiny in substantially more applications than not. *Moody*, 603 U.S. at 723–24.

Second, if it were deemed to be content- rather than speaker-based, the test-administrator exception might not pass strict scrutiny, but it would not justify enjoining enforcement of the parental-consent requirements as a whole.

As in *Barr*, the exception "is only a slice of the overall [software application] landscape." 591 U.S. at 622 (plurality op.). "This is not a case where a restriction on speech is littered with exceptions that substantially negate the restriction." *Id.*[4] The exception for test administrators does not "diminish the credibility of the government's rationale for [SB2420] in the first place." *Id.* (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994)). As in *Barr*, a narrow exception to a broad law—even if content-based—does not lead to enjoining enforcement of the law as a whole.

As a result, ordinary severability principles apply. As explained in the State's opening brief (at 30), SB2420 contains a robust severability provision. 89th Leg., R.S., ch. 200, § 2, Tex. Gen. Laws 385–90 (ROA.26-50001.388-89); *see also* Tex. Gov't Code § 311.032(a) ("If any statute contains a provision for severability, that provision prevails in interpreting that statute."); Tex. Gov't Code § 311.032(c).

---

[4] This contrasts sharply with *Brown*, in which the California law targeted only a small category of videogames based on their content. 564 U.S. at 794.

11

Even if one or both of the statute's limited exceptions to parental consent were problematic, the district court failed to follow the Act's severability provision. *See Barr*, 591 U.S. at 614 (plurality op.) ("[S]even Members of the Court conclude that the entire 1991 robocall restriction should not be invalidated, but rather that the 2015 government-debt exception must be invalidated and severed from the remainder of the statute."). CCIA cites no authority to support its argument (at 39) that severability would only apply in a case like *Barr* where the exception was added long after the more general provision was enacted.

> **5. The Court should not reach alternative arguments on prior restraint or compelled speech.**

The district court did not reach SEAT's argument that SB2420 creates a system of prior restraints. ROA.25-51073.687. On appeal, SEAT urges (at 26-30) this Court to address these arguments in the first instance. CCIA argues (at 53-54) that SB2420's age-rating provisions compel speech and trigger strict scrutiny, but the district court did not rely on a compelled-speech theory in applying strict scrutiny. "'As a court for review of errors,' [this Court does] 'not . . . decide facts or make legal conclusions in the first instance,' but 'review the actions of a trial court for claimed errors.'" *Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017) (quoting *Browning v. Kramer*, 931 F.2d 340, 345 (5th Cir. 1991)). "In other words, 'a court of appeals sits as a court of review, not of first view.'" *Id.* (quoting *United States v. Vicencio*, 647 F. App'x 170, 177 (4th Cir. 2016) (per curiam)). Thus, this Court should not reach these alternative arguments.

Even if the Court did reach the issues of prior restraint and compelled speech, the arguments change nothing. SEAT does not cite a prior restraint case that is on point, as neither age verification nor parental consent under SB2420 involves the government making any determination about the content of speech. And the age rating and content required under SB2420 is not like the ratings in *Book People, Inc. v. Wong*, where the statute itself "required vendors to undertake contextual analyses, weighing and balancing many factors to determine a rating for each book" according to the State's criteria. 91 F.4th 318, 340 (5th Cir. 2024).

### B.  SB2420 passes intermediate scrutiny.

The State's opening brief (at 23-26) explained how SB2420 passes intermediate scrutiny because each provision "'advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 495–96 (2025)) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

### 1.  SB2420 advances important governmental interests unrelated to the suppression of free speech.

Like the district court, Plaintiffs incorrectly insist that the State was required to support its legislative judgments with empirical evidence at the preliminary injunction stage. *See* SEAT Br. 43-47; CCIA Br. 42-43. But "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broad. Sys.,* 512 U.S. at 665. It is sufficient that it

be "apparent" that "[SB2420] narrowly focuses on the Government's substantial interest." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984) (recognizing that a sleeping ban serves the government's interest "in maintaining the parks in the heart of our Capital in an attractive and intact condition").

As detailed in the amicus brief of the Institute for Family Studies, Dkt. 73-1, the digital world places new demands on parents, making it challenging to fulfill their traditional role in raising children. *See Packingham v. North Carolina*, 582 U.S. 98, 118 (2017) (Alito, J., concurring in the judgment) ("Cyberspace is different from the physical world."). Parents can observe physical objects possessed by their children in their homes and are ordinarily involved in acquiring them. Seven-year-olds, for example, need their parents to take them to a bookstore or a library. *Cf. id.* ("[I]t is easier for parents to monitor the physical locations that their children visit and the individuals with whom they speak in person than it is to monitor their Internet use[, and] if a sex offender is seen approaching children or loitering in a place frequented by children, this conduct may be observed by parents, teachers, or others."). Even early videogame systems involved games played on televisions observable by parents. *See Gussin v. Nintendo of Am., Inc.*, 62 F.3d 1433 (Fed. Cir. 1995) (unpublished table decision) ("Nintendo sells the 'Super Nintendo Entertainment System' (SNES), a home video game system that allows a user of the system to play an assortment of video game cartridges on an ordinary television monitor.").

But the modern digital world is different. A child with access to an app store and a mobile device (such as a tablet or smartphone) can potentially download any number of software applications, potentially agreeing to invasions of the child's privacy

and sale of the child's data and be exposed to any conceivable content without parental consent or even parental knowledge. *See* Eldar Haber & Tammy Harel Ben Shahar, *Algorithmic Parenting*, 32 Fordham Intell. Prop. Media & Ent. L.J. 1, 12–13 (2021) (explaining that "children may be exposed to online dangers while out of their parents' sight" and that "online activity is time-consuming and difficult to monitor"); Nila Bala, *Policing Children's Data*, 103 Wash. U.L. Rev. 249, 286 (2025) ("Due to cell phones' compact size and the tendency to carry them around all the time, parents find smartphones (as compared to televisions or computers) particularly difficult to monitor.").

The district court erred by dismissing the State's important interest in advancing parental consent. Before SB2420, minor children could contract away their data and privacy rights to app stores and software developers. Curbing this practice—and empowering parents—falls squarely within Texas's core police powers of consumer protection, contract capacity, and child protection. Tex. Const. art. I, § 37; *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Free Speech Coal.*, 606 U.S. at 479 ("Requiring age verification is common when a law draws lines based on age."); *Free Speech Coal.*, 606 U.S. at 483 ("[A]dults have no First Amendment right to avoid age verification[.]"); *c.f.* Stay Order 5 ("Requiring age verification, parental consent, and app-related content ratings likely directly and materially advances Texas's substantial interest in protecting children's data, safety, and privacy in a digital world.").

15

### 2. No provision of SB2420 burdens more speech than necessary to further Texas's interests.

As explained in the State's opening brief (at 25-26), protecting parents' ability to make choices regarding their children's upbringing properly applies to all software applications available on app stores. CCIA (at 64) suggests that Texas should "tailor [SB2420's] requirements to [a] more targeted category of apps."

Narrower laws hypothesized by Plaintiffs and the district court would require the sort of content-based distinctions that this Court rejected in *Brown*. *See* ROA.26-50001.1165 (criticizing the State for not creating content-based exceptions or "narrowly target[ing] regulations toward apps that . . . have specific addictive qualities" and suggesting that the State restrict only "the subset of apps which contain harmful material"); ROA.26-50001.1166 (noting that the "same [harmful] content offered via apps remains available to minors" through other means).[5] Far from supporting the district court's conclusion, the fact that SB2420 does not serve the content-based purpose hypothesized by the district court confirms its error. SB2420 is a content-neutral regulation that empowers parents to make decisions about minor children's access to software applications on mobile devices, a purpose for which it is neither over- nor under-inclusive.

### C. The district court failed to conduct the required facial-invalidity analysis under *Moody*.

The district court did not consider the full scope of SB2420's applications and did not weigh constitutional applications against any unconstitutional ones as

---

[5] Neither Plaintiffs nor the district court explain how SB2420's text would entirely exclude native software applications.

required by *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), as the State's brief explains (at 32-35).

CCIA argues (at 60) that the State forfeited any *Moody* argument, but the argument was raised at the combined hearing before the district court. ROA.26-50001.1311 ("Plaintiffs haven't carried their burden to prove that they succeed under *Moody*."). And even if it had not been raised, *Moody* itself demonstrates that a court cannot facially invalidate without the required analysis, and Plaintiffs bear the burden of ensuring that happens. 603 U.S. at 744 ("The need for [the plaintiff] to carry its burden on those issues is the price of its decision to challenge the laws as a whole.").

CCIA also argues that it can avoid *Moody* because "CCIA brought a facial challenge with respect to app stores, rather than developers." CCIA Br. 61 (emphasis omitted). But this is no answer: CCIA continues to argue that SB2420 is unconstitutional because minors use software applications from mobile app stores to access speech protected by the First Amendment, CCIA Br. 23-24, so to address CCIA's argument, courts must consider the full scope of applications (including different software applications) of the statutory provisions that CCIA alleges to be constitutionally infirm. When this Court instructed courts to "explore the laws' full range of applications," *Moody*, 603 U.S. at 726, it did not instruct them to consider only the entities to which the law would directly apply. In addition, the district court's conclusion that SB2420 would fail strict scrutiny analysis is limited to considering "minors' access to every single category of speech," ROA.26-50001.1164, and does not address any other argument about speech rights of app stores or developers.

17

Like the district court, SEAT asserts that only "a narrow subset of content avail-able on apps (like obscenity) may be unprotected," SEAT Br. 48-49, but there is no basis for this assumption in the record. SEAT argues that "[i]t is common sense" that software applications disseminate information protected by the First Amend-ment. SEAT Br. 50-51. This may well be true of some software applications available for mobile devices, but no one asserts that every software application disseminates protected material.

For the first time before this Court, SEAT attempts to quantify the number of applications that disseminate material protected by the First Amendment, citing an article for the proposition that "about 54.9%" of software applications available on the Apple App Store "involve games, news, music, books, entertainment, sports, education, social media, health or fitness instructions, travel information and re-views, photography, lifestyle, and reference apps like Wikipedia." SEAT Br. 53. The article was not presented to the district court, and even if this Court considered it, the article (1) was last updated January 2025 and does not reflect the current makeup of the Apple App Store, (2) relies on the Apple App Store's broad categories rather than analyzing specific software applications themselves, and (3) does not give any information about the Google Play Store or Amazon Appstore. Even crediting SEAT's assumption that the content-neutral commercial regulations of SB2420 can-not constitutionally be applied to software applications that disseminate protected speech, the article fails to carry SEAT's burden to show that "the ratio of unlawful-to-lawful applications is . . . lopsided enough to justify the strong medicine of facial

invalidation." *United States v. Hansen*, 599 U.S. 762, 784 (2023) (internal quotation marks omitted).

Without a proper facial invalidity analysis under *Moody*, which may not even be possible for the app store environment, the district court's injunctions must be reversed or at least vacated. *Cf.* Stay Order 7 n.19 ("Insofar as there may be any unconstitutional application of SB2420, the district court failed to conduct a proper facial-invalidity analysis under *Moody* . . . .").

### D.  SB2420's terms are not unconstitutionally vague.

The State explained in its opening brief (at 36-39) how SB2420's age ratings requirement and the terms "material[] changes" and "new opportunities to make a purchase" are not unconstitutionally vague.

SB2420 provides that developers who in "good faith" apply "widely adopted industry standards" are not liable for an incorrect age rating. Appellant Br. 36 (citing § 121.056(b)). CCIA appears to argue that the Act's "good faith" defense for using industry standards is illusory because "[t]he Act's age categories do not align with industry standards." CCIA Br. 57-58 (citing, *e.g.*, ROA.26-50001.401-02 ¶ 34). The age categories used by Apple and Amazon match the statute exactly. *Compare* ROA.26-50001.401-02 ¶ 34, *with* Tex. Bus. & Com. Code § 121.021(b). That Apple has two categories that fit within 0-12 years of age ("4+" and "9+" as distinct from "13+" and higher age categories) is of no consequence, since anything rated for either of these categories is rated for a "child" as defined in SB2420 (under 13 years of age). The same is true of Google's "0-9" and "10+" categories, which together also coincide with the Act's "child" category. Although Google uses 13-16 and 17

19

years instead of 13-15 and 16-17 years as specified in section 121.021(b) of the Act, SB2420's combining of 16 and 17 years of age into one category suggests anything properly rated under Google's 17 years of age category is appropriately rated under the Act's 16-17 category for purposes of good faith application of widely used industry standards.

On the "material[] changes" and "new opportunities to make a purchase" terms, the State's brief (at 37-39) highlighted context that provided guidance on the meaning of these terms, suggested that a material change is one that has the capacity to influence a parent's decision on whether to consent to their child's continued use of an app, and noted the widespread use of the term "material change" in contracts, laws, regulations, and judicial decision-making. SEAT argues (at 54-55) that the "capacity to influence" standard "provides no guidance to app stores, who cannot know what considerations may influence any parent," and suggests parents will differ on what may influence their decisions. An app store that "cannot know what considerations may influence any parent" likely should not provide apps to children at all. And the fact that different parents may be influenced by different considerations suggests only that "material changes" may be broad and not that it is vague. CCIA complains (at 59) that the State does not provide an advisory opinion on specific questions it poses, but the State need only demonstrate that SB2420 provides the guidance needed for understanding the challenged terms. *Cf.* Stay Order 8 ("The district court also likely erred in determining that the terms 'new opportunities to make a purchase' and 'material[] changes' in section 121.053(b) are unconstitutionally vague."). "Regardless, any of these phrases can be severed because the rest of

SB2420 is 'capable of functioning independently' and 'fully operative.'" *Id.* at 9 (quoting *Barr*, 591 U.S. at 628).

### E.  The injunction orders fail to apply the severability clause.

As explained in the State's opening brief (at 39-40), the district court did not apply the strong severability provision in the Act in assessing Plaintiffs' likelihood of success on the merits. In addition to potentially severing either exception to the parental consent provisions or a term deemed unconstitutionally vague, any provision deemed facially invalid would be severed in accordance with the severability clause.

SEAT contends (at 59) that the parental consent provisions cannot be severed because the age verification requirements would serve no purpose without parental consent. As explained in the State's opening brief (at 39-40), requiring age verification to be performed by app stores and developers would serve the laudable purpose of preventing developers from exploiting a loophole in federal law (COPPA) meant to protect children under 13 on the basis that they do not know the age of their users (despite the app store being aware). CCIA suggests (at 51-52) without authority that severability is not considered for each separate provision of the law and all provisions may simply be invalidated if the "core" (as defined by CCIA) is suspect. CCIA (at 51) is also incorrect that the age rating provisions would not serve the valuable function of disclosure to consumers even if they were not used in obtaining parental consent. And, as one final example, even the Act's clarification that there is liability for a developer who "knowingly misrepresents an age rating," § 121.056(a)(2), serves an important purpose, even standing alone.

### F. At a minimum, the district court erred by entering universal injunctions.

The State's opening brief (at 40-41) explained that the universal injunctions issued by the district court exceeded what was necessary to redress Plaintiffs' alleged injuries and thus exceeded the limits of the court's equitable authority. *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025).

CCIA argues (at 65) that Texas forfeited this argument. But Plaintiffs never briefed the proper scope of injunctive relief, ROA.26-50001.327-82; ROA25-51073.74-103, and CCIA requested that the State be enjoined from enforcing SB2420 "against CCIA members," ROA.26-50001.380. The State cannot be faulted for not answering arguments not made. In addition, *CASA* frames the issue as a limit on courts' power. *See, e.g.*, 606 U.S. at 837. Such an error is likely not subject to forfeiture, and this Court can address an issue when it is "a pure question of law, and failure to consider it would result in a miscarriage of justice." *Batiansila v. Advanced Cardiovascular Sys., Inc.*, 952 F.2d 893, 896 (5th Cir. 1992).

CCIA also contends (at 65) that if "the injunction protected only CCIA's app stores and developers, then third-party developers would need CCIA's member app stores to engage in age verification and parental consent to comply with the Act." CCIA's argument regarding relief to developers is inconsistent with its assertion that it "brought a facial challenge with respect to app stores, rather than developers." CCIA Br. 61 (emphasis omitted). Beyond that, the argument highlights the lack of consideration for what relief would be necessary for any particular constitutional violation, especially considering the requirement to sever any specific provision

22

deemed unconstitutional. For example, the district court did not consider whether it would violate an app store's constitutional rights if it was merely required to display an age rating provided by a developer or to perform age verification.

SEAT argues (at 60-61) that *CASA* is inapplicable because *CASA* was decided based on the equitable authority that federal courts possess under the Judiciary Act of 1789. SEAT correctly notes that *CASA* does not construe 42 U.S.C. § 1983, but SEAT identifies no provision of § 1983 (or any other statute) that expands the equitable authority of the courts to providing relief to non-parties. "A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power." *CASA*, 606 U.S. at 841. One non-binding district court opinion to the contrary is not persuasive. *See* SEAT Br. 61.

SEAT next argues "app stores need to *identify* which of their users are Appellees to allow them to bypass the State's restrictions, imposing the exact gating measure Appellees sued to enjoin." SEAT Br. 61. But identifying the SEAT plaintiffs for purposes of limiting the scope of the injunction would not be equivalent to enforcing SB2420 against them, and even if identification were considered a burden or the SEAT plaintiffs were unable to engage in speech with other minors who did not obtain parental consent, SEAT Br. 61-62, such minimal burdens would not justify a universal injunction, *cf. CASA*, 606 U.S. at 853–54 ("After all, to say that a court *can* award complete relief is not to say that it *should* do so. Complete relief is not a guarantee—it is the maximum a court can provide.").

## II. Plaintiffs Have Not Shown That They Will Be Seriously and Irreparably Harmed, and Equity Favors Texas.

The remaining injunction factors favor Texas, as explained in its opening brief (at 41-43). Nothing in Plaintiffs' briefing shows otherwise, and the motions panel confirmed Texas's "strong showing on the other stay factors," Stay Order 9, which correspond with the preliminary injunction factors.

The motions panel recognized that "Texas has a substantial, if not compelling, interest in protecting children, and parents need to have the necessary information to make informed choices affecting their children's upbringing." *Id.* at 10. SEAT also concedes that Texas has a sovereign interest in enforcing SB2420. SEAT Br. 58 ("Parents' discretion over the care, custody, and control of their children constitutes perhaps the oldest of the fundamental liberty interests recognized by our Constitution." (internal quotation marks omitted)).

"Any purported burden on app stores and developers is minimal because SB2420 requires only 'commercially reasonable' verification methods and allows developers to use 'widely adopted industry standards' in determining age ratings and those related to corresponding content." Stay Order 10. CCIA contends its members will suffer "unrecoverable compliance costs," as well as "[t]he loss of First Amendment freedoms." CCIA Br. 66; *cf.* SEAT Br. 56-58 (alleging only non-monetary First Amendment harm). But an injunction to remedy that harm is "not generally regarded as a matter of right," *Shuttlesworth v. Connor*, 291 F.2d 217 (5th Cir. 1961)— "even if irreparable injury might otherwise result," *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks omitted). It is "instead an exercise of judicial

discretion . . . dependent upon the circumstances of the particular case." *Id.* Plaintiffs have not satisfied that burden here.

And even if SB2420 imposes compliance costs on CCIA members, nothing changes: only a few weeks ago, this Court's motions panel correctly concluded that SB2420, a content-neutral regulation of commercial transactions, likely complies with the First Amendment. The Supreme Court has rejected Plaintiffs' attempts to vacate that decision. *SEAT v. Paxton*, No. 25A1389 (U.S. July 6, 2026); *CCIA v. Paxton*, No. 25A1390 (U.S. July 6, 2026). Because SB2420 complies with the First Amendment and passes constitutional muster, this Court should reverse the district court's erroneous holding to the contrary. "The balance of equities and public interest are clearcut in Texas's favor." Stay Order 10.

## Conclusion and Prayer

For these reasons, this Court should reverse the district court's orders granting facial preliminary injunctions. At minimum, it should vacate and remand for a proper analysis under *Moody*, the Act's strong severability provision, and the court's authority to provide relief only to the parties.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ Jeffrey A. Stephens
Jeffrey A. Stephens
Assistant Solicitor General
Jeff.Stephens@oag.texas.gov

Mohmed I. Patel
Tevin J. Long
Assistant Attorneys General

*Counsel for Defendant-Appellant*

26

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,499 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ Jeffrey A. Stephens

JEFFREY A. STEPHENS